**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**

--------------------------------------------------------- x
In re:                                                    :
                                                          :        Chapter 11
INSIGHT TERMINAL SOLUTIONS, LLC                           :
                                                          :        Case No. 19-32231
                              Debtor.                     :
                                                          :
                                                          :
                                                          :
                                                          :
--------------------------------------------------------- x

--------------------------------------------------------- x
In re:                                                    :
                                                          :        Chapter 11
INSIGHT TERMINAL HOLDINGS, LLC                            :
                                                          :        Case No. 19-32232
                              Debtor.                     :
                                                          :
                                                          :
                                                          :
--------------------------------------------------------- x

**DECLARATION OF VIKAS TANDON IN SUPPORT OF MOTION OF AUTUMN
WIND LENDING, LLC FOR ENTRY OF AN ORDER DISMISSING THE
DEBTORS' CHAPTER 11 CASES PURSUANT TO 11 U.S.C. § 1112**

I, Vikas Tandon, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that:

1.      I am the Chief Investment Officer of JMB Capital Partners Master Fund, L.P. and

Ridgedale Partners, LLC, as well as the Manager of Autumn Wind Lending, LLC (the

"Lender"), the Lender to Debtors Insight Terminal Solutions, LLC ("ITS") and Insight Terminal

Holdings, LLC ("ITH" and, together with ITS, the "Debtors").  I submit this declaration (the

"Declaration") in support of the *Motion of Autumn Wind Lending, LLC for Entry of an Order*

*Dismissing the Debtors' Chapter 11 Cases Pursuant to 11 U.S.C. § 1112* (the "Motion")[1] filed

contemporaneously herewith.  I am authorized to file this Declaration on behalf of the Lender.

---
[1] Capitalized terms used but not defined herein shall have the meanings assigned such terms in the Motion.

2.       As the Lender's manager, I was the person primarily responsible for the negotiations, review, and execution of the documents discussed herein and I personally engaged in discussions and negotiations with, among others, the Debtors' manager, John J. Siegel, Jr. ("Siegel"),  throughout this process.  All facts set forth in this Declaration are offered to the best of my knowledge, information and belief and, except as may be otherwise indicated, are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors, Siegel, or their professionals, and information provided to me by my attorneys.  If I were called up to testify, I could and would, based on the foregoing, testify competently to the facts set forth herein.

**A.       The Debtors and the Sublease**

3.       ITS is a non-operating business with a single potential asset – a sublease for undeveloped real property.  Specifically, ITS is the subtenant under that certain Army Base Gateway Redevelopment Project Sub-Ground Lease for West Gateway by and between Oakland Bulk and Oversized Terminal, LLC (the "Landlord") and ITS dated as of September 2018 (together with all exhibits, amendments, schedules and annexes thereto, the "Sublease").

4.       The real property leased under the Sublease is a 19 acre parcel in the Port of Oakland, a port and ship facility located in Oakland, California.  The property, a portion of the Port of Oakland known as the West Gateway, is an undeveloped parcel that ITS subleases from the Landlord in order to develop and operate a ship-to-rail terminal for the purposes of exporting bulk goods and importing oversized cargo (the "Bulk and Oversized Terminal").

5.       The Sublease is ITS' sole potential asset and, upon information and belief, ITS has yet to commence development of the Bulk and Oversized Terminal nor is such development expected to commence in the near term.

6.     Prior to ITH's relinquishment of the Collateral after the Maturity Default (as defined herein), ITH owned 100% of the membership interests of ITS and, upon information and belief, such ownership interest was ITH's sole asset. Upon information and belief, as of the Petition Date, ITH has no assets, since it relinquished its rights to all Collateral (as defined in the LSA), including its interest in the Pledged Equity (as defined herein).

**B.     September 2018 Loan and Security Documents**

7.     The Debtors are indebted to the Lender pursuant to that certain Loan and Security Agreement dated September 24, 2018 (as modified or amended, the "LSA") among ITS as borrower, ITH as guarantor, and the Lender, whereby the Lender extended a senior secured term loan facility to ITS in a principal amount up to $6,800,000.00 (the "Initial Term Loan").  A true and correct copy of the LSA is attached hereto as **Exhibit A**.  The Initial Term Loan was evidenced pursuant to that certain Promissory Note dated September 24, 2018 in the amount of $6,800,000.00.

8.     In connection with entry into the LSA, the Lender requested and ITS executed and delivered a side letter agreement dated September 24, 2018 (the "ITS Side Letter").  In it, ITS agreed, among other things, that in the event ITS failed to repay all obligations under the LSA and all ancillary and related documents, instruments and agreements (collectively, the "Loan Documents")[2] on or before February 15, 2019, ITS would, on the next business day, "commence a process to market and sell, on a best efforts basis, all of its right, title and interest under and to the [Sublease]" and that "all Net Cash Proceeds received by the Borrower from a sale of the Borrower's right, title and interest under and to the [Sublease] shall, within three (3) Business Days of the receipt of such proceeds by the Borrower, be turned over to the Lender."

---

[2] The Loan Documents are voluminous. True and correct copies of certain of the relevant Loan Documents are attached hereto.  Copies of any omitted documents are available upon request to the Lender.

9.      The purpose of the agreed-upon sale process was to protect the Lender from the exact situation in which the parties find themselves today, stemming from the risk of the Debtors' long-term inability to pay debt service.  Thus, the ITS Side Letter was a material inducement for the Lender to enter into the LSA.  A true and correct copy of the ITS Side Letter is attached hereto as **Exhibit B**.

10.     Pursuant to the LSA and that certain Pledge Agreement dated as of September 24, 2018 (the "Pledge Agreement"), the Debtors granted the Lender a first priority lien upon and security interest in all of the Debtors' tangible and intangible property and proceeds thereof (as defined in the LSA, the "Collateral").  *See* LSA at § 4.  The Collateral expressly includes all rights under the Sublease and all outstanding membership interests constituting 100% of interests in ITS, as well as all general intangibles related to such membership interests (the "Pledged Equity").  A true and correct copy of the Pledge Agreement is attached hereto as **Exhibit C.** Pursuant to the Pledge Agreement, ITH pledged to the Lender the Pledged Equity along with all of its rights, privileges, authority and powers related thereto.  *See* Pledge Agreement §2.1(a).

11.     In addition, ITH delivered to the Lender Certificate No. 1 evidencing the ownership of 100 membership units of ITS by ITH and a Blocked Account Control Agreement dated February 5, 2019 (the "BACA") over that certain depository account number xxxx7132 of ITS with Central Bank & Trust Co.

12.     As additional consideration to induce the Lender to extend  the Initial Term Loan, ITH granted the Lender the right to purchase up to 10% of the membership interests in ITH ("Warrant 1").

13.     In connection with entry into the Initial Term Loan, ITS also executed and delivered that certain Unsecured Promissory Note dated September 24, 2018 in the principal amount of $3,400,000.00 (the "Initial Unsecured Note").

14.     The original maturity date of the Initial Term Loan and Initial Unsecured Note was December 31, 2019.

15.     Additionally, at the Lender's request, the Landlord and ITS executed and delivered a side letter agreement dated September 24, 2018, (the "Landlord Side Letter"), by which the Landlord agreed, among other things, that in the event ITS commenced a marketing process for the Sublease pursuant to the ITS Side Letter, Landlord would cooperate with ITS in such process, including, without limitation, by providing ITS a list of all previous expressions of interest or proposals received from third parties with respect to acting as a lessee under the Sublease.

### C.     December 2018 First Amendment

16.     Despite the Debtors' failure to commence development of the Bulk and Oversized Terminal, at the request of the Debtors, on December 19, 2018, ITS, ITH, and Lender agreed to amend the LSA pursuant to that certain First Amendment to Loan and Security Agreement (the "First Amendment").

17.     Pursuant to the First Amendment, the Lender agreed to make an additional term loan to ITS in the amount of $300,000.00 (the "Additional Term Loan" and, together with the Initial Term Loan, the "Term Loan"). The Term Loan was evidenced by that certain Amended and Restated Promissory Note dated December 19, 2018 and executed by ITS in favor of Lender in the amount of $7,100,000.00 (the "A&R Term Note"). In connection with the extension of the Additional Term Loan, ITS executed and delivered that certain Amended and Restated

Unsecured Promissory Note dated December 19, 2018 by which the Initial Unsecured Note was increased to $3,550,000 (the "A&R Unsecured Note" and, together with the Initial Unsecured Note, the "Unsecured Note).

18.    To provide assurance to the Lender that there would be sufficient liquidity for the Debtors to make the interest payments that would be owing to the Lender under the LSA, Siegel, in his capacity as ITS' manager, executed and delivered a side letter agreement dated December 19, 2018 (the "Siegel Side Letter"), by which Siegel agreed, among other things, to deposit cash or marketable securities with an aggregate value of at least $500,000.00 into an account or accounts in his control.  In addition, Siegel agreed that his failure to maintain a $500,000.00 minimum balance in such accounts would constitute an event of default under the LSA.

### D.    February 2019 Security Documents and Waiver and Amendment

19.    On February 16, 2019, the Debtors were again in default under the terms of the Loan Documents when ITS failed to (i) repay its obligations under the Term Loan on or before February 15, 2019, and (ii) commence a sale process.

20.    Notwithstanding its agreement in the ITS Side Letter to commence a process to market and sell its interest in the Sublease in the event all obligations under the Loan Documents were not repaid by that date, Siegel informed the Lender that he wished to seek a refinancing transaction in lieu of marketing the Sublease for sale as ITS initially agreed.  Siegel further assured the Lender that the Debtors would be able to achieve a refinancing that would repay the Lender in full by no later than June 30, 2019; in fact, Mr. Siegel insisted repayment would take place much sooner, and the Waiver and Amendment (as defined herein) included a schedule to repurchase Warrant 2 (as defined herein) with escalating repurchase prices at the end of each

month, reflecting Mr. Siegel's confidence in a timely refinancing.  *See* Waiver and Amendment at § 7.

21.    In the spirit of cooperation with the Debtors, the Lender agreed to grant the Debtors until June 30, 2019, to achieve a refinancing transaction as requested.  Consequently, the Debtors and the Lender negotiated the terms and entered into that certain Waiver and Amendment Agreement dated February 22, 2019 (the "Waiver and Amendment").  A true and correct copy of the Waiver and Amendment is attached hereto as **Exhibit D**.  Pursuant to the Waiver and Amendment, the Lender agreed to waive certain Events of Default and remove the requirement for a marketing process and, in exchange therefor, ITS and ITH agreed, among other things, as follows:

(a)    ITS agreed to amend the maturity date of the Term Loan from December 31, 2019 to June 30, 2019;

(b)    ITH agreed "[i]f the Obligations due under the Loan are not paid in full on or before June 30, 2019 and Lender elects not to grant any extensions to the Borrower of the Maturity Date, *__Guarantor shall relinquish its rights to the Collateral as described in the Loan Agreement__*" (emphasis added);

(c)    ITS and ITH each agreed to amend its respective organizational documents so that neither would be permitted to either (i) file for bankruptcy protection under the Bankruptcy Code or (ii) dissolve, in each case, unless ITS or ITH, as applicable, has first obtained the prior written consent of (a) all holders of membership interests in ITH, and (b) all holders of warrants exercisable for interests in ITH;

(d)    ITS agreed to continue making regularly scheduled interest payments; and

(e)    ITH agreed to grant Lender additional warrants.

22.    ITS and ITH amended their respective operating agreements in accordance with the requirements of the Waiver and Amendment.  True and correct copies of the Second Amended and Restated Operating Agreement of ITS and the Amended and Restated Operating Agreement of ITH, each dated February 22, 2019, are hereto attached as **Exhibits E** and **F**, respectively (collectively, the "Operating Agreements").  The provisions updated in accordance

with the terms of the Waiver and Amendment are reflected in Section 8.1 of the respective Second Amended and Restated Operating Agreements.

23.     Further, pursuant to the Waiver and Amendment, ITH granted the Lender an additional warrant granting Lender the right to purchase up to an additional 5% of the membership interests in ITH ("Warrant 2").  The Debtors negotiated into the Waiver and Amendment the right to repurchase 80% of Warrant 2 at prices that escalated each month. *See* Waiver and Amendment at § 7.

### E.    Maturity Default and ITH's Relinquishment of the Collateral

24.     Upon information and belief, the Debtors, through Siegel and against the advice of his advisors, ignored several promising potential lenders and strategic partners that were ready and able to pay off the Lender.  Instead, the Debtors focused their efforts entirely on reaching a deal with a single party, which Siegel viewed to be personally beneficial to him.

25.     Despite Siegel's representations that a refinancing transaction was imminent as recently as late-June 2019, no such refinancing occurred.  In fact, no written proposal or commitment letter was ever provided to the Lender.

26.     On May 1, 2019, ITS failed to make its regularly scheduled interest payment on the Term Loan when due.

27.     ITS failed to achieve a refinancing transaction by June 30, 2019.  As a result, ITS failed to repay the Term Loan by the June 30, 2019 maturity date, constituting an Event of Default under the Loan Documents (the "Maturity Default").  *See* LSA at § 12.1(a).  In accordance with ITH's agreement in the Waiver and Amendment, ITH automatically relinquished its rights in the Collateral, including in the Pledged Equity, as of July 1, 2019.

Accordingly, *ITH no longer had the right to authorize the bankruptcy filing of ITS as of July 1, 2019.*

28.     As of the date hereof, all obligations under the Loan Documents, including but not limited to principal, accrued and unpaid interest thereon, and any and all other Obligations (as defined in the LSA), are fully due and payable.  As of July 1, 2019, ITS owes Lender not less than $9,121,181.80, consisting of principal, accrued and unpaid interest, and other fees under the Term Loan plus $3,550,000.00 pursuant to the Unsecured Note.

29.     On July 2, 2019, Lender delivered that certain Notice of Retention of Collateral in Full Satisfaction of Obligations (the "Strict Foreclosure Notice") putting ITS and its creditors on notice that as a result of the Maturity Default, ITH's rights in the Collateral were waived and Lender intended to retain the Collateral in full satisfaction of the obligations under the LSA.  A true and correct copy of the Strict Foreclosure Notice is attached hereto as **Exhibit G**.

30.     On or about July 7, 2019, Lender became aware that, notwithstanding the Debtors' agreements in the Waiver and Amendment, the Maturity Default and the Strict Foreclosure Notice, the Debtors were continuing their efforts to pursue a refinancing transaction. Accordingly, on July 8, 2019, Lender delivered to ITS that certain Notice to Cease and Desist Regarding Refinancing Attempts in Connection with Lender's Collateral (the "Cease and Desist Letter").  By the Cease and Desist Letter, Lender reiterated that ITH waived and relinquished its rights in the Collateral and demanded that Debtors and Siegel immediately cease any and all efforts to seek a refinancing transaction.

31.     On July 8, 2019, the Lender received notification from the Landlord that, in addition to the Maturity Default with respect to the Term Loan, ITS failed to (i) make payments owed to the Landlord and (ii) pay taxes owed to the City of Oakland, including failing to appear

at an administrative hearing on July 1, 2019 with respect to such taxes. The Landlord's notification further delineated multiple failures by ITS to maintain and secure the property in violation of the Sublease, resulting in theft, vandalism, and the property falling into disrepair. A true and correct copy of the Landlord's correspondence is attached hereto as **Exhibit H**.

32.    The Lender, as holder of the Warrants, did not authorize the filing of these chapter 11 cases.

[*remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: July 25, 2019
Los Angeles, California

_____
Vikas Tandon

**EXHIBIT A**

*Execution Version*

**LOAN AND SECURITY AGREEMENT**

**by and among**

**Insight Terminal Solutions, LLC, as the Borrower;**


**Insight Terminal Holdings, LLC as the Guarantor**


**and**


**Autumn Wind Lending, LLC, as Lender**


Dated as of September 24, 2018

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement, dated as of September 24, 2018 (the "**Closing Date**") is made by and among Insight Terminal Solutions, LLC, a Delaware limited liability company (the "**Borrower**"), Insight Terminal Holdings, LLC, a Delaware limited liability company (the "**Guarantor**") and Autumn Wind Lending, LLC, a California limited liability company (the "**Lender**").

## RECITALS:

A.      The Borrower has requested that the Lender extend a senior secured term loan facility to the Borrower in a principal amount of up to Six Million Eight Hundred Thousand Dollars ($6,800,000), the proceeds of which will be used (i) to pay all existing obligations owed by the Borrower to Oakland Bulk and Oversized Terminal, LLC ("**OBOT**") in connection with the execution of the Sub-Ground Lease (as defined below); (ii) to prepay payments due from the Borrower to both the City of Oakland (the "**City**") and OBOT under the Sub-Ground Lease for the third and fourth calendar quarters of 2018 and the first calendar quarter of 2019; (iii) to pay Transaction Costs and (iv) to fund working capital of the Borrower.

B.      To induce the Lender to make the Loan hereunder, the Borrower has agreed to grant a first priority security interest in all its assets to secure its Obligations under the Loan Documents.

C.      To induce the Lender to make the Loan hereunder, the Guarantor, which is the owner of 100% of the membership interests of the Borrower, for good and valuable consideration, has agreed to guarantee the Obligations and to secure its obligations under such guaranty by granting to the Lender a first priority security interest in all its assets, including the membership interests of the Borrower.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties, intending to be legally bound, agree as follows:

## AGREEMENT

1.      **DEFINITIONS**. As used herein, the following terms shall have the following meanings (terms defined in the singular shall have the same meaning when used in the plural and vice versa):

1.1      "**Affiliate**" shall mean any Person: (a) which directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, Borrower; (b) which beneficially owns or holds 10% or more of any class of the voting stock or other equity interest in Borrower or 10% or more of the voting stock or other equity interest of which is beneficially owned or held by Borrower.  For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting stock or other equity interests, by contract or otherwise.

1.2    "**Agreement**" shall mean this Loan and Security Agreement, together with all Schedules and Exhibits attached or otherwise identified thereto, as the same may be amended, modified, restated or supplemented from time to time.

1.3    "**Anti-Terrorism Laws**" shall mean any and all laws, regulations, rules, orders, etc. in effect from time to time relating to anti-money laundering and terrorism, including, without limitation, Executive Order No. 13224 (effective September 24, 2001) and the USA Patriot Act.

1.4    "**Blocked Person**" shall mean any person: (a) listed in the annex to Executive Order No. 13224, (b) owned or controlled by, or acting for or on behalf of, any person listed in the annex to Executive Order No. 13224, (c) with which Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, (e) a person that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list, (f) a person that is named a "denied person" on the most current list published by the U.S. Commerce Department, or (g) (i) an agency of the government of a Sanctioned Country, (ii) an organization controlled by a Sanctioned Country, or (iii) a person resident in a Sanctioned Country to the extent subject to a sanctions program administered by OFAC.

1.5    "**Borrower**" shall have the meaning set forth in the Preamble of this Agreement.

1.6    "**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which commercial banks under the laws of the State of New York are authorized or required by law to close.

1.7    "**Change of Control**" means the occurrence of any of the following:

(a)    the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of any Loan Party taken as a whole to any "person" or "group" (as such terms are used in Section 13(d) or 14(d) of the Exchange Act or any successor provision);

(b)    the adoption of a plan relating to the liquidation or dissolution of the Borrower; or

(c)    the consummation of any transaction (including, without limitation, any merger, consolidation or other business combination), the result of which is that any "person" or "group" (as defined above) other than any of the Principals, becomes the beneficial owner of the Borrower in a single transaction or a series of related transactions, directly or indirectly, of more than 50% of the voting Equity Interests of the Borrower, measured by voting power rather than number of units.

1.8     **"City"** has the meaning set forth in Recital A.

1.9     **"Closing Date"** shall have the meaning set forth in the Preamble.

1.10    **"Code"** shall mean the Internal Revenue Code of the United States, as amended.

1.11    **"Collateral"** shall mean all tangible and intangible personal property of the Loan Parties, wherever located and whether now owned or hereafter acquired, including but not limited to all accounts, contracts rights (including, without limitation, rights under the Sub-Ground Lease), franchise rights, chattel paper, cash, general intangibles, investment property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments and commercial tort claims, together with all proceeds thereof, including insurance proceeds (as each such term above is defined in the UCC).

1.12    "**Collateral Access Agreement**" shall mean a Collateral Access Agreement with respect to the chief executive office of the Loan Parties, in form and substance acceptable to the Lender.

1.13    "**Compliance Certificate**" shall mean a compliance certificate substantially in the form attached hereto as Exhibit B.

1.14     "**Control Agreement**" means a deposit account control agreement over each deposit account (other than any payroll account or zero balance account) of each Loan Party.

1.15    **"Default"** shall mean an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default, whether or not Lender has declared an Event of Default to have occurred.

1.16    **"Default Rate"** shall have the meaning set forth in Section 3.1.

1.17    **"Environment"** shall mean any water or water vapor, any land surface or subsurface, air, fish, wildlife, biota and all other natural resources.

1.18    **"Environmental Laws"** shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the Environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of "hazardous substances" and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

1.19    "**Equity Interest**" shall mean, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated)

3

of or in such Person, whether voting or nonvoting, including membership interest (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

1.20    **ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

1.21    "**Estoppel**" means that certain Ground Lessor Estoppel Certificate and Consent to be issued by the City, OBOT, and the Borrower in connection with the Sub-Ground Lease

1.22    "**Events of Default**" shall have the meaning set forth in Article 12 of this Agreement.

1.23    "**Exit Fee**" shall mean a fee equal to 25% of the principal amount of the Loan that is paid by the Borrower, whether as a prepayment, upon the Maturity Date, due to an acceleration of Obligations after the occurrence and during the continuation of an Event of Default, or otherwise.

1.24    "**Extraordinary Receipts**" shall mean any cash received by or paid to or for the account of the Borrower not in the ordinary course of business, including without limitation amounts received in respect of indemnity obligations of a seller under any stock or asset purchase agreements, foreign, United States, state or local tax refunds and pension plan reversions, but excluding (a) cash proceeds received by the Borrower pursuant to business interruption policies of insurance and (b) cash proceeds not exceeding $10,000 (per occurrence) received from casualty insurance policies to the extent used by the Borrower to replace Equipment within sixty (60) days of receipt thereof.  For the avoidance of doubt, Borrower's receipt of rent or other consideration from time to time from any sub-subleasehold arrangements shall not constitute "Extraordinary Receipts."

1.25    "**Fiscal Year**" shall mean with respect to any Person, a year of 365 or 366 days, as the case may be, ending on the last day of June in any calendar year.

1.26    "**GAAP**" shall mean United States generally accepted accounting principles consistently applied and maintained throughout the period indicated and consistent with the prior financial practice of Borrower, except for changes mandated by the Financial Accounting Standards Board or any similar accounting authority of comparable standing. Whenever any accounting term is used herein which is not otherwise defined, it shall be interpreted in accordance with GAAP.

1.27    "**GACP Loan Agreement**" shall mean that certain Term Loan Agreement, to be executed among the Borrower and the other Persons signatory thereto as borrowers, the lenders party thereto from time to time and GACP Finance Co., LLC, as administrative agent, pursuant to which the Borrower intends to incur Indebtedness in a principal amount of approximately forty million dollars ($40,000,000) to develop real and

4

personal property in the City located in a portion of the former Oakland Army Base and commonly known as the "West Gateway".

1.28  **"Governmental Rules"** shall have the meaning set forth in <u>Section 6.20</u> of this Agreement.

1.29  "**Ground Lease**" shall mean, collectively, that certain Army Base Gateway Redevelopment Project Ground lease for West Gateway between the City and OBOT dated as of February 16, 2016 and all exhibits, amendments, schedules, and annexes thereto.

1.30  **"Guarantor"** shall have the meaning set forth in the Preamble.

1.31  "**Guaranteed Obligations**" shall have the meaning set forth in <u>Section 13.1</u>.

1.32  **"Indebtedness"** shall mean and include all obligations for borrowed money of any kind or nature, including funded debt and unfunded liabilities; contingent obligations under guaranties or letters of credit; and all obligations for the acquisition or use of any fixed asset, including capitalized leases, or improvements which are payable over a period longer than one year, regardless of the term thereof or the Person or Persons to whom the same is payable, and the Obligations; <u>provided</u> that "Indebtedness" shall not include surety bonds or performance bonds or other obligations of a like nature incurred in the Borrower's ordinary course of business as currently conducted.

1.33  **"Lender's Commitment"** shall mean Six Million Eight Hundred Thousand Dollars ($6,800,000).

1.34  **"Loan"** shall mean the term loan made by Lender under this Agreement.

1.35  **"Loan Documents"** shall mean this Agreement, the Term Loan Note, the Pledge Agreement, the Collateral Access Agreement, each Control Agreement, and all other agreements, guaranties, pledges, collateral access agreements, support agreements, assignments, certificates, documents and instruments to be delivered by any Loan Party or any other Person under this Agreement or in connection with the Loans, the Collateral or any other Indebtedness or Obligations of Borrower or the Guaranteed Obligations to Lender, as the same may be amended, modified, restated or supplemented from time to time.

1.36  **"Loan Interest Rate"** shall mean fifteen percent (15%) per annum.

1.37  **"Loan Parties"** shall mean the Borrower and the Guarantor.

1.38  **"Material Adverse Effect"** shall mean any material adverse effect on the Borrower's ability to develop, construct, or operate a commodity terminal, including: (a) the business, assets, operations, or condition, financial or otherwise, of the Borrower; (b) the Borrower's ability to pay the Obligations or any Loan Party's ability to perform its obligations under the Loan Documents to which it is a party; (c) the value, collectability or salability of the

5

Collateral or the perfection or priority of Lender's liens in the Collateral; (d) the validity or enforceability of this Agreement or any of the Loan Documents; (e) the Borrower's agreements with OBOT with respect to the Sub-Ground Lease or (f) the practical realization of the benefits, rights and remedies inuring to Lender under this Agreement or under the Loan Documents, in each case at the reasonable discretion of the Lender, provided that the preliminary determination of a governmental entity or the filing of an action shall not be considered to create a Material Adverse Effect. In such regard, only a determination of a governmental entity or court of competent jurisdiction that restricts the ability of the Premises to accept or ship any commodity, including coal, or otherwise materially adversely effects the value of the Sub-Ground Lease, shall be considered a Material Adverse Effect.

1.39    "**Material Contract**" means (a) any contract, license or other arrangement to which the Borrower is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect, (b) any contract, license, agreement or arrangement, individually or in the aggregate, to which the Borrower is a party (including, without limitation, any agreement or instrument evidencing or governing Indebtedness) involving aggregate consideration payable (A) to the Borrower in connection with a revenue-generating contract, license or agreement of $100,000 or more per Fiscal Year or (B) by the Borrower in connection with a distributor, licensor, vendor or supplier contract, license or agreement of $100,000 or more per Fiscal Year (in the case of this clause (b), other than contracts that by their terms may be terminated by such Person or the Borrower or any of its Subsidiaries in the ordinary course of its business upon less than 60 days' notice without penalty or premium), (c) the Ground Lease, the Sub-Ground Lease and each other license, contract and agreement executed in connection with the foregoing to which any Borrower is a party or has any monetary or non-monetary obligations in connection therewith, and (d) to the extent not listed above, all contracts and arrangements listed on Schedule 9.19 (and any extensions or renewals thereof).

1.40    "**Maturity Date**" shall mean December 31, 2019.

1.41    "**Net Cash Proceeds**" shall mean:

(a)    with respect to any sale or disposition by the Borrower of assets (including, without limitation, the loss, destruction or damage of any thereof or any actual or threatened (in writing to the Borrower) condemnation, confiscation, requisition, seizure or taking thereof), the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of the Borrower, in connection therewith after deducting therefrom only (i) fees, commissions, and expenses related thereto and required to be paid by the Borrower in connection with such sale or disposition to the extent that such fees, commissions and expenses are acceptable to Lender in its commercially reasonable discretion based on comparable sales or dispositions, (ii) any Indebtedness that financed such assets and that is required to be paid by the Borrower in connection with such sale or disposition and (iii) taxes paid or payable to any taxing authorities by the Borrower in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid

or payable to a Person that is not an Affiliate of the Borrower, and are properly attributable to such transaction;

(b)     with respect to the issuance or incurrence of any Indebtedness by the Borrower, or the issuance by the Borrower of any Equity Interests, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of the Borrower in connection with such issuance or incurrence, after deducting therefrom only (i) reasonable fees, commissions, and expenses related thereto and required to be paid by the Borrower in connection with such issuance or incurrence to the extent that such fees, commissions and expenses are acceptable to Lender in its commercially reasonable discretion based on comparable sales or dispositions, and (ii) taxes paid or payable to any taxing authorities by the Borrower in connection with such issuance or incurrence, in each case to the extent, but only to the extent, that the amounts so deducted are, at the time of receipt of such cash, actually paid or payable to a Person that is not an Affiliate of the Borrower, and are properly attributable to such transaction; and

(c)     with respect to any Extraordinary Receipt, the aggregate cash proceeds received by the Borrower pursuant thereto, net of the direct costs relating thereto.

1.42    **<u>Non-Disturbance Agreement</u>**" shall mean that certain Non-Disturbance Agreement, between the City, OBOT, and the Borrower in connection with the Ground Lease and the Sub-Ground Lease.

1.43    **<u>Notice of Borrowing</u>**" shall mean a borrowing request in substantially the form set forth in Exhibit A attached hereto.

1.44    **<u>Obligations</u>**" shall mean and include all loans (including the Loan), debts, liabilities, obligations, covenants and duties owing by the Borrower to the Lender or any Affiliate of the Lender of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, arising under this Agreement, or any of the other Loan Documents or under any other agreement or by operation of law, whether or not for the payment of money, whether arising by reason of an extension of credit, opening, guaranteeing or confirming of a letter of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by purchase or assignment), absolute or contingent, due or to become due, now due or hereafter arising and howsoever acquired including, without limitation, all interest, charges, expenses, fees (including the Exit Fee), commitment, facility, collateral management or other fees, attorneys' fees and expenses, consulting fees and expenses and any other sum chargeable to the Borrower under this Agreement, or any of the other Loan Documents.

1.45    **<u>OBOT</u>**" has the meaning set forth in Recital A.

1.46    **<u>OFAC</u>**" shall mean the U.S. Department of Treasury Office of Foreign Assets Control (or any successor agency).

7

1.47    **<u>Organizational Document</u>** shall mean (a) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, association or organization, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

1.48    **<u>Payment Date</u>** shall mean the first Business Day of each calendar month.

1.49    **<u>Permitted Liens</u>** shall mean:

(a)    liens securing the Obligations;

(b)    the claims of materialmen, mechanics, carriers, warehousemen, processors or landlords arising out of operation of law so long as the obligations secured thereby (i) are not past due or (ii) are being properly contested and for which the Borrower has established adequate reserves;

(c)    liens in equipment (including capital leases) to secure purchase money Indebtedness permitted under <u>Section 10.1</u> hereof, so long as such security interests do not apply to any property of the Borrower other than the equipment so acquired, and the Indebtedness secured thereby does not exceed the cost of such equipment;

(d)    liens for taxes, assessments or governmental charges that are either not delinquent or are being contested by the Borrower in good faith by appropriate proceedings being diligently conducted and for which reserves in accordance with GAAP have been established and maintained, provided that the Borrower has notified the Lender of such a lien and has provided the Lender with all relevant documentation and related correspondence, including all ongoing correspondence related to a resolution of the matter.

1.50    **<u>Person</u>** shall mean an individual, partnership, limited liability company, limited liability partnership, corporation, joint venture, joint stock company, land trust, business trust or unincorporated organization, or a government or agency or political subdivision thereof.

1.51    **<u>Plan</u>** shall mean an employee benefit plan or other plan now or hereafter maintained for employees of Borrower or any subsidiary of Borrower and covered by Title IV of ERISA.

8

1.52    "**Pledge Agreement**" shall mean that certain Pledge Agreement, dated as of the Closing Date, by and between the Guarantor and the Lender.

1.53    "**Pledged Debt**" shall mean all indebtedness for borrowed money owed to any Loan Party, whether or not evidenced by any instrument, including, without limitation, all indebtedness described on <u>Schedule 9.19</u> under the heading "Pledged Debt" (as such schedule may be amended or supplemented from time to time), issued by the obligors named therein, the instruments, if any, evidencing such any of the foregoing, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing.

1.54    "**Premises**" shall have the meaning set forth in the Sub-Ground Lease.

1.55    "**Principals**" shall mean John J. Siegel, Jr., Sharon A. Siegel, and Charles McNeil, including any entities affiliated with or controlled by each of the aforementioned individuals.

1.56    "**Replacement Loan Agreement**" shall mean any loan agreement by and between the Borrower and a Replacement Lender, whereby the Borrower incurs Indebtedness in lieu of the Indebtedness to be incurred under the GACP Loan Agreement.

1.57    "**Replacement Lender**" shall mean the lender (or lenders, as the case may be) that extends Indebtedness to the Borrower under the Replacement Loan Agreement.

1.58    "**Reportable Event**" shall have the meaning assigned to that term in Title IV of ERISA.

1.59    "**Restricted Junior Payment**" shall mean (a) any cash dividend or other distribution, direct or indirect, on account of any membership interest of the Borrower now or hereafter outstanding; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of Equity Interests of the Borrower now or hereafter outstanding;  (c) payments with respect to any earn-out obligation or deferred purchase price in connection with any acquisition agreement (other than working capital adjustments) and (d) any payments of principal, interest, premium or other amounts payable with respect to Subordinate Indebtedness.

1.60    "**Sanctioned Country**" shall mean any country subject to the sanctions program identified on the most current list maintained by OFAC.

1.61    "**Solvent**" shall mean when used with respect to any Person, such Person (a) owns property the fair value of which is greater than the amount required to pay all of such Person's Indebtedness (including contingent debts), (b) owns property the present fair salable value of which is greater than the amount that will be required to pay the probable liabilities of such Person on its then existing Indebtedness as such become absolute and matured, (c) is able to pay all of its Indebtedness as such Indebtedness matures, and (d) has capital sufficient to carry on its then existing business.

9

1.62    "**Sub-Ground Lease**" shall mean, collectively, that certain Army Base Gateway Redevelopment Project Sub-Ground lease for West Gateway by and between OBOT and the Borrower dated as of September 2018 and all exhibits, amendments, schedules and annexes thereto.

1.63    "**Subordinate Indebtedness**" shall mean any Indebtedness which is subordinated or junior in right of payment to the Loan.

1.64    "**Subsidiary**" shall mean with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

1.65    "**Term Loan Note**" shall mean the promissory note, in form and substance satisfactory to Lender, to be given by Borrower to Lender to evidence the Loan.

1.66    "**Transaction Costs**" shall mean the fees, costs and expenses payable by the Borrower on or before the Closing Date in connection with the transactions contemplated by the Loan Documents.

1.67    "**UCC**" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

1.68    "**Unsecured Promissory Note**" shall mean that certain unsecured promissory note issued by the Borrower in favor of the Lender on the Closing Date, pursuant to which the Borrower agrees to pay to the Lender an amount equal to $3,350,000 upon the date that the obligations under the GACP Loan Agreement, or any Replacement Loan Agreement are repaid in full (other than any contingent indemnification obligations), whether through a refinancing or otherwise.

1.69    "**Warrant**" means that certain Warrant, dated as of the Closing Date, issued by the Guarantor in favor of the Lender.

1.70    **UCC Definitions**. References to terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC (and, if defined in more than one Article of the UCC, shall have the meaning given in Article 9 thereof), including the meanings of Commercial Tort Claims, Commodity Account, Commodity Contract, Deposit

10

Account, Equipment, General Intangibles, Goods, Instrument, Inventory, Letter of Credit Right, Payment Intangible, Proceeds, and Securities Account.

**2.      THE LOAN**.

2.1      **Draw of Loan**. Subject to the terms and conditions of this Agreement and relying upon the representations and warranties set forth in this Agreement, the Lender agrees to make the Loan in a single draw to the Borrower in the amount of the Lender's Commitment.  The Loan is a term loan and once borrowed, may not be re-borrowed.

2.2      **Manner of Borrowing**.  The Loan shall be requested in writing sent via facsimile or electronic transmission by a Notice of Borrowing executed by an authorized officer of the Borrower not later than 4:00 p.m. Eastern Time on any Business Day. The Lender will make the Loan within one (1) Business Day after the Lender's receipt of such Notice of Borrowing, if such Notice of Borrowing has been received by the Lender no later than 3:00 p.m. Eastern Time the prior day, to an account specified by the Borrower.

2.3      **Evidence of Borrower's Obligations**.  The Borrower's obligation to pay the principal of, and interest on, the Loan made to the Borrower shall be evidenced by the Term Loan Note executed by the Borrower and delivered to the Lender.

2.4      **Payment on Maturity Date**. Notwithstanding anything herein to the contrary, on the Maturity Date, the Borrower shall pay to the Lender in full, in cash, the entire outstanding principal balance of the Loan, plus all accrued and unpaid interest thereon, the Exit Fee and all other Obligations. Any Obligations that are not paid on the Maturity Date shall bear interest at the Default Rate until paid in full.

**3.      LENDER'S COMPENSATION**.

3.1      **Interest on Loan**.

(a)      Interest shall accrue on the principal amount of the Loan from (and including) the Closing Date until the payment in full of the Loan.  Borrower shall pay interest monthly, in arrears, on each Payment Date on the outstanding principal amount of the Loan at the Loan Interest Rate; provided that (i) if the Obligations (including, for the avoidance of doubt, the Exit Fee) are indefeasibly paid in full on or prior to December 31, 2018, the payment of all interest on the principal amount of the Loan that has accrued up to and through the date of such prepayment will be waived, and (ii) if the Obligations are not indefeasibly paid in full on or prior to December 31, 2018, the Borrower shall, on the Payment Date that falls on January 2, 2019, pay all interest that has accrued on the principal amount of the Loan up to and through December 31, 2018.

(b)      Notwithstanding anything to the contrary herein, if an Event of Default has occurred and is continuing, Borrower shall pay interest on the Loan at a rate which is 2.50% per annum above the Loan Interest Rate (the "**Default Rate**"). Notwithstanding anything

11

contained herein to the contrary, in no event shall any interest to be paid under this Agreement or under any Loan Document exceed the maximum rate permitted by law.

       3.2   **Computation of Interest and Fees**.  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

       3.3   **Payments**. All payments with respect to the Obligations shall be paid, without any defense, offset or counterclaim of any kind, at 1999 Avenue of the Stars, Suite 2040, Los Angeles, CA 90067, or to such other address as the Lender shall specify, in accordance with wire instructions to be provided by the Lender, and as the Lender may update such instructions from time to time. Whenever any payment to be made shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with any such payment.

       3.4   **Optional Prepayment**. The Borrower may prepay the principal of the Loan, in whole or in part, at any time upon written notice to the Lender.  Each such prepayment of the Loan shall be accompanied by the payment of the Exit Fee for the account of the Lender and, if such prepayment occurs after December 31, 2018, accrued and unpaid interest.  Partial prepayments must be in multiples of one million dollars of principal.

       3.5   **Mandatory Prepayment**.  Except as set forth herein, the following mandatory prepayments of the Loan shall be accompanied by the payment of the Exit Fee for the account of Lender and any unpaid interest that has been accrued through the date of such prepayment:

       (a)   **Dispositions**.  Within ten (10) Business Days of the date of receipt by the Borrower of the Net Cash Proceeds of any voluntary or involuntary sale or disposition by the Borrower of assets (including, without limitation, (i) the sale of any throughput capacity; underlined provided that the Lender may, in its sole discretion and upon the prior written request of the Borrower, waive such prepayment if such sale is for an amount that the Lender determines, in its sole discretion, is *de minimis*; (ii) the assignment or other disposition by the Borrower of its interest in the Sub-Ground Lease to any third party; or (iii) the loss, destruction or damage of any thereof or any actual or threatened (in writing to the Borrower) condemnation, confiscation, requisition, seizure or taking thereof), the Borrower shall prepay the outstanding principal amount of the Loan in an amount equal to one hundred percent (100%) of such Net Cash Proceeds received by the Borrower in connection with such sales or dispositions; provided, however, that as long as no Default or Event of Default is continuing, no such mandatory prepayment shall be required in connection with any sale or disposition of Equipment by the Borrower if the Net Cash Proceeds from such sale or disposition are used within 60 days of the receipt thereof to purchase other Equipment necessary for the business of the Borrower and the amount of such Net Cash Proceeds so used does not exceed $10,000 in any fiscal year.

       (b)   **Indebtedness**.  Within ten (10) Business Days of the date of incurrence by the Borrower of any Indebtedness (including the incurrence of Indebtedness under

12

the GACP Loan Agreement or any Replacement Loan Agreement, but excluding other Indebtedness expressly permitted under <u>Section 10.1</u>), the Borrower shall prepay the outstanding principal amount of the Loan in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received by such Person in connection with such incurrence (or such lesser amount as may be necessary to prepay the Loan, the Exit Fee, and accrued but unpaid interest on the amount of the principal prepaid).  The provisions of this <u>Section 3.5(b)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms of this Agreement.

(c)    **Equity**.  Within ten (10) Business Days of the date of the issuance by the Borrower of any Equity Interests for cash (other than the issuance of Equity Interests of the Borrower to the Guarantor or to directors, officers and employees of the Borrower pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the members of the Borrower), the Borrower shall prepay the outstanding principal amount of the Loan in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received by the Borrower in connection with such issuance.  The provisions of this <u>Section 3.4(c)</u> shall not be deemed to be implied consent to any such issuance otherwise prohibited by the terms of this Agreement.

(d)    **Extraordinary Receipts**.  As soon as reasonably practicable (but in any event within ten (10) Business Days) following the receipt by the Borrower of any Net Cash Proceeds of Extraordinary Receipts, the Borrower shall prepay the outstanding principal amount of the Loan in an amount equal to 100% of such Net Cash Proceeds.

3.6    **Original Issue Discount**.  The Loan Parties and the Lender agree (i) that the Loan is debt for U.S. federal income tax purposes, (ii) that the Loan constitutes a single debt instrument for purposes of Sections 1271 through 1275 of the Code and the Treasury Regulations thereunder (pursuant to Treasury Regulations Section 1.1275-1(c)), (iii) that such debt instrument is described in Treasury Regulations Section 1.1272-1(c)(2) and therefore is governed by the rules set out in Treasury Regulations Section 1.1272-1(c), including Section 1.1272-1(c)(5), and is not governed by the rules set out in Treasury Regulations Section 1.1275-4, and (iv) not to file any tax return, report or declaration inconsistent with the foregoing.

4.    <u>**GRANT OF SECURITY INTEREST**</u>.

4.1    <u>**Grant of Security Interest**</u>. To induce the Lender to make the Loan hereunder, and to secure the payment, promptly when due, and the otherwise punctual performance of all of the Obligations, each Loan Party hereby pledges, transfers and assigns to Lender, and grants to Lender and agrees that Lender shall have, a first priority continuing lien upon and security interest in all of the Collateral.

4.2    <u>**Authorization to File**</u>. Each Loan Party hereby authorizes Lender to file any financing statements, continuation statements or amendments thereto that indicate the Collateral as all assets of such Loan Party or words of similar effect, and contain any other information required by Part 5 of Article 9 of the UCC. Each Loan Party acknowledges that it is not authorized to file any financing statement or amendment, termination or corrective

13

statement with respect to any financing statement without the prior written consent of the Lender and agrees that it will not do so without the prior written consent of the Lender.

4.3    **Other Perfection**. Subject to <u>Section 9.21</u>, each Loan Party will execute and deliver to the Lender such security agreements, assignments and other papers as the Lender may at any time or from time to time reasonably request that are required to perfect or protect the security interest granted hereby, including, without limitation, (a) any notices to third parties of the Lender's lien in the Collateral, (b) appropriate waivers or subordinations of interests from any third parties with interests in the Collateral and (c) such agreements, records or other documentation necessary to establish the Lender's control over the Collateral consisting of deposit accounts, investment property, letter-of-credit rights or electronic chattel paper. Each Loan Party shall promptly, and in any event within five (5) Business Days after the same is acquired by it, notify the Lender of any Commercial Tort Claim acquired by it and shall enter into a supplement to this Agreement granting to the Lender a security interest in such Commercial Tort Claim.

4.4    **Maintenance of Collateral**.  Each Loan Party shall, at its sole expense, take good care of all Collateral and afford it suitable preventive maintenance. No Loan Party will permit anything to be done that might in any way impair the value of any Collateral or any of the security intended to be afforded by this Agreement.  No Loan Party shall pledge, assign or otherwise further encumber, or permit any additional liens or security interests (other than Permitted Liens) to attach to, any of the Collateral, nor permit any of the Collateral to be levied upon under any legal process, nor permit any of the Collateral to become or be a fixture, except with the express written consent of Lender. Upon any breach of the foregoing covenant against encumbrances, Lender may, at its sole election but without obligation to do so, and without limiting Lender's other remedies (including without limitation declaring an Event of Default), discharge the encumbrance for the account of and without notice to the relevant Loan Party, and all expenses incurred by the Lender in so doing shall be added to the Obligations and shall be payable by the Borrower upon demand, together with, at the Lender's election, interest thereon at the Default Rate; provided that Lender shall not have such right to discharge such encumbrance if the Borrower has, in the Lender's reasonable discretion, appropriately challenged such encumbrance under applicable law and has created reasonable reserves for the satisfaction of such encumbrance.

4.5    **Attorney in Fact**. Upon the occurrence and during the continuance of an Event of Default, each Loan Party hereby appoints the Lender and such Person(s) as the Lender may designate as its attorney in fact to (a) endorse the name of such Loan Party on any checks, notes, drafts or other forms of payment or security that may come into the possession of Lender or any Affiliate of Lender, (b) sign such Loan Party's name on invoices or bills of lading, drafts against customers, notice of assignment, verifications and schedules, and with respect to invoices, sell the accounts receivable generated from such invoices, (c) continue or obtain any insurance and pay all or any part of the premiums therefor and costs thereof, and make, settle and adjust all claims under such policies of insurance, (d) pay or discharge any taxes, liens, security interests or other encumbrances levied or placed on or threatened against such Loan Party or its property, (e) instruct any third party having custody or control of any Collateral or

14

books and records belonging or relating to such Loan Party to give Lender the same rights of access and other rights with respect thereto as Lender has under this Agreement and the Loan Documents, (f) notify the Post Office authorities to change the address of delivery of mail to an address designated by Lender, and open and dispose of mail addressed to such Loan Party, and (g) generally, to do all things necessary to carry out the terms and provisions of this Agreement. The powers granted herein, being coupled with an interest, are irrevocable, and such Loan Party approves and ratifies all acts of the attorney-in-fact. Neither Lender nor its designated Person(s) shall be liable for any act or omission, error in judgment or mistake of law so long as the same is not willful or grossly negligent. Any and all sums paid, and any and all costs, expenses, liabilities, obligations and attorneys' fees incurred by Lender with respect to the foregoing shall be added and become part of the Obligations, shall be payable on demand, and shall bear interest at the Loan Interest Rate, except that, any sums paid by Lender as a result of any Loan Party's breach of its covenants set forth in <u>Section 4.4</u> shall, at Lender's election, bear interest at the Default Rate. Each Loan Party agrees that Lender's rights under the foregoing power of attorney or any of Lender's other rights under this Agreement and the other Loan Documents shall not be construed to indicate that Lender is in control of the business, management or properties of such Loan Party.

5. **APPLICATION OF PROCEEDS**. The proceeds of the Loan shall be used solely by the Borrower as set forth in Recital A of this Agreement.

6. **INDUCING REPRESENTATIONS**. In order to induce Lender to make the Loans, each Loan Party makes the following representations and warranties to Lender:

6.1 **Organization and Qualifications**. Such Loan Party (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as identified in <u>Schedule 6.1</u>, (b) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect, is qualified to do business and in good standing in every jurisdiction wherever necessary to carry out its business and operations.

6.2 **Name and Address**. Except as set forth on <u>Schedule 6.2</u>, during the preceding five (5) years, such Loan Party not has been known by, nor has used any other name, whether corporate, fictitious or otherwise. The address of such Loan Party's chief executive office is set forth in <u>Schedule 6.2</u>.

6.3 **Structure; Equity Interests**. The Borrower does not have any subsidiaries and the Guarantor does not have any subsidiaries other than the Borrower. All of the issued and outstanding Equity Interests of each Loan Party are owned by the Persons and in such amounts/percentages as set forth in <u>Schedule 6.3</u> attached hereto. The Equity Interests of the Borrower are certificated securities under, and the Organizational Documents relating to such interests expressly state that the interests are "securities" governed by, Article 8 of the UCC.

15

6.4     **Legally Enforceable Agreement**. The execution, delivery and performance of this Agreement, each and all of the other Loan Documents and each and all other instruments and documents to be delivered by the Loan Parties under this Agreement, and the creation of all liens and security interests provided for herein, are within the relevant Loan Party's limited liability company power, have been duly authorized by all necessary or proper limited liability company action (including the consent of members where required), are not in contravention of any agreement or indenture to which the relevant Loan Party is a party or by which it is bound, or of the charter documents (articles/certificate of incorporation, by-laws, articles/certificate of organization/formation or operating agreement, as the case may be) of such Loan Party, and are not in contravention of any provision of law and the same do not require the consent or approval of any governmental body, agency, authority or any other Person which has not been obtained and a copy thereof furnished to Lender.  Each Loan Document is the legally and valid binding obligation of the Loan Parties party thereto, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

6.5     **Solvent Financial Condition**. Such Loan Party is Solvent.

6.6     **Joint Ventures**. Except as set forth in Schedule 6.6, no Loan Party is engaged in any joint venture or partnership with any other Person.

6.7     **Real Estate**. Attached hereto as Schedule 6.7 is a list showing all real property owned or leased by such Loan Party, and if leased, the correct name and address of the landlord and the date and term of the applicable lease.

6.8     **Intellectual Property**. Such Loan Party does not own any registered patents, trademarks, service marks, trade names, or copyrights.

6.9     **Existing Business Relationship**. Except as set forth in Schedule 6.9, there exists no actual or threatened termination, cancellation or limitation of, or any adverse modification or change in, the business relationship of the Borrower with any supplier, customer or group of customers whose purchases individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

6.10    **Investment Company Act: Federal Reserve Board Regulations**. No Loan Party is an "investment company", or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended (15 U.S.C. §§ 80(a)(1), et seq.). The making of the Loan under this Agreement by the Lender, the application of the proceeds and repayment thereof by the Borrower and the performance of the transactions contemplated by this Agreement will not violate any provision of such Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder. No Loan Party owns any margin security as that term is defined in Regulation U of the Board of Governors of the Federal Reserve System and the proceeds of the Loan made pursuant to this Agreement will be used only for the purposes contemplated under this Agreement. None of the proceeds will be used, directly or indirectly, for the purpose of purchasing or carrying any margin security or for the purpose of

16

reducing or retiring any Indebtedness which was originally incurred to purchase or carry margin
security or for any other purpose which might constitute any of the Loans under this Agreement
a "purpose credit" within the meaning of said Regulation U or Regulations T or X of the
Federal Reserve Board. No Loan Party will take, nor permit any agent acting on its behalf to
take, any action which might cause this Agreement or any document or instrument delivered
pursuant hereto to violate any regulation of the Federal Reserve Board.

       6.11   **Tax Returns**.  Such Loan Party has filed all tax returns (federal, state or
local) required to be filed and paid all taxes shown thereon to be due including interest and
penalties. No assessments have been made against such Loan Party by any taxing authority, nor
has any penalty or deficiency been made by any such authority, which remains outstanding or
unpaid. To the best of such Loan Party's knowledge, no Federal income tax return of such Loan
Party is presently being examined by the Internal Revenue Service nor are the results of any
prior examination by the Internal Revenue Service or any State or local tax authority being
contested by such Loan Party.

       6.12   **Litigation**. Except as set forth in <u>Schedule 6.12</u>, no action or proceeding
is now pending or, to the knowledge of such Loan Party, is threatened against such Loan Party,
in equity or otherwise, before any court, board, commission, agency or instrumentality of the
Federal or state government or of any municipal government or any agency or subdivision
thereof, or before any arbitrator or panel of arbitrators, and such Loan Party has not accepted
liability for any such action or proceeding.  None of the pending proceedings listed on <u>Schedule
6.12</u>, individually or collectively, if adversely determined, could reasonably be expected to have
a Material Adverse Effect.

       6.13   **Title/ Liens**. Such Loan Party has good and marketable title to the
Collateral that it has pledged as sole owner thereof. There are no existing liens on any
Collateral, except for Permitted Liens.  None of the Collateral is subject to any prohibition
against encumbering, pledging, hypothecating or assigning the same or requires notice or
consent in connection therewith.

       6.14   **Existing Indebtedness**. No Loan Party has any existing Indebtedness
except the Indebtedness permitted under <u>Section 10.1</u>.

       6.15   **ERISA Matters**. If the Borrower maintains a Plan, the present value of
all accrued vested benefits under such Plan (calculated on the basis of the actuarial valuation for
the Plan) does not exceed, as of the sale of the most recent actuarial valuation for such Plan, the
fair market value of the assets of such Plan allocable to such benefits. The Borrower is not
aware of any information since the date of such valuation which would affect the information
contained therein. No Plan has incurred a funding shortfall, as that term is defined in Section
302 of ERISA or Section 412 and/or 430 of the Code (whether or not waived), no liability to the
Pension Benefit Guaranty Corporation (other than required premiums which have become due
and payable, all of which have been paid) has been incurred with respect to the Plan and there
has not been any Reportable Event. The Borrower has not engaged in any transaction which
would subject the Borrower to tax, penalty or liability for prohibited transactions imposed by

ERISA or the Code. The Borrower has not incurred any withdrawal liability, as that term is used in Title IV of ERISA.

6.16 **O.S.H.A**. The Borrower has duly complied with, and its facilities, business, leaseholds, equipment and other property are in compliance in all material respects with, the provisions of the federal Occupational Safety and Health Act and all rules and regulations thereunder and all similar state and local Governmental Rules. There are no outstanding citations, notices or orders of non-compliance issued to the Borrower or relating to its facilities, business. leaseholds, equipment or other property under any such Governmental Rules.

6.17 **Environmental Matters**. Such Loan Party is in material compliance with all Environmental Laws.

6.18 **Labor Disputes**. There are no pending or, to the Borrower's knowledge, threatened labor disputes against the Borrower.

6.19 **Compliance With Laws**. Such Loan Party is in compliance in all material respects with all Federal, state and local governmental rules, ordinances and regulations ("**Governmental Rules**") applicable to its ownership or use of properties or the conduct of its business.

6.20 **Anti-Money Laundering and Terrorism Regulations**. Such Loan Party (a) is familiar with all applicable Anti-Terrorism Laws; (b) acknowledges that its transactions are subject to applicable Anti-Terrorism Laws; (c) will comply in all material respects with all applicable Anti-Terrorism Laws, including, if appropriate, the USA Patriot Act; (d) acknowledges that the Lender's performance hereunder is also subject to the Lender's compliance with all applicable Anti-Terrorism Laws, including the USA Patriot Act; (e) and, to such Loan Party's knowledge, its Affiliates are not Blocked Persons; (f) acknowledges that the Lender will not conduct business with any Blocked Person; (g) will not (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law; (h) shall provide to the Lender all such information about such Loan Party's ownership, officers, directors, business structure and, to the extent not prohibited by applicable law or agreement, customers, as the Lender may reasonably require; and (i) will take such other action as the Lender requires to identify such Loan Party in accordance with the USA Patriot Act and as the Lender may otherwise reasonably request in connection with its obligations described in clause (d) above. In addition, the Lender has the right to periodically conduct OFAC searches and customary background checks for senior management and key principals of such Loan Party.

6.21   **No Other Violations**.  Such Loan Party is not in violation of any term of its charter documents (articles/certificate of incorporation, by-laws, articles or certificate of organization/formation or operating agreement, as the case may be) and no event or condition has occurred or is continuing which constitutes or results in (or would constitute or result in, with the giving of notice, lapse of time or other condition) (a) a material breach of, or a material default under, any material agreement, undertaking or instrument to which such Loan Party is a party or by which it or any of the Collateral may be affected, or (b) the imposition of any lien (other than a Permitted Lien) on any Collateral.

6.22   **Full Disclosure**. No information contained in any Loan Document, the financial statements or any written statement furnished by or on behalf of such Loan Party under any Loan Document, or to induce Lender to execute the Loan Documents, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

6.23   **Warrant**.  The membership units to be issued to the Lender under the Warrant shall, when issued upon exercise of the Warrant, shall be duly and validly issued, fully paid and non-assessable and are not and shall not be subject to any preemptive rights or rights of first refusal that have not been properly waived or complied with and shall not be subject to any liens or other encumbrances.

6.24   **Survival of Representations and Warranties**.  Such Loan Party covenants, warrants and represents to the Lender that all representations and warranties of such Loan Party contained in this Agreement or in any other Loan Documents shall be true at the time of such Loan Party's execution of this Agreement and the other Loan Documents, and Lender's right to bring an action for breach of any such representation or warranty or to exercise any remedy under this Agreement based upon the breach of such representation or warranty shall survive the execution, delivery and acceptance hereof by Lender and the closing of the transactions described herein or related hereto until the Obligations are finally and irrevocably paid in full.

7.   **FINANCIAL STATEMENTS AND INFORMATION; CERTAIN NOTICES TO LENDER**.  So long as the Borrower shall have any Obligations to Lender under this Agreement, the Borrower shall deliver to the Lender, or shall cause to be delivered to the Lender, which may be satisfied by delivery via electronic mail to individuals who are specified from time-to-time by Lender:

7.1   **Annual Financial Statements**. Within ninety (90) days after the close of each Fiscal Year of the Borrower, the audited consolidated balance sheet of the Loan Parties as at the end of, and the related audited statements of income, stockholder or member equity and cash flows for, such Fiscal Year (or, if audited financial statements are not available, unaudited consolidated balance sheet and unaudited consolidated statements of income, stockholder or member equity and cash flows of the Loan Parties).

19

7.2    **Quarterly/Other Financial Statements**. Within forty-five (45) days after the end of each of the first three fiscal quarters of each Fiscal Year of the Borrower, unaudited consolidated financial statements consisting of a balance sheet, statements of operations and retained earnings, and statements of cash flow, prepared by management of the Loan Parties in accordance with GAAP (subject to normal year-end adjustments and the absence of footnotes).

7.3    **Compliance Certificate**.  Each time the financial statements of Borrower are required to be delivered pursuant to Sections 7.1 and 7.2, Borrower shall deliver to Lender a duly executed and completed Compliance Certificate.

7.4    **Notice Regarding Material Contracts**.  Promptly, and in any event within ten (10) Business Days (i) after any Material Contract is terminated or amended in a manner that is materially adverse to the Borrower, (ii) the occurrence of a default under any Material Contract, to the extent that such default would have a Material Adverse Effect or (iii) any new Material Contract is entered into, the Borrower shall deliver to the Lender (x) a written statement describing such event, with copies of such material amendments or new contracts (to the extent such delivery is permitted by the terms of any such Material Contract, provided no such prohibition on delivery shall be effective if it were bargained for by the Borrower with the intent of avoiding compliance with this Section 7.4), and an explanation of any actions being taken with respect thereto.

7.5    **Insurance**.  Within thirty (30) days of the renewal date of each insurance policy, evidence of renewal of insurance in form and content satisfactory to Lender and otherwise in compliance with Section 9.6 of this Agreement, together with the original insurance policy.

7.6    **Notice of Event of Default and Adverse Business Developments**. Within three (3) Business Days after becoming aware of the existence of a Default or an Event of Default or any of the following:

(a)    any material dispute that may arise between any Loan Party and any governmental regulatory body or law enforcement authority, including any action relating to any tax liability of such Loan Party;

(b)    any labor controversy resulting in or threatening to result in a strike or work stoppage against the Borrower;

(c)    any proposal by any public authority to acquire the assets or business of any Loan Party;

(d)    the relocation of any material Collateral other than at the Borrower's place of business, at the Premises or as permitted under this Agreement;

20

(e)      any proposed or actual change of any Loan Party's name, identity, residence, state of organization or corporate/limited liability company structure, in each case to the extent applicable to such Loan Party; or

(f)      any other matter which has resulted or may reasonably be expected to result in a Material Adverse Effect.

In each case, the Borrower will provide Lender with telephonic notice followed by written notice specifying and describing the nature of such Default, Event of Default or development or information, and such anticipated effect.

7.7      **Other Information**. Such other information respecting the payment of payroll taxes, the financial condition of any Loan Party, or any Collateral as the Lender may, from time to time, reasonably request.

8.      **ACCOUNTING**. The Lender will account monthly to the Borrower. Each and every account shall be deemed final, binding and conclusive upon the Borrower in all respects (absent manifest error), as to all matters reflected therein, unless the Borrower, within ten (10) days after the date the account was rendered, delivers to the Lender written notice of any objections which the Borrower may have to any such account and in that event only those items expressly objected to in such notice shall be deemed to be disputed by the Borrower. If the Borrower disputes the correctness of any statement, the Borrower's notice shall specify in detail the particulars of its basis for contending that such statement is incorrect.

9.      **AFFIRMATIVE COVENANTS**. Each Loan Party covenants and agrees that, so long as any Obligations to the Lender are outstanding under this Agreement, such Loan Party will:

9.1      **Business and Existence**. Preserve and maintain its separate existence and rights, privileges and franchises.

9.2      **Trade Names**. Transact business in such Loan Party's own name (subject to, in the case of the Guarantor, Section 10.16), and the Borrower shall invoice all of the Borrower's receivables in the Borrower's own name.

9.3      **Transactions with Affiliates**. Whenever such Loan Party engages in transactions with any of its Affiliates, conduct such transactions on an arms-length basis.

9.4      **Taxes**. Pay and discharge all taxes, assessments, government charges and levies imposed upon such Loan Party, upon such Loan Party's income, profits or employees or upon any Collateral prior to the due date thereof, unless such item is being contested by such Loan Party in good faith by appropriate proceedings being diligently conducted and reserves in accordance with GAAP have been established and maintained.

9.5      **Compliance with Laws**. Comply in all material respects with all Governmental Rules applicable to such Loan Party including, without limitation, all laws and

21

regulations regarding the collection and payment of employees' income, payroll, unemployment and Social Security taxes.

      9.6     **Maintain Properties; Insurance; Compliance with Material Contracts**. Safeguard and protect all Collateral and keep all of the Collateral insured with insurance companies licensed to do business in the states where the Collateral is located against loss or damage by fire or other risk under extended coverage endorsement and against theft, burglary, and pilferage together with such other hazards as is customary in the case of companies engaged in businesses similar to the business of the Borrower. Subject to <u>Section 9.21</u>, the Borrower shall deliver to the Lender copies of the Borrower's insurance policies, or certificates of insurance, together with endorsements in form satisfactory to the Lender naming the Lender as lender loss payee or additional insured, as the case may be, and providing that the relevant policy shall not be canceled, amended or terminated except upon thirty (30) days' prior written notice to the Lender. All insurance proceeds received by the Lender shall be retained by the Lender for application to the payment of such portion of the Obligations as the Lender may determine in the Lender's sole discretion, provided that so long as any Loan Party is not in Default hereunder, Borrower shall be entitled to use in accordance with <u>Section 3.5(a)</u> any insurance proceeds paid as a result of damage to the Premises to rebuild or repair the Premises. The Borrower shall promptly notify Lender of any event or occurrence causing a loss or decline in the value of any Collateral that is insured or the existence of an event justifying a claim under any insurance and the estimated amount thereof. The Borrower shall perform and comply with its obligations under, and enforce its rights in respect of, all Material Contracts, except where failure to perform and comply with such obligations or to enforce such rights would not reasonably have a Material Adverse Effect.

      9.7     **Business Records**. Keep adequate records and books of account with respect to such Loan Party's business activities in which proper entries are made in accordance with sound bookkeeping practices reflecting all financial transactions of such Loan Party.

      9.8     **Litigation**. Give the Lender prompt notice of any suit at law or in equity against such Loan Party involving money or property valued in excess of $100,000 and advise the Lender in such notice as to whether the same is fully covered by insurance and the insurer has accepted liability therefor in writing.

      9.9     **Damage or Destruction of Collateral**. Maintain or cause to be maintained the Collateral in good condition and repair at all times (normal wear and tear excepted), preserve the Collateral from loss, damage, or destruction of any nature whatsoever and provide the Lender with prompt written notice of any destruction or substantial damage to any Collateral and of the occurrence of any condition or event which has caused, or would reasonably be expected to cause, material loss or depreciation in the value of any Collateral.

      9.10     **Name Change**. Provide the Lender with at least thirty (30) days written notice prior to any proposed change of name or the creation of any subsidiary (subject to the prohibition on creation of subsidiaries in <u>Section 10.15 </u>below) and, in the case of such new subsidiary, cause such subsidiary, promptly upon request of Lender, to become a guarantor of

all of the Obligations and grant to Lender a security interest in all of such subsidiary's assets, as
security for such guarantee.

9.11    **Access to Books, Records and other Collateral**. During normal
business hours (unless an Event of Default has occurred and is continuing in which event at any
and all times), (a) provide the Lender, or the Lender's designee, with such reports and with such
access to such Loan Party's books and records, and permit the Lender to copy and inspect such
reports and books and records, all as the Lender deems necessary or desirable to enable the
Lender to monitor the Loan extended and the liens granted hereby, and (b) permit the Lender, or
the Lender's designee, to examine and inspect the inventory, equipment or other Collateral and
examine, inspect and copy all books and records with respect thereto.  Such Loan Party shall
maintain full, accurate and complete records respecting inventory and all other Collateral at all
times.

9.12    **Solvency**. Continue to be Solvent.

9.13    **Compliance With Environmental Laws**. Comply in all material
respects with all applicable Environmental Laws.

9.14    **Compliance with ERISA and other Employment Laws**. (a) Comply in
all material respects with all applicable provisions of ERISA and the Code, and any other
applicable laws, rules or regulations relating to the compensation of employees and funding of
employee benefit plans, and (b) pay, when due, all minimum required contributions (as that
term is used in Section 430 of the Code) and all amounts required to be contributed and/or paid
to any Plan under the Borrower's collective bargaining agreement, if any.

9.15    **Delivery of Control Agreement, Certificated Shares and Promissory
Notes**.  Subject to Section 9.21, promptly deliver to the Lender (a) with respect to each
applicable deposit account of such Loan Party (other than payroll accounts), a Control
Agreement duly executed by such Loan Party and the depositary bank, (b) to the extent issued,
any certificated shares or membership interests that constitute Collateral, along with
corresponding transfer powers executed in blank and (iii) all promissory notes in favor of such
Loan Party, if any, with corresponding allonges executed in blank

9.16    **Notice of Defaults and Events of Default**. As soon as possible and, in
any event, within ten (10) days after the occurrence of each Default and Event of Default,
furnish to the Lender a written notice setting forth the details of such Default or Event of
Default and the action that is proposed to be taken by such Loan Party with respect thereto.

9.17    **Management Changes**. Provide the Lender with written notice within
thirty (30) days of appointments to the offices of the president, chairman, chief executive officer
or chief financial officer of such Loan Party.

9.18    **Commercial Tort Claims**.  In the event that such Loan Party hereafter
acquires or has any Commercial Tort Claim in excess of $50,000 individually, such Loan Party
shall promptly identify such Commercial Tort Claim to the Lender in writing, and provide such

23

supplementary and supporting information as the Lender may reasonably request to perfect its lien in such Commercial Tort Claim.

9.19    **Collateral Identification**.  Schedule 9.19 (as such schedule may be amended or supplemented from time to time) sets forth under the appropriate headings all of such Loan Party's: (1) Pledged Debt, (2) Securities Accounts, (3) Deposit Accounts, (4) Commodity Contracts and Commodity Accounts, (5) Commercial Tort Claims other than any Commercial Tort Claims having a value of less than $50,000 individually, (6) Letter of Credit Rights for letters of credit other than any Letters of Credit Rights worth less than $50,000 individually, (7) the name and address of any warehouseman, bailee or other third party in possession of any Inventory, Equipment and other tangible personal property, and (8) Material Contracts.  The Borrower shall supplement such schedules as necessary to ensure that such schedules are accurate with respect to each Loan Party at the end of each fiscal quarter of the Borrower and at such other times as the Lender may reasonably request.

9.20    **General Information**. Provide the Lender with such other information respecting the condition or operations, financial or otherwise, of such Loan Party as the Lender from time to time may reasonably request.

9.21    **Post-Closing Obligations**.

(a)    Within five (5) Business Days of the Closing Date, the Borrower shall have provided a written request to the City, asking that the City execute and deliver to the Borrower the Non-Disturbance Agreement and the Estoppel.  The Borrower shall provide a copy of such request to the Lender.  Upon receipt of duly executed copies of the Non-Disturbance Agreement and Estoppel from the City, the Borrower shall provide a copy thereof to GACP Finance Co., LLC or a Replacement Lender, as applicable, to satisfy the related condition precedent under the GACP Loan Agreement or Replacement Loan Agreement, as applicable, and shall notify the Lender that the Borrower has received each of the duly executed Non-Disturbance Agreement and the Estoppel and provided copies to GACP Finance Co., LLC or the Replacement Lender, as applicable.

(b)    By (and including) December 31, 2018 (as such period may be extended in the sole discretion of the Lender), the Borrower shall have delivered to the Lender copies of the Collateral Access Agreement and Control Agreements over each applicable account of the Borrower, in each case, duly executed by all parties thereto.

(c)    By (and including) the tenth calendar day following the Closing Date (as such period may be extended in the sole discretion of the Lender), the Borrower shall have delivered to the Lender copies of the Borrower's insurance policy or policies, or certificates of insurance, together with endorsements in form satisfactory to the Lender naming the Lender as lender loss payee or additional insured, as the case may be, and providing that the relevant insurance policy shall not be canceled, amended or terminated except upon thirty (30) days' prior written notice to the Lender.

**10.    NEGATIVE COVENANTS**. So long as any Obligations are outstanding under this Agreement and unless the Lender has first consented thereto in writing, no Loan Party shall:

10.1    **Indebtedness**. Create, incur, assume or suffer to exist, voluntarily or involuntarily, any Indebtedness, except (a) Obligations to the Lender, (b) the Unsecured Promissory Note, (c) trade payables incurred in the ordinary course of the Borrower's business that are not past due, (d) purchase money financing and equipment leases, (e) Indebtedness to any other Loan Party and (e) Indebtedness owed by the Borrower under the Sub-Ground Lease; provided that the Borrower must obtain the Lender's prior written consent to incur any Indebtedness under the Sub-Ground Lease if such Indebtedness was not contemplated by the Sub-Ground Lease as of the Closing Date.

10.2    **Mergers; Consolidations; Acquisitions**.  Enter into any merger, acquisition, consolidation, reorganization or recapitalization with any other Person other than a Principal; take any steps in contemplation of dissolution or liquidation; or acquire the stock or all or any substantial part of the properties of any Person, whether by purchase of stock or assets or otherwise.  No Loan Party may utilize cash assets as consideration, in whole or in part, for any acquisition or investment in any Person without the prior written consent of the Lender.

10.3    **Sale or Disposition**. Sell or dispose of all or any Collateral or grant any Person an option to acquire any Collateral, underlined provided, however, that the foregoing shall not prohibit disposals of obsolete, worn out or surplus equipment, provided that the Net Cash Proceeds of such dispositions are applied to the prepayment of the Loan in accordance with underlined Section 3.5(a).

10.4    **Defaults**. Permit any landlord, mortgagee, trustee under deed of trust or lienholder to declare a default under any lease, mortgage, deed of trust or lien on real estate owned or leased by such Loan Party, which default remains uncured after any stated cure period or for a period in excess of thirty (30) days from its occurrence, whichever is less, unless such default is being contested by such Loan Party in good faith by appropriate proceedings being diligently conducted and reserves satisfactory to Lender have been established and maintained.

10.5    **Liens**. Suffer any lien, encumbrance, mortgage or security interest on any of its property, except Permitted Liens.

10.6    **Restricted Junior Payments**.  (x) Declare, order, pay or make any Restricted Junior Payment or set apart any sum for any Restricted Junior Payment, or (y) agree to declare, order, pay or make any Restricted Junior Payment or set apart any sum for any Restricted Junior Payment, other than by the Borrower to the Guarantor to pay taxes and operating costs of the Guarantor.

10.7    **Borrower's Name and Offices**. Without at least thirty (30) days prior notice to Lender, change such Loan Party's chief executive office or change its organizational name or office where it maintains its records (including computer printouts and programs) or any other Collateral.

10.8    **Fiscal Year**. Change its Fiscal Year.

10.9    **Change of Control/Management**.  Cause or permit any Change of Control.

10.10   **Guaranties; Contingent Liabilities**. Assume, guarantee, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any Person, except by the endorsement of negotiable instruments for deposit or collection or similar transactions, or the incurrence of surety bonds or performance bonds and other obligations of like nature, in its ordinary course of business as currently conducted.

10.11   **Change of Business**. Cause or permit a change in the nature of its business as conducted on the date of this Agreement, except that it may engage in any business that is reasonably related, similar, complementary or ancillary to such business or a reasonable extension, development or expansion of such business.

10.12   **Change of Accounting Practices**. Change its present accounting principles or practices in any respect, except, upon written notice to the Lender, as may be required by changes in GAAP.

10.13   **Inconsistent Agreement**. Enter into any agreement containing any provision which would be violated by the performance of the Obligations or other obligations under this Agreement or any other Loan Document.

10.14   **Loan or Advances**. Make any loans or advances to any Person.

10.15   **Investments**. Make any investment in any Person including, without limitation, in any Affiliates or form any Affiliates or subsidiaries not existing on the date hereof.

10.16   **Holding Company**.  The Guarantor shall not (a) engage in any business or activities, or enter into, execute or perform any agreement, arrangement, instrument or transaction, (b) own any property other than the Equity Interests of Holdings and cash for operating expenses, (c) incur any Indebtedness, or (d) grant any liens in any of its property, other than (i) entering into and fulfilling its obligations and exercising its rights under the Loan Documents to which it is a party, (ii) undertaking activities incidental to its status as a holding company for the Borrower, (iii) incurring administrative overhead, costs and expenses relating to its business as a holding company of the Borrower, and (iv) holding meetings of managers and members.

**11.    CONDITIONS PRECEDENT**.  The obligation of the Lender to make the Loan hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived) as determined by the Lender in its sole discretion:

11.1    **Loan Documents**.  The Lender shall have received copies of this Agreement and each other Loan Document executed and delivered by each applicable Loan Party and each other Person party thereto.

26

11.2    **Unsecured Promissory Note**.  The Lender shall have received the Unsecured Promissory Note, duly executed by the Borrower.

11.3    **Evidence of Payment to OBOT**.  The Lender shall have received evidence that, on the Closing Date and upon funding of the Loan, all obligations owed or to be owed by the Borrower to OBOT through March 31, 2019 shall have been paid, including, without limitation, written confirmation from OBOT to the Borrower that such obligations have been satisfied upon receipt of the payment by the Lender from the Loan.

11.4    **Sub-Ground Lease**.  The Lender shall have received a duly executed copy of the Sub-Ground Lease, in form and substance acceptable to the Lender.

11.5    **Reaffirmation of Ground Lease**.  Lender shall have received written reaffirmation from OBOT of its agreement to perform its obligations under the Ground Lease (provided that there is no default or event of default on the part of the Borrower under the Ground Lease).

11.6    **GACP Loan Agreement**.  The Lender shall have received an execution copy of the GACP Loan Agreement in form and substance acceptable to the Lender.

11.7    **Warrant**.  The Lender shall have received a fully executed copy of the Warrant.

11.8    **Notice of Borrowing**. The Lender shall have received a fully executed Notice of Borrowing.

11.9    **Organizational Documents; Incumbency**.  The Lender shall have received (a) copies of each Organizational Document of the Borrower and, to the extent applicable, certified as of a recent date by the appropriate governmental official, each dated the Closing Date or a recent date prior thereto; (b) signature and incumbency certificates for each Person executing any Loan Documents; (c) resolutions of the Member of the Borrower approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by the Borrower's Member as being in full force and effect without modification or amendment; (d) a good standing certificate from the applicable governmental authority (x) of the Borrower's jurisdiction of formation and (y) in each jurisdiction in which it is qualified as a foreign entity to do business, each dated a recent date prior to the Closing Date, except, in the case of subclause (y) where failure to so qualify would not reasonably be expected to result in a Material Adverse Effect.

11.10    **Governmental Authorizations and Consents**.  The Borrower shall have obtained all governmental authorizations and all consents of other Persons, in each case that are necessary or reasonably advisable in connection with the transactions contemplated by the Loan Documents, and each of the foregoing shall be in full force and effect and in form and substance satisfactory to the Lender.

27

11.11  **Personal Property Collateral**.  In order to create in favor of the Lender a valid, perfected and continuing first priority security interest in the Collateral, the Lender shall have received:

(a)    copies of UCC-1 financing statements to be filed against each Loan Party in the applicable filing office immediately after the effectiveness of this Agreement;

(b)    tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions in which any Loan Party resides, is organized or maintains its chief executive office and such other searches that the Lender deems necessary or appropriate, none of which shall evidence an encumbrance on the Collateral covered or intended to be covered by the Loan Documents (other than Permitted Liens or any other liens acceptable to the Lender); and

(c)    all promissory notes in favor of the Borrower, with corresponding alloonges executed in blank, if any.

11.12  **No Litigation**.  There shall not exist any action, suit, investigation, litigation or proceeding or other legal or regulatory developments, pending or, to the knowledge of the Borrower, threatened in writing in any court or before any arbitrator or governmental authority that, in the reasonable discretion of the Lender, singly or in the aggregate: (a) prohibits, limits, restrains or impairs the making of the Loan or the rights of the Lender under this Agreement or any of the other transactions contemplated by the Loan Documents, (b) prohibits, limits, retains or impairs the grant by the Loan Parties of a first priority lien on the Collateral in favor of the Lenders, or (c) that could have a Material Adverse Effect.

11.13  **No Material Adverse Effect**.  Since August 31, 2018, no event, circumstance or change shall have occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

11.14  **Representations and Warranties**. Immediately before and immediately after giving effect to the Loan, the representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representation or warranty that is already qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Closing Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representation or warranty that is already qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date.

28

11.15   **No Default**. As of the Closing Date, no event shall have occurred and be continuing or would immediately result from the consummation of the Loan that would constitute an Event of Default or a Default.

11.16   **Expenses**.  Borrower shall have paid or reimbursed the Lender for its reasonable due diligence expenses, including the fees and disbursements of its legal counsel, incurred in connection with preparation, execution and delivery of this Agreement.  Lender acknowledges that Borrower has paid to Lender a $50,000 work fee, which amount shall be applied to such expenses of the Lender.

11.17   **Additional Documents**.  The Lender shall have received such other approvals, documents, agreements, instruments, certificates and materials as are set forth on the closing checklist provided to the Borrower and/or as the Lender may request in its reasonable discretion.

12.   **EVENTS OF DEFAULT**.

12.1   **Defaults**. The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a)   if the Borrower shall fail to make any payment when due on any Obligation under this Agreement or any other Loan Document;

(b)   if any Loan Party shall fail to comply with any term, condition, covenant or agreement contained in Article 7 or Article 10;

(c)   if any Loan Party shall fail to comply with any term, condition, covenant or agreement contained in this Agreement or in any other Loan Document, and such failure continues for a period of fifteen (15) days after the earlier to occur of (i) the date on which such failure to comply is known or reasonably should have become known to any officer of such Loan Party, or (ii) the date on which Lender shall have notified such Loan Party of such failure; provided, however, that such fifteen (15) day period shall not apply in the case of any failure which is not capable of being cured at all or within such fifteen (15) day period (or such longer period as the Lender may allow in its sole discretion) or which has been the subject of a prior failure within a six (6) month period; or

(d)   if any Loan Party shall cease to be Solvent, make an assignment for the benefit of its creditors, call a meeting of its creditors to obtain any general financial accommodation, or, in the case of the Borrower, suspend business, or if any case under any provision of the Bankruptcy Codes including provisions for reorganizations, shall be commenced by or against the Borrower (and such case shall not have been dismissed within sixty (60) days) or if a receiver, trustee or equivalent officer shall be appointed for all or any substantial part of the Collateral; or

(e)   if any representation or warranty contained in this Agreement or any Loan Document, or in any written statement pursuant hereto or thereto, or in any report,

29

financial statement or certificate delivered by any Loan Party to Lender shall be false, in any material respect, when made and such falsehood has or is likely to have a Material Adverse Effect; or

(f)    if any federal or state tax lien is filed of record against any Loan Party, and is not bonded or discharged within fifteen (15) days of filing; or

(g)    if a judgment for $50,000 or more shall be entered against any Loan Party in any action or proceeding and shall not be stayed, vacated, bonded, paid or discharged within fifteen (15) days of entry, except a judgment where the claim is fully covered by insurance (other than the deductible) and the insurance company has accepted liability therefor in writing; or

(h)    if any obligation of any Loan Party in respect of any Indebtedness with a then-outstanding principal balance of $50,000 or more shall be declared to be or shall become due and payable prior to its stated maturity or such obligation shall not be paid as and when the same becomes due and payable; or there shall occur any event or condition which constitutes an event of default under any note, mortgage, indenture, instrument, agreement or evidence of such Indebtedness relating to any obligation of such Loan Party in excess of $50,000 or more in respect of any such Indebtedness the effect of which is to permit the holder or the holders of such note, mortgage, indenture, instrument, agreement or evidence of such Indebtedness, or a trustee, agent or other representative on behalf of such holder or holders, to cause the Indebtedness evidenced thereby to become due prior to its stated maturity; or

(i)    upon the happening of any Reportable Event, or if the Borrower terminates or withdraws (full or partial) from any Plan, or if a trustee shall be appointed by an appropriate United States District Court or other court or administrative tribunal to administer any Plan, or if the Pension Benefit Guaranty Corporation shall institute proceedings to terminate any Plan or to appoint a trustee to administer any Plan; or

(j)    upon the occurrence and continuance of any Material Adverse Effect which impairs the Lender's security, increases the Lender's risks, or impairs any Loan Party's ability to perform under this Agreement or under any of the other Loan Documents; or

(k)    upon a Default or Event of Default under any other Loan Document, the Warrant, or the Sub-Ground Lease; or

(l)    termination or invalidation, for any reason, of the Sub-Ground Lease.

12.2    **Remedies**. If an Event of Default has occurred, and is continuing, the Lender may, without notice or demand, declare all of the Obligations to be immediately due and payable, and exercise any rights and remedies provided to the Lender under this Agreement, the other Loan Documents, or at law or equity, including all remedies provided under the UCC; provided, that upon the occurrence of any Event of Default specified in Section 12.1(d), all Obligations shall become immediately due and payable without declaration, notice or demand

30

by the Lender. Without limiting the foregoing, the Lender may (a) accelerate the payment of all
Obligations and demand immediate payment thereof to the Lender, (b) with or without judicial
process or the aid or assistance of others, enter upon any premises on or in which any of the
Collateral may be located and take possession of the Collateral or complete processing,
manufacturing and repair of all or any portion of the Collateral, (c) require the Loan Parties, at
their expense, to assemble and make available to the Lender any part or all of the Collateral at
any place and time designated by the Lender, (d) collect, foreclose, receive, appropriate, setoff
and realize upon any and all Collateral, and (e) sell, lease, transfer, assign, deliver or otherwise
dispose of any and all Collateral (including, without limitation, entering into contracts with
respect thereto, by public or private sales at any exchange, broker's board, any office of Lender
or elsewhere) at such prices or terms as the Lender may deem reasonable, for cash, upon credit
or for future delivery, with the Lender having the right to purchase the whole or any part of the
Collateral at any such public sale, all of the foregoing being free from any right or equity of
redemption of the Loan Parties, which right or equity of redemption is hereby expressly waived
and released by the Loan Parties. If any of the Collateral is sold or leased by the Lender upon
credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until
payment therefor is finally collected by the Lender. If notice of disposition of Collateral is
required by law, ten (10) days prior notice by the Lender to the Loan Parties designating the
time and place of any public sale or the time after which any private sale or other intended
disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and shall
constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the
UCC, and the Loan Parties waive any other notice. In the event the Lender institutes an action
to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy,
the Loan Parties waive the posting of any bond which might otherwise be required. Upon the
occurrence and continuation of an Event of Default,  the Lender may without, notice, demand or
legal process of any kind, take possession of any or all of the Collateral, wherever it may be
found, and for that purpose may pursue the same wherever it may be found, and may at any
time enter into any premises of any Loan Party where any of the Collateral may be or is
supposed to be, and search for, take possession of, remove, keep and store any of the Collateral
until the same shall be sold or otherwise disposed of, and the Lender shall have the right to store
and conduct a sale of the same in any premises of any Loan Party without cost or charge to the
Lender.

      12.3   **Remedies Cumulative**. All rights and remedies granted to the Lender
under this or any other agreement between any Loan Party and the Lender will be deemed
concurrent and cumulative and not alternative, and the Lender may proceed with any number of
remedies at the same time or at different times until all Obligations are fully satisfied. The Loan
Parties hereby waive all rights of notice or dishonor, any other rights of notice or the right to
require the Lender to marshal assets. The Borrower shall pay to the Lender on demand any and
all expenses, including reasonable attorneys' fees and legal expenses which may have been
incurred by the Lender, with interest at the Default Rate: (a) in the prosecution or defense of any
action growing out of or connected with the subject matter of this Agreement, the Obligations,
the Collateral or any of the Lender's rights therein, and (b) in connection with the custody,
preservation, protection, use, operation, preparation for sale or sale of any Collateral, and
enforcement of any and all of Lender's rights and remedies under this Agreement or any other

Loan Document, the incurring of all of which are hereby authorized to the extent Lender deems the same advisable.

12.4    **Exit Fee upon Acceleration of Obligations**. If the Obligations are accelerated due to the occurrence and continuation of an Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the Exit Fee shall be due and payable and shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of the Lender's lost profits as a result thereof. Such Exit Fee shall be presumed to be the liquidated damages sustained by the Lender as the result of the early payment of the Obligations and the Loan Parties agree that it is reasonable under the circumstances currently existing.

12.5    **Continuation of Security Interests**. Notwithstanding any termination of this Agreement, until all Obligations shall have been fully paid and satisfied (other than any contingent indemnification obligations not due and owing), the Lender shall retain all security in and title to all existing and future Collateral held by the Lender hereunder or under any other Loan Document. At such time after the Maturity Date as all Obligations have been fully paid and satisfied (other than any contingent indemnification obligations not due and owing), the security interest granted hereunder shall automatically terminate and the Lender shall promptly deliver to the relevant Loan Party any Collateral delivered by such Loan Party to Lender pursuant to this Agreement and execute and deliver all UCC termination statements and/or other documents reasonably requested by such Loan Party to evidence such termination.

13.    **GUARANTY**.

13.1    **Guaranteed Obligations**.  The Guarantor hereby irrevocably and unconditionally guaranties to the Lender the performance and payment in full of all Obligations when the same become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "**Guaranteed Obligations**").

13.2    **Payment by Guarantor**.  The Guarantor hereby agrees, in furtherance of the foregoing and not in limitation of any other right which the Lender may have at law or in equity against the Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when such become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Guarantor shall upon demand pay, or cause to be paid, in cash, to the Lender, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for any Loan Party becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against such Loan Party for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to the Lender as aforesaid.

32

13.3    **Liability of Guarantor Absolute.**  The Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, the Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collection;

(b)    this Guaranty is a primary obligation of the Guarantor and not merely a contract of surety;

(c)    the Lender may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between any Loan Party and the Lender with respect to the existence of such Event of Default;

(d)    the obligations of the Guarantor hereunder are independent of the obligations of the Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against the Guarantor whether or not any action is brought against the Borrower or any other guarantor and whether or not the Borrower or any other guarantor is joined in any such action or actions;

(e)    payment by the Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge the Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if the Lender is awarded a judgment in any suit brought to enforce the Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release the Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by the Guarantor, limit, affect, modify or abridge the Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(f)    the Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability of the Guaranteed Obligations or giving rise to any reduction, limitation, impairment, discharge or termination of the Guarantor's liability hereunder, from time to time and in conformance with the terms and conditions of the Loan Documents may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person with respect to

33

the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of the Lender in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that the Lender may have against any such security, in each case as the Lender in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantor against Borrower or any other guarantor or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(g)    the Guarantor waives, to the maximum extent permitted by law, all suretyship defenses available now or in the future under law or equity.  In furtherance of the foregoing and without limiting the generality thereof, the Guarantor agrees that the guaranty under this Section 13 and the obligations of the Guarantor hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not the Guarantor has notice or knowledge of any of them:  (i) any failure or omission to assert or enforce or any agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to depart from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) any of the Guaranteed Obligations, or any agreement relating thereto, at any time is illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though the Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) the Lender's consent to the change, reorganization or termination of the corporate structure or existence of the Borrower and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue the perfection of, any subordination or failure to maintain the priority of, or any failure to enforce or release of security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which the Borrower or any other Loan Party may allege or assert against the Lender in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or

34

omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of the Guarantor as an obligor in respect of the Guaranteed Obligations.

13.4    **Waivers by Guarantor**.  To the extent permitted by law, the Guarantor hereby waives, for the benefit of the Lender:  (a) any right to require the Lender, as a condition of payment or performance by the Guarantor, to (i) proceed against the Borrower, any other guarantor of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any Collateral or other property securing any obligation of the Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of the Lender in favor of the Borrower or any other Person, or (iv) pursue any other remedy in the power of the Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Borrower or any other guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon the Lender's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of the Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting the Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that the Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to the Borrower and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof (other than payment in full of the Guaranteed Obligations); (h) any defense based upon an election of remedies by the Lender, including any election to proceed by judicial or nonjudicial foreclosure of any Collateral, whether real property or personal property security, or by deed in lieu thereof, and whether or not every aspect of any foreclosure sale is commercially reasonable, or any election of remedies, including remedies relating to real property or personal property security, which destroys or otherwise impairs the subrogation rights of the Guarantor.

13.5    **Guarantors' Rights of Subrogation, etc**.  Until the Guaranteed Obligations shall have been indefeasibly paid in full, the Guarantor hereby waives any claim, right or remedy, direct or indirect, that the Guarantor now has or may hereafter have against the Borrower or any of its assets in connection with this guaranty or the performance by the Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without

35

limitation (a) any right of subrogation, reimbursement or indemnification that the Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that the Lender now has or may hereafter have against the Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Lender.  In addition, until the Guaranteed Obligations shall have been paid in full, the Guarantor shall withhold exercise of any right of contribution or reimbursement the Guarantor may have against any other guarantor of the Guaranteed Obligations.  The Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification the Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution or reimbursement the Guarantor may have against any other guarantor, shall be junior and subordinate to any rights the Lender may have against the Borrower, to all right, title and interest the Lender may have in any such collateral or security, and to any right the Lender may have against such other guarantor.  If any amount shall be paid to the Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for the Lender and shall forthwith be paid over to the Lender to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

13.6     **Subordination of Other Obligations**.  Any Indebtedness of the Borrower now or hereafter held by the Guarantor is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Lender and shall forthwith be paid over to the Lender to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Guarantor under any other provision hereof.  Additionally, the Guarantor agrees not to assert or enforce, and to the maximum extent permitted by applicable law, hereby waives, any and all rights of subrogation, reimbursement, indemnification and contribution against the Borrower or against any collateral or security, and any rights of contribution the Guarantor may have against any other guarantor (including after the payment in full of the Obligations (other than contingent indemnification obligations for which no claim has been made) or the Guaranteed Obligations) if all or any portion of the Obligations or the Guaranteed Obligations shall have been satisfied in connection with an exercise of remedies by the Lender in respect of the Capital Stock of  the Borrower whether pursuant to the Pledge Agreement or otherwise.

13.7     **Continuing Guaranty**.  The guaranty under this Section 13 is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations whether now existing or hereafter created or arising shall have been indefeasibly paid in full.  The Guarantor hereby irrevocably waives any right to revoke this guaranty as to future transactions giving rise to any Guaranteed Obligations.

36

13.8    **Financial Condition of Borrower**.  The Loan may be continued from time to time without notice to or authorization from the Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation.  The Lender shall not have any obligation to disclose or discuss with the Guarantor its assessment of the financial condition of the Borrower.  The Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform their obligations under the Loan Documents, and the Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  The Guarantor hereby waives and relinquishes any duty on the part of the Lender to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by the Lender.

13.9    **Bankruptcy, etc**.

(a)    The obligations of the Guarantor hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or by any defense which the Borrower may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)    The Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of the Guarantor and the Lender that the Guaranteed Obligations which are guaranteed by the Guarantor pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations.  The Guarantor will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay the Lender, or allow the claim of the Lender in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the obligations of the Guarantor hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from the Lender as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

37

14.    **GENERAL PROVISIONS**.

14.1    **Rights Cumulative**. The Lender's rights and remedies under this
Agreement shall be cumulative and non-exclusive of any other rights or remedies which the
Lender may have under any other agreement or instrument, by operation of law or otherwise.

14.2    **Governing Law; Consent to Jurisdiction**. This Agreement shall be
governed by and construed in accordance with the internal laws of the State of New York,
without giving effect to conflicts of law principles of such state. Any judicial proceeding
brought by or against any Loan Party with respect to any of the Obligations, this Agreement or
any related agreement may be brought in any court of competent jurisdiction in the State of
New York; provided that any judicial proceeding by Loan Party against the Lender involving,
directly or indirectly, any matter or claim in any way arising out of, related to or connected with
this Agreement or any related agreement, shall be brought only in a federal or state court located
in the County of New York, State of New York.  By execution and delivery of this Agreement,
each Loan Party accepts for itself and in connection with its properties, generally and
unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to
be bound by any judgment rendered thereby in connection with this Agreement. Each Loan
Party hereby waives personal service of any and all process upon it and consents that all such
service of process may be made by registered mail (return receipt requested) directed to such
Loan Party at its address set forth in Section 14.4 and service so made shall be deemed
completed five (5) days after the same shall have been so deposited in the mails of the United
States of America. Nothing herein shall affect the right to serve process in any manner
permitted by law or shall limit the right of the Lender to bring proceedings against any Loan
Party in the courts of any other jurisdiction.  Each Loan Party waives any objection to
jurisdiction and venue of any action instituted hereunder and shall not assert any defense based
on lack of jurisdiction or venue or based upon forum *non conveniens*.

14.3    **Successors and Assigns**. This Agreement is entered into for the benefit
of the parties hereto and their successors and assigns. It shall be binding upon and shall inure to
the benefit of the parties, their successors and assigns. The Lender shall have the right, without
the necessity of any further consent or authorization by any Loan Party, to sell, assign,
securitize or grant participations in all, or a portion of, the Lender's interest in the Loan, to other
financial institutions and to any Person (whether a corporation, partnership, trust or otherwise)
that is engaged in the business of making, purchasing, holding or otherwise investing in loans
and extensions of credit in the ordinary course of its business, in each case, of the Lender's
choice and on such terms as are acceptable to the Lender in its sole discretion.

14.4    **Notice**. Wherever this Agreement provides for notice to any party (except
as expressly provided to the contrary), it shall be given by messenger, certified U.S. mail with
return receipt requested, or nationally recognized overnight courier with receipt requested,
effective when either received or receipt rejected by the party to whom addressed, and shall be
addressed as follows, or to such other address as the party affected may hereafter designate:

38

If to Lender:

> Autumn Wind Lending, LLC
> 1999 Avenue of the Stars, Suite 2040
> Los Angeles, CA 90067
> Attn: Vikas Tandon
> Telephone: 310-286-2929
> Facsimile: 310-286-6662
> Email:  vikas@jmbcapital.com

With a copy (that shall not constitute notice) to:

> Arent Fox LLP
> 1301 Avenue of the Americas, Floor 42
> New York, NY 10019
> Telephone: 212-457-5430
> Attn: Robert M. Hirsh
> (robert.hirsh@arentfox.com)
> Attn: Cynthia Weiss
> (cynthia.weiss@arentfox.com)

If to any Loan Party:

> Insight Terminal Solutions, LLC
> 6100 Dutchmans Lane, 9th Floor
> Louisville, KY 40205
> Attention: John Siegel
> Telephone: (502) 584-6022
> Email: jsiegel@westernbit.com

With a copy (that shall not constitute notice) to:

> Middleton Reutlinger
> 401 South Fourth Street, Ste 2600
> Louisville, Kentucky 40202
> Attention: Thomas W. Ice Jr.
> Telephone: (502) 625-2807
> Email: tice@middletonlaw.com

14.5  **Strict Performance**. The failure, at any time or times hereafter, to require strict performance by any Loan Party of any provision of this Agreement shall not waive, affect or diminish any right of the Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by the Lender of any Default or Event of Default by any Loan Party under this Agreement or any other Loan Document shall not suspend, waive or affect any other Default or Event of Default by such Loan Party under this

Agreement or any other Loan Document, whether the same is prior or subsequent thereto and whether of the same or a different type.

14.6    **Waiver**. Each Loan Party waives presentment, protest, notice of dishonor and notice of protest upon any instrument on which it may be liable to Lender as maker, endorser, guarantor or otherwise.

14.7    **Construction of Agreement**. The parties hereto agree that the terms and language of this Agreement were the result of negotiations between the parties, and, as a result, there shall be no presumption that any ambiguities in this Agreement shall be resolved against either party. Any controversy over the construction of this Agreement shall be decided mutually without regard to events of authorship or negotiation.

14.8    **Expenses**. If, at any time or times prior or subsequent to the date hereof, regardless of whether or not a Default or an Event of Default then exists or any of the transactions contemplated under this Agreement are concluded, the Lender employs counsel for advice or other representation, or incurs legal expenses, or consulting fees and expenses, or other costs or out-of-pocket expenses in connection with: (a) (i) the negotiation and preparation of this Agreement and the other Loan Documents or (ii) any amendment of or modification of this Agreement or any other Loan Document; (b) the administration of this Agreement or any of the other Loan Documents and the transactions contemplated hereby or thereby; (c) periodic audits and appraisals performed by Lender as permitted hereunder; (d) any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Lender, any Loan Party or any other Person) in any way relating to the Collateral, this Agreement or any other Loan Document; (e) the perfection of any lien on the Collateral; (f) any attempt to enforce any rights or remedies of Lender against any Loan Party or any other Person which may be obligated to Lender by virtue of this Agreement or any other Loan Document; or (g) any attempt to inspect, verify, protect, preserve, restore, collect, sell, liquidate or otherwise dispose of or realize upon the Collateral; then, in any such event, the reasonable attorneys' fees and actual expenses arising from such services and all expenses, costs, charges and other fees of such counsel of the Lender or relating to any of the events or actions described in this Section 14.8 shall be payable by the Borrower to the Lender, and shall be additional Obligations under this Agreement secured by the Collateral. Additionally, if any taxes (excluding taxes imposed upon or measured by the net income of the Lender, but including any intangibles tax, stamp tax or recording tax) shall be payable on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any other Loan Document, or the creation of any of the Obligations under this Agreement, by reason of any existing or hereafter enacted federal or state statute, the Borrower will pay (or will promptly reimburse the Lender for the payment of) all such taxes including, but not limited to, any interest and penalties thereon, and will indemnify, defend and hold the Lender harmless from and against any liability in connection therewith. The Borrower shall also reimburse the Lender for all other expenses incurred by the Lender in connection with the transactions contemplated under this Agreement or the other Loan Documents, including, without limitation, all UCC filing fees and all other filing fees in connection with perfection of the Lender's security interests in the Collateral, fees in connection

with any bank account, wire charges, automatic clearing house fees and other similar costs and expenses.

14.9    **Waiver of Right to Jury Trial**.

(a)    Each Loan Party and the Lender recognize that in matters related to the Loan and this Agreement, and as it may be subsequently modified and/or amended, any such party may be entitled to a trial in which matters of fact are determined by a jury (as opposed to a trial in which such matters are determined by a federal or state judge). By execution of this Agreement, the Lender and each Loan Party will give up their respective right to a trial by jury. Each Loan Party and the Lender each hereby expressly acknowledges that this waiver is entered into to avoid delays, minimize trial expenses, and streamline the legal proceedings in order to accomplish a quick resolution of claims arising under or in connection with the Note and this Agreement.

(b)    WAIVER OF JURY TRIAL. TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, EACH LOAN PARTY AND THE LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT THAT SUCH LOAN PARTY OR LENDER MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION, DIRECTLY OR INDIRECTLY, AT ANY TIME ARISING OUT OF, UNDER, OR IN CONNECTION WITH THE LOAN, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR ANY TRANSACTION CONTEMPLATED THEREBY OR HEREBY, BEFORE OR AFTER MATURITY.

(c)    CERTIFICATIONS. EACH LOAN PARTY HEREBY CERTIFIES THAT NEITHER ANY REPRESENTATIVE NOR AGENT OF LENDER NOR LENDER'S COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. EACH LOAN PARTY ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THE TRANSACTION BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATION HEREIN.

14.10    **Indemnification by Borrower/Waiver of Claims**. The Borrower hereby covenants and agrees to indemnify, defend (with counsel selected by the Lender) and hold harmless Lender and its officers, partners, employees, consultants, attorneys and agents from and against any and all claims, damages, liabilities, costs and expenses (including, without limitation, the actual fees and expenses of counsel) which may be incurred by or asserted against the Lender or any such other Person in connection with:

(a)    any investigation, action or proceeding arising out of or in any way relating to this Agreement, the Loan, any of the other Loan Documents, any other agreement relating to any of the Obligations, any of the Collateral, or any act or omission relating to any of the foregoing; or

41

(b)        any taxes, liabilities, claims or damages in connection with the Loan or this Agreement and relating to any Loan Party, the employees of the Borrower, the Collateral or Lender's liens thereon; or

(c)        the correctness, validity or genuineness of any instrument or document that may be released or endorsed to any Loan Party by the Lender (which shall automatically be deemed to be without recourse to Lender in any event), or the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; or

(d)        any broker's commission, finder's fee or similar charge or fee in connection with the Loan and the transactions contemplated in this Agreement.

Notwithstanding anything contained herein to the contrary, the Borrower's indemnification obligations under this <u>Section 14.10</u> (i) shall not apply to any claims, damages, liabilities, costs and expenses solely attributable to the Lender's gross negligence or willful misconduct, and (ii) shall survive repayment of the Obligations and the termination of this Agreement and the other Loan Documents.

14.11    **Savings Clause for Indemnification**. To the extent that the undertaking to indemnify, pay and hold harmless set forth in <u>Section 14.10</u> above may be unenforceable because it violates any law or public policy, the Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all matters referred to under <u>Section 14.10</u>.

14.12    **Waiver**. To the extent permitted by applicable law, no claim may be made by the Borrower or any other Person against the Lender or any of its Affiliates, partners, officers, employees, agents, attorneys or consultants for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract, tort or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or the other Loan Documents or any act, omission or event occurring in connection therewith; and the Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor. Neither Lender nor any of its Affiliates, partners, officers, employees, agents, attorneys or consultants shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the transactions contemplated hereby, except for its or their own gross negligence or willful misconduct.

14.13    **Entire Agreement; Waiver/Lender's Consent; Amendment**. This Agreement (including the Exhibits and Schedules thereto) and the other Loan Documents supersede, with respect to their subject matter, all prior and contemporaneous agreements, understandings, inducements or conditions between the respective parties, whether express or implied, oral or written.  No waiver of any provision of this Agreement or any other Loan Document, nor consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No

42

amendment of any provision of this Agreement or any other Loan Document shall in any event be effective unless the same shall be in a writing signed by the Lender and any Loan Parties party thereto.

14.14 **Cross Default**. The Borrower hereby agrees that all other agreements between the Borrower and the Lender are hereby amended so that a Default or an Event of Default under this Agreement is a default under all such other agreements and a default under any one of the other agreements is a Default or an Event of Default under this Agreement.

14.15 **Execution in Counterparts**. This Agreement and any other Loan Document may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement or and any other Loan Document by telecopier, facsimile machine, portable document format or other electronic means shall be as effective as delivery of a manually executed counterpart thereof.

14.16 **Severability of Provisions**. Any provision of this Agreement or any of the other Loan Documents that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or the other Loan Documents or affecting the validity or enforceability of such provision in any other jurisdiction.

14.17 **Headings**. The headings preceding the text of this Agreement are inserted solely for convenience of reference and shall not constitute a part of this Agreement or affect its meaning, construction or effect.

14.18 **Exhibits and Schedules**. All of the Exhibits and Schedules to this Agreement are hereby incorporated by reference herein and made a part hereof.

14.19 **No Broker's Fee**. Notwithstanding anything contained herein or in any Loan Documents, the Borrower shall be solely responsible for any broker's commission, finder's fee or similar charge or fee in connection with the Loans and the transactions contemplated in this Agreement

**[Signatures Follow.]**

43

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their officers thereunto duly authorized on the day and year first above written.

**BORROWER**:

**Insight Terminal Solutions, LLC**

By: _____
Name:  John J. Siegel, Jr.
Title:   Manager

**GUARANTOR**:

**Insight Terminal Holdings, LLC**

By: _____
Name: John J. Siegel, Jr.
Title:   Manager

**LENDER**:

**Autumn Wind Lending, LLC**

By: _____
Name: Vikas Tandon
Title:   Manager

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their officers thereunto duly authorized on the day and year first above written.

**BORROWER**:

**Insight Terminal Solutions, LLC**

By: _____
Name:  John J. Siegel, Jr.
Title:   Manager

**GUARANTOR**:

**Insight Terminal Holdings, LLC**

By: _____
Name:  John J. Siegel, Jr.
Title:   Manager

**LENDER**:

**Autumn Wind Lending, LLC**

By: _____
Name: Vikas Tandon
Title:  Manager

[Signature Page to Loan and Security Agreement]

**EXHIBIT B**

*Execution Version*

**Insight Terminal Solutions, LLC**
**6100 Dutchmans Lane, 9th Floor**
**Louisville, KY 40205**

September 24, 2018

<u>Via Federal Express and Email</u>

Autumn Wind Lending, LLC
1999 Avenue of the Stars, Suite 2040
Los Angeles, CA 90067
Attn: Vikas Tandon

RE:    <u>Army Base Gateway Redevelopment Project Sub-Ground Lease, dated as of September</u>
       <u>2018 (the "Sub-Ground Lease") for West Gateway by and between Oakland Bulk and</u>
       <u>Oversized Terminal, LLC ("OBOT") and Insight Terminal Solutions, LLC (the</u>
       <u>"Borrower")</u>

Dear Mr. Tandon:

Reference is hereby made to (i) that certain Loan and Security Agreement, dated as of the date hereof (as amended, restated, supplemented or modified from time to time, the "<u>Loan</u> <u>Agreement</u>"), by and among the Borrower, Insight Terminal Holdings, LLC as Guarantor and Autumn Wind Lending, LLC as Lender and (ii) that certain Warrant, dated as of the date hereof (the "<u>Warrant</u>"), issued by the Borrower to the Lender.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Loan Agreement.

The Borrower hereby agrees and covenants to the Lender that, in the event that the Obligations (other than contingent indemnification obligations not due and owing) are not indefeasibly repaid in full on or prior to February 15, 2019, the Borrower shall, on the next Business Day, commence a process to market and sell, on a best efforts basis, all of its right, title and interest under and to the Sub-Ground Lease. All Net Cash Proceeds received by the Borrower from a sale of the Borrower's right, title and interest under and to the Sub-Ground Lease shall, within three (3) Business Days of the receipt of such proceeds by the Borrower, be turned over to the Lender.  The Lender shall apply the Net Cash Proceeds to satisfy the outstanding Obligations in such order as the Lender may determine in its sole discretion, and the Lender shall be entitled to retain any surplus of the Net Cash Proceeds in excess of the Obligations for its own account.  The Borrower recognizes and agrees that the Lender has incurred certain risks in extending the Loan and that the retention of such surplus by the Lender is reasonable compensation for the incurrence of such risk. For the avoidance of doubt, nothing herein shall effect the Borrower's right to prepay the Obligations pursuant to the terms of the Loan Agreement prior to the sale of the Sub-Ground Lease.

The Borrower also hereby agrees that a breach of its obligations under the Warrant shall constitute an Event of Default under the Loan Agreement.

Please indicate your acknowledgment and agreement as of the date first written above by returning a countersigned copy of this letter to the Borrower.

*[Signature Page Follows.]*

Very truly yours,

**Insight Terminal Solutions, LLC**

By: _____

Name: John J. Siegel, Jr.

Title:  Manager

**Accepted and agreed:**

**Autumn Wind Lending, LLC**

By: _____

Name: Vikas Tandon

Title:  Manager

[Signature Page to Side Letter Agreement re: Disposition of Sub-Ground Lease]

Very truly yours,

**Insight Terminal Solutions, LLC**

By:  _____
Name:  John J. Siegel, Jr.
Title:  Manager

**Accepted and agreed:**

**Autumn Wind Lending, LLC**

By:  _____
Name: Vikas Tandon
Title:  Manager

[Signature Page to Side Letter Agreement re: Disposition of Sub-Ground Lease]

**EXHIBIT C**

*Execution Version*

# PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of September 24, 2018 by and among Insight Terminal Holdings, LLC, a Delaware limited liability company ("Pledgor") and Autumn Wind Lending, LLC ("Lender").

## RECITALS

A.    Reference is made to that certain Loan and Security Agreement dated as of the date hereof (as the same now exists or hereafter may be amended, modified, supplemented, extended, renewed, restated or replaced from time to time, the "Loan Agreement") by and among Insight Terminal Solutions, LLC, a Delaware limited liability company (the "Borrower"), the Pledgor and the Lender.

B.    The Pledgor owns one hundred percent (100%) of the membership interests in the Borrower.  As a condition precedent to the Lender entering into the Loan Agreement, and making the Loan and other financial accommodations available to the Borrower, the Pledgor is required to enter into this Agreement to secure the payment and performance of the Secured Obligations for the benefit of the Lender.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto hereby agree as follows:

## SECTION 1.
## DEFINITIONS

1.1    Defined Terms.  Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Loan Agreement or, to the extent the same are used or defined therein, the meanings provided in Article 9 of the UCC.  Whenever the context so requires, each reference to gender includes the masculine and feminine, the singular number includes the plural and vice versa.  This Agreement shall mean such agreement as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, from time to time.  Unless otherwise specified, all accounting terms not defined in the Loan Documents shall have the meanings given to such terms in and shall be interpreted in accordance with GAAP.  References in this Agreement to any Person shall include such Person and its successors and permitted assigns.  In this Agreement, the following terms shall mean as follows:

"Loan Collateral" shall mean, collectively and each individually, (i) the Pledged Collateral as defined herein, and (ii) the Collateral as defined in the Loan Agreement.

"Pledged Collateral" shall mean, collectively and each individually, (i) the issued and outstanding membership interests (and all general intangibles related to such membership interests) of the Borrower (the "Pledged Entity") owned or held of record or beneficially by the Pledgor on the date hereof as listed on Schedule 1.1 hereto (and the certificates representing such

interests); (ii) all other membership interests (and all general intangibles related to such membership interests) and ownership interests of the Pledged Entity owned or held of record or beneficially by the Pledgor at any time and from time to time (and the certificates representing such shares, securities and/or interests) (the items described in the foregoing clauses (i) and (ii), the "Pledged Securities"); (iii) all of Pledgor's interests in the profits and losses of the Pledged Entity as a holder of the Pledged Securities; (iv) all of Pledgor's interests (as a holder of the Pledged Securities) to receive dividends or other distributions of the Pledged Entity's assets and properties; (v) all of Pledgor's rights, as a holder of the Pledged Securities, to participate in the management of the Pledged Entity, (vi) all rights, privileges, authority and powers of the Pledgor, as holder of the Pledged Securities, including, without limitation, all general intangibles and other property incident or related thereto and (vii) any and all replacements, products and proceeds of, and dividends, distributions in property or securities, returns of capital or other distributions made on or with respect to, any of the foregoing.

"Pledgor's Obligations" has the meaning set forth in Section 2.1(a).

"Secured Obligations" has the meaning set forth in Section 2.1(a).

## SECTION 2.
## COLLATERAL

2.1    Pledge of Pledged Collateral.

(a)    As security for (i) the prompt and complete payment, performance and observance of all (whether at stated maturity, by acceleration, or otherwise) the Obligations and all renewals, extensions, restructurings and refinancings thereof and (ii) the due and punctual payment and performance by the Pledgor of its Obligations under, arising out of or in connection with this Agreement and each other Loan Document to which the Pledgor is a party (collectively, "Pledgor's Obligations", and  together with the Obligations, the "Secured Obligations"), subject to the terms and conditions hereof, the Pledgor hereby pledges, assigns, hypothecates, transfers, delivers and grants to the Lender, a continuing first priority security interest in and Lien on the Pledged Collateral and all proceeds thereof and all of Pledgor's right, title and interest in and to the foregoing.

(b)    The Pledgor has delivered to the Lender all certificates representing the Pledged Collateral described in clause (i) of the definition of Pledged Collateral, and the Pledgor will deliver to the Lender all certificates representing the Pledged Collateral described in clauses (ii) and (vii) of the definition of Pledged Collateral within five (5) Business Days after the Pledgor's receipt of such Pledged Collateral (or such longer period as may be agreed to by The Lender), in each case registered in the name of the Pledgor, duly endorsed in blank or accompanied by a membership unit transfer power, in substantially the form attached as Exhibit A, duly executed by the Pledgor in blank, with any and all documentary tax stamps and other documents necessary to cause the Lender to have a good, valid and perfected continuing first priority pledge of and Lien on the Pledged Collateral (free and clear of any other Liens other than Permitted Liens imposed by Applicable Law), including, without limitation, any necessary notations in the books or other records of the Pledgor or the Pledged Entity.  At any time after

2

the occurrence and during the continuance of an Event of Default, at the option of the Lender and upon notice to the Pledgor, the Pledged Collateral or any part thereof may be registered in the name of the Lender, or of its nominees, without notice to the Pledged Entity, and the Pledgor covenants that, upon demand by the Lender, the Pledgor shall, and shall cause the Pledged Entity to, effect such registration.

(c)     If the Pledgor fails to timely do so, the Lender shall have the right (but not the obligation) to pay any taxes relating to the Pledged Collateral and any costs to preserve the Pledged Collateral, which payments shall be part of the Secured Obligations.  No injury to, or loss or destruction of any of, the Loan Collateral or any Material Adverse Effect shall relieve the Pledgor of any of the Secured Obligations.

2.2     Voting Rights, Dividends and Distributions.

(a)     So long as no Default or Event of Default has occurred and is continuing, or would result therefrom or be caused thereby, subject to the terms of this Agreement, (i) the Pledgor shall be entitled to exercise all voting and/or consensual rights and powers relating to the Pledged Collateral in any manner not inconsistent with this Agreement, the Loan Agreement or any other Loan Document, and (ii) the Pledgor shall be entitled to receive and retain cash dividends and/or distributions payable on the Pledged Collateral to the extent permitted to be paid  pursuant to the Loan Agreement.

(b)     Each party hereto shall execute and deliver (or cause to be executed and delivered) to the other party such proxies, powers of attorney, dividend orders and other instruments as such other party may reasonably request for the purpose of enabling it to exercise the voting and/or consensual rights and powers that it is entitled to exercise pursuant to this Agreement and/or to receive the dividends that it is authorized to receive and retain pursuant to the Loan Agreement or this Agreement.

(c)     Upon the occurrence and during continuation of an Event of Default, all rights of the Pledgor to exercise voting and/or consensual rights and powers and/or to receive dividends or other distributions that the Pledgor is entitled to exercise and/or receive pursuant to this Section 2.2 shall cease immediately without any notice to the Pledgor or action by or on behalf of the Lender or any other Person, and all such rights thereupon shall become vested solely and exclusively in the Lender, automatically without any action by any Person.  The Pledgor hereby appoints the Lender its attorney-in-fact, with full power of substitution, which appointment as attorney-in-fact is irrevocable and coupled with an interest, to take all such actions upon or after the occurrence and during continuation of an Event of Default, whether in the name of the Lender or the Pledgor, as the Lender may consider necessary or desirable for the purpose of exercising such rights and receiving such dividends or other distributions.  Any dividends, distributions in property, returns of capital and other distributions made on or in respect of the Pledged Collateral, and any and all cash and other property received in exchange therefor and/or redemption of any Pledged Collateral delivered to the Pledgor in violation of this Agreement shall be held in trust for the benefit of the Lender, and forthwith shall be delivered to the Lender.  Any and all money and other property received by the Lender pursuant to the provisions of this Section 2.2(c) shall be retained by the Lender as part of the Pledged Collateral.

3

## SECTION 3.
## REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1    The Pledgor hereby represents and warrants to the Lender (which representations and warranties shall survive the execution and delivery of this Agreement and the making of Loans under the Loan Agreement) as follows:

3.1.1    Pledged Collateral.  (a) The Pledgor is, or, with respect to the Pledged Collateral described in clauses (ii) and (vii) of the definition of Pledged Collateral, will be, the direct record and beneficial owner of each share, security and other interest that comprises the Pledged Collateral owned or otherwise attributed to it or represented to be owned by it, and the Pledgor has and will have good, valid and marketable title thereto, free and clear of all Liens other than those created by this Agreement; (b) all of the Pledged Collateral has been, or, with respect to the Pledged Collateral described in clauses (ii) and (vii) of the definition of Pledged Collateral, will be, duly and validly issued, fully paid and nonassessable, as applicable; (c) as of the Closing Date, the Pledged Collateral set forth on Schedule 1.1 hereto constitutes that percentage of the issued and outstanding equity interests of the Pledged Entity in which such Pledged Collateral represents an equity interest (calculated on a fully diluted, as converted basis) and there are no outstanding warrants, options or other agreements with respect to the Pledged Collateral; and (d) upon delivery to the Lender of the certificates representing equity interests included in the Pledged Collateral and/or the filing of a financing statement in the jurisdiction of incorporation or formation of the Pledgor, which financing statement names the Pledgor as debtor and the Lender as secured party and describes the Pledged Collateral, the Pledged Collateral is and will be duly and validly pledged to the Lender, in accordance with law, and the Lender has and will have a good, valid and perfected first priority Lien on and security interest in the Pledged Collateral and the proceeds thereof subject to no other Liens (other than Permitted Liens), and no other filing or action will be necessary to perfect or protect such Lien other than  delivery to the Lender of certificates representing the Pledged Collateral.  The Pledgor has full legal authority and power to own the Pledged Collateral and to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereunder, and the Pledgor is under no legal restriction, limitation or disability that would prevent any of the foregoing.  No financing statement relating to any of the Pledged Collateral is on file in any public office except those on behalf of the Lender and any financing statements to be terminated on the Closing Date.  The Pledgor's name and organizational identification number, if applicable, as of the date hereof as it appears in official filings in the state of its incorporation or formation, as applicable, is as it appears on the signature page hereto.

3.2    Covenants.  The Pledgor hereby covenants and agrees that:

(a)    At any time and from time to time upon the written request of the Lender and at the sole expense of the Pledgor, the Pledgor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as the Lender may deem necessary or reasonably desirable to obtain the full benefits of this Agreement and of the rights and powers herein granted.  Without limiting the generality of the foregoing, the Pledgor will, upon the Lender's request, appear in and defend any action or proceeding that may affect the Pledgor's title to or the Lender's security interest in the Pledged Collateral.

(b)     The Pledgor hereby agrees to take or cause to be taken promptly such
further actions, obtain such consents and approvals and duly execute and deliver or cause to be
executed and delivered such further agreements, assignments, instructions or documents that the
Lender may request in its discretion with respect to or in order to fully effectuate the purposes,
terms and conditions of this Agreement and the consummation of the transactions contemplated
hereby, whether before, at or after the performance and/or consummation of such transactions or
the occurrence of a Default or Event of Default, including, without limitation, any of the
foregoing necessary or required or reasonably requested by the Lender to create, perfect,
maintain, preserve, continue, validate or otherwise protect, and from time to time renew, the
Lender's perfected first priority Lien on and pledge of the Pledged Collateral.  Without limiting
the foregoing, upon the exercise by the Lender or any of its Affiliates of any right or remedy
which requires any consent, approval or registration with, or consent, qualification or
authorization by, any Person, the Pledgor shall execute and deliver, or cause the execution and
delivery of, all applications, certificates, instruments and other documents that the Lender or its
Affiliates may be required to obtain for such consent, approval, registration, qualification or
authorization.

(c)     The Pledgor shall, and shall cause the Pledged Entity to, (i) keep true,
complete and accurate records with respect to the Pledged Collateral, and (ii) not take or permit
to be taken any action in connection with the Pledged Collateral or otherwise which would
impair in any material respect (as determined by the Lender in its discretion) the value of the
Pledged Collateral or any portion thereof or the value of the interests or rights of the Pledgor or
the Lender therein, including, without limitation, any amendment to or modification of the
certificate of formation (or similar charter documents) or operating agreement (or similar
documents) of the Pledgor or the Pledged Entity which would have such effect.

(d)     The Pledgor (i) shall cause the Pledged Entity to amend or maintain, as
applicable, its organizational documents to provide that the Pledged Entity elects or opts to have
all of its equity interests subject to or governed by Article 8 of the UCC, and (ii) shall not take or
permit to be taken any action that would terminate, void or otherwise interfere with such election
or option.

3.3     <u>No Third Party Beneficiary</u>.  No rights are intended to be created under this
Agreement for the benefit of any third party donee, creditor or incidental beneficiary of the
Pledgor.

## SECTION 4.
## RIGHTS AND REMEDIES

4.1     <u>Rights and Remedies in Loan Documents</u>.

(a)     In addition to the provisions set forth in this Agreement, upon the
occurrence and during continuation of an Event of Default, the Lender shall have the right to
exercise any and all rights, powers, options and remedies provided for in any Loan Document
and/or herein, under the UCC or at law or in equity, including, without limitation, to the fullest
extent permitted by applicable law and which the Pledgor hereby agrees to be commercially

5

reasonable, the right (in its sole and absolute discretion) to (i) apply the Pledged Collateral and any other property of the Pledgor, including, without limitation, the Loan Collateral, held by the Lender to reduce the Secured Obligations, (ii) foreclose the Liens created hereunder and under the Loan Documents, (iii) realize upon, take possession of and/or sell or otherwise dispose of any Pledged Collateral, with or without judicial process, at public or private sales or at any broker's board or on any securities exchange or otherwise, (iv) exercise all rights and powers with respect to the Pledged Collateral as the Pledgor might exercise in its absolute discretion, including, without limitation, to (1) relinquish or abandon any Pledged Collateral or any Lien thereon, (2) to vote all or any part of the Pledged Collateral and otherwise act with respect thereto as though it were the outright owner thereof, (3) to settle, adjust, compromise and arrange all claims and demands whatsoever in relation to all or any part of the Pledged Collateral, (4) to execute all such contracts, agreements, deeds, documents and instruments, to bring, defend and abandon all such actions, suits and proceedings, and to take all actions in relation to all or any part of the Pledged Collateral, and/or (5) to appoint managers, sub-agents, and officers for any of the purposes mentioned in the foregoing provisions of this Section and to dismiss the same, (v) collect and send notices regarding the Pledged Collateral, with or without judicial process, (vi) by its own means or with judicial assistance, enter any premises at which Pledged Collateral is located, render any of the foregoing unusable or dispose of the Pledged Collateral on such premises without any liability for rent, storage, utilities, or other sums (except as otherwise provided in any applicable Landlord Waiver and Consent), and the Pledgor shall not resist or interfere with such action, (vii) at the Pledgor's expense, require that all or any part of the Pledged Collateral be assembled and made available to the Lender at any place designated by the Lender in its sole discretion, and/or (viii) relinquish or abandon any Pledged Collateral or any Lien thereon. The Lender shall have the right in its sole discretion to determine which rights and/or remedies the Lender may at any time pursue, relinquish, subordinate or modify, and such determination will not in any way modify or affect any of the Lender's rights, Liens or remedies under any Loan Document or this Agreement, applicable law or equity. The enumeration of any rights and remedies in this Agreement or any other Loan Document is not intended to be exhaustive, and all rights and remedies of the Lender described in this Agreement and the Loan Documents are cumulative and are not alternative to or exclusive of any other rights or remedies which the Lender otherwise may have. The partial or complete exercise of any right or remedy shall not preclude any other further exercise of such or any other right or remedy.

(b)      Notwithstanding any provision of any Loan Document, the Lender, in its sole discretion, shall have the right, but not the obligation, at any time that the Pledgor shall fail to do so, and from time to time, without prior notice, as applicable, to: (i) obtain insurance covering any of the Pledged Collateral to the extent required under the Loan Agreement; (ii) discharge taxes, levies or Liens on any of the Pledged Collateral that are in violation of any Loan Document unless the Pledgor is in good faith with due diligence by appropriate proceedings contesting those items; and (iii) pay for the maintenance, repair and/or preservation of the Pledged Collateral. Such expenses and advances shall be added to the Obligations until reimbursed to the Lender and shall be secured by the Pledged Collateral, and such payments by the Lender shall not be construed as a waiver by the Lender of any Event of Default or any other rights or remedies of the Lender.

6

(c)     The Pledgor agrees that notice received by it at least ten (10) calendar days before the time of any intended public sale, or the time after which any private sale or other disposition of Pledged Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition.  At any sale or disposition of Pledged Collateral, the Lender may (to the extent permitted by applicable law) (i) purchase all or any part thereof free from any right of redemption by the Pledged Entity, the Pledgor or any other Person guaranteeing the Obligations, which right is hereby waived and released, (ii) restrict the number of prospective bidders or purchasers and/or further restrict such prospective bidders or purchasers to Persons who will represent and agree that they are purchasing for their own account, for investment and not with a view to the distribution or resale of the Pledged Collateral, and (iii) otherwise require that such sale be conducted subject to restrictions as to such other matters as the Lender may deem necessary in order that such sale may be effected in such manner as to comply with all applicable state and federal securities and other laws.

(d)     The Pledgor hereby acknowledges that (i) notwithstanding that a higher price might be obtained for the Pledged Collateral at a public sale than at a private sale or sales, the making of a public sale of the Pledged Collateral may be subject to registration requirements under applicable securities laws and other legal restrictions, compliance with which would require such actions on the part of the Pledgor, would entail such expenses and would subject the Lender, any underwriter through whom the Pledged Collateral may be sold or any controlling Person of any of the foregoing to such liabilities, as would make a public sale of the Pledged Collateral impractical, and accordingly, the Pledgor hereby agrees that private sales made by the Lender in good faith in accordance with the provisions of this Agreement may be at prices and on other terms less favorable to the seller than if the Pledged Collateral were sold at a public sale, and that the Lender shall not have any obligation to take any steps in order to permit the Pledged Collateral to be sold at a public sale, such a private sale being considered or deemed to be a sale in a commercially reasonable manner; and (ii) the Lender is hereby authorized to comply with any limitation or restriction in connection with such sale that may be necessary in order to avoid any violation of applicable law or in order to obtain any required approval of the purchaser(s) by any Governmental Authority or officer or court.

4.2     <u>Application of Proceeds</u>.  In addition to any other rights, options and remedies the Lender have under the Loan Documents, the UCC, at law or in equity, the proceeds of any collection, recovery, receipt, appropriation, realization, transfer, exchange, disposition or sale of the Pledged Collateral as aforesaid shall be applied in accordance with the Loan Agreement.

4.3     <u>Right of the Lender to Appoint Receiver</u>.  Without limiting and in addition to any other rights, options and remedies the Lender have hereunder or under the other Loan Documents, the UCC, at law or in equity, upon the occurrence and continuation of an Event of Default, the Lender shall have the right to apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by the Lender to enforce its rights and remedies in order to manage, protect and preserve the Pledged Collateral and continue the operation of the business of the Pledged Entity and to collect all revenues and profits thereof and apply the same to the payment of all expenses and other charges of such receivership including the compensation of the receiver and to the payments as aforesaid until a sale or other disposition of such Pledged Collateral shall be finally made and consummated.

7

4.4    <u>Attorney in Fact</u>.  The Pledgor hereby irrevocably appoints the Lender as its attorney in fact to take any action the Lender deems necessary or desirable upon the occurrence and continuation of an Event of Default to perfect, protect and realize upon its Lien and first priority security interest in the Pledged Collateral, including the execution and delivery of any and all documents or instruments related to the Pledged Collateral in the Pledgor's name, or otherwise to effect fully the purpose, terms and conditions of this Agreement and the other Loan Documents, and said appointment shall create in the Lender a power coupled with an interest.

**SECTION 5.**
**MISCELLANEOUS**

5.1    <u>No Waiver of Defaults; Waiver</u>.   No course of action or dealing, renewal, waiver, release or extension of any provision of any Loan Document or this Agreement, or single or partial exercise of any such provision, or delay, failure or omission on the Lender's part in enforcing any such provision shall affect the liability of the Pledgor or operate as a waiver of such provision or preclude any other or further exercise of such provision.  No waiver by the Lender of any one or more defaults by any other party in the performance of any of the provisions of this Agreement or any other Loan Document shall operate or be construed as a waiver of any future default, whether of a like or different nature, and each such waiver shall be limited solely to the express terms and provisions of such waiver.  Notwithstanding any other provision of this Agreement or any other Loan Document, by completing the Closing and/or by making Advances and/or funding the Loans, the Lender shall not waive any breach of any representation or warranty under this Agreement or any other Loan Document, and all of the Lender's claims and rights resulting therefrom are specifically reserved.  Except as expressly provided for herein, the Pledgor hereby waives setoff, counterclaim, demand, presentment, protest, all defenses with respect to any and all instruments and all notices and demands of any description (including, without limitation, notice of acceptance hereof, notice of any Loan made, credit extended, collateral received or delivered) and the pleading of any statute of limitations as a defense to any demand under any other Loan Document, it being the intention that the Pledgor shall remain liable under this Agreement and the other Loan Documents until indefeasible payment in full of the Secured Obligations, other than contingent indemnification obligations not due and owing (such payment, "<u>Payment in Full</u>").   The Pledgor hereby waives any and all defenses and counterclaims it may have or could interpose in any action or procedure brought by the Lender to obtain an order of court recognizing the assignment of, or Lien of the Lender, in and to, any Pledged Collateral.

5.2    <u>Entire Agreement</u>.  This Agreement and the other Loan Documents to which the Pledgor is a party constitute the entire agreement between the Pledgor and the Lender with respect to the subject matter hereof and thereof, and supersede all prior agreements and understandings, if any, relating to the subject matter hereof or thereof.   Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing signed by the parties hereto.  Each party hereto acknowledges that it has been advised by counsel in connection with the negotiation and execution of this Agreement and is not relying upon oral representations or statements inconsistent with the terms and provisions hereof.

8

5.3    Amendment.    No provision of this Agreement may be changed, modified, amended, restated, waived, supplemented, discharged, canceled or terminated orally or by any course of dealing or in any other manner other than by a written agreement signed by the Lender and the Pledgor.

5.4    Notices.  Any notice or request under this Agreement shall be given to any party thereto at such party's address as set forth in Section 14.4 of the Loan Agreement.

5.5    Governing Law; Consent to Jurisdiction.    THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT RESULT IN THE APPLICATION OF THE LAWS OF A DIFFERENT JURISDICTION.  Any judicial proceeding brought by or against the Pledgor with respect to any of the Secured Obligations, this Agreement or any related agreement may be brought in any court of competent jurisdiction in the State of New York; provided that any judicial proceeding by the Pledgor against the Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of New York, State of New York.   By execution and delivery of this Agreement, each party hereto accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement. The Pledgor hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to such Loan Party at its address set forth in Section 14.4 of the Loan Agreement and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America.  Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of the Lender to bring proceedings against the Pledgor in the courts of any other jurisdiction.   The Pledgor waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*.

5.6    Severability; Captions; Counterparts; Facsimile/Electronic Signature.    If any provision of this Agreement is adjudicated to be invalid under applicable laws or regulations, such provision shall be inapplicable to the extent of such invalidity without affecting the validity or enforceability of the remainder of this Agreement which shall be given effect so far as possible.  The captions in this Agreement are intended for convenience and reference only and shall not affect the meaning or interpretation of this Agreement.   This Agreement may be executed in one or more counterparts (which taken together, as applicable, shall constitute one and the same instrument) and by facsimile transmission or other electronic transmission, which such signatures shall be considered original executed counterparts.  Each party to this Agreement agrees that it will be bound by its own facsimile or electronic, as the case may be, signature and that it accepts the facsimile or electronic, as the case may be, signature of each other party.

5.7    Successors and Assigns.  This Agreement (a) shall inure to the benefit of, and may be enforced by, the Lender and each of its successors and permitted assigns, and (b) shall be

9

binding upon and enforceable against the Pledgor and the Pledgor's permitted and respective heirs, administrators, executors, successors and assigns. The Pledgor shall not assign, delegate or transfer this Agreement or any of its rights or obligations hereunder without the prior written consent of The Lender. Nothing contained in this Agreement or any other Loan Document shall be construed as a delegation to the Lender of the Pledgor's duty of performance. No sales of participations, other sales, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner impair the Lien granted to the Lender hereunder.

5.8    <u>Waiver of Jury Trial</u>. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING HEREUNDER OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT HERETO OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF SUCH PARTY'S RESPECTIVE RIGHTS TO TRIAL BY JURY.

5.9    <u>Expenses</u>. The Pledgor shall pay all costs and expenses incurred by the Lender in connection herewith in accordance with the terms of <u>Section 14.8</u> of the Loan Agreement.

5.10    <u>Termination; Survival</u>. Subject to <u>Section 5.13</u> hereof, this Agreement shall continue in full force and effect until Payment in Full of the Secured Obligations. Notwithstanding any other provision of this Agreement or any Loan Document, no termination of this Agreement shall affect the Lender's rights or any of the Secured Obligations existing as of the effective date of such termination until the Secured Obligations have been fully performed and indefeasibly paid in cash in full. The Liens granted to the Lender hereunder and any financing statements filed pursuant hereto and the rights and powers of the Lender hereunder shall continue in full force and effect until all of the Secured Obligations have been Paid in Full. It is the express intention and agreement of the parties hereto that all covenants, representations, warranties and waivers and indemnities made by the Pledgor herein shall survive the execution, delivery and termination of this Agreement until all Obligations are Paid in Full.

5.11    <u>Approvals and Duties; Release of Pledged Collateral</u>. The Lender shall have no responsibility for or obligation or duty with respect to any of the Pledged Collateral (other than the duty of reasonable care with respect to the safekeeping of such Pledged Collateral in its custody) or any matter or proceeding arising out of or relating thereto, including, without limitation, any obligation or duty to collect any sums due in respect thereof or to protect or preserve any rights pertaining thereto. Promptly following Payment in Full, the Liens created hereby shall terminate and the Lender shall execute and deliver such documents, at the Pledgor's expense, as are necessary or reasonably requested by the Pledgor to release the Lender's Liens in the Pledged Collateral (or portion thereof, as applicable) and the Lender shall return such

10

Pledged Collateral to the Pledgor.  The Lender shall not be deemed to have made any representation or warranty with respect to any Pledged Collateral so delivered except that such Pledged Collateral is free and clear, on the date of such delivery, of any and all Liens arising from its own acts.

5.12    <u>Conflict</u>.  In the event of any conflict between any term, covenant or condition of this Agreement and any term, covenant or condition of the Loan Agreement, the provisions of the Loan Agreement shall control and govern.

5.13    <u>Reinstatement</u>.  This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Pledgor for liquidation or reorganization, should the Pledgor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Pledgor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**[Signatures Follow.]**

11

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Pledge Agreement as of the date first written above.

**PLEDGOR:**

**Insight Terminal Holdings, LLC**

By: _____
Name:  John J. Siegel, Jr.
Title:   Manager

**LENDER:**

**Autumn Wind Lending, LLC**

By:_____
Name: Vikas Tandon
Title:   Manager

[Signature Page to Pledge Agreement]

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Pledge Agreement as of the date first written above.

**PLEDGOR:**

**Insight Terminal Holdings, LLC**

By: _____
Name:  John J. Siegel, Jr.
Title:   Manager

**LENDER:**

**Autumn Wind Lending, LLC**

By: _____
Name: Vikas Tandon
Title:   Manager

[Signature Page to Pledge Agreement]

**EXHIBIT A**

**FORM OF MEMBERSHIP UNIT TRANSFER POWER**

FOR VALUE RECEIVED, [_____], a [_____] hereby sells, assigns and transfers unto _____ (_____) membership units of Insight Terminal Solutions, LLC, a Delaware limited liability company (the "Company"), standing in its name on the books of said Company represented by Certificate(s) No(s). ___ herewith and does hereby irrevocably constitute and appoint as attorney to transfer the said membership units on the books of said Company, with full power of substitution in the premises.

Dated: _____

**Insight Terminal Holdings, LLC**

By:      _____
Name: _____
Title:   _____

**Schedule 1.1**

| Pledgor | Pledged Entity | Class of Securities | Percentage of Ownership | Certificate No. Representing Securities |
|---|---|---|---|---|
| Insight Terminal Holdings, LLC | Insight Terminal Solutions, LLC | Membership units | 100% | 1 |

**EXHIBIT D**

*Execution Copy*

## WAIVER AND AMENDMENT AGREEMENT

This Waiver and Amendment (this **"Waiver and Amendment")** is entered into as of February 22, 2019 (the "**Effective Date**") by and among Insight Terminal Solutions, LLC, a Delaware limited liability company **("Borrower"),** Insight Terminal Holdings, LLC, a Delaware limited liability company (the **"Guarantor"**) (collectively, the **"Loan Parties"**) and Autumn Wind Lending, LLC, a California limited liability company **(**the **"Lender"**), and amends that certain Loan and Security Agreement, dated as of September 24, 2018 (as amended by that certain First Amendment (as defined below), the **"Existing Loan Agreement"** and as further amended by this Waiver and Amendment, the **"Loan Agreement")** by and among Borrower, Guarantor and Lender. Capitalized terms used herein which are not defined herein shall have the meanings given to them in the Existing Loan Agreement.

## <u>RECITALS:</u>

A.      Pursuant to the Existing Loan Agreement, the Lender made a senior secured term loan to the Borrower in the amount of Six Million Eight Hundred Thousand Dollars ($6,800,000) (the **"Loan"**). The Lender made an additional loan in the amount of Three Hundred Thousand Dollars ($300,000) (the **"Second Loan"**) pursuant to the terms of the First Amendment to Loan and Security Agreement, dated as of December 18, 2018 (the "**First Amendment**") by and among the Borrower, the Guarantor and the Lender. The Loan and the Second Loan are collectively hereinafter referred to as the **"Loan"**. To induce the Lender to make the Loan, and to secure the Obligations under the Loan Documents, the Borrower granted to the Lender a first priority security interest in all its assets. In addition, the Guarantor guaranteed the Borrower's Obligations under the Loan Documents and granted to the Lender a first priority security interest in all the assets of the Guarantor.

B.      Pursuant to and subject to the terms and conditions of Loan, the Lender agrees to waive non-compliance by the Borrower with certain post-closing obligations under Section 9.21 of the Loan Agreement. To induce the Lender to waive such non-compliance, and in consideration thereof, and without admitting that such non-compliance constituted an ongoing Event of Default, Borrower agrees to certain terms described below.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties, intending to be legally bound, agree as follows:

1.      Subject to the terms and conditions of this Waiver and Amendment, Lender agrees to waive any and all identified Events of Default or any unidentified Events of Default described in the Loan Agreement through June 30, 2019.

*Execution Copy*

2.      As a condition of the foregoing waiver, Borrower agrees to amend the term of the Maturity Date of the Loan from December 31, 2019 to June 30, 2019.

3.      If the Obligations due under the Loan are not paid in full on or before June 30, 2019 and Lender elects not to grant any extensions to the Borrower of the Maturity Date, Guarantor shall relinquish its rights to the Collateral as described in the Loan Agreement.

4.      Lender waives all non-curable defaults that have occurred to date and waives Borrower's obligation to comply with the post-closing obligations described in Section 9.21 of the Loan Agreement.

5.      Within five (5) Business Days of the Effective Date, each of Borrower and Guarantor shall amend its respective Organizational Documents so that neither Borrower nor Guarantor, respectively, is permitted to either (i) file for Bankruptcy protection as defined under the United States Bankruptcy Code Title 11 United States Code or (ii) dissolve, in each case, unless Borrower or Guarantor, as applicable, has first obtained the prior written consent of (a) all holders of Class A Units and Class B Units of Guarantor, and (b) all holders of Warrants exercisable for Class B Units of Guarantor. Borrower and Guarantor acknowledge and agree that the foregoing obligations are subject to Lender's review and approval in advance of their adoption.

6.      Borrower agrees to continue making regularly scheduled interest payments under the Loan.

7.      (a)  Within five (5) Business Days of the Effective Date, Guarantor shall issue to Lender an additional Warrant granting Lender the right to acquire the number of Class B Units of the Guarantor equal to five percent (5%) of the Guarantor's economic interests on a fully-diluted basis (the "**Additional Warrant**").

(b)  Guarantor, in its sole discretion, may repurchase up to eighty (80%) of the Additional Warrant in accordance with the purchase prices set forth below upon repayment in full of the Obligations owed under the Loan Documents either (i) by paying the cash amount indicated below simultaneously with the repayment of the Obligations or (ii) by causing Borrower to increase the principal amount owed to Lender under the Unsecured Promissory Note by 150% of the applicable purchase price set forth in clause (c) below.

(c)  The purchase price of the Additional Warrant payable by Guarantor shall be determined as follows:

i.    If the repurchase of the Additional Warrant occurs on or before March 31, 2019, the price shall be $1 million.
ii.   If the repurchase of the Additional Warrant occurs on or before April 30, 2019, the price shall be $1.5 million.
iii.  If the repurchase of the Additional Warrant occurs on or before May 31, 2019, the price shall be $2 million.
iv.   If the repurchase of the Additional Warrant occurs on or before June 30, 2019, the price shall be $2.5 million.

8.      This Waiver and Amendment may be executed in any number of counterparts, and by the parties on separate counterparts, but will not be effective until each party has executed at least

*Execution Copy*

one counterpart.  Each counterpart will constitute an original of this Waiver and Amendment, but all the counterparts will together constitute but one and the same instrument.

9.     Except as herein expressly modified or amended, all terms, covenants, and provisions of the Existing Loan Agreement are hereby ratified and confirmed by the Borrower, Guarantors and Lender and remain in full force and effect.

10.     This Waiver and Amendment constitutes a Loan Document.  The parties hereto acknowledge and agree that any breach of an obligation hereunder shall constitute an Event of Default under the Loan Agreement.

11.     The provisions of Section 14.2 of the Loan Agreement entitled "Governing Law; Consent to Jurisdiction" are hereby incorporated into this letter agreement by this reference to the fullest extent as if the text of such section were set forth in its entirety herein.

12.     The terms and conditions of the Loan Agreement shall be and remain confidential, and Borrower, Guarantor, and Lender shall not disclose in any manner the terms and conditions of the Loan Agreement to a third party, provided that nothing stated herein shall prohibit Borrower, Guarantor, or Lender from disclosing the terms and conditions of the Loan Agreement to their respective employees and agents so long as such parties are bound by this confidentiality provision.  Further, nothing stated herein shall prohibit Borrower, Guarantor, and their respective representatives from disclosing the terms and conditions of the Loan Agreement to prospective investors and purchasers, so long as such third parties execute a confidentiality agreement in advance of such disclosures.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Waiver and Amendment Agreement to be executed by their officers thereunto duly authorized on the day and year first above written.

BORROWER:

Insight Terminal Solutions, LLC

By: _____
Name:  John J. Siegel, Jr.
Title:    Manager


GUARANTOR:

Insight Terminal Holdings, LLC

By: _____
Name:  John J. Siegel, Jr.
Title:    Manager


LENDER:

Autumn Wind Lending, LLC

By: _____
Name:   Vikas Tandon
Title:    Manager

[Signature Page to Waiver and Amendment Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Waiver and Amendment Agreement to be executed by their officers thereunto duly authorized on the day and year first above written.

BORROWER:

Insight Terminal Solutions, LLC

By: _____
Name:  John J. Siegel, Jr.
Title:    Manager


GUARANTOR:

Insight Terminal Holdings, LLC

By: _____
Name:  John J. Siegel, Jr.
Title:    Manager


LENDER:

Autumn Wind Lending, LLC

By: _____
Name:   Vikas Tandon
Title:    Manager

**EXHIBIT E**

# SECOND AMENDED AND RESTATED
# OPERATING AGREEMENT
# OF
# INSIGHT TERMINAL SOLUTIONS, LLC
# A DELAWARE LIMITED LIABILITY COMPANY

**THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT** ("Agreement") of Insight Terminal Solutions, LLC (the "Company") is made effective as of the 22nd day of February 2019 ("Effective Date") by its sole member, Insight Terminal Holdings, LLC (the "Member").

1.    **FORMATION OF LIMITED LIABILITY COMPANY**

   **1.1.** ***Formation of Company***.  On or about October 19, 2017, the Company was organized as a Delaware limited liability company after its Articles of Organization were executed by the organizer and delivered to the Delaware Department of State in accordance with and pursuant to the Act. The operation of the Company shall be governed by the terms of this Agreement and the provisions of the Delaware Limited Liability Company Act hereinafter referred to as the "Act." To the extent permitted by the Act, the terms and provisions of this Agreement shall control if there is a conflict between the Act and this Agreement.

   **1.2.** ***Name; Purpose***.  The name of the Company shall be "Insight Terminal Solutions, LLC." The purpose of the Company is to conduct, perform or engage in any act or business in which a limited liability company is allowed to participate in Delaware and other states that Member shall desire to do so.

   **1.3.** ***Registered Office and Registered Agent***.  The registered office of the Company shall be 1209 Orange Street, Wilmington, Delaware 19801, and the registered agent at such office shall be Corporation Service Company. The Member may change the registered office and/or registered agent from time to time.

   **1.4.** ***Duration***.  The Company will commence business as of the date of filing and will continue in perpetuity unless dissolved and terminated in accordance with Section 8 of this Agreement.

   **1.5.** ***Fiscal Year***.  The Company's fiscal and tax year shall end December 31.

2.    **CAPITAL STRUCTURE**

   **2.1.** ***Units of Membership Interests***.  The Company shall have a capital structure consisting of 100 units of one class of membership interests (the "Units"). All Units shall be identical with each other in every respect. The ownership of Units is shown on Exhibit A attached hereto.

   **2.2.** ***Membership Interest Certificates***.  The Company hereby irrevocably elects that all Units shall be securities governed by Article 8 of the Uniform Commercial Code as in

effect from time to time in the State of Delaware. Each certificate evidencing Units (each, a "Membership Interest Certificate") shall bear the following legend: "This certificate evidences an interest in Insight Terminal Solutions, LLC and shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware."

**2.3.** *Replacement of Membership Interest Certificates.* The Company shall issue a new Membership Interest Certificate in place of any Membership Interest Certificate previously issued if the holder of the Units represented by such Membership Interest Certificate, as reflected on the books and records of the Company:

(a) makes proof by affidavit, in form and substance satisfactory to the Company, that such previously issued Membership Interest Certificate has been lost, stolen or destroyed;

(b) requests the issuance of a new Membership Interest Certificate before the Company has notice that such previously issued Membership Interest Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c) if requested by the Company, indemnifies the Company against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Membership Interest Certificate; and

(d) satisfies any other reasonable requirements imposed by the Company in connection with the re-issuance of such Membership Interest Certificate.

**2.4.** *Transfers of Units and Issuance of New Membership Interest Certificates.* Upon the transfer by a Member in accordance with the provisions of this Agreement of any or all Units represented by a Membership Interest Certificate, the transferor of such Units shall deliver such Membership Interest Certificate, duly endorsed for transfer by the Transferee, to the Company for cancellation, and the Company shall thereupon issue a new Membership Interest Certificate to the transferee for the number of Units being transferred and, if applicable, cause to be issued to the transferor a new Membership Interest Certificate for the number of Units that were represented by the canceled Membership Interest Certificate and that are not being transferred.

**3.** MEMBERS

**3.1.** *Initial Member.* The Member shall own all 100 Units issued and outstanding as depicted on Exhibit A.

**3.2.** *Additional Members.* One or more additional members may be admitted to the Company with the consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

**4.** MANAGEMENT. The Member has chosen John. J. Siegel, Jr. as the manager for the

2

purposes of managing the Company (the "Manager"). The Manager shall have all rights and privileges of the Member for the purposes of its business, including the execution in the Company name of all instruments for carrying on business in the usual manner, unless otherwise restricted by the Member. The Manager may be considered an officer for the purposes of this Agreement.

5.    CONTRIBUTIONS, PROFITS, LOSSES, AND DISTRIBUTIONS

   5.1.    *Additional Contributions*.  The Member may, but shall not be required to, make additional capital contributions to the Company from time to time.

   5.2.    *Income and Deductions*. All items of income, gain, loss, deduction and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction and credit of the Member.

   5.3.    *Distributions*.   The Member shall determine, in the Member's sole discretion, the amount and timing of any distributions to the Member and whether such distributions shall be paid in cash or property.

6.    DUTIES; LIMITATION OF LIABILITY; INDEMNIFICATION AND INSURANCE

   6.1.    *Duties of Member and Officers; Limitation of Liability*.  The Member, Manager, and any officers shall perform their duties in good faith, in a manner they reasonably believe to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. Except as otherwise required in the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member and the Manager shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member or the Manager or participating in the management of the Company.  None of the Member, Manager, or officer, by reason of being or having been a Member, Manager, or officer, shall be liable to the Company or to any other Member, Manager, or officer for any loss or damage sustained by the Company or any other Member, Manager, or officer unless the loss or damage shall have been the result of fraud, deceit, gross negligence, breach of fiduciary responsibility, willful misconduct, or a wrongful taking by that Member, Manager, or officer.

   6.2.    *Member Has No Exclusive Duty to Company*.  The Member and the Manager shall not be required to participate in the Company as their sole and exclusive business. The Member and the Manager may have other business interests and may participate in other investments or activities in addition to those relating to the Company.

   6.3.    *Indemnification and Insurance*.

      (a)    Right to Indemnification.

         (i)    To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim or expense (including

3

attorneys' fees) whatsoever incurred by the Member and/or Manager relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by the Member and/or Manager on behalf of the Company; provided, however, that any indemnity under this Section 6.3(a)(i) shall be provided out of and to the extent of Company assets only, and neither the Member, the Manager, nor any other person shall have any personal liability on account thereof.

> (ii)    Any person who is or was an officer of the Company and who is or may be a party to any civil or criminal action because of his/her participation in or with the Company, and who acted in good faith and in a manner which he/she reasonably believed to be in, or not opposed to, the best interests of the Company may be indemnified and held harmless by the Company; provided, however, that any indemnity under this Section 6.3(a)(ii) shall be provided out of and to the extent of Company assets only, and neither the Member, the Manager, nor any other person shall have any personal liability on account thereof

> (b)    Insurance.  The Member may cause the Company to purchase and maintain insurance for the Company, for its Member and officers, and/or on behalf of any third party or parties whom the Member might determine should be entitled to such insurance coverage.

> (c)    Effect of Amendment.  No amendment, repeal or modification of this Section 5.1 shall adversely affect any rights hereunder with respect to any action or omission occurring prior to the date when such amendment, repeal or modification became effective.

7.    PLEDGE, TRANSFER, OR ASSIGNMENT OF MEMBER'S INTEREST.

> 7.1.    *Pledging of Interests.*  Notwithstanding anything contained herein to the contrary, the Member shall be permitted to pledge, transfer, assign, or hypothecate any or all of its Units, including, without limitation, all economic rights and privileges, all control rights, authority, and powers, and all status rights as a Member, to any lender to the Company or any affiliate of the Company, or to any agent acting on such lender's behalf, and any transfer of such Units pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation shall be permitted under this Agreement with no further action or approval required hereunder. Notwithstanding anything contained herein to the contrary, subject to the terms of the financing giving rise to any pledge or hypothecation of Units, the lender (or agent) shall have the right, to the extent set forth in the applicable pledge or hypothecation agreement, and without further approval of any Member and without becoming a Member (unless such lender (or agent) expressly elects in writing to become a Member), to exercise the membership voting rights of the Member granting such pledge or hypothecation. Notwithstanding anything contained herein to the contrary, and without complying with any other procedures set forth in this Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, to the extent set forth in the applicable pledge or hypothecation agreement, (a) the lender (or agent) shall, if it so elects, become a Member under this Agreement and shall succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the Company, and shall be bound by all of the obligations, of a Member under this Agreement without taking any further action on the part of such lender (or agent) and (b) following such exercise of remedies, the pledging Member shall cease to be a Member and shall have no further rights or powers under this Agreement. Notwithstanding anything contained herein to the contrary, no legal opinion shall be

required in connection with any pledge or hypothecation of Units, or any transfer or exercise of rights or remedies pursuant hereto. The execution and delivery of this Agreement by the Member shall constitute any necessary approval of Member under the Act to the foregoing provisions of this paragraph.

**7.2.    *GACP Loan.*** Upon consummation and funding of the Loan Agreement with GACP Finance Co, LLC (defined below), the following provisions shall apply: Notwithstanding any redemption or comparable provisions contained in this Agreement to the contrary, the Member agrees that it, as applicable, will not accept any Restricted Junior Payment (as defined in that certain Term Loan Agreement dated as of [September] [__], 2018, among Insight Terminal Solutions, LLC, certain of its affiliates, GACP Finance Co., LLC, as agent, and the lenders party thereto, as amended, restated or otherwise modified from time to time (the "Loan Agreement"), except to the extent that such Restricted Junior Payment is expressly permitted to be made under such Loan Agreement (or following a refinancing of all of the Obligations (as defined in the Loan Agreement), any agreement evidencing debt which refinances all or any portion of the Obligations), and that in connection with any Change in Control (as defined in such Loan Agreement) or any other sale, transfer or other disposition of any Capital Stock (as defined in the Loan Agreement) of any Borrowers or any of its Subsidiaries (as defined in the Loan Agreement), each Member's only claim with respect to any proceeds generated by such Change in Control or other sale, transfer or other disposition will be to the proceeds thereof after the Obligations (or any debt which refinances all or any portion of the Obligations) are paid in full.

**7.4.    *No Modification of Provisions.*** The foregoing provisions may not be amended or modified so long as any of the Units is subject to a pledge or hypothecation without the pledgee's (or the transferee of such pledgee's) prior written consent. Each recipient of a pledge or hypothecation of the Units shall be a third party beneficiary of the provisions of this provision.

**8.    DISSOLUTION.**

**8.1.    *Termination of Company.*** The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: **(a)** the written consent of the Member or **(b)** any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act. Dissolution of the Company shall be effective upon the date on which the event giving rise to the dissolution occurs, but the Company shall not terminate until the assets of the Company shall have been distributed as provided in this Article. Notwithstanding dissolution of the Company, prior to the liquidation and termination of the Company, the Company shall continue to be governed by this Agreement. Notwithstanding anything to the contrary in this Agreement, the Company shall not, and the Manager shall not cause or allow the Company to, (i) file for bankruptcy protection as defined under the United States Bankruptcy Code Title 11 United States Code or (ii) dissolve, in each case, unless the Company has first obtained the prior written consent of (y) all holders of Class A Units and Class B Units in Insight Terminal Holdings, LLC, and (z) all holders of warrants exercisable for Class B Units in Insight Terminal Holdings, LLC.

**8.2.    *Sale of Assets upon Dissolution.*** Following the dissolution of the Company, the Company shall be wound up and the Manager shall determine whether some or all of the assets of the Company are to be sold or whether some or all of such assets of the Company

are to be distributed to the Member in kind in liquidation of the Company.  Upon the completion of the winding up of the Company, the Manager shall file Articles of Dissolution in accordance with the Act.

        **8.3.**    *Final Distributions*.  Upon the dissolution of the Company, at the Manager's discretion, the properties of the Company to be sold shall be liquidated in orderly fashion and the proceeds thereof, and the property to be distributed in kind, shall be distributed as follows: (a) to the Company creditors, to the extent otherwise permitted by law, in satisfaction of the Company's liabilities, whether by payment or the making of reasonable provision for payment thereof; and (b) thereafter, to Member.

        **9.**    **TAX MATTERS.** As long as the Company has only one member, it is the intention of the Company and the Member that for federal, state and local income tax purposes the Company be disregarded as an entity separate from the Member in accordance with the provisions of Treas. Reg. §§ 301.7701(c)(ii) and 301.7701-3(b)(ii).  The Member shall take all actions which may be necessary or required in order for the Company to be so disregarded for income tax purposes. All provisions of this Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

        **10.**    **RECORDS AND INFORMATION.** The Company shall maintain at its place of business the Articles of Organization, any amendments thereto, this Agreement, and all other Company records required to be kept by the Act, and the same shall be subject to inspection at the principal place of business with reasonable request of Member.

        **11.**    **MISCELLANEOUS PROVISIONS.**

        **11.1.**    *Amendment*.  This Agreement may be modified or amended from time to time only upon the written consent of the Member.

        **11.2.**    *Applicable Law*.  To the extent permitted by law, this Agreement shall be construed in accordance with and governed by the laws of the State of Delaware.

        **11.3.**    *Pronouns, Etc*.  References to a Member or officer, including by use of a pronoun, shall be deemed to include masculine, feminine, singular, plural, individuals, partnerships or corporations where applicable.

        **11.4.**    *Entire Agreement*.  This Agreement contains the entire agreement with respect to the subject thereof and supersedes all prior operating agreements.

        **11.5.**    *Severability*. In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

        *[**Remainder of page intentionally left blank. Signature appears on following page**.]*

IN WITNESS WHEREOF, the Member has executed this Second Amended and Restated Operating Agreement as of the Effective Date.

**MEMBER**
INSIGHT TERMINAL HOLDINGS, LLC

By: _____

**Sharon A. Siegel, as Sole Member of Insight Terminal Holdings, LLC, Member**

**MANAGER**

By: _____

**John J. Siegel, Jr.**

## Exhibit A

### Units of Membership Interest

| Member | Membership Interest |
|---|---|
| Insight Terminal Holdings, LLC | 100 Units |

**EXHIBIT F**

# AMENDED AND RESTATED OPERATING AGREEMENT
## OF
# INSIGHT TERMINAL HOLDINGS, LLC
## A DELAWARE LIMITED LIABILITY COMPANY

**THIS AMENDED AND RESTATED OPERATING AGREEMENT** ("Agreement") of Insight Terminal Holdings, LLC (the "Company") is made effective as of the 22nd day of February 2019 ("Effective Date") by its sole member, Sharon A. Siegel (the "Member").

1. **FORMATION OF LIMITED LIABILITY COMPANY**

    **1.1.**    ***Formation of Company***.  On or about September 14, 2018, the Member caused the Company to be organized as a Delaware limited liability company by causing the Articles of Organization to be executed by the organizer and delivered to the Delaware Department of State in accordance with and pursuant to the Act. The operation of the Company shall be governed by the terms of this Agreement and the provisions of the Delaware Limited Liability Company Act hereinafter referred to as the "Act." To the extent permitted by the Act, the terms and provisions of this Agreement shall control if there is a conflict between the Act and this Agreement.

    **1.2.**    ***Name; Purpose***.  The name of the Company shall be "Insight Terminal Holdings, LLC." The purpose of the Company is to conduct, perform or engage in any act or business in which a limited liability company is allowed to participate in Delaware and other states that Member shall desire to do so.

    **1.3.**    ***Registered Office and Registered Agent***.  The registered office of the Company shall be 1675 South State Street, Suite B, Dover, Delaware 19901, and the registered agent at such office shall be Capitol Services, Inc. The Member may change the registered office and/or registered agent from time to time.

    **1.4.**    ***Duration***.  The Company will commence business as of the date of filing and will continue in perpetuity unless dissolved and terminated in accordance with Section 8 of this Agreement.

    **1.5.**    ***Fiscal Year***.  The Company's fiscal and tax year shall end December 31.

2. **CAPITAL STRUCTURE**

    **2.1.**    ***Units of Membership Interests.***  The Company shall have a capital structure consisting of two classes of membership interests: Class A Units and Class B Units (collectively, the "Units"). Any holder of Class B Units shall be a non-voting member of the Company; provided, however, and notwithstanding the foregoing, any holder of Class B Units shall be entitled to vote with respect to any proposed Change of Control.  For purposes of this Section 2.1, "Change of Control" shall mean (a) the consummation of any transaction (including, without limitation, any merger, consolidation or other business combination), the result of which is that any Person or

"group" (as such terms are used in Section 13(d) or 14(d) of the Securities Exchange Act of 1934 or any successor provisions) other than the Principals (as defined in the Loan Agreement), becomes the beneficial owner of the Company in a single transaction or a series of related transactions, directly or indirectly, of more than 50% of the voting equity interests of the Company or economic rights; (b) the direct or indirect sale, lease, transfer, exchange, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company or any of its Subsidiaries; (c) a consolidation, reorganization, or merger of the Company; or (d) the adoption of a plan relating to the liquidation or dissolution of the Company or any of its Subsidiaries.  All Units that are not Class B Units shall be Class A Units.

      **2.2.**   ***Ownership of Units.*** The ownership of outstanding Units is shown on Exhibit A attached hereto.

      **2.3.**   ***Certificates.*** The Company hereby irrevocably elects that all Units shall be securities governed by Article 8 of the Uniform Commercial Code as in effect from time to time in the State of Delaware. Each certificate evidencing Units (each, a "Membership Interest Certificate") shall bear the following legend: "This certificate evidences an interest in Insight Terminal Holdings, LLC and shall be a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware."

      **2.4.**   ***Replacement of Membership Interest Certificates***.  The Company shall issue a new Membership Interest Certificate in place of any Membership Interest Certificate previously issued if the holder of the Units represented by such Membership Interest Certificate, as reflected on the books and records of the Company:

      (a)   makes proof by affidavit, in form and substance satisfactory to the Company, that such previously issued Membership Interest Certificate has been lost, stolen or destroyed;

      (b)   requests the issuance of a new Membership Interest Certificate before the Company has notice that such previously issued Membership Interest Certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

      (c)   if requested by the Company, indemnifies the Company against any claim that may be made on account of the alleged loss, destruction or theft of the previously issued Membership Interest Certificate; and

      *(d)*   satisfies any other reasonable requirements imposed by the Company in connection ***with the re-issuance of such Membership Interest Certificate.***

      **2.5.**   ***Transfers of Units and Issuance of New Membership Interest Certificates***. Upon the transfer by a Member in accordance with the provisions of this Agreement of any or all Units represented by a Membership Interest Certificate, the transferor of such Units shall deliver such Membership Interest Certificate, duly endorsed for transfer by the Transferee, to the Company for cancellation, and the Company shall thereupon issue a new Membership Interest Certificate to the transferee for the number of Units being transferred and, if applicable, cause to be issued to the transferor a new Membership Interest Certificate for the number of Units that were

represented by the canceled Membership Interest Certificate and that are not being transferred.

3.  **MEMBERS**

3.1.  *Initial Member*. The initial Member shall own all of the Units.

3.2.  *Holders of Convertible Securities*. As of the date hereof, the Company has issued convertible securities to Autumn Wind Lending, LLC, and Bay Bridge Exports, LLC, pursuant to which such holders have the right, respectively, to purchase or otherwise acquire Units in accordance with the terms of their respective convertible instrument (collectively, the "Convertible Securities").

3.3.  *Additional Members*. One or more additional members may be admitted to the Company with the consent of the Member; provided, however, the holders of Convertible Securities shall be admitted as Members automatically upon exercise of their respective Convertible Securities. Any amendments to this Agreement related to the admission of additional Members shall be subject to the conditions set forth in the Convertible Securities. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

4.  **MANAGEMENT.**

4.1.  *Manager*. The Member has chosen John. J. Siegel, Jr. as the manager for the purposes of managing the Company (the "Manager"). Subject to the terms of this Agreement, the Manager shall have all rights and privileges of the Member for the purposes of its business, including the execution in the Company name of all instruments for carrying on business in the usual manner, unless otherwise restricted by the Member. The Manager may be considered an officer for the purposes of this Agreement.

4.2.  *Limitation on Manager and Members.* This Agreement is and shall remain subject in all cases to the terms and conditions of each Convertible Security until such time as such Convertible Security expires or is earlier terminated in accordance with its terms. Neither the Manager nor any Member shall take or cause to be taken any action in contravention of the Convertible Securities.

5.  **CONTRIBUTIONS, PROFITS, LOSSES, AND DISTRIBUTIONS**

5.1.  *Additional Contributions*. The Member may, but shall not be required to, make additional capital contributions to the Company from time to time.

5.2.  *Income and Deductions*. All items of income, gain, loss, deduction and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction and credit of the Member.

5.3.  *Distributions*. The Member shall determine, in the Member's sole discretion, the amount and timing of any distributions to the Member and whether such distributions shall be paid in cash or property, provided that the Company shall, to the extent that the Company has cash in excess of its current liabilities and sufficient for reasonable working

capital, make distributions to the Member(s) to provide them with funds to pay applicable federal, state and local income tax liabilities (including quarterly estimated income tax liabilities) attributable to Company income allocated to them ("Tax Distribution"). To the extent that Member(s) receives a Tax Distribution pursuant to this Section 5.3, the amounts otherwise distributable to such Member, or such Member's successor or Transferee shall be reduced by any such Tax Distribution, but only to the extent that such Tax Distribution has not previously been so taken into account. No Tax Distribution shall be due in respect of any gain recognized on the sale of all or substantially all of the Company's assets in connection with the liquidation of the Company.

6.  **DUTIES; LIMITATION OF LIABILITY; INDEMNIFICATION AND INSURANCE**

6.1.  *Duties of Member and Officers; Limitation of Liability*. The Member, the Manager, and any officers shall perform their duties in good faith, in a manner they reasonably believe to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. Except as otherwise required in the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member and the Manager shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member or the Manager or participating in the management of the Company. None of the Member, the Manager, or any officer, by reason of being or having been a Member, Manager, or officer, shall be liable to the Company or to any other Member, Manager, or officer for any loss or damage sustained by the Company or any other Member, Manager, or officer unless the loss or damage shall have been the result of fraud, deceit, gross negligence, breach of fiduciary responsibility, willful misconduct, or a wrongful taking by that Member, Manager, or officer.

6.2.  *Member Has No Exclusive Duty to Company*. The Member and the Manager shall not be required to participate in the Company as their sole and exclusive business. The Member may have other business interests and may participate in other investments or activities in addition to those relating to the Company.

6.3.  *Indemnification and Insurance*.

(a)  Right to Indemnification.

(i)  To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim or expense (including attorneys' fees) whatsoever incurred by the Member and the Manager relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by the Member and/or the Manager on behalf of the Company; provided, however, that any indemnity under this Section 6.3(a)(i) shall be provided out of and to the extent of Company assets only, and neither the Member, the Manager nor any other person shall have any personal liability on account thereof.

(ii)  Any person who is or was an officer of the Company and

4

who is or may be a party to any civil or criminal action because of his/her participation in or with the Company, and who acted in good faith and in a manner which he/she reasonably believed to be in, or not opposed to, the best interests of the Company may be indemnified and held harmless by the Company; provided, however, that any indemnity under this Section 6.3(a)(ii) shall be provided out of and to the extent of Company assets only, and neither the Member nor any other person shall have any personal liability on account thereof

       (b)   Insurance.  The Member may cause the Company to purchase and maintain insurance for the Company, for its Member and officers, and/or on behalf of any third party or parties whom the Member might determine should be entitled to such insurance coverage.

       (c)   Effect of Amendment.  No amendment, repeal or modification of this Section 6 shall adversely affect any rights hereunder with respect to any action or omission occurring prior to the date when such amendment, repeal or modification became effective.

7.     PLEDGE, TRANSFER, OR ASSIGNMENT OF MEMBER'S INTEREST.

       7.1.   ***Pledging of Interests.*** Notwithstanding anything contained herein to the contrary, the Member shall be permitted to pledge, transfer, assign, or hypothecate any or all of its Units, including, without limitation, all economic rights and privileges, all control rights, authority, and powers, and all status rights as a Member, to any lender to the Company or any affiliate of the Company, or to any agent acting on such lender's behalf, and any transfer of such Units pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation shall be permitted under this Agreement with no further action or approval required hereunder. Notwithstanding anything contained herein to the contrary, subject to the terms of the financing giving rise to any pledge or hypothecation of Units, the lender (or agent) shall have the right, to the extent set forth in the applicable pledge or hypothecation agreement, and without further approval of any Member and without becoming a Member (unless such lender (or agent) expressly elects in writing to become a Member), to exercise the membership voting rights of the Member granting such pledge or hypothecation. Notwithstanding anything contained herein to the contrary, and without complying with any other procedures set forth in this Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, to the extent set forth in the applicable pledge or hypothecation agreement, (a) the lender (or agent) shall, if it so elects, become a Member under this Agreement and shall succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the Company, and shall be bound by all of the obligations, of a Member under this Agreement without taking any further action on the part of such lender (or agent) and (b) following such exercise of remedies, the pledging Member shall cease to be a Member and shall have no further rights or powers under this Agreement. Notwithstanding anything contained herein to the contrary, no legal opinion shall be required in connection with any pledge or hypothecation of Units, or any transfer or exercise of rights or remedies pursuant hereto. The execution and delivery of this Agreement by the Member shall constitute any necessary approval of Member under the Act to the foregoing provisions of this paragraph.

       7.2.   ***UCC Article 8.*** So long as any pledge or hypothecation of any Units is in effect, the Company shall not elect that its Units become governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction without the prior written consent of all

pledgees of such Units or the delivery of any applicable limited liability company certificate or control agreement necessary to perfect each such pledgee's interests in the applicable Units.

**7.3.    *GACP Loan.*** Upon consummation and funding of the Loan Agreement with GACP Finance Co, LLC (defined below) but only during the duration of such Loan Agreement, the following provisions shall apply: Notwithstanding any redemption or comparable provisions contained in this Agreement to the contrary, the Member agrees that it, as applicable, will not accept any Restricted Junior Payment (as defined in that certain Term Loan Agreement dated as of [September] [__], 2018, among Insight Terminal Solutions, LLC, certain of its affiliates, GACP Finance Co., LLC, as agent, and the lenders party thereto, as amended, restated or otherwise modified from time to time (the "Loan Agreement"), except to the extent that such Restricted Junior Payment is expressly permitted to be made under such Loan Agreement (or following a refinancing of all of the Obligations (as defined in the Loan Agreement), any agreement evidencing debt which refinances all or any portion of the Obligations), and that in connection with any Change in Control (as defined in such Loan Agreement) or any other sale, transfer or other disposition of any Capital Stock (as defined in the Loan Agreement) of any Borrowers or any of its Subsidiaries (as defined in the Loan Agreement), each Member's only claim with respect to any proceeds generated by such Change in Control or other sale, transfer or other disposition will be to the proceeds thereof after the Obligations (or any debt which refinances all or any portion of the Obligations) are paid in full.

**7.4.    *No Modification of Provisions.*** The forgoing provisions may not be amended or modified so long as any of the Units are subject to a pledge or hypothecation without the pledgee's (or the Transferee of such pledgee's) prior written consent. Each recipient of a pledge or hypothecation of the Units shall be a third party beneficiary of the provisions of this provision.

**8.    DISSOLUTION.**

**8.1.    *Termination of Company.*** The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (a) the written consent of the Member or (b) any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act. Dissolution of the Company shall be effective upon the date on which the event giving rise to the dissolution occurs, but the Company shall not terminate until the assets of the Company shall have been distributed as provided in this Article. Notwithstanding dissolution of the Company, prior to the liquidation and termination of the Company, the Company shall continue to be governed by this Agreement. Notwithstanding anything to the contrary in this Agreement, the Company shall not, and the Manager shall not cause or allow the Company to, (i) file for bankruptcy protection as defined under the United States Bankruptcy Code Title 11 United States Code or (ii) dissolve, in each case, unless the Company has first obtained the prior written consent of (y) all holders of Class A Units and Class B Units, and (z) all holders of warrants exercisable for Class B Units.

**8.2.    *Sale of Assets upon Dissolution*.** Following the dissolution of the Company, the Company shall be wound up and the Manager shall determine whether some or all of the assets of the Company are to be sold or whether some or all of such assets of the Company are to be distributed to the Member in kind in liquidation of the Company. Upon the completion of the winding up of the Company, the Manager shall file Articles of Dissolution in accordance

with the Act.

**8.3.** *Final Distributions.* Upon the dissolution of the Company, at the Manager's discretion, the properties of the Company to be sold shall be liquidated in orderly fashion and the proceeds thereof, and the property to be distributed in kind, shall be distributed as follows: (a) to the Company creditors, to the extent otherwise permitted by law, in satisfaction of the Company's liabilities, whether by payment or the making of reasonable provision for payment thereof; and (b) thereafter, to Member.

**9.** TAX MATTERS. As long as the Company has only one member, it is the intention of the Company and the Member that for federal, state and local income tax purposes the Company be disregarded as an entity separate from the Member in accordance with the provisions of Treas. Reg. §§ 301.7701(c)(ii) and 301.7701-3(b)(ii). The Member shall take all actions which may be necessary or required in order for the Company to be so disregarded for income tax purposes. All provisions of this Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

**10.** RECORDS AND INFORMATION. The Company shall maintain at its place of business the Articles of Organization, any amendments thereto, this Agreement, and all other Company records required to be kept by the Act, and the same shall be subject to inspection at the principal place of business with reasonable request of Member.

**11.** MISCELLANEOUS PROVISIONS.

**11.1.** *Amendment.* This Agreement may be modified or amended from time to time only upon the written consent of the Member.

**11.2.** *Applicable Law.* To the extent permitted by law, this Agreement shall be construed in accordance with and governed by the laws of the State of Delaware.

**11.3.** *Pronouns, Etc.* References to a Member or officer, including by use of a pronoun, shall be deemed to include masculine, feminine, singular, plural, individuals, partnerships or corporations where applicable.

**11.4.** *Entire Agreement.* This Agreement contains the entire agreement with respect to the subject thereof and supersedes all prior operating agreements.

**11.5.** *Severability.* In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

[*Remainder of page intentionally left blank. Signature appears on following page.*]

7

IN WITNESS WHEREOF, the Member has executed this Amended and Restated Operating Agreement as of the Effective Date.

**MEMBER**

By: _____

**Sharon A. Siegel, Sole Member**

**MANAGER**

By: _____

**John J. Siegel, Jr.**

8

## Exhibit A

### Units of Membership Interest

| Member | Class A Units | Class B Units |
|---|---|---|
| Sharon A. Siegel | 100 Units | 0 Units |

**EXHIBIT G**

**Autumn Wind Lending, LLC**
**1999 Avenue of the Stars, Suite 2040**
**Los Angeles, CA 90067**

July 2, 2019

<u>Via Federal Express and Email</u>
Insight Terminal Solutions, LLC
6100 Dutchmans Lane, 9th Floor
Louisville, KY 40205
Attention: John Siegel
Telephone: (502) 584-6022
Email: jsiegel@westernbit.com

Middleton Reutlinger
401 South Fourth Street, Ste 2600
Louisville, Kentucky 40202
Attention: Thomas W. Ice Jr.
Telephone: (502) 625-2807
Email: tice@middletonlaw.com

Re:    **NOTICE OF RETENTION OF COLLATERAL IN
FULL SATISFACTION OF OBLIGATIONS**

Dear Mr. Siegel:

Reference is made to (i) the Loan and Security Agreement, dated as of September 24, 2018 (as amended, modified and supplemented from time to time, the "**Loan Agreement**"), by and among Insight Terminal Solutions, LLC ("**Borrower**"), Insight Terminal Holdings, LLC ("**Guarantor**") and Autumn Wind Lending, LLC ("**Lender**") and (ii) the Waiver and Amendment Agreement, dated as of February 22, 2019 (the "**Waiver Agreement**") by and among Borrower, Guarantor and Lender.   All capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Loan Agreement.

Pursuant to <u>Section 2</u> of the Waiver Agreement, the Maturity Date of the Loan was amended from December 31, 2019 to June 30, 2019.  Pursuant to <u>Section 2.4</u> of the Loan Agreement, on the Maturity Date, the Borrower shall pay to the Lender, in full, in cash, the entire outstanding principal balance of the Loan, plus all accrued and unpaid interest thereon, the Exit Fee and all other Obligations.  As of July 1, 2019, the Borrower owed the Lender $9,121,181.80, consisting of principal, and accrued and unpaid interest and fees.

As of the end of business on July 1, 2019, the Borrower failed to pay the Obligations when due, which constitutes an Event of Default.  Pursuant to <u>Section 3</u> of the Waiver Agreement, the Guarantor has waived all its rights in the Collateral if the Obligations are not paid in full on or before June 30, 2019 and pursuant to <u>Section 12.2</u> of the Loan Agreement, Lender is entitled to foreclose on all Collateral while an Event of Default is continuing.

Insight Terminal Solutions, LLC
July 2, 2019
Page 2


This notice is being delivered pursuant to Section 9-620 of the UCC to notify you that Lender intends to retain the Collateral in full satisfaction of the Obligations.  In addition, pursuant to Section 9-620 and 9-621 of the UCC, Lender has notified parties with interests in the Collateral, as set forth on <u>Exhibit A</u> hereto.

Notwithstanding anything contained in this notice, Lender reserves all of its rights and remedies under the Loan Documents and under applicable law or equity, of any and every type or nature whatsoever, against the Loan Parties.

[*Signature Page Follows*]

Very truly yours,

AUTUMN WIND LENDING, LLC, in its capacity
as Agent and Lender

By: _____

Name:  Vikas Tandon

Title:   Manager

**Exhibit A**

**Additional Parties with Interests in the Collateral**

1. Phillip Tagami

2. Charles McNeil

**EXHIBIT H**

7/8/2019

CALIFORNIA
CAPITAL & INVESTMENT
GROUP

***Sent Electronically & FedEx***

**To:**   Insight Terminal Solutions, LLC
6100 Dutchmans Lane, 9th Floor
Louisville KY, 40205
Attn: John Siegel
JSiegel@insightterminals.com

**Copy**   Autumn Wind Lending, LLC              NexGen Resources Corporation
**To:**     1999 Avenue of the Stars, Suite 2040   5251 DTC Parkway, Suite 800
Los Angeles, CA 90067                  Greenwood Village, CO 80111
Attn: Vikas Tandon                     Attn: Charlie McNeil
vikas@jmbcapital.com                   cmcneil@nexgen-group.com

Middleton Reutlinger
401 South Fourth Street, Suite 2600
Louisville, KY 40202
Attn: Tom Ice
tice@middletonlaw.com

**RE:**   **NOTICE OF UNMATURED EVENT OF DEFAULT – Army Base
Gateway Redevelopment Project Sub-Ground Lease for West
Gateway, dated September 24, 2018 ("Sublease")**

Mr. Siegel,

On behalf of Oakland Bulk and Oversized Terminal, LLC ("Sublandlord"), I hereby provide
notice to Insight Terminal Solutions, LLC ("Subtenant") that the following Unmatured Events of
Default have occurred under the Sublease. Capitalized terms used but not otherwise expressly
defined herein will have the same meaning as set forth in the Sublease, which Sublease is
incorporated herein by reference.

## I.   Failure to Pay Rent

Section 2.1 of the Sublease requires Subtenant to pay all Rent to Sublandlord "at the times and
in the manner provided in . . . [the] Sublease." The definition of Rent includes the term
Additional Rent, defined as "any and all sum, other than Sublease Bonus Rent, Ground Lease
Base Rent, Participation Rent, Sublease Base Rent and Balloon Rent, that may become due or be
payable by Subtenant at any time pursuant to this Sublease." This definition is consistent with
Section 2.10 of the Sublease, which states, "all costs, fees, interest, charges, expenses,
reimbursements and Subtenant's obligations of every kind and nature relating to the Premises
that may arise or become due under this Sublease, whether foreseen or unforeseen, which are
payable by Subtenant to Sublandlord pursuant tot his Sublease, shall be deemed Additional
Rent." Captured within the term Additional Rent are all amounts expended by Sublandlord in
the on-going legal disputes with the City related to the Premises. To wit, Section 2.10.1 provides
that "Prior to the True Up Date, Subtenant will reimburse Sublandlord for fifty percent (50%) of
all legal costs (including, without limitation attorney's fees) incurred by Sublandlord after the
Commencement Date and related to the Litigation, including any appeal thereof."

While Subtenant has previously paid amounts towards reimbursing Sublandlord for fifty percent (50%) of the on-going legal costs, including partial payments in January and February of 2019, there is currently an **outstanding balance of $1,872,011.72** owed to Sublandlord for legal expenses through May 31, 2019. (Please see attached invoice.) PLEASE NOTE: this amount *does not* include legal costs incurred in June 2019, which are still being reconciled and will be sent to Subtenant once finalized. This amount also *does not* include the legal fees due under Section 2.13.3 of the Sublease, which amounts are due as of the True Up Date.

Therefore, Subtenant is hereby notified that to prevent an Event of Default under the Sublease, the $1,872,011.72 is due within ten (10) days from the date of this notice.

## II.    Failure to Maintain the Premises

Article 7 of the Sublease requires Subtenant to maintain, operate and repair the Premises.

Despite Sublandlord turning over to Subtenant possession of the Premises, Subtenant has failed to maintain, operate and repair the Premises. Sublandlord has previously provided to Subtenant (on multiple occasions) binders delineating property management matters that need to be addressed by Subtenant. To Sublandlord's knowledge, Subtenant has not addressed any of these matters. Related thereto, Sublandlord has provided to Subtenant multiple incident reports addressing acts of vandalism and theft that have taken place at the Premises, including, without limitation, the theft of electrical wiring at the large warehouse; it will likely cost hundreds of thousands of dollars to repair cost to re-energize the building. A contributing factor to the acts of vandalism and theft has been Subtenant's failure to properly secure the Premises.

Therefore, Subtenant is hereby notified that to prevent an Event of Default under the Sublease, at a minimum, Subtenant needs to properly secure the Premises within thirty (30) days from the date of this notice, which work may require Subtenant to re-energize the large warehouse.

## III.    Failure to Pay Transfer Taxes

Section 4.1.1 of the Sublease requires Subtenant to "pay or cause to be paid, prior to delinquency, all Impositions comprised of possessory interest and property taxes assessed, levied or imposed on the Premises . . . ," including "any City transfer tax payable with respect to the Parties' initial entry into this Sublease." And while Subtenant has the right to contest any such Impositions under Section 4.3, it must do so through "appropriate proceedings conducted in good faith and with due diligence, at no cost to Sublandlord." Section 4.3 goes on to say that "Subtenant shall be responsible for the payment of any interest, penalties or other charges which may accrue as a result of any contest, and Subtenant shall provide a statutory lien release bond or other security reasonably satisfactory to Sublandlord in any instance where Sublandlord's interest in the Premises may be subjected to such lien or claim."

As you are aware, the City elected to redetermine the amount of transfer tax that was due to the City in connection with Subtenant entering into the Sublease. As identified in the attached Notice of Determination ("Tax Determination Notice"), the $105,367.50 additional transfer tax ("Additional Tax") was required to be paid to the City on or before June 24, 2019, otherwise Subtenant was required to appear at an administrative hearing on Monday, July 1, 2019, to

contest the Additional Tax.  To Sublandlord's knowledge, Subtenant has not paid the Additional Tax and Subtenant did not appear at the July 1st hearing to contest the Additional Tax.

Therefore, Subtenant is hereby notified that to prevent an Event of Default under the Sublease, within thirty (30) days from the date of this notice, Subtenant must either (i) pay the Additional Tax, (ii) obtain from the City written confirmation that the Additional Tax was incorrectly assessed and will not be due at any time, or (iii) obtain a statutory lien release bond or other security reasonably satisfactory to Sublandlord.  PLEASE NOTE:  pursuant to the Tax Determination Notice, if the Additional Tax is not paid on or before August 10, 2019, the City will record a lien against the Premises, resulting in a further Event of Default under the Sublease.

Sublandlord advises Subtenant to take all corrective measures to cure the aforementioned Unmatured Events of Default, otherwise, Sublandlord will be forced to pursue all of its rights and remedies under the Sublease, including, without limitation, termination of the Sublease.

Consistent with Section 18.1.1, this notice will serve as any notice required under Section 1161 of the California Code of Civil Procedure.  Nothing in this Notice of Default will be deemed a waiver by Sublandlord of any other Events of Default by Subtenant, whether or not addressed by this notice.

In connection with Sublandlord's obligations under Section 18.3 of the Sublease, this notice is being sent to both Autumn Wind Lending, LLC and NexGen Resources Corporation who, based on information and belief, may each qualify as Investors under the Sublease given their respective interest in and to Subtenant.

Respectfully,

**Phil Tagami**
*President & CEO*
California Capital & Investment Group, Inc.

## ATTACHMENT 1

**Legal Invoices**

[See Attached]

Print Date: 7/8/2019

| ITS Invoice Summary Through May 2019 | Monthly Amount Due | Previous Balance | 1.5% Late Charge (§2.9) | Total Amount Due |
|---|---|---|---|---|
| OBOT - November 2018 Expenses Total | $ 134,529.27 | | $ 2,017.94 | $ 136,547.21 |
| OBOT - December 2018 Expenses Total | $ 19,961.22 | $ 136,547.21 | $ 2,347.63 | $ 158,856.06 |
| *ITS - 1/21/19 Partial Payment* | $ (15,500.00) | | | |
| OBOT - January 2019 Expenses Total | $ 65,999.05 | $ 158,856.06 | $ 3,372.83 | $ 228,227.93 |
| *ITS - 2/28/19 Partial Payment* | $ (25,000.00) | | | |
| OBOT - February 2019 Expenses Total | $ 203,977.48 | $ 228,227.93 | $ 6,483.08 | $ 438,688.49 |
| OBOT - March 2019 Expenses Total | $ 83,586.96 | $ 438,688.49 | $ 7,834.13 | $ 530,109.59 |
| OBOT - April 2019 Expenses Total | $ 16,583.04 | $ 530,109.59 | $ 8,200.39 | $ 554,893.01 |
| | | | | |
| MONTHLY BALANCE REMAINING | $ 484,137.02 | | | |
| MONTHLY BALANCE REMAINING + LATE CHARGES | $ 554,893.01 | | $ 30,255.99 | |
| | | | | |
| OBOT - May 2019 Expenses | | | | |
| 50% of On-Going Litigation Costs (per Sublease §2.10.1) | $ 120,980.93 | | | |
| CCIG Monthly Services through 5/31/19 | $ 3,895.00 | | | |
| WGW Utilities 4/09/19 - 5/08/19 (65%) | $ 297.24 | | | |
| May 2019 Expenses | $ 125,173.17 | $ 554,893.01 | $ 10,200.99 | $ 690,267.17 |

| | | |
|---|---|---|
| OBOT MAY 2019 EXPENSES TOTAL | $ | 680,066.18 |
| MAY 2019 LATE CHARGES | $ | 10,200.99 |
| MAY 2019 EXPENSES + LATE CHARGES | $ | 690,267.17 |
| | | |
| TOTAL OUTSTANDING ITS 50% SHARE OF LITIGATION COSTS THRU AUG. 2018 | $ | 1,181,744.55 |
| | | |
| TOAL AMOUNT DUE NOV.'18 - MAY 2019 INCLUDING LATE CHARGES | $ | 1,872,011.72 |

## <u>ATTACHMENT 2</u>

## Tax Determination Notice

[See Attached]

CITY OF OAKLAND



150 FRANK H. OGAWA PLAZA, SUITE 5342 • OAKLAND, CALIFORNIA 94612

Finance & Management Agency                                    (510) 238-7024
Revenue Division                                             TDD (510) 238-3254

May 2, 2019
Revised June 4, 2019

Grantee:

Insight Terminal Solutions, LLC                 Account:
6100 Dutchmans Lane, 9th Floor                  Document No.: 2019000590
Louisville, KY  40205                           Date Recorded: 01/02/2019
Attention: John Siegel                          Parcel No.     Army Base
                                                Address:       West Gateway

**RE:      Real Property Transfer Tax- Notice of Determination**

A review of public records suggests that tax is due on the above transfer.

Pursuant to Oakland Municipal Code, Chapter 4, Article 20, all transfers of real property within the city limits of Oakland are subject to the real property transfer tax. The tax is due upon transfer of an interest of real property and is payable at the time of recordation with the Alameda County Recorder. The tax rate is 1.50 percent of the total value of consideration transferred, with some exceptions provided by statute. The grantor and grantee are jointly and severally liable for payment of tax.

The tax imposed under this chapter is due and payable at the time the deed instrument or writing affecting a transfer subject to the tax is delivered, and is delinquent if unpaid at the time of recordation thereof. (OMC 4.20.070). Delinquent payments are subject to applicable penalties and interest.

According to the records of the Alameda County Recorder, the details above is as follows:

| | | |
|---|---|---|
| Value of Consideration | $ | 8,028,000.00 |
| Tax | | 200,700.00 |
| Less Amount Paid at Recordation | | 120,420.00 |
| Net Amount of Tax Due | | 80,280.00 |
| Penalty (25%) | | 20,070.00 |
| Interest (1% per month) | | 5,017.50 |
| Subtotal | $ | 105,367.50 |
| Payments | | 0.00 |
| **Total Amount Due \*** | **$** | **105,367.50** |

Please remit your payment, along with the payment stub by **June 24, 2019.** A self – addressed envelope has been enclosed for your convenience. Additional charges will accrue and appropriate action will be taken to place a lien on the property if this account remains unpaid or unresolved within sixty (60) days of the date of this notice. If the recorded lien is not paid before August 10, 2019, the amount of the lien will be added to your property tax bill. For more information, please refer to the page titled "Real Property Transfer Tax – Additional Information".

If you wish to schedule an administrative hearing on **Monday, July 1, 2019**, please complete the enclosed form titled "Notice of Administrative Hearing on Petition for Redetermination", and return it to this office within sixty (60) days of the date of this notification. If you do not want an administrative hearing, please disregard the enclosed hearing notice. For more information, please refer to the page titled "Real Property Transfer Tax Information"

# CITY OF OAKLAND



150 FRANK H. OGAWA PLAZA, SUITE 5342 • OAKLAND, CALIFORNIA 94612

Finance & Management Agency                                    (510) 238-7024
Revenue Division                                          TDD (510) 238-3254

If you like to schedule an appointment or have any questions, please e-mail me at eparodi@oaklandca.gov or call (510) 238-7024.

Sincerely,

*Evelyn Parodi*

Evelyn Parodi
Tax Auditor II