## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY

-------------------------------------------------------- x
In re:                                                 :
                                                       :        Chapter 11
INSIGHT TERMINAL SOLUTIONS, LLC                        :
                                                       :        Case No. 19-32231
                              Debtor.                  :
                                                       :
                                                       :
                                                       :
                                                       :
-------------------------------------------------------- x

-------------------------------------------------------- x
In re:                                                 :
                                                       :        Chapter 11
INSIGHT TERMINAL HOLDINGS, LLC                         :
                                                       :        Case No. 19-32232
                              Debtor.                  :
                                                       :
                                                       :
                                                       :
-------------------------------------------------------- x

## MOTION OF AUTUMN WIND LENDING, LLC
## FOR ENTRY OF AN ORDER DISMISSING THE
## DEBTORS' CHAPTER 11 CASES PURSUANT TO 11 U.S.C. § 1112

Autumn Wind Lending, LLC ("Autumn Wind" or the "Lender"), by and through its undersigned counsel, hereby moves for entry of an order dismissing the chapter 11 cases of Debtors Insight Terminal Solutions, LLC ("ITS") and Insight Terminal Holdings, LLC ("ITH" and, together with ITS, the "Debtors") pursuant to §1112(b) of the Bankruptcy Code, and respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      The cases of these non-operating Debtors contain all of the hallmarks of a "bad faith" filing and warrant immediate dismissal.  The Debtors commenced these chapter 11 cases for one purpose only:  to frustrate the Lender from exercising its bargained-for contractual and legal rights to the Collateral and allow the Debtors' manager, John J. Siegel, Jr. ("Siegel") to

continue his efforts (in contravention of numerous agreements with the Lender) to retain control of ITS' rights to a sublease to develop and operate a rail terminal in Oakland, CA – a project that has yet to even commence.   Such efforts, however, are too late.  The Debtors lacked authority to file the petitions on July 17, 2019, since all the Debtors' assets, including ITH's ownership interest in ITS, were affirmatively and automatically relinquished when the Debtors failed to repay their obligations under the Loan and Security Agreement dated September 24, 2018 (the "LSA") and other Loan Documents[1] on June 30, 2019.   As a result, the chapter 11 cases must be dismissed to allow the contractual agreements between the parties to be enforced.

2.    The terms of the Loan Documents are clear.   ITH expressly agreed to automatically relinquish its rights to the Collateral (including its 100% ownership interest in ITS) to the Lender in the event of a failure to repay all obligations by June 30, 2019.  Moreover, pursuant to the Pledge Agreement, ITH granted the Lender a security interest in 100% of the membership interests in ITS and agreed that, upon the occurrence and during continuation of an Event of Default, ITH's right to exercise voting and/or consensual rights and powers over such membership interests would cease immediately, without any notice to ITH or action by or on behalf of the Lender or any other person, and that all such rights would become vested solely and exclusively in the Lender, automatically and without any action by any person.   Upon the Debtors' failure to repay their obligations on June 30, 2019, ITH's interest in the Collateral, including the right to vote its membership interests in ITS, were automatically terminated.  ITH did not have the necessary corporate authority to authorize ITS' bankruptcy filing.  Moreover, both Debtors lacked authority to file under the express terms of their Operating Agreements, which require the Lender's consent, in its capacity as warrant holder, to any bankruptcy filing.

---

[1]    Capitalized terms used in this Preliminary Statement and not otherwise defined shall have the meanings assigned such terms elsewhere in this Motion or in the Loan Documents, as applicable.

The Lender's consent to the bankruptcy filings was neither requested nor obtained, providing another basis for dismissal of the chapter 11 cases.[2]

      3.      The Loan Documents reflect the business deal struck by the parties.  The Lender conditioned the initial advance of funds upon the Debtors' agreement to commence a process to market and sell ITS' right, title and interest under the Sublease absent repayment by February 15, 2019, with the payment of all proceeds from any sale to be turned over to the Lender. Repayment did not occur on February 15, and the Debtors requested additional time to refinance the Term Loan rather than commence a sale process.  The Lender granted the request and waived existing defaults on the condition that the parties agree that (i) the maturity date of the Term Loan would be amended to June 30, 2019 and (ii) if repayment of all obligations under the Loan Documents were not made in full by such date, ITH would consensually turn over the Collateral it had pledged to the Lender (as opposed to a marketing and sale process for the Sublease as initially agreed).  Despite such concessions by the Lender induced by, among other things, Siegel's adamant assurances of an imminent refinancing transaction, the maturity date of June 30, 2019, passed without either a refinancing or repayment of the Term Loan.  The commencement of the chapter 11 cases on July 17, 2019 failed to undo the automatic relinquishment and disclaimer of ITH's interest in the Collateral upon the June 30, 2019 default. Such transfer of the Collateral already occurred, rendering the Debtors' cases ripe for dismissal for lack of authorization.

      4.      Even assuming the filings were properly authorized (which they were not), the cases should be dismissed as bad faith filings.  The Debtors filed these cases for the sole benefit

---

[2]   In fact, the Debtors acknowledge such limitation and attempt, through their Corporate Resolutions authorizing the filings [Docket No. 2], to amend the Operating Agreements to remove this requirement in addition to several additional protections for the Lender to which the parties previously agreed.  The Corporate Resolutions, though dated June 28, 2019,  are ineffective since the July 17 chapter 11 filings occurred *after*  ITH's right to exercise voting and/or consensual rights and powers over such membership interests in ITS were terminated.

and protection of Siegel without any regard for other parties in interest in these cases. The Debtors have little or no cash or liquid assets, no true operations or revenue, and at most a handful of employees. As a result, the Debtors plainly have no ability to service the Term Loan, the risk of which was the precise reason for the parties' original agreement to implement a marketing and sale process absent repayment by February 15, 2019. The Debtors' sole potential asset is a sublease to develop and operate a rail terminal in the Port of Oakland in Oakland, CA. Despite ITS, the subtenant, taking possession of the subject property nearly a year ago, the Debtors have, upon information and belief, failed to maintain and secure the property or even to commence development of the project, rendering it a liability at this time. Moreover, in addition to defaulting with respect to their obligations to the Lender, the Debtors have, upon information and belief, also failed to honor their payment obligations to the Landlord and the City of Oakland. The Debtors' mismanagement and complete lack of attention to the property have, upon information and belief, resulted in theft, vandalism, and a state of disrepair. As a result, the property and its value are deteriorating and the erosion of value will happen all the more rapidly as long as Siegel is allowed to retain control.

5.      Since entering the Sublease, rather than develop the property, the Debtors, through Siegel, have instead made several agreements with the Lender to induce concessions, each of which Siegel either failed to honor or outright violated. Further demonstrative of Siegel's mismanagement of the Debtors and self-dealing is the fact that, against the advice of his advisors, he ignored several promising potential lenders and strategic partners that were ready and able to pay off the Lender and, instead, focused his efforts entirely on reaching a deal with a single party, which he viewed to be personally beneficial to him. Of course, this deal never materialized and, after the June 30, 2019 payment default, the Debtors refused to honor their

agreement in the Waiver and Amendment to turn over the Collateral and continued to seek a refinancing transaction (ignoring a cease and desist letter issued by the Lender dated July 8, 2019). Shortly after the Lender demanded the Debtors cease their refinancing efforts, they commenced the Chapter 11 cases.

6.      These cases were not commenced to maximize value for the Debtors' estates and creditors. Nor were they commenced to reorganize a business, as there is none to reorganize. Rather, they were commenced as a stalling tactic to allow Siegel to continue his efforts to only benefit himself and retain the Sublease in what is essentially a two-party dispute involving quintessential state law issues. There is no proper bankruptcy purpose served by the Debtors seeking to forestall the exercise of the legal and contractual rights of the Lender, the Debtors' primary creditor. The Debtors already agreed to hand over the keys to the Lender, and equity demands that these cases be dismissed to prevent the Debtors from abusing the chapter 11 process to evade their agreed-upon obligations to the Lender and further erode the value of the Lender's collateral.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (O). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate upon which relief is requested is section 1112(b) of the Bankruptcy Code.

## BACKGROUND

8.      On July 17, 2019 (the "Petition Date"), the Debtors each filed a voluntary petition in the Bankruptcy Court for the Western District of Kentucky (the "Court") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

9.     The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases to date.

> ### A.     The Debtors and the Sublease

10.     ITS is a non-operating business with a single potential asset – a sublease for undeveloped real property.  Specifically, ITS is the subtenant under that certain Army Base Gateway Redevelopment Project Sub-Ground Lease for West Gateway by and between Oakland Bulk and Oversized Terminal, LLC (the "Landlord") and ITS dated as of September 2018 (together with all exhibits, amendments, schedules and annexes thereto, the "Sublease").  *See Declaration of Vikas Tandon In Support of Motion of Autumn Wind Lending, LLC for Entry of an Order Dismissing the Debtors' Chapter 11 Cases Pursuant to 11 U.S.C. § 1112* dated July 25, 2019 [DE # 12] (the "Tandon Declaration") at ¶ 3.

11.     The real property leased under the Sublease is a 19 acre parcel in the Port of Oakland, a port and ship facility located in Oakland, California.  The property, a portion of the Port of Oakland known as the West Gateway, is an undeveloped parcel that ITS subleases from the Landlord in order to develop and operate a ship-to-rail terminal for the purposes of exporting bulk goods and importing oversized cargo (the "Bulk and Oversized Terminal").  *Id.* at ¶ 4.

12.     The Sublease is ITS' sole potential asset and, upon information and belief, ITS has yet to commence development of the Bulk and Oversized Terminal nor is such development expected to commence in the near term.  *Id.* at ¶ 5.

13.     Prior to ITH's relinquishment of the Collateral after the Maturity Default (as defined herein), ITH owned 100% of the membership interests of ITS and, upon information and belief, such ownership interest was ITH's sole asset.  *Id.* at ¶ 6.  Upon information and belief, as

of the Petition Date, ITH has no assets, since it relinquished its rights to all Collateral (as defined in the LSA), including its interest in the Pledged Equity (as defined herein). *Id.*

        **B.**     **September 2018 Loan and Security Documents**

    14.     Under the LSA dated September 24, 2018, among ITS as borrower, ITH as guarantor, and the Lender, the Lender extended a senior secured term loan facility to ITS in a principal amount up to $6,800,000.00 (the "Initial Term Loan"). A true and correct copy of the LSA is attached to the Tandon Declaration as **Exhibit A**. The Initial Term Loan was evidenced pursuant to that certain Promissory Note dated September 24, 2018 in the amount of $6,800,000.00. *Id.* at ¶ 7.

    15.     In connection with entry into the LSA, the Lender requested and ITS executed and delivered a side letter between the Lender and ITS dated September 24, 2018 (the "ITS Side Letter"). A true and correct copy of the ITS Side Letter is attached to the Tandon Declaration as **Exhibit B**. In it, ITS agreed, among other things, that in the event ITS failed to repay all obligations under the LSA and all ancillary and related documents, instruments and agreements (collectively, the "Loan Documents")[3] on or before February 15, 2019, ITS would, on the next business day, "commence a process to market and sell, on a best efforts basis, all of its right, title and interest under and to the [Sublease]" and that "all Net Cash Proceeds received by the Borrower from a sale of the Borrower's right, title and interest under and to the [Sublease] shall, within three (3) Business Days of the receipt of such proceeds by the Borrower, be turned over to the Lender." The purpose of the agreed-upon sale process was to protect the Lender from the exact situation in which the parties find themselves today, stemming from the risk of the

---

[3]   The Loan Documents are voluminous. True and correct copies of certain of the relevant Loan Documents are attached to the Tandon Declaration. Copies of any omitted documents are available upon request to the Lender.

Debtors' long-term inability to pay debt service. Thus, the ITS Side Letter was a material inducement for the Lender to enter into the LSA. *Id.* at ¶ 8-9.

16.     Pursuant to the LSA and the Pledge Agreement dated September 24, 2018 (the "Pledge Agreement")[4], the Debtors granted the Lender a first priority lien upon and security interest in all of the Debtors' tangible and intangible property and proceeds thereof (as defined in the LSA, the "Collateral"). *See* LSA at § 4. The Collateral expressly includes all rights under the Sublease and all outstanding membership interests of ITS, as well as all general intangibles related to such membership interests (the "Pledged Equity"). Pursuant to the Pledge Agreement, ITH pledged to the Lender the Pledged Equity along with all of its rights, privileges, authority and powers related thereto. *See* Pledge Agreement §2.1(a).

17.     In addition, ITH delivered to the Lender Certificate No. 1 evidencing the ownership of 100 membership units of ITS by ITH and a Blocked Account Control Agreement dated February 5, 2019 (the "BACA") over that certain depository account number xxxx7132 of ITS with Central Bank & Trust Co. *Tandon Declaration* at ¶ 11.

18.     As additional consideration to induce the Lender to extend the Initial Term Loan, ITH granted the Lender the right to purchase up to 10% of the membership interests in ITH ("Warrant 1"). *Id.* at ¶ 12.

19.     In connection with entry into the Initial Term Loan, ITS also executed and delivered that certain Unsecured Promissory Note dated September 24, 2018 in the principal amount of $3,400,000.00 (the "Initial Unsecured Note"). *Id.* at ¶ 13.

20.     The original maturity date of the Initial Term Loan and Initial Unsecured Note was December 31, 2019. *Id.* at ¶ 14.

---

[4]     A true and correct copy of the Pledge Agreement is attached to the Tandon Declaration as **Exhibit C**.

21.     Additionally, at the Lender's request, the Landlord and ITS executed and delivered a side letter agreement dated September 24, 2018, (the "Landlord Side Letter"), by which the Landlord agreed, among other things, that in the event ITS commenced a marketing process for the Sublease pursuant to the ITS Side Letter, Landlord would cooperate with ITS in such process, including, without limitation, by providing ITS a list of all previous expressions of interest or proposals received from third parties with respect to acting as a lessee under the Sublease. *Id.* at ¶ 15.

## C.     December 2018 First Amendment

22.     Despite the Debtors' failure to commence development of the Bulk and Oversized Terminal, at the request of the Debtors, on December 19, 2018, ITS, ITH, and Lender agreed to amend the LSA pursuant to that certain First Amendment to Loan and Security Agreement (the "First Amendment"). *Id.* at ¶ 16.

23.     Pursuant to the First Amendment, the Lender agreed to make an additional term loan to ITS in the amount of $300,000.00 (the "Additional Term Loan" and, together with the Initial Term Loan, the "Term Loan"). The Term Loan was evidenced by that certain Amended and Restated Promissory Note dated December 19, 2018 and executed by ITS in favor of Lender in the amount of $7,100,000.00 (the "A&R Term Note"). In connection with the extension of the Additional Term Loan, ITS executed and delivered that certain Amended and Restated Unsecured Promissory Note dated December 19, 2018 by which the Initial Unsecured Note was increased to $3,550,000 (the "A&R Unsecured Note" and, together with the Initial Unsecured Note, the "Unsecured Note). *Id.* at ¶ 17.

24.     To provide assurance to the Lender that there would be sufficient liquidity for the Debtors to make the interest payments that would be owing to the Lender under the LSA, Siegel,

in his capacity as ITS' manager, executed and delivered a side letter agreement dated December
19, 2018 (the "Siegel Side Letter"), by which Siegel agreed, among other things, to deposit cash
or marketable securities with an aggregate value of at least $500,000.00 into an account or
accounts in his control.  In addition, Siegel agreed that his failure to maintain a $500,000.00
minimum balance in such accounts would constitute an event of default under the LSA. *Id.* at ¶
18.

### D.    February 2019 Security Documents and Waiver and Amendment

25.    On February 16, 2019, the Debtors were again in default under the terms of the
Loan Documents when ITS failed to (i) repay its obligations under the Term Loan on or before
February 15, 2019, and (ii) commence a sale process.  *Id.* at ¶ 19.  Notwithstanding its agreement
in the ITS Side Letter to commence a process to market and sell its interest in the Sublease in the
event all obligations under the Loan Documents were not repaid by that date, Siegel informed the
Lender that he wished to seek a refinancing transaction in lieu of marketing the Sublease for sale
as ITS initially agreed.  *Id.* at ¶ 20.  Siegel further assured the Lender that the Debtors would be
able to achieve a refinancing that would repay the Lender in full by no later than June 30, 2019;
in fact, Mr. Siegel insisted repayment would take place much sooner, and the Waiver and
Amendment (as defined herein) included a schedule to repurchase Warrant 2 (as defined herein)
with escalating repurchase prices at the end of each month, reflecting Mr. Siegel's confidence in
a timely refinancing.  *Id.*  In the spirit of cooperation with the Debtors, the Lender agreed to
grant the Debtors until June 30, 2019 to achieve a refinancing transaction as requested.  *Id.* at ¶
21.  Consequently, the Debtors and the Lender negotiated the terms and entered into that certain
Waiver and Amendment Agreement dated February 22, 2019 (the "Waiver and Amendment").
A true and correct copy of the Waiver and Amendment is attached to the Tandon Declaration as

**Exhibit D**.  Pursuant to the Waiver and Amendment, the Lender agreed to waive certain Events of Default and remove the requirement for a marketing process and, in exchange therefor, ITS and ITH agreed, among other things, as follows:

    (a)      ITS agreed to amend the maturity date of the Term Loan from December 31, 2019 to June 30, 2019;

    (b)      ITH agreed "[i]f the Obligations due under the Loan are not paid in full on or before June 30, 2019 and Lender elects not to grant any extensions to the Borrower of the Maturity Date, ***Guarantor shall relinquish its rights to the Collateral as described in the Loan Agreement***" (emphasis added);

    (c)      ITS and ITH each agreed to amend its respective organizational documents so that neither would be permitted to either (i) file for bankruptcy protection under the Bankruptcy Code or (ii) dissolve, in each case, unless ITS or ITH, as applicable, has first obtained the prior written consent of (a) all holders of membership interests in ITH, and (b) all holders of warrants exercisable for interests in ITH;

    (d)      ITS agreed to continue making regularly scheduled interest payments; and

    (e)      ITH agreed to grant Lender additional warrants.

26.      ITS and ITH amended their respective operating agreements in accordance with the requirements of the Waiver and Amendment.  True and correct copies of the Second Amended and Restated Operating Agreement of ITS and the Amended and Restated Operating Agreement of ITH, each dated February 22, 2019, are attached as **Exhibits E** and **F**, respectively, to the Tandon Declaration (collectively, the "Operating Agreements").  The provisions updated in accordance with the terms of the Waiver and Amendment are reflected in Section 8.1 of the respective Second Amended and Restated Operating Agreements.

27.      Further, pursuant to the Waiver and Amendment, ITH granted the Lender an additional warrant granting Lender the right to purchase up to an additional 5% of the membership interests in ITH ("Warrant 2").  *Tandon Declaration* at ¶ 23.  Reflecting the Debtors' bullishness on the ability to refinance the obligations quickly, the Debtors negotiated

into the Waiver and Amendment the right to repurchase 80% of Warrant 2 at prices that escalated each month. *See* Waiver and Amendment at § 7. *Id.*

### E.    <u>Maturity Default and ITH's Relinquishment of the Pledged Equity</u>

28.    Aware of the need to refinance and the impact of the Debtors' failure to repay the Term Loan by June 30, 2019, upon information and belief, the Debtors, through Siegel and against the advice of his advisors, ignored several promising potential lenders and strategic partners that were ready and able to pay off the Lender. *Id.* at ¶ 24. Instead, the Debtors focused their efforts entirely on reaching a deal with a single party, which Siegel viewed to be personally beneficial to him. *Id.*

29.    Despite Siegel's representations that a refinancing transaction was imminent as recently as late-June 2019 (*see id.* at ¶ 25), no such refinancing occurred. In fact, no written proposal or commitment letter was ever provided to the Lender. *Id.*

30.    On May 1, 2019, ITS failed to make its regularly scheduled interest payment on the Term Loan when due. *Id.* at ¶ 26.

31.    ITS failed to achieve a refinancing transaction by June 30, 2019. *Id.* at ¶ 27. As a result, ITS failed to repay the Term Loan by the June 30, 2019 maturity date, constituting an Event of Default under the Loan Documents (the "<u>Maturity Default</u>"). *See* LSA at § 12.1(a). In accordance with ITH's agreement in the Waiver and Amendment, ITH automatically relinquished its rights in the Collateral, including in the Pledged Equity, as of July 1, 2019. Accordingly, ***ITH no longer had the right or capacity to authorize the bankruptcy filing of ITS as of July 1, 2019.***

32.    As of the date hereof, all obligations under the Loan Documents, including but not limited to principal, accrued and unpaid interest thereon, and any and all other Obligations

(as defined in the LSA), are fully due and payable.  As of July 1, 2019, ITS owes Lender not less than $9,121,181.80, consisting of principal, accrued and unpaid interest, and other fees under the Term Loan plus $3,550,000.00 pursuant to the Unsecured Note.  *Id.* at ¶ 28.

33.    On July 2, 2019, Lender delivered that certain Notice of Retention of Collateral in Full Satisfaction of Obligations (the "Strict Foreclosure Notice") putting ITS and its creditors on notice that as a result of the Maturity Default, ITH's rights in the Collateral were waived and Lender intended to retain the Collateral in full satisfaction of the obligations under the LSA.  A true and correct copy of the Strict Foreclosure Notice is attached to the Tandon Declaration as **Exhibit G**.

34.    On or about July 7, 2019, Lender became aware that, notwithstanding the Debtors' agreements in the Waiver and Amendment, the Maturity Default and the Strict Foreclosure Notice, the Debtors were continuing their efforts to pursue a refinancing transaction. *Id.* at ¶ 30.  Accordingly, on July 8, 2019, Lender delivered to ITS that certain Notice to Cease and Desist Regarding Refinancing Attempts in Connection with Lender's Collateral (the "Cease and Desist Letter").  By the Cease and Desist Letter, Lender reiterated that ITH waived and relinquished its rights in the Collateral and demanded that Debtors and Siegel immediately cease any and all efforts to seek a refinancing transaction.  *Id.*

35.    Furthermore, on July 8, 2019, the Lender received notification from the Landlord that, in addition to the Maturity Default with respect to the Term Loan, ITS failed to (i) make payments owed to the Landlord and (ii) pay taxes owed to the City of Oakland, including failing to appear at an administrative hearing on July 1, 2019 with respect to such taxes.  *Id.* at ¶ 31  The Landlord's notification further delineated multiple failures by ITS to maintain and secure the property in violation of the Sublease, resulting in theft, vandalism, and the property falling into

disrepair.  A true and correct copy of the Landlord's correspondence is attached to the Tandon Declaration as **Exhibit H**.

### F.    The Debtors Commence these Chapter 11 Cases

36.    On July 17, 2019, the Debtors commenced the Chapter 11 Cases.  The Corporate Resolutions filed for each of the Debtors in support of the bankruptcy filings are deficient.

37.    ITS' Corporate Resolution [Docket No. 2] authorizing its bankruptcy filing is claimed to solely originate from ITH's purported authority as the sole member of ITS.  ITH's Corporate Resolution [Docket No. 2] authorizing its bankruptcy filing is claimed to solely originate from Sharon A. Siegel, ITH's sole member and John Siegel as Manager.

38.    ITH, however, automatically lost the right to vote the Collateral upon the Maturity Default on June 30, 2019, since it affirmatively relinquished its rights to the Collateral.

39.    Both the Corporate Resolutions fail to conform with the Operating Agreements as neither the Lender nor any Warrant Holder authorized the filing of these chapter 11 cases.

### ARGUMENT

### I.    Cause Exists to Dismiss These Cases Pursuant to 11 U.S.C. § 1112(b)

40.    Courts are afforded broad discretion under section 1112(b) to dispose of a chapter 11 case for "cause".  Section 1112(b)(1) provides in pertinent part:

> [O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establishes that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

*Id.* (emphasis added).

41.    Section 1112(b)(4) sets forth a non-exhaustive list of factors that illustrate examples of cause.  Not all of the enumerated factors need to be present in order to establish

"cause," and, "the Court may dismiss a Chapter 11 case for reasons other than those specified in section 1112(b) so long as those reasons satisfy 'cause.'"  *In re TCR of Denver, LLC,* 338 B.R. 494, 500 (Bankr. D. Colo. 2006). For at least two, independently-sufficient reasons, "cause" exists to dismiss this case.

### A.        The Debtors Lacked Corporate Authority to File the Petitions

42.    The Debtors' chapter 11 cases must be dismissed because they were unauthorized.

43.    First, ITS' petition must be dismissed because ITH lacked any authority to authorize the filing of ITS' petition.  The Pledge Agreement is clear:  during an Event of Default, ITH's right to exercise voting and/or consensual rights and powers over the Pledged Equity ceases immediately and all such rights automatically vest solely and exclusively in the Lender. *See Pledge Agreement* § 2.2(c).  There can be no dispute that ITS failed to repay its obligations on the June 30, 2019 maturity date.  Upon the Maturity Default, ITH's right to vote its membership interest in ITS was automatically terminated and such right automatically vested in the Lender.  More importantly, the Maturity Default triggered the surrender of *all* of ITH's rights to the Collateral, not just its voting rights.  When the Debtors negotiated for additional time to refinance the Term Loan in the Waiver and Amendment, ITH agreed that "[i]f the Obligations due under the Loan are not paid in full on or before June 30, 2019 and Lender elects not to grant any extensions to the Borrower of the Maturity Date, Guarantor shall relinquish its rights to the Collateral as described in the Loan Agreement."  Consequently, as of July 1, 2019, ITH no longer owned nor had any rights to the equity ownership of ITS.

44.    The Lender's steps to comply with UCC sections 9-620 and 9-621 by delivering the Strict Foreclosure Notice to ITS and its creditors were taken for purposes of exercising its economic rights to the Collateral and to put other parties with interest in the Collateral on notice

of the Lender's rights in the Collateral, as required by the UCC, in order to effectively cleanse any third party claims against the Collateral.  ITH's actual waiver of its voting rights and disclaiming of its interests, however, took effect immediately upon the Maturity Default.  As a result, ITH now lacks authority to take any action on behalf of ITS, let alone commence a bankruptcy proceeding, because it cannot take actions on Collateral in which it affirmatively disclaimed any interest.  Accordingly, ITS' chapter 11 petition must be dismissed.

45.    Furthermore, assuming ITH retained its voting membership interest in ITS (which it did not), both ITH and ITS lacked authority to file these chapter 11 cases under their respective Operating Agreements.  "Determining authority is a question of state law, and in the case of a limited liability company is governed by the operating agreement, which defines the rights of members."  *In re FKF Madison Park Grp. Owner, LLC*, 2011 WL 350306, at *3 (Bankr. D. Del. Jan. 31, 2011).  The Operating Agreements are governed by the Delaware Limited Liability Company Act, which "give[s] the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."  Del. Code Ann. tit. 6, § 18-1101(b).

46.    Here, the Debtors' authority to file for bankruptcy protection is expressly governed by the Operating Agreements.  Section 8.1 of the Operating Agreements, which are identical in substance, plainly and expressly preclude the filing of a bankruptcy petition without the prior written consent of all holders of warrants in ITH.  Specifically, the Operating Agreements provide as follows:

> Notwithstanding anything to the contrary in this Agreement, the Company shall not, and the Manager shall not cause or allow the Company to, (i) file for bankruptcy protection as defined under the United States Bankruptcy Code Title 11 United States Code or (ii) dissolve, in each case, unless the Company has first obtained the prior written consent of (y) all holders of Class A Units and Class B Units in Insight Terminal Holdings, LLC, and (z) all holders of warrants exercisable for Class B Units in Insight Terminal Holdings, LLC.

-16-

*See* ITS Operating Agreement at § 8.1; *see also* ITH Operating Agreement at § 8.1 (providing the same).  The Lender holds warrants in Debtor ITH and, thus, its prior written consent was required for both of the Debtors to obtain authority to file for bankruptcy protection.    The Lender's consent was never sought nor given and, thus, the petitions must be dismissed for lack of authority.[5]

47.    The Lender is aware of precedent in the Eastern District of Kentucky whereby that bankruptcy court, on public policy grounds, declined to enforce provisions of an operating agreement similar to the provisions in these cases.  *See In re Lexington Hosp. Grp., LLC*, 577 B.R. 676, 684 (Bankr. E.D. Ky. 2017).  The Lender respectfully submits such decision is not binding on this Court and is not aware of any decision holding similarly that is binding on this Court.

48.    Moreover, even if the Court is inclined to follow such decision, the additional grounds raised herein warrant dismissal.  It was precisely the Lender's awareness of this precedent and its suspicions that the Debtors would once again renege on a business deal that prompted the Lender to request inclusion of the clause providing that ITH automatically disclaim its rights to the Collateral upon a Maturity Default, in an effort to leave no ambiguity on the nature and terms of the agreed-upon business deal.

## B.    The Petitions Must be Dismissed as Bad Faith Filings

49.    Even if the Court finds that the Debtors' petitions were authorized (which they were not), the Court should still dismiss these cases because the Debtors filed the petitions in bad faith.  The Sixth Circuit Court of Appeals has identified eight (8) factors, none of which is dispositive, that may be probative of an organizational debtor's lack of good faith:

---

[5]    As discussed herein, the Debtors attempted to rid themselves of these obligations through their Corporate Resolutions authorizing the filings by purporting to amend the Operating Agreements to remove this requirement in addition to several additional protections for the Lender that were previously agreed to.

(1) the debtor has one asset;

(2) the pre-petition conduct of the debtor has been improper;

(3) there are only a few unsecured creditors;

(4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;

(5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;

(6) the filing of the petition effectively allows the debtor to evade court orders;

(7) the debtor has no ongoing business or employees; and

(8) the lack of possibility of reorganization.

*In re Four Wells Ltd.*, 2016 WL 1445393, at *11 (B.A.P. 6th Cir. Apr. 12, 2016) (citing *In re Trident Assocs. Ltd. P'ship*, 52 F.3d 127, 130 (6th Cir. 1995)).

50.    The Debtors' cases satisfy nearly every one of these factors.  **First**, ITS' sole potential asset is the Sublease.  As of July 1, 2019, ITH holds no assets and, even prior to its relinquishment of its voting interest in ITS, such interest was its only asset.  Even given a generous assumption that ITH continues to own voting rights in ITS, these cases bear the hallmarks of a bad faith filing commenced by what are essentially debtors with a single, non-operational asset.  "Bad faith is commonly found in single asset cases involving debtors with no current business operations to reorganize."  *In re Platte River Bottom, LLC*, 2016 WL 241464, at *9 (Bankr. D. Colo. Jan. 19, 2016).

51.    **Second**, prior to the Petition Date, the Debtors acted improperly, by, among other things, (i) ITS shirking numerous responsibilities to maintain and secure the property; (ii) ITH failing to relinquish its voting rights in the Pledged Equity despite its prior agreement that, in the event of a Maturity Default, ITH's voting rights over the Pledged Collateral were waived; (iii) failing to seek Autumn Wind's consent, both in its capacity as the Lender and as a Warrant

holder, to the commencement of these cases in accordance with the Operating Agreements; (iv) failing to make payments owed to the Landlord and the City of Oakland as required by the Sublease; and (v) filing these cases without the Lender's consent despite their explicit agreements not to do so without proper authority under the Operating Agreements.  The Debtors attempted to rid themselves of these obligations through their Corporate Resolutions authorizing the filings by purporting to amend the Operating Agreements to remove this requirement in addition to several additional protections for the Lender that were previously agreed to.[6]  The Debtors' filing of these cases despite their agreement not to do so without the consent of all warrant holders and their last minute attempt to strip the Lender of its consent right are just the latest instances of many in which the Debtors reneged on a deal with the Lender and is probative of their bad faith.  If the Debtors are allowed to proceed with these cases, and Siegel retains control of the Debtors,  his improper conduct and gross mismanagement will only continue to the detriment of the Lender, the value of its Collateral, and other creditors.

52.    ***Third***, there are very few unsecured creditors in these cases. ITS lists only 11 creditors, several of which are attorneys or other professionals, and ITH only names the Lender. Furthermore, a review of ITS' list demonstrates that the Lender is by far the largest creditor in these cases.  Courts recognize the small number of unsecured creditors as a "recurring" pattern in bad faith cases. *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986).  In a single asset real estate case with large secured claims, a bad faith finding is appropriate where "unsecured debt is owed primarily to accountants and attorneys of the debtor whose claims are relatively small."  *In re RAD Props., Inc.*, 84 B.R. 827, 830 (M.D. Fla. Bankr. 1988).

---

[6]   The Corporate Resolutions, though dated June 28, 2019,are ineffective since the Petition Date occurred after ITH's right to exercise voting and/or consensual rights and powers over such membership interests in ITS were terminated.

53.     *Fourth*, while ITH's rights in the Pledged Equity were automatically relinquished upon the Maturity Default, the Lender sent the Debtors a Strict Foreclosure Notice to commence foreclosure and realize the economic value of the Collateral, the blocking of which was the Debtors' sole motivation for commencing these cases.  Courts have repeatedly recognized that the Bankruptcy Code should not be used as a litigation tactic to resolve what is "essentially a two party dispute capable of prompt adjudication in state court." *In re St. Paul Self Storage Ltd. P'ship,* 185 B.R. 580, 583 (B.A.P. 9th Cir. 1995); *see also In re 15375 Mem. Corp.*, 400 B.R. 420, 427 (D. Del. 2009) (finding bad faith where "Debtors' primary objective in filing the petitions was to gain a tactical advantage in litigation"); *see also In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1415-1416 (10th Cir. 1996) (finding bad faith where single asset real estate debtor filed bankruptcy petition "the day before the scheduled foreclosure").

54.     *Fifth*, the Debtors have no true ongoing business and few employees.  As stated herein and in the Tandon Declaration, the Debtors have yet to commence development of the Bulk and Oversized Terminal, nor is such development expected to commence in the near term. The Debtors have never carried on any business nor employed more than one or two persons in addition to Siegel, its manager.  This is plainly not an ongoing business, nor can ITS demonstrate any viable prospects of conducting business in the near term.

55.     *Finally*, the Debtors cannot demonstrate a possibility of reorganizing their businesses, as there are no businesses to reorganize.  ITH has waived its rights to exercise voting or other rights with respect to the Pledged Equity, which is its sole asset.  ITS, as stated above, is not conducting business.   As in *In re Platte River Bottom*, ITS "has no intention of rehabilitating an existing business because no business exists." 2016 WL 241464, at *11.  The Debtors' lack of operations – and indeed their lack of effort to even attempt a reorganization – is highlighted by

the fact that, despite filing for bankruptcy on July 17, 2019, the Debtors have not filed first day motions seeking the Court's authority to continue honoring any obligations in the ordinary course of their businesses, because there are none.[7]  The Debtors' use of chapter 11 as a sword to obtain a tactical advantage in their efforts to further shirk their agreements, in this case to turn over the Collateral to which ITH waived its rights, is an abuse of the chapter 11 process that the good faith requirement is designed to prevent. Courts have long recognized that the protections offered to a debtor by the Bankruptcy Code were intended as shield and not a sword.  *See Shell Oil Co., v. Waldron (In re Waldron)*, 785 F.2d 936, 940 (11th Cir. 1986) (citation omitted) ("The bankruptcy laws were simply not intended to be used as a sword by the rapacious."); *Braniff Int'l Airlines, Inc. v. Aeron Aviation Resources Holdings II, Inc. (In re Braniff Int'l Airlines, Inc.)*, 159 B.R. 117, 125 (E.D.N.Y. 1993) ("The protections for the debtor under the Bankruptcy Code operate as a shield, not a sword.").

## **RESERVATION OF RIGHTS**

56.    The Lender reserves its rights to further address the Motion and any other ancillary issues and to respond to any objection of any party, either by further submissions to this Court, at oral argument or by testimony to be presented at any hearing.

[*remainder of page intentionally left blank*]

---

[7]    By their inaction, the Debtors implicitly acknowledge their inability to reorganize because they are not taking any steps towards effecting any such reorganization.

WHEREFORE, the Lender respectfully requests that the Court grant the Motion and enter an Order dismissing the Debtors' chapter 11 petitions and take such other actions as the Court may deem appropriate.

_/s/ Edward M. King_

Ronald E. Gold
Edward M. King
FROST BROWN TODD LLC
400 W. Jefferson Street, 32nd Floor
Louisville, KY  40202
Telephone: (502) 589-5400
Facsimile: (502) 581-1087
rgold@fbtlaw.com
tking@fbtlaw.com
_Counsel for Autumn Wind Lending, LLC_

OF COUNSEL:

Robert M. Hirsh, Esq.
Jordana L. Renert, Esq.
Arent Fox LLP
1301 Avenue of the Americas
42nd Floor
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-4990

_Counsel to Autumn Wind Lending, LLC_

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of July, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will serve notice on all parties registered to receive notice in this case.


/s/ Edward M. King
COUNSEL    FOR    AUTUMN    WIND
LENDING, LLC


FROST BROWN TODD LLC
400 W. Market Street, 32nd Floor
Louisville, KY  40202
(502) 589-5400

-2-