# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| IN RE: | Case No. 19-32231-jal |
| INSIGHT TERMINAL SOLUTIONS, LLC[1] | Jointly Administered |
| Debtors. | Chapter 11 |

### INSIGHT TERMINAL SOLUTIONS, LLC'S AND INSIGHT TERMINAL HOLDINGS, LLC'S PROPOSED FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO BANKRUPTCY CODE SECTION 1121(a)

**MIDDLETON REUTLINGER**
Andrew D. Stosberg
KBA ID No. 87969
401 South Fourth Street, Suite 2600
Louisville, Kentucky 40202
Tel: (502) 625-2734
Fax: (52) 561-0442
astosberg@middletonlaw.com

Dated: June 19, 2020

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE OR A LEGALLY BINDING OBLIGATION OF DEBTORS OR ANY OTHER PARTY IN INTEREST AND, THE PLAN WILL BE SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THE PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. SUCH A SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES AND/OR BANKRUPTCY LAWS.**

---

[1] The Debtors in these Chapter 11 Cases are Insight Terminal Solutions, LLC (Case No. 19-32231) and Insight Terminal Holdings, LLC (Case No. 19-32232), and the Court has entered an order in these cases directing for the procedural consolidation and joint administration of these cases. The docket in this Case No. 19-32231 should be consulted for all matters affecting the above listed cases.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION..................................................................................................................1

ARTICLE I         DEFINITIONS, RULES OF INTERPRETATION, AND
                  CONSTRUCTION ........................................................................ 1
    A.    Defined Terms ................................................................................ 1
    B.    Rules of Construction ..................................................................... 8

ARTICLE II        TREATMENT OF UNCLASSIFIED CLAIMS ............................. 9
    A.    Administrative Claims .................................................................... 9
    B.    Professional Fee Claims ................................................................. 9
    C.    Priority Tax Claims ........................................................................ 9
    D.    DIP Financing Claims .................................................................... 9

ARTICLE III CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
                  AND INTERESTS ...................................................................... 10
    A.    Classification and Treatment Generally ...................................... 10
    B.    Classification and Treatment of Classified Claims and Interests ......................... 10

ARTICLE IV TREATMENT OF THE DEBTORS' EXECUTORY CONTRACTS
                  AND UNEXPIRED LEASES ...................................................... 12
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ......... 12
    B.    Procedures Related to Rejection of Executory Contracts or Unexpired
        Leases ........................................................................................... 13
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ....... 14
    D.    Modifications, Amendments, Supplements, Restatements, or Other
        Agreements................................................................................... 15
    E.    Contracts and Leases Entered into After the Petition Date ......... 15

ARTICLE V INTERESTS ............................................................................... 16
    A.    Retention of Interests.................................................................... 16
    B.    Cancellation of Existing Loan Agreements................................. 16

ARTICLE VI CORPORATE GOVERNANCE AND IMPLEMENTATION OF THE
                  PLAN........................................................................................... 16
    A.    No Substantive Consolidation for Plan Purposes........................ 16
    B.    Vesting of Assets.......................................................................... 16
    C.    Books and Records....................................................................... 16
    D.    Amended Organizational Documents and Corporate Governance ..................... 16

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| E. | Plan Funding & Terminal Construction | 17 |
| F. | Discharge | 17 |
| G. | Distributions | 17 |
| H. | Effectiveness of Instruments and Agreements | 17 |
| I. | No Company Action Required | 17 |

ARTICLE VII EFFECT OF THE PLAN ON CLAIMS, INTERESTS AND CAUSES OF ACTION ............................................................ 18

| | | |
|---|---|---|
| A. | Binding Effect | 18 |
| B. | Release and Discharge | 18 |
| C. | Term of Injunctions or Stays | 18 |
| D. | Exculpation | 19 |
| E. | Injunction Related to Releases and Exculpation | 20 |
| F. | Releases by the Debtors | 20 |
| G. | Releases by Holders of Claims and Interests | 20 |
| H. | Waiver of Statutory Limitations on Releases | 21 |
| I. | Retention, Reservation and Prosecution of Litigation Claims | 21 |

ARTICLE VIII DETERMINATION OF CLAIMS; EFFECTIVE DATE ................................. 21

| | | |
|---|---|---|
| A. | Administrative Claims Bar Date | 21 |
| B. | Objections to Claims | 22 |
| C. | Conditions to Effectiveness | 22 |
| D. | Waiver of Conditions | 22 |
| E. | Effect of Non-Occurrence of the Effective Date | 22 |

ARTICLE IX MISCELLANEOUS PLAN PROVISIONS ................................................ 22

| | | |
|---|---|---|
| A. | Retention of Jurisdiction | 22 |
| B. | Effecting Documents; Further Transactions; Timing | 24 |
| C. | Governing Law | 24 |
| D. | Exemption from Transfer Taxes | 24 |

**TABLE OF CONTENTS**
(continued)

Page

E.    Post-Effective Date Fees; Final Decree ..................................................24

F.    Method of Payment; Payments, Filings, and Notices Only on Business Days ....................................................................................................25

G.    Undeliverable or Unclaimed Distributions ............................................25

H.    Time Bar to Cash Payments...................................................................25

I.    Revocation, Withdrawal, or Non-Consummation ..................................25

J.    Notices ..................................................................................................25

K.    Entire Agreement ..................................................................................26

L.    Severability ...........................................................................................26

M.    Exhibits .................................................................................................26

**N.**    Conflicts.................................................................................................27

## INTRODUCTION

Debtors, Insight Terminal Solutions, LLC ("ITS") and Insight Terminal Holdings, LLC ("ITH", and collectively with ITS, the "Debtors"), in the above-captioned jointly administered and procedurally consolidated chapter 11 cases, by and through counsel, proposes the following chapter 11 plan of reorganization (the "Plan") pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used in the Plan have the meanings ascribed to the terms in Article I.A of the Plan. Please refer to the Disclosure Statement for a discussion of the Debtors' history, as well as a summary and analysis of the Plan and other related matters, including distributions to be made under the Plan. The Debtors are the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, FEDERAL RULE OF BANKRUPTCY PROCEDURE 3019 AND THIS PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THIS PLAN BEFORE ITS EFFECTIVE DATE.**

## ARTICLE I
## DEFINITIONS, RULES OF INTERPRETATION, AND CONSTRUCTION

A.    Defined Terms. The following terms have the meanings specified below, except as expressly provided in other sections of the Plan, unless the context otherwise requires (such meanings to be equally applicable to both the singular and plural, and masculine and feminine, forms of the terms defined). Any capitalized term used in the Plan but not defined here shall have the meaning assigned to that term in the Bankruptcy Code or Bankruptcy Rules.

1.    "Administrative Claim" means a Claim for any expense Allowed under Bankruptcy Code sections 503(b), 507(b), or 546(c)(2) and entitled to priority under Bankruptcy Code section 507(a)(2), including: (a) fees payable under 28 U.S.C. § 1930; (b) actual and necessary costs and expenses incurred in the ordinary course of the Debtors' business; (c) actual and necessary costs and expenses of preserving the Estates or administering the Chapter 11 Cases; and (d) any Professional Fee Claims to the extent Allowed by Final Order under Bankruptcy Code sections 330, 331, or 503.

2.    "Allowed" means, with respect to any Claim or Interest, such Claim or Interest or any portion thereof that the Reorganized Debtors have assented to the validity of or that has been (a) expressly allowed under the Plan, (b) that is not Disputed, (c) that is either allowed or determined by a Final Order of a court of competent jurisdiction, or (d) that is agreed to by the Reorganized Debtors and the holder of such Claim or Interest; provided, however, that, notwithstanding anything to the contrary, by treating a Claim as an "Allowed Claim" or an Interest as an "Allowed Interest," the Reorganized Debtors do not waive their rights to contest the amount and validity of such Claim or Interest to the extent it is disputed, contingent or unliquidated, in the manner and venue in which such Claim or equity Interest would have been determined, resolved or adjudicated if the Chapter 11 Case had not been commenced; and provided, further that the amount of any Allowed Claim or Allowed Interest shall be determined

in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.

3.      "Amended Organizational Documents" means the amendments to the form of certificates or articles of organization, operating agreements, and other applicable formation documents of the Debtors. Substantially final forms of the Amended Organizational Documents shall be contained in the Plan Supplement.

4.      "Avoidance Actions" means any and all actual or potential claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors and its recovery, subordination, or other remedies that may be brought by and on behalf of the Debtors and their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code.

5.      "AWL" means Autumn Wind Lending, LLC.

6.      "AWL General Unsecured Claim" means any Claim held by AWL against the Debtors existing as of the Petition Date other than an Administrative Claim, DIP Financing Claim, Subordinated Claim, Secured Claim, Priority Tax Claim or Priority Claim.

7.      "Bankruptcy Code" means Title 11 of the United States Code as of the Petition Date.

8.      "Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Kentucky, which has jurisdiction over the Chapter 11 Case.

9.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case or proceedings therein.

10.      "Bay Bridge" means Bay Bridge Exports, LLC, a Colorado limited liability company.

11.      "Business Day" means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a) (6)), on which commercial banks are open for business in Louisville, Kentucky.

12.      "Cash" means currency, checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks, money orders, and wire transfers of immediately available funds.

13.      "Cecelia" means Cecelia Financial Management, LLC, a Florida limited liability company.

14.  "Cecelia Unsecured Claim" means the Allowed General Unsecured Claim of Cecelia.

15.  "Chapter 11 Case" means the Debtors' jointly administered cases under chapter 11 of the Bankruptcy Code, pending before the Bankruptcy Court under Case No. 19-32231-jal and Case No. 32232 -jal.

16.  "Claim" means a claim against the Debtors or their property as defined in Bankruptcy Code section 101(5), including: (a) any right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured arising at any time before the Effective Date; or (b) any right to an equitable remedy for breach of performance if the breach gives rise to a right to payment, whether or not the right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

17.  "Claims Bar Date" means the last date to file a proof of claim, as determined by the Bankruptcy Court under Federal Rule of Bankruptcy Procedure 3003.

18.  "Claims Objection Deadline" means the last day to file an objection to any Claim under Bankruptcy Code section 502(a), which shall be one hundred eighty (180) days after the Confirmation Date, which may be extended upon request of the Reorganized Debtors.

19.  "Class" means a category consisting of holders of Claims or Interests substantially similar in nature to the Claims or Interests of other holders placed in that category, as designated in Article III of the Plan.

14.  "Collateral" means any property or interest in property of the estates of the Debtors subject to a Lien to secure the payment or performance of a claim, provided the Lien is not subject to avoidance under the Bankruptcy Code or applicable state law.

15.  "Confirmation Date" means the date the Clerk of the Bankruptcy Court enters the Confirmation Order.

16.  "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

17.  "Confirmation Order" means the order(s) confirming the Plan in accordance with the provisions of the Bankruptcy Code.

18.  "Convertible Note" means that Second Amended and Restated Secured Convertible Promissory Note dated January 2, 2019, executed by John in favor of Bay Bridge in the original principal amount of $5,500,000.00, as amended.

19.  "Cure" means the payment of Cash by the Reorganized Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as

necessary to cure monetary defaults under an Executory Contract or Unexpired Lease of the Debtors and to permit the Reorganized Debtors to assume that contract or lease under section 365(a) of the Bankruptcy Code.

20.    "Cure Schedule" means the schedule of proposed Cure amounts for each Executory Contract and Unexpired Lease proposed to be assumed, as the same may be amended, modified, or supplemented from time to time and which will be included in the Plan Supplement.

21.    "Debtors" means Insight Terminal Solutions, LLC and Insight Terminal Holdings, LLC.

22.    "DIP Financing Claims" means the Claims of the DIP Lenders arising from the debtor-in-possession financing provided by the DIP Lenders pursuant to the DIP Orders.

23.    "DIP Lenders" means Bay Bridge and Cecelia.

24.    "DIP Orders" means collectively the following: (a) Order Granting Motion to Amend Interim Order Granting Motion to Borrow dated August 5, 2019 [Doc. No. 53]; (b) Interim Order (I) Authorizing Financing Pursuant to Sections 364 and 507(B), (II) Modifying Automatic Stay Under Section 362, (III) Reserving Certain Issues for Final Hearing, and (IV) Granting Other Related Relief dated September 5, 2019 [Doc. No. 83]; (c) Agreed Order Amending Interim Bay Bridge DIP Order dated September 30, 2019 [Doc. No. 102]; (d) Final Order (i) Authorizing Financing from Bay Bridge Pursuant to Sections 364(b) and 503(b)(1), (ii) Modifying Automatic Stay under Section 362, and (iii) Granting Other Related Relief dated January 31, 2020 [Doc. No. 167]; (e) Agreed Order Modifying Prior DIP Financing Orders dated February 19, 2020 [Doc. No. 175]; and (f) any subsequent order entered by the Court approving debtor-in-possession financing.

25.    "Disclosure Statement" means the written statement and any supplemental materials provided by the Debtors under Bankruptcy Code section 1125.

26.    "Disputed" means, as to any Claim (or portion thereof) or Interest against the Debtors, a Claim or Interest to the extent the allowance of such Claim or Interest is the subject of (i) a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Confirmation Order, and which objection, request for estimation or dispute has not been withdrawn, with prejudice, or determined by an order of the Bankruptcy Court, or (ii) a Claim subject to a dispute that is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law.

27.    "Effective Date" means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which all conditions precedent to the effectiveness of this Plan specified in Article VIII, have been satisfied, or, if capable of being waived, waived, which date shall be specified in a notice filed by the Reorganized Debtors, as applicable, with the Bankruptcy Court.

28.    "Estates" means the Debtors' bankruptcy estates created pursuant to section 541 of the Bankruptcy Code.

29.    "Exculpated Parties" means collectively, and, in each case, solely in their capacities as such: the Debtors, the Reorganized Debtors, the DIP Lenders and their successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case solely in their capacity as such.

30.    "Executory Contract" means any contract to which the Debtors are a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

31.    "Final Order" means an order as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, move for re-argument, or rehearing shall have been waived in writing or, in the event an appeal, writ of certiorari, or re-argument or rehearing has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which re-argument or rehearing was sought, and the time to take any further appeal, petition for certiorari, or motion for re-argument or rehearing shall have expired.

32.    "General Unsecured Claim" means any Claim against the Debtors existing as of the Petition Date other than an Administrative Claim, DIP Financing Claim, Subordinated Claim, Secured Claim, Priority Tax Claim, Priority Claim, or AWL General Unsecured Claim.

33.    "Governmental Unit" means an entity defined in Bankruptcy Code section 101(27).

34.    "Holder" means a Person or entity holding a Claim or Interest.

35.    "Impaired" means impaired within the meaning of section 1124 of the Bankruptcy Code.

36.    "Interest" means any equity interest in the Debtors represented by any certificated or uncertificated shares or membership interest issued to any Person before the Effective Date, and any warrants, options, or rights to purchase any equity interest, or any other instrument evidencing a present ownership interest, direct or indirect, inchoate or otherwise, in the Debtors, or right to convert into such an equity interest or acquire any equity interest of the Debtors, which was in existence prior to or on the Petition Date.

26.    "Lien" means any charge against, security interest in, encumbrance upon, or other interest in property to secure payment of a debt or performance of an obligation.

37.    "Litigation Claims" means any and all actions, claims, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including actions brought prior to the Petition Date, actions under chapter 5 of the Bankruptcy Code, including any Avoidance Action, and actions against any Person or entity for failure to pay for products or services provided or rendered by the Debtors, all claims, suits or proceedings relating to enforcement of the Debtors' intellectual property rights, including patents, copyrights and trademarks, and all claims or causes of action seeking recovery of the Debtors' or the Reorganized Debtors' accounts receivable or other receivables or rights to payment created or arising in the ordinary course of the Debtors' or the Reorganized Debtors' businesses, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date.

38.    "Membership Interests" means the membership interests of Sharon in ITH and the membership interests of ITH in ITS as they existed on the Petition Date.

39.    "Priority Claim" means any Claim (or portion of a Claim) entitled to priority under section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

40.    "Person" means an individual, corporation, partnership, limited liability company (including its members), joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

41.    "Petition Date" means July 17, 2019, the date on which the Debtors commenced their Chapter 11 Cases.

42.    "Plan" means the plan of reorganization submitted by the Debtors pursuant to Chapter 11 of the Bankruptcy Code.

43.    "Plan Supplement" means the supplement to the Plan, if any, which is incorporated fully into the Plan, that will contain the exhibits and Plan documents necessary and appropriate to implement the terms of the Plan including, but not limited to, the Amended Organization Documents, and which shall be filed no later than fifteen (15) days prior to the Confirmation Hearing or such other date as may be approved by the Bankruptcy Court, including any amendments, modifications, and/or supplements thereto.

44.    "Prepetition Loan and Security Agreement" means that certain Loan and Security Agreement dated as of September 24, 2018 (as amended, restated, supplemented or otherwise modified) between AWL and the Debtors.

45.    "Priority Tax Claim" means any Claim of a Governmental Unit, as defined in section 101(27) of the Bankruptcy Code, entitled to priority under Bankruptcy Code section 507(a)(8).

46.    "Professionals" means any law, financial advisory, restructuring, accounting, or other advisory firm or person retained by the Debtors in connection with these Chapter 11 Cases.

47.    "Professional Fee Claim"    means an Administrative Claim for compensation and reimbursement of expenses of a professional incurred before the Effective Date submitted in accordance with Bankruptcy Code sections 328, 330, 331, or 503(b).

48.    "Professional Fee Bar Date" means the last day to file an application for approval of Professional Fee Claims, which is 45 days after the Confirmation Date pursuant to Article VII of the Plan.

49.    "Released Parties" means (i) each present and former manager, director, officer and employee of the Debtors, in his or her capacity as such, (ii) each Holder of a DIP Financing Claim in its capacity as such, and (iii) each Advisor of the Debtors and the Holders of the DIP Financing Claims.  For purposes of this definition, "Advisors" means each of the following: financial advisor, investment banker, Professional, accountant, and attorney, and each of their respective employees, members, parent corporations, subsidiaries, affiliates, and partners.

50.    "Reorganized Debtors" means Insight Terminal Solutions, LLC, and Insight Terminal Holdings, LLC, as of the Effective Date.

51.    "Rejection Bar Date" means the date that is twenty-one (21) days after the Effective Date.

52.    "Rejection Damages Claim" means any Claim on account of the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

56.    "Schedule of Rejected Executory Contracts and Unexpired Leases" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors and/or Reorganized Debtors, as the same may be amended, modified, or supplemented from time to time, and which will be included in the Plan Supplement.

57.    "Schedules" means, unless otherwise specified, the respective schedules of assets and liabilities, the list of Holders of Interests, and the statement of financial affairs filed by the Debtors in accordance with section 521 of the Bankruptcy Code and the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended on or prior to the Confirmation Date.

58.    "Secured Claim" means a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy

Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code

        59.     "Sharon" means Sharon Siegel.

        60.     "Subordinated" means a Claim that is thereafter subordinated in a Final Order pursuant to section 510 or any other provision of the Bankruptcy Code or applicable law.

        61.     "Unexpired Lease" means a lease of nonresidential real property to which the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

        62.     "Warrants" means that certain Warrant Certificate No. 1 by and between ITH and AWL and dated as of September 24, 2018, and that certain Warrant Certificate No. 2 by and between ITH and AWL and dated as of February 22, 2019.

    B.    Rules of Construction.

        1.     Generally. For purposes of the Plan: (i) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented; (ii) unless otherwise specified, all references in the Plan to Sections, Articles, and exhibits are references to Sections, Articles, and exhibits of or to the Plan; and (iii) the rules of construction set forth in section 102 of the Bankruptcy Code and the Bankruptcy Rules shall apply unless superseded herein or in the Confirmation Order.

        2.     Time Periods. In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

        3.     Miscellaneous Rules. (i) The words "herein," "hereof," "hereunder," and other words of similar import refer to the Plan as a whole, not to any particular Section, subsection, or clause, unless the context requires otherwise; (ii) whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, and each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine, and the neuter; and (iii) captions and headings to Articles and Sections of the Plan are inserted for convenience of reference only and are not intended to be a part or to affect the interpretation of the Plan.

## ARTICLE II
## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a) (1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

A.    Administrative Claims. Except to the extent that a Holder of an Allowed Administrative Claim and the Reorganized Debtors agree to less favorable treatment, each Holder of an Allowed Administrative Claim (other than Professional Fee Claims) will, in exchange for full and final satisfaction, settlement, release, and discharge of such Allowed Administrative Claim, be paid the full unpaid amount of such Allowed Administrative Claim in Cash on, or as soon thereafter as is reasonably practicable, (a) the Effective Date or, if payment is not then due, (b) on the due date of such Allowed Administrative Claim, or (c) within five (5) Business Days from such Administrative Claim being Allowed; *provided, however*, that Administrative Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due. Any taxes that arose post-petition shall be paid in the ordinary course of business.

B.    Professional Fee Claims. Each Allowed Professional Fee Claim shall be paid in full in Cash on the later of: (a) five (5) Business Days after the Professional Fee Claim is Allowed; and (b) another date on which the Holder of the Professional Fee Claim and the Reorganized Debtors agree. Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve on the Reorganized Debtors its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by the Professional Fee Bar Date.

C.    Priority Tax Claims. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive the treatment set forth in Section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Reorganized Debtors and such Holder or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

D.    DIP Financing Claims. On the Effective Date, each DIP Lender shall be paid Cash in an amount equal to its DIP Financing Claim.

**ARTICLE III**
**CLASSIFICATION AND**
**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

A.    <u>Classification and Treatment Generally</u>. Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests, which are placed in a particular Class for all purposes under the Plan, including, without limitation, voting, confirmation, and receiving distributions under the Plan, as set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Claims arising under sections 507(a)(2) or 507(a)(8) of the Bankruptcy Code are not classified and their treatment is set forth in Article II.

B.    <u>Classification and Treatment of Classified Claims and Interests</u>. Classified Claims and Interests are divided into numbered classes as follows:

| Class | Treatment | Entitled To Vote |
|---|---|---|
| Class 1 – Priority Claims | Unimpaired | No (Deemed to Accept) |
| Class 2 – Secured Claims | Unimpaired | No (Deemed to Accept) |
| Class 3 – AWL General Unsecured Claim(s) | Unimpaired | No (Deemed to Accept) |
| Class 4 – General Unsecured Claims | Unimpaired | No (Deemed to Accept) |
| Class 5 – Interests | Unimpaired | No (Deemed to Accept) |

1.    <u>Class 1: Priority Claims</u>

(a)    Treatment: Except to the extent that a Holder of a Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, each Holder of such Priority Claim shall receive the following at the option of the Reorganized Debtors:

(i)    Payment of an Allowed Priority Claim in full in Cash in the ordinary course of business;

(ii)    Reinstatement of such Priority claim; or

(iii)    Such other treatment rendering such Priority Claim Unimpaired.

(b)    Impairment: Holders of Priority Claims are unimpaired and all Holders of Priority Claims are conclusively deemed to have accepted the Plan.

10

2. <u>Class 2: Secured Claims</u>

    (a)    Treatment: Except to the extent that a Holder of a Secured Claim agrees to less favorable treatment, each Holder of an Allowed Secured Claim shall, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, receive payment in Cash in the full amount of an Allowed Secured Claim, which payment shall occur on the later of (i) thirty (30) days after the Effective Date, (ii) thirty (30) days after such Claim is Allowed, and (iii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Secured Claim.

    (b)    Impairment: Holders of Secured Claims are unimpaired, and all Holders of Secured Claims are conclusively deemed to have accepted the Plan.

3. <u>Class 3: AWL General Unsecured Claim(s)</u>

    (a)    Treatment: Except to the extent that AWL agrees to less favorable treatment, AWL, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim(s), shall receive payment in Cash in the full amount of any AWL General Unsecured Claim, which payment shall occur on the later of (i) thirty (30) days after the Effective Date, (ii) thirty (30) days after such Claim is Allowed, and (iii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed AWL General Unsecured Claim.

    (b)    Impairment: AWL as a Holder of the AWL General Unsecured Claim(s) is unimpaired, and is conclusively deemed to have accepted the Plan.

4. <u>Class 4: General Unsecured Claims</u>

    (a)    Treatment: Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall, in exchange for full and final satisfaction, settlement, release, and discharge of such Claim, receive payment in Cash in the full amount of an Allowed General Unsecured Claim, which payment shall occur on the later of (i) thirty (30) days after the Effective Date, (ii) thirty (30) days after such Claim is Allowed, and (iii) the date due in the ordinary course of business in accordance with the terms and conditions of the

particular transaction giving rise to such Allowed General Unsecured Claim.

Cecelia has agreed that ITS shall assume the Allowed Cecelia Unsecured Claim and payment due thereon shall be deferred until after the Effective Date and after all the distributions under the Plan have been made or the Reorganized Debtors have reserved sufficient funds for any distributions not yet made. For avoidance of doubt, such treatment does not apply to Cecelia's DIP Financing Claim. The Allowed Cecelia Unsecured Claim shall be subordinate in right of payment to any financing provided to the Reorganized Debtors on the Effective Date. Cecelia shall also subordinate the Allowed Cecelia Unsecured Claim in right of payment to the extent necessary or required for the Reorganized Debtors to obtain future financing.

(b)    Impairment: Holders of General Unsecured Claims are unimpaired, and all Holders of General Unsecured Claims are conclusively deemed to have accepted the Plan.

5.    <u>Class 5: Interests</u>

(a)    Treatment:  Except as otherwise provided for herein, Holders of Allowed Interests shall retain those Allowed Interests.

(b)    Impairment: Interest Holders are unimpaired.  The Holders are conclusively presumed to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code and will not vote on the Plan.

AWL's Interests are limited to the Warrants and are Disputed. The Debtors will object to and seek the disallowance of the Warrants pursuant to sections 105 and 502(a), and other applicable provisions of the Bankruptcy Code, because they are unenforceable against Debtors due to the failure of a condition precedent to the exercise of the Warrants. The Debtors further reserve the right to seek to reject the Warrants in accordance with section 365 of the Bankruptcy Code.

## ARTICLE IV
## TREATMENT OF THE DEBTORS' EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases.</u>

1.      Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to Sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (a) is identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) was assumed or rejected previously by the Debtor; (c) expired or terminated pursuant to its own terms before the Effective Date; (d) is the subject of a motion to assume pending on the Confirmation Date; or (e) is the subject of a motion pending on the Confirmation Date to assume an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

2.      Entry of the Confirmation Order shall constitute a Final Order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, as of the Effective Date, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

3.      All assumed Executory Contracts and Unexpired Leases shall remain in full force and effect for the benefit of the Reorganized Debtors, and be enforceable by the Reorganized Debtors in accordance with their terms, notwithstanding any provision in such assumed Executory Contract or Unexpired Lease that prohibits, restricts or conditions such assumption, assignment or transfer. Any provision in the assumed Executory Contracts and Unexpired Leases that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases or any successor cases shall be deemed unenforceable. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed unenforceable such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by a court order or by applicable law.

4.      Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to alter, amend, modify or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time before the Confirmation Date, including without limitation the right to remove any Executory Contract or Unexpired Lease therefrom. The Debtors further reserve the right to remove any Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Effective Date upon the consent of the applicable non-Debtor counterparty.

B.      Procedures Related to Rejection of Executory Contracts or Unexpired Leases. The Debtors will file the Schedule of Rejected Executory Contracts and Unexpired Leases with the Plan Supplement on or before the date that is fourteen (14) days before the Confirmation Hearing. Each non-Debtors counterparty to an Executory Contract or Unexpired Lease to be rejected pursuant to the Plan shall have until 4:00 p.m. (Eastern time) on the date that is seven (7) days

after service of the Schedule of Rejected Executory Contracts and Unexpired Leases upon such counterparty to file a written objection to the rejection of its Executory Contract or Unexpired Lease and serve it in a manner to be actually received by each of the following: (i) counsel to the Debtors, Middleton Reutlinger, 401 S. Fourth Street, Suite 2600, Louisville, Kentucky 40202, Attn: Andrew D. Stosberg; and (ii) the United States Trustee, 601 West Broadway, Suite 512, Louisville, KY 40202, Attn: John R. Stonitsch. Any such objections that cannot be consensually resolved by the Debtors and the objecting non-Debtors counterparty shall be considered by the Bankruptcy Court at the Confirmation Hearing or such other date requested by the Debtors.

1.      <u>Schedule of Rejected Executory Contracts and Unexpired Leases</u>. Executory Contracts and Unexpired Leases set forth on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date.

2.      <u>Abandonment of Personal Property</u>. Any fixtures, furniture, advertising displays, other office and store equipment or any other personal property left by the Debtors on the premises related to Unexpired Leases rejected pursuant to the Plan shall be deemed abandoned as of the Rejection Date pursuant to section 554 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute authorization by the Bankruptcy Court of such abandonment and, as of the Effective Date, the non-Debtors counterparties to such rejected Unexpired Leases may dispose of any such personal property in their sole and absolute discretion without notice or liability to the Debtors or third parties.

3.      <u>Claim Procedures for Rejection Damages Claim Holders</u>. Each non-Debtors counterparty to an Executory Contract or Unexpired Lease identified on the Schedule of Rejected Executory Contracts and Unexpired Leases must file a proof of claim asserting any Rejection Damages Claim on or before the Rejection Bar Date. **Any Person with a Rejection Damages Claim is required to file a proof of Claim asserting a Rejection Damages Claim and failure to do so on or before the Rejection Bar Date shall result in any Rejection Damages Claim being disallowed in accordance with section 502 of the Bankruptcy Code and forever barred, estopped, and enjoined from assertion and any such Rejection Damages Claim shall not be enforceable against the Reorganized Debtors, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding a proof of Claim to the contrary.**

C.      <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>.

1.      The proposed Cure amount for all Executory Contracts not identified on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be $0.00 unless otherwise indicated on the Cure Schedule. The Debtors shall file the Cure Schedule on or before the date that is fourteen (14) days prior to the Confirmation Hearing. The Debtors shall not be required to serve the Cure Schedule on any Executory Contract counterparty not specifically named therein. **For the avoidance of doubt, if an Executory Contract between the Debtors and any non-Debtors counterparty is not listed on either (a) the Schedule of Rejected Executory Contracts and Unexpired Leases or (b) the Cure Schedule as an assumed Executory Contract with a**

proposed Cure amount, then the Reorganized Debtors intends to assume such Executory Contract and asserts that the Cure amount for such Executory Contract is $0.00.

        2.      Any counterparty to an Executory Contract or Unexpired Lease that objects to (1) the assumption of such Executory Contract or Unexpired Lease, (2) the proposed Cure amount, (3) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, shall file a written objection thereto and serve it in a manner to be actually received by each of the following by no later than 4:00 p.m. (Eastern time) on the date that is seven (7) days prior to the Confirmation Hearing: (i) counsel to the Debtors: Middleton Reutlinger, 401 S. Fourth Street, Suite 2600, Louisville, Kentucky 40202, Attn: Andrew D. Stosberg;: and (ii) the United States Trustee, 601 West Broadway, Suite 512, Louisville, Kentucky 40202, Attn: John R. Stonitsch. Any timely filed responses or objections will be heard by the Bankruptcy Court at the Confirmation Hearing or on such other date agreed to by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to any of the foregoing matters related to assumption will be deemed to have assented and will be deemed to have forever released and waived any such objection. Payment of any Cure amount shall be made following the entry of a Final Order or orders resolving any dispute related thereto and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

        D.      <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>. Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant hereunder.

        Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors or Reorganized Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

        E.      <u>Contracts and Leases Entered into After the Petition Date</u>. Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors, may be performed by the Reorganized Debtors in the ordinary course of business and in accordance with the terms thereof.

## ARTICLE V
## INTERESTS

A.    <u>Retention of Interests</u>. On the Effective Date, all Allowed Interests in the Debtors shall be retained by the Holders of such Interests. For avoidance of doubt, Sharon and ITH shall retain their Membership Interests, and Bay Bridge shall retain all of its rights arising under or in connection with the Convertible Note. The Interests of Sharon and Bay Bridge in ITH and the Interests of ITH in ITS are deemed Allowed. As discussed above, the Interests of AWL in ITH are Disputed.

B.    <u>Cancellation of Existing Loan Agreements</u>. On the Effective Date, all agreements, instruments, and other documents evidencing any Claim (other than the Cecelia Unsecured Claim) including the Prepetition Loan and Security Agreement, and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the underlying obligations of the Debtors shall be deemed fully satisfied, released, and discharged.

## ARTICLE VI
## CORPORATE GOVERNANCE AND IMPLEMENTATION OF THE PLAN

A.    <u>No Substantive Consolidation for Plan Purposes</u>. The Plan applies solely to the Debtors, and the Debtors' Estates have not been substantively consolidated.

B.    <u>Vesting of Assets</u>. Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estates (including Litigation Claims, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, interests, and encumbrances. As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims, Interests, or Litigation Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

C.    <u>Books and Records</u>. The Reorganized Debtors will retain the books and records of the Reorganized Debtors as of the Effective Date.

D.    <u>Amended Organizational Documents and Corporate Governance</u>.

1.    <u>Amendment and Restatement</u>. The Debtors' certificates or articles of organization, operating agreements and other applicable formation documents shall be amended and restated in the Amended Organizational Documents. On the Effective Date, the Amended Organization Documents shall be deemed authorized and approved in all respects.

2.    <u>Member and Manager for the Reorganized Debtors.</u> On the Effective Date, John Siegel will be the sole Manager of Insight Terminal Solutions, LLC. John Siegel previously served in this role for the Debtors.

16

E.    Plan Funding & Terminal Construction

1.    Cash Reserves. Distributions under the Plan may be partially funded from the Reorganized Debtors' cash on hand as of the Effective Date.

2.    Cash Contribution. On the Effective Date, the State of Utah shall contribute funds (the "Utah Funds") to the Reorganized Debtors in an amount sufficient to fund the Plan, as reflected in those certain letters from the Commissioners of the Counties of Carbon, Sevier, Emery, and Sanpete (the "Utah Letters") attached to this Plan as Exhibit A. The Utah Funds shall be used solely to pay all Allowed Claims in accordance with the Plan and after payment of all Allowed Claims, may be retained by the Reorganized Debtors as working capital to further the Project. The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Plan without any further corporate or limited liability company action and without further action by the Holders of Claims.

F.    Discharge. Except as provided in this Plan or the Confirmation Order, the rights granted under this Plan and the treatment of Claims and Interests under this Plan shall be in full and final satisfaction, discharge, and release of all Claims and Interests. Except as provided in this Plan or the Confirmation Order, confirmation of this Plan discharges the Reorganized Debtors from all Claims or other debts that arose before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Bankruptcy Code section 501; (b) a Claim based on such debt is Allowed under Bankruptcy Code section 502; or (c) the holder of a Claim based on such debt has accepted this Plan. Without limiting the foregoing, the discharge granted under this Plan is granted to the fullest extent allowed under Bankruptcy Code sections 1141(a), 1141(b), 1141(c), and 1141(d)(1).

G.    Distributions. The Reorganized Debtors, as applicable, shall make all distributions in accordance with the terms of the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Holders of Allowed Claims entitled to distributions under the Plan shall provide any information requested by the Reorganized Debtors necessary for making such distribution.

H.    Effectiveness of Instruments and Agreements. On the Effective Date, all instruments, agreements, and documents issued, entered into, delivered, or filed under the Plan are effective, binding, and enforceable in accordance with their respective terms.

I.    No Company Action Required. As of the Effective Date: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements related to or contemplated by the Plan; and (b) the other matters provided for under, or in furtherance of, the Plan involving corporate action required of the Debtors or Reorganized Debtors, as applicable, are deemed to have occurred, are effective as provided in the Plan, and are deemed authorized and approved in all respects without further order of the Bankruptcy Court

or any further action by the Debtors' or Reorganized Debtors' officers, shareholders, members, or managers.

## ARTICLE VII
## EFFECT OF THE PLAN
## ON CLAIMS, INTERESTS AND CAUSES OF ACTION

A.    **Binding Effect**. **Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is impaired under this Plan and whether such Holder has accepted this Plan.**

B.    **Release and Discharge**. **Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each Holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors and Reorganized Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Interest in the Debtors and Reorganized Debtors.**

C.    **Term of Injunctions or Stays**. **Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.**

1.    **Injunction Against Interference with Plan**. **Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; provided, that nothing herein or in the Confirmation Order shall preclude, limit, restrict or prohibit any party in interest from seeking to enforce the terms of the Plan, the Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan. Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative, or other forum) against or**

affecting, directly or indirectly, the Debtors, the Reorganized Debtors, or the Estates, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to the Debtors, the Reorganized Debtors, or any property of any such transferee or successor; (b) enforcing, levying, attaching (including, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Estates or their property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the Debtors, the Reorganized Debtors, or the Estates or any property of any such transferee or successor; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Estates or any of their property, or any direct or indirect transferee of any property of, or successor in interest to, the Debtors, the Reorganized Debtors, or the Estates or any property of any such transferee or successor; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the full extent permitted by applicable law; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; provided, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against the Debtors, the Reorganized Debtors, or the Estates from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of this Plan, the Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.

       **2.** By accepting distributions pursuant to this Plan, each holder of an Allowed Claim will be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in this Article.

       **D.** <u>**Exculpation.**</u> Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, cause of action, loss, remedy, or liability for any claim (including, but not limited to, any claim for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases; the Disclosure Statement, the Plan, the Schedule of Rejected Executory Contracts and Unexpired Leases, or any agreement, transaction, or document related to any of the foregoing, or the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; or the transactions in furtherance of any of the foregoing; except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties and each of their respective affiliates, agents, directors, officers, managers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distributions pursuant to this Plan and, therefore,

are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

       E.    <u>Injunction Related to Releases and Exculpation</u>. The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, losses, or liabilities released pursuant to this Plan, including, the claims, obligations, suits, judgments, damages, demands, debts, rights and liabilities released or exculpated in this Plan.

       F.    <u>Releases by the Debtors.</u> As of and subject to the occurrence of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the Plan Supplement, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Plan, and except as otherwise provided in this Plan or in the Confirmation Order, the Debtors, the Reorganized Debtors, and any person seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to unconditionally forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities in connection with or related to the Debtors, the Reorganization Cases, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, indentures, and other agreements or documents delivered or assumed thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Estates, the Chapter 11 Cases, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates or the Reorganized Debtors against the Released Parties.

       G.    <u>Releases by Holders of Claims and Interests</u>. As of and subject to the occurrence of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Supplement, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, (i) each holder of a Claim that votes in favor of the Plan (or is deemed to accept the Plan), and (ii) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim or Interest that does not vote to accept the Plan or is deemed to reject the Plan, as applicable, shall be deemed to unconditionally, forever release, waive and discharge each of the Released Parties, from

any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtors, the Estates, the Chapter 11 Cases, or the Plan whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the Reorganized Debtors, the Chapter 11 Cases or the Plan.

      **H.**    <u>Waiver of Statutory Limitations on Releases</u>. **Each Releasing Party in each of the releases contained in the Plan expressly acknowledges that although ordinarily a general release may not extend to claims which the releasing party does not know or suspect to exist in his favor, which if known by it may have materially affected its settlement with the party released, each Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each releasing party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party, including the provisions of California Civil Code section 1542. The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.**

      **I.**    <u>Retention, Reservation and Prosecution of Litigation Claims</u>. Except as otherwise provided in the Plan, all Litigation Claims are retained and reserved for the Reorganized Debtors, which is designated as the Estates' representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the Litigation Claims. The Reorganized Debtors shall have the sole authority to prosecute, defend, compromise, settle, and otherwise deal with any Litigation Claims and does so in its capacity as a representative of the Estates in accordance with Bankruptcy Code § 1123(b)(3)(B). The Reorganized Debtors shall have sole discretion to determine in its business judgment which Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements. In pursuing any claim, right, or Litigation Claim, the Reorganized Debtors shall be entitled to the extensions provided under section 108 of the Bankruptcy Code. Except as otherwise provided in the Plan, all Litigation Claims shall survive confirmation and the commencement or prosecution of Litigation Claims shall not be barred or limited by any estoppel, whether judicial, equitable, or otherwise.

**ARTICLE VIII**
**DETERMINATION OF CLAIMS; EFFECTIVE DATE**

      **A.**    <u>Administrative Claims Bar Date</u>. All requests for payment of administrative costs and expenses incurred before the Effective Date pursuant to section 507(a)(1) or 503(b) of the Bankruptcy Code shall be served on the Reorganized Debtors and filed with the Bankruptcy Court

no later than forty-five (45) days after the Confirmation Date. Any such Claim that is not served and filed within this time shall be forever barred.

B.    Objections to Claims. The Reorganized Debtors and/or any other party in interest may object to the allowance of any Claim. Objections must be filed no later than the Claims Objection Deadline. The Reorganized Debtors will make no distribution on account of any claim that is not Allowed unless or until the claim becomes an Allowed Claim.

C.    Conditions to Effectiveness. The Effective Date does not occur unless and until:

1.    The Confirmation Date occurs and the Confirmation Order has become a Final Order, which shall, among other things, provide that the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to enter into any transactions contemplated thereunder;

2.    No request for revocation of the Confirmation Order under Bankruptcy Code section 1144 is pending;

3.    All instruments and agreements to be issued, entered into, delivered, or filed under the Plan are issued, entered into, delivered, or filed and are effective.

D.    Waiver of Conditions. The Debtors may waive any condition to confirmation or the Effective Date, in whole or in part, at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to confirmation and consummation of the Plan.

E.    Effect of Non-Occurrence of the Effective Date. If the Effective Date does not occur, on or before 120 days of the Confirmation Order becoming a Final Order, the Plan shall be null and void and nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims against the Debtors; or (ii) constitute an admission, acknowledgement, offer or undertaking by the Debtors or Sharon.

## ARTICLE IX
## MISCELLANEOUS PLAN PROVISIONS

A.    Retention of Jurisdiction. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.    resolve any matters related to Executory Contracts and Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases, and to hear and determine the allowance of Claims resulting therefrom including the amount of Cure, if any, required to be paid; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors' amendment, modification, or supplement after the Confirmation Date, pursuant to Article IV of

the Plan, of the Schedule of Executory Contracts and Unexpired Leases; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

2.    adjudicate any and all adversary proceedings, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases, this Plan, or that were the subject of proceedings before the Bankruptcy Court, prior to the Effective Date, proceedings to adjudicate the allowance of Disputed Claims, and all controversies and issues arising from or relating to any of the foregoing;

3.    ensure that distributions to Holders of Allowed Claims are accomplished as provided herein and adjudicate any and all disputes arising from or relating to distributions under the Plan;

4.    enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified, and/or vacated;

5.    issue and implement orders in aid of execution, implementation, or consummation of the Plan;

6.    consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

7.    hear and determine all applications for allowance of compensation and reimbursement of Professional Fee Claims under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; determine requests for the payment of Claims entitled to priority under section 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto; adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan and disputes arising in connection with any Person or entity's obligations incurred in connection with the Plan;

9.    hear and determine all suits or adversary proceedings to recover assets of the Reorganized Debtors and property of their Estates, wherever located;

10.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

11.    grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, or in the event that the Effective Date does not occur, to consider any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4);

12.     hear any other matter not inconsistent with the Bankruptcy Code;

13.     hear and determine all disputes involving the existence, nature or scope of the Reorganized Debtors' discharge;

14.     issue a final decree and enter an order closing the Chapter 11 Cases; and

15.     enforce all orders previously entered by the Bankruptcy Court.

After the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters that were subject to its jurisdiction prior to the Confirmation Date. Nothing contained herein shall be construed to increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the Bankruptcy Court.

B.     Effecting Documents; Further Transactions; Timing. The Reorganized Debtors is authorized and directed as of the Effective Date, without further order of the Bankruptcy Court, to execute, deliver, file, or record all contracts, instruments, releases, and other agreements or documents, and to take all actions necessary or appropriate to effect and further evidence the terms of the Plan. All transactions required to occur on the Effective Date under the terms of the Plan are deemed to have occurred simultaneously.

C.     Governing Law. Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal laws apply, the laws of the State of Delaware shall govern the rights and obligations arising under the Plan, without giving effect to principles of conflicts of law of Delaware.

D.     Exemption from Transfer Taxes. Under Bankruptcy Code section 1146(a): (i) the issuance, distribution, transfer, and exchange of assets or property of the Estates; (ii) the execution, assignment, modification, or recording of any lease or sublease; and (iii) the execution, delivery, or recording of a deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, the Confirmation Order, or any transaction contemplated above, or any transactions arising out of, contemplated by, or in any way related to, the foregoing are not subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, or real estate transfer tax, or other similar tax or governmental assessment and the appropriate state or local government officials or agents are directed to forego the collection of any such tax or assessment and to accept for filing or recordation any of the foregoing instruments or other documents without the payment of any such tax or assessment.

E.     Post-Effective Date Fees; Final Decree. Notwithstanding anything to the contrary contained in the Plan, all fees payable through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid on the Effective Date, or as soon as practicable thereafter. The Reorganized Debtors is responsible for paying any post-Effective Date fees under 28 U.S.C. § 1930(a)(6) and filing post-confirmation reports until the Bankruptcy Court enters a final decree, which Reorganized Debtors will seek as soon as feasible after distributions under the Plan have commenced. Notice of application for a final decree need be given only to those holders of Claims and Interests and other parties that, after the Effective Date, specifically request such notice.

24

F.    Method of Payment; Payments, Filings, and Notices Only on Business Days. Payments of Cash under the Plan must be made by check drawn on a domestic bank or by wire transfer from a domestic bank. Whenever any payment, distribution, filing, delivery, or notice to be made under the Plan is due on a day other than a Business Day, such payment, distribution, filing, delivery, or notice may instead be made, without interest or penalty, on the immediately following Business Day.

G.    Undeliverable or Unclaimed Distributions. If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors are notified in writing of such Holder's then-current address or other necessary information for delivery, at which time such undelivered distribution shall be made to such Holder within ninety (90) days of receipt of such Holder's then-current address or other necessary information; provided that any such undelivered distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the initial attempted distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheat, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any Holder to such property or interest in property shall be discharged and forever barred. Notwithstanding anything to the contrary contained in the Plan, nothing in this provision shall act as a bar to entry of a final decree closing the Chapter 11 Cases.

H.    Time Bar to Cash Payments. Checks issued by the Reorganized Debtors in respect of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof. Requests for reissuance of any check shall be in writing to the Reorganized Debtors by the Holder of the Allowed Claim to whom such check originally was issued. Any such written claim in respect of such a voided check must be received by the Reorganized Debtors on or before sixty (60) days after the expiration of the sixty (60) day period following the date of issuance of such check. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors free and clear of any restrictions. Any Claim in respect of such voided check shall be discharged and forever barred from assertion against the Debtors, the Estates, or the Reorganized Debtors.

I.    Revocation, Withdrawal, or Non-Consummation. The Debtors reserve the right to revoke or withdraw this Plan at any time prior to the Effective Date, which revocation or withdrawal shall occur upon the Debtors' filing of a notice thereof, and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, it shall be null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Litigation Claims or Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of any Person in any further proceedings involving the Debtors.

J.    Notices. After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered on the parties below shall be served as follows:

     If to the Reorganized Debtors:

          Insight Terminal Solutions, LLC and
          Insight Terminal Holdings, LLC
          6100 Dutchman's Lane, 9th Floor
          Louisville, Kentucky 40205-3284
          Attn: John J. Siegel, Jr.

     With a copy (which shall not constitute notice) to:

          Middleton Reutlinger
          401 South Fourth Street, Suite 2600
          Louisville, Kentucky 40202
          Attn: Andrew D. Stosberg and Thomas W. Ice

     If to U.S. Trustee:

          Office of the United States Trustee
          601 West Broadway, Suite 512
          Louisville, KY 40202
          Attn: John R. Stonitsch, Esq.

     K.     Entire Agreement. Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

     L.     Severability. If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Reorganized Debtors' consent, and (c) nonseverable and mutually dependent.

     M.     Exhibits. All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Debtors' counsel, by contacting Middleton Reutlinger, 401 S. Fourth Street, Suite 2600, Louisville, Kentucky 40202, Attn: Andrew D. Stosberg.

N.    Conflicts. Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; provided, however, that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control.

(SIGNATURE PAGE TO FOLLOW)

INSIGHT TERMINAL SOLUTIONS, LLC


BY:    /s/John J. Siegel, Jr.
       John J. Siegel, Jr., Manager
       6100 Dutchmans Lane
       Suite 900
       Louisville, Kentucky 40205-3284



INSIGHT TERMINAL HOLDINGS, LLC



BY:    /s/Sharon A. Siegel
       Sharon A Siegel, Sole Member
       6100 Dutchmans Lane
       Suite 900
       Louisville, Kentucky 40205-3284

BY:    /s/John J. Siegel, Jr.
       John J. Siegel, Jr., Manager
       6100 Dutchmans Lane
       Suite 900
       Louisville, Kentucky 40205-3284



Respectfully submitted, as of June 19, 2020


/s/Andrew D. Stsoberg
Andrew D. Stosberg
KBA ID No. 87969
MIDDLETON REUTLINGER
401 South Fourth Street, Suite 2600
Louisville, Kentucky  40202
Telephone (502) 625-2734
Facsimile (502) 588-1944
astosberg@middletonlaw.com

# EXHIBIT A



Carbon County
Administration Building
751 East 100 North
Price, UT 84501
Office: (435) 636-3226
www.carbon.utah.gov

Board of County Commissioners

May 18, 2020

John J. Siegel
Executive Chairman
Insight Terminal Solutions
6100 Dutchmans Lane, 9th Floor
Louisville, KY 40205

Re:    Insight Terminal Solutions, LLC ("ITS") Port of Oakland Project

Dear Mr. Siegel:

As you know, Carbon County has been a supportive partner in the Oakland Bulk and
Oversized Terminal ("OBOT") project with you since we were approached in 2013. The
State of Utah is a landlocked State as to export by ocean carrier. However, it is a State
rich in valuable bulk commodities including; potash, iron ore, waxy crude oil, soda ash
and the cleanest thermal coal in the fifty United States. For the last seven years, along
with our partners Emery, Sevier and San Pete Counties, we have been focused on the
opportunity to secure throughput rights in the Oakland terminal to allow our Utah
companies deep-water access to the international commodities markets at the best
possible transportation cost.

We understand the difficulty in successfully developing such a terminal amid the hostile
political headwinds existing in the Bay Area and other areas. We have remained steadfast
through these seven years, as you approach the conclusion of your efforts to navigate
those headwinds with the City of Oakland and other stakeholders.

On our part, the we have been working aggressively on this partnership to make the
Oakland Bulk terminal a reality for the mineral producing counties in our State. As you
know, in 2013, the Community Impact Board (the "CIB") voted to set aside $53,000,000
of their funds to grant to the four coal-producing counties: Carbon, Sanpete, Sevier and
Emery. The counties have been working together to form an inter-local entity to act as the
principal partner with ITS in the OBOT project. Upon our request, the Utah State Senate
has sponsored and the full legislature passed two specific sets of legislation in 2016 and
2018, to change the monies that were set-aside at the CIB level into State sales tax funds,
to specifically earmark these funds into a special Infrastructure Account to be specifically
used for this OBOT project and to clearly authorize the use of such funds outside the
borders of the State of Utah.

| Casey Hopes | Larry Jensen | Tony Martines |
|---|---|---|
| Commissioner | Commissioner | Commissioner |
| (435) 636-3272 | (435) 636-3273 | (435) 636-3271 |
| casey.hopes@carbon.utah.gov | larry.jensen@carbon.utah.gov | tony.martines@carbon.utah.gov |

The funds are ready to be spent on the project. We understand that there has been litigation between your landlord and the City of Oakland and we are encouraged by the progress you have reported as a result of ITS' efforts to resolve outstanding issues that would allow the litigation to be dismissed and the project to proceed. We are also aware of the impact that the COVID-19 virus has had on your progress and your ability to successfully submit a Plan of Reorganization and to emerge from the Chapter 11 Bankruptcy which such delays required you to seek.

Carbon County is, and continues to be in full support of the project and the $53,000,000 stands ready in cash, as authorized by the Legislature, to contribute to any aspect of the project funding. We are preparing to submit to the CIB, our application to draw down the $53 million, but also do so in a manner that would allow us to advance a portion of those funds sufficient for ITS to emerge from Bankruptcy, on the sole condition that the Court accepts ITS' Plan of Reorganization.

Please let us know how we may additionally help with this critical project,

Sincerely,

Casey Hopes
Carbon County
Commissioner

[Designee from Carbon County on the Interlocal Agreement]



**Sanpete County Courthouse**
**160 North Main**
**Manti, Utah 84642**

| | |
|---|---|
| Assessor: | Kenneth Bench |
| Attorney: | Kevin L. Daniels |
| Auditor: | Stacey Lyon |
| Clerk: | Sandy Neill |
| Recorder: | Reed D. Hatch |
| Sheriff: | Brian Nielson |
| Treasurer: | Amy Willden |

Commissioners: Scott Bartholomew (Chair), Steven J. Lund, Edwin Sunderland

---

May 18, 2020

John J. Siegel
Executive Chairman
Insight Terminal Solutions
6100 Dutchmans Lane, 9th Floor
Louisville, KY 40205

Re: Insight Terminal Solutions, LLC ("ITS") Port of Oakland Project

Dear Mr. Siegel:

As you know, Sanpete County has been a supportive partner in the Oakland Bulk and Oversized Terminal ("OBOT") project with you since we were approached in 2013. The State of Utah is a landlocked State as to export by ocean carrier. However, it is a State rich in valuable bulk commodities including potash, iron ore, waxy crude oil, soda ash and the cleanest thermal coal in the fifty United States. For the last seven years, along with our partners Carbon, Sevier, and Emery Counties, we have been focused on the opportunity to secure throughput rights in the Oakland terminal to allow our Utah companies deep-water access to the international commodities markets at the best possible transportation cost.

We understand the difficulty in successfully developing such a terminal amid the hostile political headwinds existing in the Bay Area and other areas. We have remained steadfast through these seven years, as you approach the conclusion of your efforts to navigate those headwinds with the City of Oakland and other stakeholders.

On our part, we have been working aggressively on this partnership to make the Oakland Bulk terminal a reality for the mineral producing counties in our State. As you know, in 2013, the Community Impact Board (the "CIB") voted to set aside $53,000,000 of their funds to grant to the four coal-producing counties: Carbon, Sanpete, Sevier and Emery. The counties have been working together to form an inter-local entity to act as the principal partner with ITS in the OBOT project. Upon our request, the Utah State Senate has sponsored and the full legislature passed two specific sets of legislation in 2016 and 2018, to change the monies that were set-aside at the CIB level into State sales tax funds, to specifically earmark these funds into a special Infrastructure Account to be specifically used for this OBOT project and to clearly authorize the use of such funds outside the borders of the State of Utah.

The funds are ready to be spent on the project. We understand that there has been litigation between your landlord and the City of Oakland and we are encouraged by the progress you have reported as a result of ITS' efforts to resolve outstanding issues that would allow the litigation to be dismissed and the project to proceed. We are also aware of the impact that the COVID-19 virus has had on your progress and your ability to successfully submit a Plan of Reorganization and to emerge from the Chapter 11 Bankruptcy which such delays required you to seek.

Sanpete County is, and continues to be in full support of the project and the $53,000,000 stands ready in cash, as authorized by the Legislature, to contribute to any aspect of the project funding. We are preparing to submit to the CIB, our application to draw down the $53 million, but also do so in a manner that would allow us to advance a portion of those funds sufficient for ITS to emerge from Bankruptcy, on the sole condition that the Court accepts ITS' Plan of Reorganization.

Please let us know how we may additionally help with this critical project.

Sincerely,

Scott Bartholomew, Commission Chair [Designee from Sanpete County on the Interlocal Agreement]



# Sevier County

| COMMISSIONERS:<br>Ralph Brown<br>Garth 'Tooter' Ogden<br>Scott T. Johnson | Administration Building<br>250 North Main<br>Richfield, Utah 84701<br>(435) 893-0400<br>FAX (435) 896-8888 | Steven C. Wall - Clerk/Auditor<br>Amy Garren-Clark - Assessor<br>Cheryl Buchanan - Treasurer<br>Carolyn M. Bagley - Recorder |
| --- | --- | --- |

May 18, 2020

John J. Siegel
Executive Chairman
Insight Terminal Solutions
6100 Dutchmans Lane, 9th Floor
Louisville, KY 40205

Re:    Insight Terminal Solutions, LLC (ITS) Port of Oakland Project

Dear Mr. Siegel:

Sevier County has been a supportive partner in the Oakland Bulk and Oversized Terminal (OBOT) project with you since we were approached in 2013. Utah is a landlocked state as to export by ocean carrier; however, it is rich in valuable bulk commodities including potash, iron ore, salt, waxy crude oil, soda ash, and coal. For the last seven years, along with our partners Emery, Sanpete, and Carbon Counties, we have been focused on the opportunity to secure throughput rights in the Oakland terminal to allow Utah companies deep-water access to the international commodities markets at the best possible transportation cost.

We understand the difficulty in developing a terminal amid the hostile political headwinds in the Bay Area. We have remained steadfast through these seven years, as you approach the conclusion of your efforts to navigate those headwinds with Oakland City and others.

We have been working aggressively on this partnership to make the Oakland terminal a reality for the mineral producing counties in our state. As you know, in 2013, the Utah Permanent Community Impact Board (CIB) voted to set aside $53,000,000 of their funds to grant to the four coal-producing counties: Carbon, Sanpete, Sevier and Emery. The counties have been working together to form an inter-local entity to act as the principal partner with ITS in the OBOT project. Upon our request, the Utah State Senate has sponsored and the full legislature passed two specific legislative bills in 2016 and 2018, to change the monies that were set-aside at the CIB level into Utah sales tax funds, to specifically earmark these funds into a special infrastructure account to be specifically

used for this OBOT project and to clearly authorize the use of such funds outside the borders of Utah.

We understand that there has been litigation between your landlord and the city of Oakland and we are encouraged by the progress you have reported as a result of ITS' efforts to resolve outstanding issues that would allow the litigation to be dismissed and the project to proceed. We are also aware of the impact that the COVID-19 virus has had on your progress and your ability to successfully submit a plan of reorganization and to emerge from Chapter 11 bankruptcy which such delays required you to seek.

We continue to be in full support of the project and the available funds stand ready to contribute to any aspect of the project funding. We are prepared to work with our partner counties to draw down available funds that would allow us to advance a portion of those funds sufficient for ITS to emerge from bankruptcy, on the sole condition that the Court accepts ITS' Plan of Reorganization.

Please let us know how we may additionally help with this critical project.

Sincerely,

Garth "Tooter" Ogden
Commission Chair


cc:    Commissioner Scott Johnson
       Commissioner Ralph Brown



**Board of Commissioners**
**Lynn Sitterud-Kent Wilson-Gil Conover**
75 East Main Street • P.O. Box 629 • Castle Dale, Utah 84513

May 18, 2020

John J. Siegel
Executive Chairman
Insight Terminal Solutions
6100 Dutchmans Lane, 9 Floor
Louisville, KY 40205

Re:    Insight Terminal Solutions, LLC ("ITS") Port of Oakland Project

Dear Mr. Siegel:

As you know, Emery County has been a supportive partner in the Oakland Bulk and Oversized Terminal ("OBOT") project with you since we were approached in 2013. The State of Utah is a landlocked State as to export by ocean carrier. However, it is a State rich in valuable bulk commodities including; potash, iron ore, waxy crude oil, soda ash and the cleanest thermal coal in the fifty United States. For the last seven years, along with our partners Carbon, Sanpete and Sevier Counties, we have been focused on the opportunity to secure throughput rights in the Oakland terminal to allow our Utah companies deep-water access to the international commodities markets at the best possible transportation cost.

We understand the difficulty in successfully developing such a terminal amid the hostile political headwinds existing in the Bay Area and other areas. We have remained steadfast through these seven years, as you approach the conclusion of your efforts to navigate those headwinds with the City of Oakland and other stakeholders.

On our part, the we have been working aggressively on this partnership to make the Oakland Bulk terminal a reality for the mineral producing counties in our State. As you know, in 2013, the Community Impact Board (the "CIB") voted to set aside $53,000,000 of their funds to grant

to the four coal-producing counties: Carbon, Sanpete, Sevier and Emery. The counties have been working together to form an inter-local entity to act as the principal partner with ITS in the OBOT project. Upon our request, the Utah State Senate has sponsored and the full legislature passed two specific sets of legislation in 2016 and 2018, to change the monies that were set-aside at the CIB level into State sales tax funds, to specifically earmark these funds into a special Infrastructure Account to be specifically used for this OBOT project and to clearly authorize the use of such funds outside the borders of the State of Utah.

The funds are ready to be spent on the project. We understand that there has been litigation between your landlord and the City of Oakland and we are encouraged by the progress you have reported as a result of ITS' efforts to resolve outstanding issues that would allow the litigation to be dismissed and the project to proceed. We are also aware of the impact that the COVID-19 virus has had on your progress and your ability to successfully submit a Plan of Reorganization and to emerge from the Chapter 11 Bankruptcy which such delays required you to seek.

Emery County is, and continues to be in full support of the project and the $53,000,000 stands ready in cash, as authorized by the Legislature, to contribute to any aspect of the project funding. We are preparing to submit to the CIB, our application to draw down the $53 million, but also do so in a manner that would allow us to advance a portion of those funds sufficient for ITS to emerge from Bankruptcy, on the sole condition that the Court accepts ITS' Plan of Reorganization.

Please let us know how we may additionally help with this critical project.

Sincerely,

Lynn Sitterud
Emery County Commission Chairman

# EXHIBIT B

STATE OF UTAH        )
                     )
COUNTY OF CARBON    )

## **AFFIDAVIT**

The undersigned, being first duly sworn, states that:

1.    I served as a Carbon County Commissioner from January 1, 2011, through December 31, 2018. During that 8-year period of time I served multiple times as Chairman of the Carbon County Commission. I also served a four-year term as a Board Member of the Utah Permanent Community Impact Fund Board ("CIB").

2.    In 2016, while I was a County Commissioner and Member of the CIB, I initiated and participated in the establishment of the Utah Throughput Infrastructure Fund (the "Throughput Infrastructure Fund"), which sets aside $53,000,000 for the purpose of building and operating a bulk commodity terminal (the "Terminal") at the West Gateway property at the Old Army Base at the Port of Oakland.

3.    Although the CIB was given authority to manage the Throughput Infrastructure Fund, the Throughput Infrastructure Fund is separate and distinct from the Community Impact Fund, is to be used for different purposes and is subject to different rules and procedures for disbursement of the $53,000.000 contained therein.

4.    Significant due diligence on the Terminal was performed by the staffs of Carbon, Sevier, Emery, and Sanpete Counties in Utah (together, the "Four Counties"), and various Legislature staff members both before and after the establishment of the Throughput Infrastructure Fund.

5.    Since my retirement as Commissioner in 2019, I have continued to work closely with representatives of the Four Counties, the CIB, and Insight Terminal Solutions, LLC ("ITS") to ensure that the Throughput Infrastructure Fund remains available to assist ITS in the development of the Terminal.

6.    I am aware that the Four Counties intend to file an application (the "Four Counties' Application") for disbursement of funds from the Throughput Infrastructure Fund to be used, in part, to reimburse appropriate administrative and project related expenditures made by ITS. Such reimbursement will be used by ITS to emerge from Chapter 11 Bankruptcy., and I understand the amount required to ensure ITS's emergence from Chapter 11 Bankruptcy is approximately $20,000,000.

7.    The CIB's process and procedures governing the Four Counties' Application are unique and are not the same as those governing applications for loans or grants from the Community Impact Fund. For example, the timelines for filing, approval and funding of applications for loans or grants from the Community Impact Fund are not applicable to the Four Counties' Application.

8.    The Four Counties should complete their application within a few weeks.

9.    To my knowledge and belief, there are no material issues that would prevent the Four Counties' Application from being timely approved.

10.    To my knowledge and belief, the Four Counties' Application will be on the CIB August 2020 meeting agenda, with disbursement of the funds requested therein to the Four Counties in September 2020.

Further, affiant sayeth not.

Jae Potter

STATE OF UTAH          )
                                    )

COUNTY OF CARBON   )

Sworn to and subscribed before me this _4th_ day of _June_, 2020 by Jae Potter.

      My commission expires: ___4/14/2021___.

Notary Public

J VALYN PEACOCK
NOTARY PUBLIC-STATE OF UTAH
COMMISSION# 694607
COMM. EXP. 04-14-2021

2

# EXHIBIT C

STATE OF UTAH )
)
COUNTY OF SEVIER )

## **AFFIDAVIT**

The undersigned, being first duly sworn, states that:

1.  I am the Chairman of the County Commission of Sevier County, Utah as well as a Board Member of the Permanent Community Impact Fund ("CIB") and have knowledge of the matters set forth herein.

2.  In my capacities as Chairman and Commissioner of Sevier County and Board Member of the CIB, I manage the government administrative affairs of Sevier County, and carryout the normal duties of a Board Member of an institution such as the CIB.

3.  I executed one of the four letters (the "Utah Letters"), written by the Four Counties as defined in the Plan of Reorganization (the "Plan") filed by Insight Terminal Holdings, LLC, and Insight Terminal Solutions, LLC (together, the "Debtors").

4.  The Utah Letters each provide that the Four Counties will submit an application (the "Application") to the CIB to draw down the $53 million currently held by the State of Utah pursuant to Senate Bill 248 and dedicated specifically to the ITS Terminal Project.

5.  The Four Counties intend to submit the Application in the near future.

6.  Upon submitting the Application, a reasonable timeframe for the Application's review and approval is 90 days; however, the Four Counties may seek a more expedited review and approval process for the Application.

7.  Attached as an Exhibit is a description of the process of applying for *Throughput Infrastructure Funds.*

Further, affiant sayeth not.

Garth "Tooter" Ogden

STATE OF UTAH )
)
COUNTY OF Sevier )

Sworn to and subscribed before me this 29th day of May , 2020 by (~~insert name~~). Garth 'Tooter' Ogden

My commission expires: 9|13|2023 .

BARBARA ANN CROWTHER
Notary Public
State of Utah
My Commission Expires 09/13/2023
COMMISSION NUMBER 708167

Notary Public

# PROCESS OF APPLYING FOR AND RECEIVING
# SB 248 *THROUGHPUT INFRASTRUCTURE FUNDS*

The process of applying for, receiving and using the funds from the Throughput Infrastructure Fund should not be confused with the traditional loan and grant process of the Permanent Community Impact Fund (CIB). They are not the same. These two funds are separate pools of money with two very different purposes.

CIB funds are federal dollars received from mineral extraction on federal lands and are used to support the impact of this extraction in rural counties. Over $1 Billion have been granted or loaned for roads, buildings, and community recreation facilities, just to name a few.

The process of applying for and getting these funds, are based on a "trimester" schedule where funding happens every 4 months. The applications and timing are specific, and the uses of the funds are regulated by federal guidelines. For example, an application submitted by June 1st would anticipate an October funding, etc.

The Throughput Infrastructure Funds are state dollars without the federal restrictions. Through SB 246 and SB 248, the Utah State Legislature gave the Utah Department of Transportation $53,000,000 of Federal Mineral money to be used on roads and in exchange, took $53,000,000 in state funds to establish the Throughput Infrastructure Fund to be used specifically for the Oakland Port Project.

The reason the CIB has been charged with the handling of the Throughput Infrastructure Fund is that the CIB is a state board with a process in place to handle the application and distribution of funds. This is what they have done for many years with the federal mineral monies received by the State of Utah.

The process of applying for and receiving the funds from the Throughput Infrastructure Fund, as stated above, will be different. It is anticipated that the application, timeline, and disbursement of the funds will be as follows:

1. The four Counties are prepared to submit the application in the next few weeks.
2. The CIB staff and third-party consultants will review the package and prepare the information to go to the CIB Board.
3. It is anticipated that the Oakland project will be on the August 2020 Board meeting agenda.
4. Following the approval, the funding should take place within the September – October timeframe.

This is the process and timeline by which the four Counties will be funded for the Oakland Project. This Project is of vital importance to The State of Utah and especially the energy producing counties of the state. This project will not only save high paying jobs but will promote economic growth in rural Utah and create new and lasting jobs for the state and region.

The four Counties look forward to a successful closing of the funds and the opportunity to be part of a world class export facility.

# EXHIBIT D

STATE OF UTAH           )
                                           )

COUNTY OF CARBON     )

## AFFIDAVIT

The undersigned, being first duly sworn, states that:

1.      I am a current Carbon County Commissioner and have served several times as the Chairman of the Commission.

2.      The Utah counties of Carbon, Sevier, Emery, and Sanpete (together, the "Four Counties") have been working with the assistance of Insight Terminal Solutions, LLC ("ITS") to prepare an application (the "Application") for presentation to the Utah Permanent Community Impact Fund Board ("CIB") to allow the Four Counties to access the Throughput Infrastructure Fund.

3.      The review of an application for funding from the Throughput Infrastructure Fund is different than an application for funding from the Permanent Community Impact Fund (the "Community Impact Fund").

4.      While both the Throughput Infrastructure Fund and the Community Impact Fund are administered by the CIB, applications for funding from the Throughput Infrastructure Fund are reviewed as submitted, with funding available from the Throughput Infrastructure Fund very shortly after approval.

5.      Applications for funding from the Community Impact Fund are reviewed by the CIB at its regularly scheduled meetings, but funding from the Community Impact Fund is only available on a trimester basis.

6.      The trimester-based funding does not apply to the Throughput Infrastructure Fund.

7.      The Four Counties expect the Application to be filed within the next several weeks for consideration by the CIB at the August 2020 meeting.

8.      To my knowledge and belief, there are no material issues that would prevent the Application from being approved.

9.      Assuming approval, the Throughput Infrastructure Fund should be available to the Four Counties in September or October 2020.

10.    On behalf of Carbon County, I executed that certain letter to ITS dated May 18, 2020 (the "May 18 Letter"), in which Carbon County expresses its intention to advance a portion of the Throughput Infrastructure Fund in an amount that is sufficient to allow ITS to emerge from bankruptcy on the sole condition that the bankruptcy court approve the ITS reorganization plan.

11.    It is my understanding that such amount is approximately $20 million.

12.    **To my knowledge and belief, the intentions expressed in the May 18 Letter remain true for Carbon County and the other members of the Four Counties.**

Further, affiant sayeth not.

Casey Hopes

STATE OF UTAH                              )
                                           )
COUNTY OF CARBON                           )

Sworn to and subscribed before me this 8th day of June, 2020 by Casey Hopes.

My commission expires: 7-11-22 .

Notary Public

LORI PEREZ
NOTARY PUBLIC-STATE OF UTAH
COMMISSION# 701216
COMM. EXP. 07-11-2022

2