**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| In re | Case No. 19-32231-jal |
| INSIGHT TERMINAL SOLUTIONS, LLC, *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

**OBJECTION TO PROPOSED CURE AMOUNTS IN CONNECTION WITH DEBTORS' FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED JUNE 19, 2020 AND AUTUMN WIND LENDING, LLC'S CHAPTER 11 PLAN OF REORGANIZATION**

Creditor Oakland Bulk & Oversized Terminal ("OBOT"), for its Objection to Proposed Cure Amounts in Connection with Debtors' First Amended Chapter 11 Plan of Reorganization dated June 19, 2020 and Autumn Wind Lending, LLC's Chapter 11 Plan of Reorganization listed for OBOT by Debtors in Debtors' Chapter 11 Plan Supplement [Doc. 264] and by Autumn Wind Lending, LLC ("AWL") in its Notice of Filing of Plan Supplement [Doc. 265], states as follows:

**BACKGROUND**

1. On June 19, 2020, Debtors filed Debtors' First Amended Chapter 11 Plan of Reorganization dated June 19, 2020 [Docket No. 247] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented, "Debtors' Plan").

---

[1] Debtors in these Chapter 11 cases are Insight Terminal Solutions, LLC (Case No. 19-32231) and Insight Terminal Holdings, LLC (Case No. 19-32232), and the Court has entered an order directing the procedural consolidation and joint administration of these cases. The docket in Case No. 19-32231 should be consulted for all matters affecting the above listed cases.

2. In accordance with Debtors' Plan, on July 27, 2020, Debtors filed Debtors' Chapter 11 Plan Supplement [Docket. No. 264] ("Debtors' Supplement"). Debtors' Supplement proposes the amount necessary to cure defaults is $0.00 under the *Army Gateway Redevelopment Sublease for West Gateway dated as of September 24, 2018, between Oakland Bulk and Oversized Terminal, LLC, as sub-landlord, and ITS, as subtenant* (the "Sublease").

3. On April 27, 2020, AWL filed Autumn Wind Lending, LLC's Chapter 11 Plan of Reorganization for the Bankruptcy Estate of Debtor Insight Terminal Solutions, LLC Pursuant to Bankruptcy Code Section 1121(c)(2) [Docket No. 195] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented, "AWL's Plan").

4. In accordance with AWL's Plan, on July 27, 2020, AWL filed its Notice of Filing of Plan Supplement [Docket. No. 265] ("AWL's Supplement"). AWL's Supplement identifies a Sublease cure amount of $2,335,668.54.

## ARGUMENT

5. Pursuant to 11 U.S.C. § 365(b)(1)(A), Debtors must cure any defaults under the Sublease in connection with any proposed assumption, as well as provide adequate assurance of future performance. Both Debtors' and AWL's proposed cure amounts are insufficient to cure the existing defaults on the Sublease. In order to assume the Sublease, the amount of at least $4,701,781.94 needs to be paid to OBOT by the assuming party. Additional amounts continue to accrue under the Sublease, and any party which assumes the Sublease will be obligated for amounts which accrue prior to the date of assumption.

6.      Where "there has been a default" in an unexpired lease to which debtor is a party, "the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee" cures all monetary defaults under the lease agreement.[2]  Additionally, under the Bankruptcy Code provision governing unexpired leases, timely performance is required for obligations of debtor which arise from and after the order for relief until the lease is assumed or rejected.[3]  Thus, the assuming party must cure both pre- and post-petition defaults.

7.      Here, in order for Debtors or Autumn Wind Lending to assume the Sublease, the assuming party must cure the defaults of all of Debtors' monetary obligations arising under the Sublease.  Capitalized terms used but not expressly defined herein have the same meaning as set forth in the Sublease.[4]  As further set forth below, ITS's (defined as the "Subtenant" in the Sublease) outstanding monetary obligations under the Sublease as of June 30, 2020 total **$4,701,781.94** ("Cure Amount"); as further set forth below, this Cure Amount does not include the additional $2,820,950.88 in Rent which OBOT has not waived but is not pursuing at this time.  Therefore, in order for the Sublease to be assumed, OBOT (defined as "Sublandlord" in the Sublease) seeks payment of the Cure Amount and adequate assurances that future obligations—both accrued and accruing—will be satisfied.

---

[2] 11 U.S.C.A. § 365.  Consistent with § 365, this response does not address Subtenant's non-Rent obligations under the Sublease.  While under no obligation to do so, OBOT has acquiesced to three (3) extensions of the assumption or rejection date, presently extending the same to August 15, 2020.

[3] *See In re Handy Andy Home Improvement Ctrs.*, 196 B.R. 87 (Bankr. N.D. Ill. 1996) (holding that "[i]f the lease is ultimately assumed under § 365(a), then debtor will have to cure both pre-and post-petition defaults under § 365(b)).

[4] Nothing in this Objection will be deemed to amend or otherwise modify the terms of the Sublease.

### A. Definition of Rent Under the Sublease

8. The 140-page Sublease (not including the thousands of pages of exhibits) expressly sets forth the rights and obligations of the parties, including, without limitation, Subtenant's obligation to pay "Rent" during the term of the Sublease. Article 40 of the Sublease defines Rent as "collectively, Sublease Bonus Rent, Ground Lease Base Rent, Participation Rent, Sublease Base Rent, Balloon Rent and Additional Rent." The term "Additional Rent" is further defined in Article 40 as "any and all sums, *other than* Sublease Bonus Rent, Ground Lease Base Rent, Participation Rent, Sublease Base Rent and Balloon Rent, that may become due or be payable by Subtenant at any time pursuant to this Sublease."[5] Moreover, Sections 2.10 and 2.11 of the Sublease provide as follows:

> Except as otherwise provided in this Sublease, all costs, fees, interest, charges, expenses, reimbursements and Subtenant's obligations of every kind and nature relating to the Premises that may arise or become due under this Sublease, whether foreseen or unforeseen, which are payable by Subtenant to Sublandlord pursuant to this Sublease, shall be deemed Additional Rent. Sublandlord shall have the same rights, powers and remedies, whether provided by law or in this Sublease, in the case of non-payment of Additional Rent as in the case of non-payment of Rent. . . .
>
> . . . .
>
> It is the purpose of this Sublease and intent of Sublandlord and Subtenant that, except as specifically stated to the contrary in this Sublease, all Rent shall be absolutely net to Sublandlord, so that this Sublease shall yield to Sublandlord the full amount of the Rent at all times during the Term, without deduction, abatement or offset. Under no circumstances, whether now existing or hereafter arising, and whether or not beyond the present contemplation of the Parties, except as may be otherwise expressly provided in this Sublease (including any Interim Subleases), Sublandlord shall not be expected or required to incur any expense or make any payment of any kind

---

[5] Emphasis added.

> with respect to this Sublease or Subtenant's use or occupancy of the Premises, including any Improvements.

Thus, the term Rent is very broad. It captures most, if not all, amounts due and payable under the Sublease. Furthermore, the Sublease expressly states that as between Sublandlord and Subtenant, Sublandlord is not obligated to make any payments related to Subtenant's use or occupancy of the Premises.[6] Instead, all costs, including those advanced by Sublandlord, are to be borne by Subtenant. The Sublease also states that, except as expressly permitted therein, all amounts of Rent are to be paid "without any abatement, setoff, deduction, or counterclaim."[7] Therefore, Subtenant is responsible to pay to Sublandlord all Rent incurred to date, or else Subtenant is in default of its obligations under the Sublease.[8]

## B. Subtenant's Rent Obligations

9. Subtenant's primary Rent obligations under the Sublease are set forth as follows:

> 1. *Ground Lease Base Rent.* Section 2.2 et seq. of the Sublease requires Subtenant to pay Sublandlord the Ground Lease Base Rent due under the Master Lease; Sublandlord, in turn, passes the Ground Lease Base Rent onto

---

[6] Sublandlord delivered occupancy of the Premises to Subtenant on the effective date of the Sublease: September 24, 2018. *See* Sublease, § 1.2 (identifying Subtenant's possession of the Premises as the Commencement Date).

[7] Sublease, § 2.7.

[8] Sublease, § 18.1.1 declares that an Event of Default occurs where "Subtenant fails to pay any Rent to Sublandlord when due, which failure continues for ten (10) days following written notice from Sublandlord." Overdue Rent accrues interest at an annual rate equal to five percent (5%) in excess of the rate the Federal Reserve Bank of San Francisco charges. Sublease, § 2.8. Additionally, overdue Rent incurs a Late Fee "equal to one and one-half percent (1-1/2%) of all Rent or any portion thereof which remains unpaid more than ten (10) days after Sublandlord's notice to Subtenant of such failure to pay Rent when due." Sublease, § 2.9.

the City.  From the Commencement Date to the present, the Ground Lease Base Rent is estimated at $33,087.72 per month.[9]

2.    *Participation Rent.*  In addition to the Ground Lease Base Rent, Section 2.3 et seq. of the Sublease requires Subtenant to reimburse Sublandlord for the amount of Participation Rent due under the Master Lease, calculated as a percentage of commodity tariffs and dockage or wharfage fees.[10]

3.    *Sublease Base Rent.*  In addition to the Ground Lease Base Rent and Participation Rent, Section 2.4 et seq. of the Sublease requires Subtenant to pay Sublandlord Sublease Base Rent.  From the Commencement Date to the present, the quarterly Sublease Base Rent is calculated as the greater of "(A) $0.40 for each Metric Ton of Commodity exported through the Bulk Oversized Terminal in such quarter, or (B) $500,000.00."[11]

4.    *Balloon Rent.*  In addition to the Ground Lease Base Rent, Participation Rent, and Sublease Base Rent, Section 2.5 et seq. of the Sublease requires Subtenant to pay to Sublandlord the amount of $64,000,000.00.  The Balloon Rent is to be paid pursuant to the fixed schedule set forth in Section 2.5.1 of the Sublease.  With the exception of Balloon Payment 1, the schedule uses actual dates, unconditioned upon any other right or obligation of the parties under the Sublease.

5.    *Security Deposit.*  Upon the True Up Date, Section 2.12 requires Subtenant to deliver to Sublandlord a Security Deposit in the amount of $3 million.  The Security Deposit increases to $4 million upon commencement of operations of the Project.

6.    *Sublease Bonus Rent.*  Section 2.13 et seq. requires Subtenant to make the following payments:

   i.   Take Down Payment in the amount of $6.3 million due on the Commencement Date;

   ii.  True Up Payment in the amount of $8,562,290.00 due on or before the True Up Date; and

---

[9] This amount is subject to a Consumer Price Index (CPI) increase fixed to certain anniversary dates of the Sublease.

[10] It is Sublandlord's understanding that Subtenant has not received any commodity tariffs, dockage or wharfage fees.  Consequently, Sublandlord has not attempted to collect any Participation Rent from Subtenant.

[11] Sublease §§ 2.4.1–2.4.3.  This amount is subject to fixed increases based on certain anniversary dates of the Sublease.  It is Sublandlord's understanding that Subtenant has not handled any Commodities at the Premises, thus the Sublease Base Rent has been calculated using $500,000.00 per quarter.

    iii.    Reimbursable Expense Payment in the amount of $3,033,019.71 due on or before the True Up Date.

Each of the Take Down Payment, True Up Payment, and Reimbursable Expense Payment are further broken down in the Sublease, identifying the specific obligations to which the respective Sublease Bonus Rent payments are to be applied.

6.    *Additional Rent*.  The following monetary obligations are considered Additional Rent because they are, *inter alia*, monetary obligations other than Sublease Bonus Rent, Ground Lease Base Rent, Participation Rent, Sublease Base Rent and Balloon Rent:

    i.    <u>Possessory Interest Tax</u>.  Section 4.1.1 requires Subtenant "to pay any and all possessory interest taxes levied upon Subtenant's interest pursuant to an assessment lawfully made by the applicable governmental Assessor."  The same section includes an express acknowledgment by Subtenant that entering into the Sublease may trigger a possessory interest tax to be assessed.

    ii.    <u>Property Taxes and Other Impositions</u>.  "Without limiting the provisions of Section 4.1.1," Section 4.1.2 of the Sublease requires Subtenant to "pay or cause to be paid all other Impositions . . . which may be assessed, levied, confirmed or imposed on or in respect of or be a lien upon the Premises, any Improvements now or hereafter located thereon, any Personal Property now or hereafter located thereon, . . ." including, without limitation, any and all property taxes assessed against the Premises.

    iii.    <u>Maintenance & Repair Costs</u>.  Except as otherwise expressly identified in the Sublease, Article 7 of the Sublease requires Subtenant to pay for all "cost to maintain and repair" the Premises "at no cost to Sublandlord."[12]

    iv.    <u>Utilities</u>.  Section 8.1 of the Sublease states, "Subtenant will pay or cause to be paid as the same become due all deposits, charges, meter installation fees, connection fees and other costs for all public or

---

[12] Sublease § 7.2.  *See also* Sublease § 7.3 ("As between Sublandlord and Subtenant, and except as otherwise expressly provided in Article 15: (i) Subtenant shall be solely responsible for the condition, operation, repair, maintenance and management of the Premises . . . .").

    private utility services at any time rendered to the Premises or any part of the Premises."

 v. <u>Legal Fees</u>.  In addition to the standard legal fees provision included in Section 38.13 of the Sublease—which, in pertinent part, requires Subtenant to pay for any costs incurred by Sublandlord in Subtenant's non-performance of its obligations under the Sublease[13]—Subtenant is responsible to reimburse Sublandlord the litigation expenses (including attorney's fees) incurred by Sublandlord as part of its dispute with the City of Oakland. Specifically, Section 2.10.1 states that "Prior to the True Up Date, Subtenant is responsible for fifty percent (50%) of all legal costs (including, without limitation attorney's fees) incurred by Sublandlord after the Commencement Date and related to the Litigation, including any appeal thereof."  This is in addition to the litigation cost reimbursement (for legal fees incurred up to August 2018) that Subtenant is required to pay as part of the Reimbursable Expense Payment.[14]   After the True Up Date, Subtenant is responsible for one hundred percent (100%) of the costs associated with the Litigation.

 vi. <u>Indemnification</u>. Section 31.1 requires Subtenant to Indemnify the Indemnified Parties from and against any and all Losses incurred by the Indemnified Parties, including, without limitation, the following:

    (iii) any use, possession, occupation, operation, maintenance, or management of the Premises or any part thereof by Subtenant or any of its Agents, Invitees, or Sub-Subtenants . . . (v) any failure on the part of Subtenant or its Agents or Sub-Subtenants, as applicable, to perform or comply with any of the terms of this Sublease or with applicable Laws, rules or regulations, or permits in connection with use or occupancy of the Premises, . . . and (viii) any other legal actions or suits initiated by any user or occupant of the Premises.

---

[13] Section 18.1.2. identifies Subtenant's filing of a petition for relief with a bankruptcy court as an Event of Default under the Sublease.  Although Sublandlord has not held Subtenant in default of the Sublease by filing the present bankruptcy action, Sublandlord does require that Subtenant reimburse Sublandlord for the latter's legal fees incurred in response to the bankruptcy action.

[14] *See* Sublease § 2.13.3.

> The term "Losses" includes all "costs and expenses, (including, without limitation, reasonable Attorneys' Fees and Costs and consultants' fees and costs) of whatever kind or nature, known or unknown, contingent or otherwise."

Subtenant's monetary Rent obligations are clearly delineated under the Sublease and Subtenant is required to pay the same without abatement, setoff, deduction, or counterclaim.

### C. Subtenant's Failure to Pay Rent is Not Excused or Otherwise Waived

10. Although Subtenant has not provided Sublandlord with a formal notice of Force Majeure as required under Article 16 of the Sublease, assuming arguendo that Subtenant had submitted a claim of Force Majeure (it has not) alleging it was excused from paying Rent, Article 16 of the Sublease expressly states the following:

> For all purposes of this Sublease, a Party whose performance of its obligations hereunder is hindered or affected by events of Force Majeure shall not be considered in breach of or in default in its obligations hereunder to the extent of any delay resulting from Force Majeure, provided, *however, that the provisions of this Section 16.1 shall not apply to Subtenant's obligation to pay Rent, including Additional Rent*. A Party seeking an extension of time pursuant to the provisions of this Section 16.1 shall give notice to the other Party describing with reasonable particularity (to the extent known) the facts and circumstances constituting Force Majeure within (a) a reasonable time (but not more than thirty (30) days unless the other Party's rights are not prejudiced by such delinquent notice) after the date that the claiming party has actual knowledge of the scope and magnitude of the applicable Force Majeure event or (b) promptly after the other Party's demand for performance. *The parties hereto acknowledge and agree that the Litigation is not a Force Majeure event*.[15]

---

[15] Emphasis added. On May 26, 2020, the United States Court of Appeals for the Ninth Circuit upheld the ruling of the United States District Court for the Northern District of California, finding that the City of Oakland breached its development agreement with OBOT when it applied an ordinance banning the transportation, handling, and storage of coal and petroleum coke to the Premises. On August 3, 2020, the United States Court of Appeals for the Ninth Circuit denied the City's Petition for Rehearing or Rehearing En Banc.

Thus, even were Subtenant to properly assert a claim of Force Majeure, it is still required to pay all Rent to Sublandlord. Additionally, Subtenant expressly acknowledged that OBOT's dispute with the City was not a Force Majeure event. Moreover, Sublandlord has not agreed to any modification of the Sublease nor has Sublandlord waived any amounts of Rent due under the Sublease.[16] Therefore, Subtenant is not excused from paying Rent under the Sublease.

### D.  Paid to Date

11.   To date, the only Rent paid by Subtenant to Sublandlord was the $6.3 million Take Down Payment paid at the Commencement Date. The Take Down Payment was credited towards Subtenant's Rent obligations as follows:

| Payment | Amount |
|---|---|
| Reimbursement | $3,800,011.00 |
| Q3 + Q4 2018 OBOT Sublease Base Rent | $1,333,323.00 |
| Q1 2019 OBOT Sublease Base Rent | $ 500,000.00 |
| 2019 City Ground Lease Base Rent | $ 666,666.00 |

Subtenant has not made any other Rent payments to Sublandlord.

### E.  Notices of Default and the Cure Amount

12.   Following the Commencement Date, Sublandlord provided to Subtenant multiple invoices identifying the amount of Rent that Subtenant was required to pay

---

[16] Section 21.1 provides, "No failure by Sublandlord or Subtenant to insist upon the strict performance of any term of this Sublease or to exercise any right, power or remedy consequent upon a breach of any such term, shall be deemed to imply any waiver of any such breach or of any such term unless clearly expressed in writing by the Party against which waiver is being asserted. No waiver of any breach shall affect or alter this Sublease, which shall continue in full force and effect, or the respective rights of Sublandlord or Subtenant with respect to any other then existing or subsequent breach." Additionally, any modification of the Sublease requires a written agreement executed by both Sublandlord and Subtenant. *See* Sublease § 38.8. Sublandlord has not executed any written agreement amending the terms of the Sublease, nor has Sublandlord agreed to waive any amounts owed under the Sublease.

under the Sublease. Rent is identifiable in the invoices as falling within the aforementioned categories of Rent. The majority of Rent identified in the invoices are attributable to Additional Rent (utility bills, maintenance costs, taxes, legal fees, etc.) and the Balloon Payment 2, which became due and payable on February 1, 2020.

13. On or about July 8, 2019, Sublandlord delivered to Subtenant that certain Notice of Unmatured Default ("NOD 1"), asserting that Subtenant had failed to (i) make Rent payments in the amount of $1,872,011.72, (ii) maintain the Premises, and (iii) pay a supplemental possessory interest tax in the amount of $105,367.50, attached as **Exhibit A**. On or about January 20, 2020, Sublandlord provided to Subtenant that certain Notice of Outstanding Amounts ("NOD 2"), claiming that the amount of Rent due under the Sublease had increased to $2,251,055.87, attached as **Exhibit B**.

14. Sublandlord has continued to provide Subtenant with Rent invoices. Most recently, on or about July 24, 2020, Sublandlord provided to Subtenant an invoice for all Rent due through June 30, 2020 ("June Invoice"). The June Invoice identified the outstanding Rent (as of the end of June) as $4,701,781.94 ("Cure Amount").[17] Attached hereto as **Exhibit C** is a revised version of the June Invoice, preserving the Cure Amount, but clarifying the amounts due under the June Invoice. Sublandlord believes the Cure Amount reasonably reflects Subtenant's pre-petition and post-petition monetary obligations.

---

[17] This Cure Amount includes Sublandlord's litigation costs for its dispute with the City along with its legal costs associated with Subtenant's bankruptcy filing.

15. As noted on the revised June Invoice (Exhibit C), without waiving any claim thereto and despite the amounts being due, Sublandlord is not currently demanding that Subtenant immediately pay the outstanding Ground Lease Base Rent and Sublease Base Rent (in an amount of $2,820,950.88) to cure the default and assume the Sublease. Moreover, Sublandlord has not requested payment of any amounts due and payable upon the occurrence of the True Up Date. These obligations, however, must be assumed with the Sublease.

16. Therefore, in order to assume the Sublease, the amount of at least $4,701,781.94 needs to be paid to Sublandlord by the assuming party for Subtenant's Rent obligations through June 30, 2020, understanding that the assuming party is responsible for additional accruing Rent, including, without limitation, Rent for July 2020.

17. Moreover, Sublandlord seeks adequate assurances from the assuming party regarding the assuming party's ability to meet future obligations under the Sublease.

18. OBOT reserves the right to supplement this Objection, including, but not limited to, for the purpose of asserting attorneys' fees, expenses, and/or interest due at the time of assumption. OBOT also reserves the right to alter, modify, and/or assert additional amounts due or becoming due to be included in the Cure Amount.

Respectfully submitted,

*/s/ Brian R. Pollock*
Elizabeth L. Thompson (ethompson@stites.com)
Brian R. Pollock (bpollock@stites.com)
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352
Telephone: (502) 587-3400
*Counsel for Oakland Bulk & Oversized Terminal*

## CERTIFICATE OF SERVICE

I certify that on August 4, 2020, the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all registered users.

*/s/ Brian R. Pollock*
Brian R. Pollock