Heidi McIntosh (CO SBN 48230, *pro hac vice admission pending*)
Earthjustice
633 17th Street, Suite 1600
Denver, Colorado  80220
303.623.9466
Email: hmcintosh@earthjustice.org

*Counsel to Sierra Club and Utah Chapter*
*of the Sierra Club*

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| IN RE: | Chapter 11 |
| INSIGHT TERMINAL SOLUTIONS, LLC, et al.[1] | Case No. 19-32231 |
| Debtors | (Jointly Administered) |
| | Judge Joan A. Lloyd |

## NOTICE OF INFORMATION PERTAINING TO
## DEBTOR INSIGHT TERMINAL SOLUTIONS, LLC'S AND
## DEBTOR INSIGHT TERMINAL HOLDINGS, LLC'S
## PROPOSED FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION

---

[1] The Debtors in these chapter 11 cases are Insight Terminal Solutions, LLC (Case No. 19-32231) and Insight Terminal Holdings, LLC (Case No. 19-32232). The Court has ordered the joint administration of theses chapter 11 cases. The docket in this Case No. 19-32231 should be consulted for all matters affecting the above listed cases.

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 3

II.  BACKGROUND ................................................................................................. 5

    A.  The Proposed Coal Export Facility in Oakland, California ........................................ 5

    B.  The Utah Counties' Efforts to Use Funds Derived from the Federal Mineral Leasing Act—Earmarked for Local Community Mitigation—to Invest in the Oakland Terminal ............................................................................................. 5

        1.  *Mineral Leasing Act Funds May Only be Used for Local, Public Projects that Mitigate the Adverse Effects of Mineral Extraction* ................. 6

        2.  *In 2015, the Utah Community Impact Board Initiated, and then Suspended, Efforts to Use MLA Funds to Invest in the Oakland Terminal After Questions Surfaced About the Scheme's Legality* .................. 8

        3.  *The Utah Legislature Enacted the 2016 Amendments to the Community Impact Alleviation Act to Make MLA-Derived Funds Available for Private Investment in the Oakland Terminal* ........................... 9

III. THE SERIOUS QUESTIONS CONCERNING THE CIB'S AUTHORITY TO FUND THE PLAN AS PROPOSED MUST BE TAKEN INTO ACCOUNT WHEN DETERMINING IF THE PLAN IS BOTH LEGAL AND FEASIBLE. ........ 12

    A.  Use of the Utah Funds to Pay Off ITS's Debts Appears to be Barred by State and Federal Law ................................................................................... 13

        1.  *The Utah Constitution Prohibits the State from Lending its Credit* ............. 13

        2.  *A Long-Standing Principle of Utah Law Bars the State from Spending Public Funds on Private Enterprise* ............................................ 14

        3.  *Funding the Reorganization of a Private Entity Pursuant to the Bankruptcy Code is Not a Permissible Use of the Throughput Infrastructure Fund* .................................................................................... 16

        4.  *There are Serious Questions about the Legality of the Community Impact Alleviation Act's Scheme to Eliminate Restrictions on the Use of MLA Funds by Moving them through the TIF Account* .................... 17

    B.  The Plan's Feasibility Cannot be Determined Until ITS Addresses These Questions Regarding the Actual Availability of the Utah Funds. ............................. 19

        1.  *The Declarants' Description of the Timing and Approval Process for the Utah Funds has Already Proved Overly Optimistic* ......................... 19

        2.  *Uncertainties Surrounding the Timing and Construction of the Terminal Raise Additional Unanswered Questions about the Feasibility of the Reorganization Plan* ....................................................... 22

IV.  CONCLUSION ................................................................................................. 23

## I.    INTRODUCTION

The Sierra Club and the Utah Chapter of the Sierra Club (collectively, "the Sierra Club") submit this filing to bring to the Court's attention certain information material to the Court's consideration of Debtor Insight Terminal Solutions, LLC's and Insight Terminal Holdings, LLC's Proposed First Amended Chapter 11 Plan of Reorganization Pursuant to Bankruptcy Code § 1121(a), Case No. 19-32231-jal, ECF No. 247, as supplemented by the Chapter 11 Plan Supplement, ECF No. 264. With this filing, the Sierra Club is not taking a formal position on the Proposed First Amended Plan or any other motion currently pending before this Court, but supplements the City of Oakland's Objections to Competing Chapter 11 Plans of Reorganization and Assumption of Ground Lease, ECF No. 276. The City's Objections, in part, identified unresolved questions concerning the availability of $53 million in funding from the State of Utah. (*See* ECF No. 276 at 10-11). The additional information offered in this filing bears on the Court's obligation to ensure that the reorganization plan complies with 11 U.S.C. § 1129(a). Any reorganization must be both lawful, 11 U.S.C. § 1129(a)(3) and feasible, 11 U.S.C. § 1129(a)(11). The significant issues identified below raise serious questions about whether the Debtor's proposed plan satisfies these requirements and warrant the court's close examination of the plan and its underlying assumptions.

Debtors Insight Terminal Solutions, LLC and Insight Terminal Holdings, LLC (cumulatively, ITS) have proposed a plan that is entirely contingent upon the ability of a coalition of four coal-producing Utah counties to convince the Utah Permanent Community Impact Fund Board (CIB) to grant them $53 million of public funds, up to $20 million of which would be used to pay allowed claims from ITS's creditors in this bankruptcy. However, CIB's authority to award public funds for the purely private purposes of funding ITS's bankruptcy reorganization is legally questionable under state and federal law. Further, ITS's financial

viability hinges upon the construction of a future coal export facility in California that is widely opposed in the community, which inspired the passage of a city ordinance banning coal exports from the Oakland port, and has been embroiled in litigation for years. Finally, to date, the four counties have not filed any application for the funding cited in the proposed plan (notwithstanding the counties' assertions in ECF Nos. 247-3 and 247-4 that such an application was imminent). Indeed, it appears that the CIB has yet to approve the process and template for this unprecedented application, there is no official timeline for CIB to review the application, and the ITS reorganization plan prejudges the outcome of the CIB's review process.

The Sierra Club's members have an interest in the outcome of this bankruptcy. Members of Sierra Club's Utah Chapter have an interest in how state funds are used, including whether public funds that would otherwise be available for public projects designed to mitigate the impacts of coal extraction on local communities in Utah would instead be diverted to ITS and its creditors. In California, Sierra Club members live near, and along the rail route to, the coal export terminal that ITS hopes to operate when it emerges from bankruptcy. The transport of coal through these local communities puts residents' health at risk through the exposure to coal dust pollution, noise, and the risk of catastrophic explosion caused by the shipment of combustible products.

The following analysis first outlines the history of the unbuilt coal export terminal, and its financially questionable funding sources from the State of Utah in Section I. Section II describes questions and concerns regarding the lawfulness and feasibility of these funding sources. We believe this information will assist this Court in determining whether it can make the findings required under 11 U.S.C. § 1129(a).

## II.    BACKGROUND

### A.    The Proposed Coal Export Facility in Oakland, California

Debtor Insight Terminal Solutions, LLC is a stevedoring company that aspires to sublet land from a proposed bulk goods terminal called the Oakland Bulk & Oversized Terminal that has not yet been built.[2]  The Oakland Terminal has been the subject of multiple lawsuits in state and federal court, two of which are still live controversies.  *See City of Oakland v. Oakland Bulk & Oversized Terminal, LLC*, No. RG20062473 (complaint filed in Cal. Super. Ct., May 27, 2020); *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603 (9th Cir. 2020); *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, No. A157330 (appeal filed in Cal. App. Ct. May 20, 2019); *see also* City's Objections, ECF No. 276 at 5 (describing status of ongoing litigation).  Construction has been indefinitely delayed because of ongoing litigation and it remains an open question whether the Oakland Terminal will ultimately be built.

### B.    The Utah Counties' Efforts to Use Funds Derived from the Federal Mineral Leasing Act—Earmarked for Local Community Mitigation—to Invest in the Oakland Terminal

In 2015, the CIB attempted to fund the Oakland Terminal using monies set aside by federal law—the Mineral Leasing Act—that may only be spent on public community improvements and infrastructure *within* Utah.  Understanding this history, and the legal limitations that apply to the funding that ITS proposes to use to finance its reorganization plan, is necessary to an assessment of whether the plan is both lawful and feasible pursuant to 11 U.S.C. § 1129(a)(3) (requiring demonstration that plan is "proposed in good faith and not by any means forbidden by law") and 11 U.S.C. § 1129(a)(11) (requiring demonstration that the plan is feasible).

---

[2] Insight Terminal Solutions, "ITS Multi-Commodity Bulk Terminal," http://insightterminals.com/about/ (last accessed August 3, 2020).

1.  *Mineral Leasing Act Funds May Only be Used for Local, Public Projects that Mitigate the Adverse Effects of Mineral Extraction*

Pursuant to the federal Mineral Leasing Act (MLA), leaseholders of federal land must make royalty, bonus, and mineral payments to the U.S. government for the development and production of non-metalliferous minerals, including oil, gas, and coal.  30 U.S.C. §§ 181–195. Half of these payments are then returned to the states where the leased lands are located and must be used specifically to mitigate the social and economic burdens on local communities caused by mineral extraction in their area.  The MLA strictly limits the funds' application to three specific uses:  (i) planning, (ii) construction and maintenance of public facilities, and (iii) provision of public service.  *Id.* § 191.  Use of the MLA funds for any other purpose, including to fund a strictly private enterprise, is a violation of the Act.

The MLA's legislative history demonstrates that Congress designed the program to support public infrastructure and services in localities impacted by mineral extraction.   During deliberations over the Federal Coal Leasing Amendments Act of 1975, which added section 191 to the MLA,[3] Senator Lee Metcalf, the bill's sponsor, explained the purpose of section 191:

> Western States with Federal coal reserves stand in dire need of assistance for planning and creating public facilities and services demanded by the thousands of workers who will be attracted to jobs in the coal mines and related processing and power generating plants . . . . *We must avoid burdening the coal-producing regions with the social and environmental costs associated with coal development*.[4]

In 1993, the Utah Attorney General issued Opinion 92-003 (Feb. 24, 1993) (*see* Exhibit 1), which addresses whether MLA funds may be used for private investment.  Relying on the plain terms of the MLA and the clear legislative history of section 191, the opinion concludes

---

[3] Federal Coal Leasing Amendments Act of 1975, Pub. L. 94-377, 90 Stat. 1083 (Aug. 4, 1976).

[4] 94 Cong. Rec. 9982 (June 21, 1976) (statements of Sen. Lee Metcalf regarding the Federal Coal Leasing Amendments Act of 1975) (emphasis added).

that MLA payments may be used only for local public facilities and services: "[A]n economic development project, in and of itself, is not eligible for funding with mineral lease monies because it does not qualify as 'planning,' 'construction and maintenance of public facilities,' or 'providing a public service.'" *Id.* at 1.

The Utah Attorney General's opinion stressed the narrow purposes for which the MLA fund could be used, drawing heavily from the legislative purpose behind the funding restrictions:

> Congress recognized that local communities need the funds to assist them in building governmental infrastructure and providing local governmental services during the boom and bust cycles that accompany natural resources development. By restricting the use of the funds to planning, construction and maintenance of public facilities, and to the provision of public services, Congress provided a source of funding for traditional local governmental services that are impacted, such as law enforcement, public health, and governmental facilities.
> . . . .
> *Based on the language of the acts and the purposes for which they were passed, it is our conclusion that grants or loans "merely" for economic development are not authorized under the state and federal acts.* However, a grant and loan for the construction and maintenance of a public facility or the provision of public service, which may have economic development as an additional goal or benefit, would be authorized. *Economic development, by itself is not one of the traditional local government services that Congress intended to be eligible for funding by mineral monies.* . . . Congress, however, chose to limit the use of the funds to assist local communities in providing those traditional local government services and facilities that may be impacted by resource development.

*Id.* at 6 (emphasis added). The Utah Code mirrors the MLA use restrictions. Utah Code Ann. § 35A-8-301 (acknowledging that payments from federal mineral lease revenues are "to be used for the alleviation of social, economic, and public finance impacts resulting from the development of natural resources in this state . . . ."); *id.* § 35A-8-303(5); *id.* § 35A-8-305(1)(a)(empowering CIB to administer the MLA funds, using language that mirrors the MLA); § 35A-8-304 (statutory language establishing the CIB).

Thus, pursuant to the MLA, and as recognized by the Utah Attorney General in an opinion that successors have since declined to amend, federal law bars use of MLA funds for all

private investments such as the Oakland Terminal. These funds may only be used for expenditures that mitigate the impacts of mineral extraction in local communities impacted by those extraction activities.

        2.   *In 2015, the Utah Community Impact Board Initiated, and then Suspended, Efforts to Use MLA Funds to Invest in the Oakland Terminal After Questions Surfaced About the Scheme's Legality*

Despite the 1993 Attorney General's opinion and the undisputed restrictions on the uses of MLA funding, and as noted above, the CIB voted in April 2015 to spend $53 million of MLA funds on the construction of the Oakland Terminal, approximately 600 miles west of any of the counties that would normally reap the intended benefits of the MLA funds.[5] The decision generated controversy in Utah where opponents objected to the diversion to California of MLA funds that were meant to be used by Utah communities for schools, roads, health centers, recreation centers and other public facilities to mitigate the impacts of mineral development at home.[6]

In the face of these concerns, the CIB requested the Utah Attorney General to provide an opinion approving the use of the MLA for investment in the Oakland Terminal; to date, that office has declined to provide the requested opinion and the 1993 opinion cited above remains

---

[5] The effect of this investment would have been to export the extraction-related impacts to the West Oakland community near the Terminal and rail line, where residents would have been exposed to coal dust pollution, noise, the risk of catastrophic explosion caused by the shipment of combustible products, and other impacts associated with transporting Utah coal through their neighborhoods. However, MLA funds to mitigate these burdens would not be available to the West Oakland community because the coal originated in Utah. The MLA's purpose in ameliorating the impacts of coal mining on local communities would therefore be doubly frustrated.

[6] Brian Maffly, Salt Lake Tribune, "Utah coal: California, here it comes — and not everyone is happy" (Apr. 27, 2015), https://archive.sltrib.com/article.php?id=2425141&itype=CMSID (last visited July 29, 2020); Editorial: "Coal port scheme lives in the shadows," Salt Lake Tribune (Nov. 9, 2015), https://archive.sltrib.com/article.php?id=3133590&itype=CMSID (last visited July 29, 2020); David Irvine, Op-ed: "Oakland coal port is private investors exploiting state fund," Salt Lake Tribune (Nov. 6, 2015), https://archive.sltrib.com/article.php?id=3142361&itype=CMSID (last visited July 29, 2020); Molly Marcello, "Questions raised about CIB funding of major infrastructure projects," The Times-Independent (Sept. 17, 2015) https://moabtimes.com/2015/09/17/26863431-questions-raised-about-cib-funding-of-major-infrastructure-projects (last visited July 29, 2020).

the official position of the Utah Attorney General's office.  At about the same time, environmental and other local groups, including the Sierra Club, also submitted a letter to the Utah Attorney General requesting an investigation of the CIB's decision and the apparent conflicts of interest associated with that decision.  (*See* Exhibit 2.)  CIB then suspended its plan to invest in the Oakland Terminal in favor of a new legislative strategy that it believed would circumvent the MLA restrictions and facilitate state investment in the Oakland Terminal. As described below, that strategy would funnel the MLA funds through a newly-created account, also administered by the CIB, and then on to the counties for transmittal to the Terminal operators.

> 3.    *The Utah Legislature Enacted the 2016 Amendments to the Community Impact Alleviation Act to Make MLA-Derived Funds Available for Private Investment in the Oakland Terminal*

After questions about the legality of using MLA funds for the Oakland Terminal arose, and in the wake of the CIB's inability to obtain the Utah Attorney General's blessing for the investment of public funds in the Oakland Terminal, proponents of the Terminal sought help from the Utah Legislature.  Their efforts bore fruit: near the end of the 2016 Utah legislative session, Senator Stuart Adams introduced Senate Bill 246 as a vehicle to facilitate the use of MLA funds for investment in the Oakland Terminal.  It works by funneling $53 million in MLA payments—not to the CIB where they would normally reside—but to a state transportation fund, while simultaneously moving exactly the same sum in state sales tax revenues to an account controlled by the CIB for diversion to the Oakland Terminal.[7]  (*See* Exhibit 3, CIB document explaining the funding mechanism).  *See also* Utah Code Ann. § 72-2-128 (creating the Impacted

---

[7] A recording of the Utah Senate Government Operations and Political Subdivisions Committee hearing is at: https://le.utah.gov/av/committeeArchive.jsp?mtgID=14314 (last visited Aug. 2, 2020).  Senator Adams' remarks are at 2:37–3:50; *see also id.* at 2:01:20-:30 (describing the legislature's role as simply trading state money for federal money).

Communities Transportation Restricted Account and directing that Mineral Lease Account money be deposited in that account); Utah Code Ann. § 59-21-2(2)(d)(ii), (iii) (directing that a total of $53 million be transferred from the Mineral Lease Account to the transportation account).

The theory behind the proposed legislation was that the fund switching would *ipso facto* scrub the MLA monies of the federal use restrictions. Statements by legislators at the time indicate that they understood that the bill was explicitly designed to free the MLA funds for private investment through this accounting strategy. Senator David Hinkins, defending the bill against naysayers who complained about investing tax dollars in a risky endeavor, explained that no taxpayer dollars would be spent on the Oakland Terminal because the bill effectively uses MLA payments to fund the terminal: "We're not talking about taxpayer dollars, per se. *It's money that was taken [from] some of the royalties that come[] off of these extraction industries, and that's the money we're talking about*."[8]

Jae Potter (who submitted an affidavit in the ITS bankruptcy matter before this Court, representing that the Utah funds would be available to fund ITS's reorganization plan, ECF No. 247-2) testified in support of the proposed legislation. He admitted that its purpose was to divert MLA funds away from impacted communities and give it to "the coal industry": "This opportunity is about taking dollars that could be used for mitigation and to improve communities, and giving the coal industry in particular the ability to grow and continue to modify in adapting to the future."[9] These statements confirm that the purpose and effect of the

---

[8] *Id.* at 23:50-24:25 (comments of Senator Hinkins) (emphasis added).

[9] *Id.* at 17:15-18:00.

legislation is to use the MLA funds as the cornerstone of a scheme to facilitate a private investment in the Oakland Terminal.

During debate in the full Senate, Senator Adams reiterated that the proposed legislation would automatically transform, just by virtue of the funding switch, restricted MLA money into funds that could be used, no strings attached, to subsidize private development at the Oakland Terminal. He makes the point that, in reality, it would be MLA funds that would be invested in the Terminal: "These funds are not state tax dollars. The 53 million dollars is in a savings account; this community impact board has it in their savings account. . . . *It's all community impact money*. . . . We are simply trading federal money for state money."[10] He described the legislative effort as "helping [the counties] find a vehicle to be able to spend [MLA money]" on the Oakland Terminal.[11] It is necessary "to trade that federal money for state money," Senator Adams said, "because federal money has strings attached to it that we're trying to alleviate."[12] Senate Bill 246 was signed into law in March 2016 and subsequently codified as an amendment to the Utah Community Impact Alleviation Act. *See* Utah Code Ann. §§ 35A-8-302, 308, 309.

In 2017, in furtherance of this accounting scheme, the Utah legislature created an account through which sales tax revenues would be instantaneously swapped with federal MLA funds and then flow ultimately to the Oakland Terminal. In particular, the amendments instruct the state's Division of Finance to redirect a total of $53 million in state sales tax revenue to a newly created "Throughput Infrastructure Fund" (TIF). Utah Code Ann. § 35A-8-308 (creating the TIF

---

[10] A recording of the Senate floor debate is available at https://le.utah.gov/av/floorArchive.jsp?markerID=96890 (last visited August 3, 2020). Senator Adams's remarks are at 2:01:20-:30 (emphasis added); *see also id.* 1:58:30-:45 ("The CIB gives us $53 million, we give them $53 million."); *id.*, 2:01:20-:30 ("The state's role in this is simply trading state money for federal money."). Senator Adams described this during the floor debate as a simultaneous swap of federal for state dollars. *Id.*, 1:58:44.

[11] *Id.* at 1:40:05-1:40:15.

[12] *Id.* at 1:59:30-1:59:45.

fund); *id*. § 59-12-103(12) (reducing appropriations to general fund by $53 million and appropriating same amount to TIF over a two-year period).  At the same time, Mineral Leasing Act revenues would be redirected to a transportation account to backfill the hole in that account created by the loss of the sales tax revenues that were diverted to the TIF for use on the Terminal.[13]  The CIB would administer loan and grants applications from the TIF, just as it does with the MLA fund.  *Id*. § 35A-8-309.  (This movement of funds through the various accounts is depicted in graphic form in the CIB document attached as Exhibit 3.)  This arrangement operationalized the legally dubious swap of restricted federal funds for unrestricted state funds through a simple accounting maneuver, thereby purportedly stripping the MLA funds of their use restrictions and opening the door to use public funds for a private venture – the Terminal.

## III.    THE SERIOUS QUESTIONS CONCERNING THE CIB'S AUTHORITY TO FUND THE PLAN AS PROPOSED MUST BE TAKEN INTO ACCOUNT WHEN DETERMINING IF THE PLAN IS BOTH LEGAL AND FEASIBLE.

Despite the legislators' efforts to facilitate funding of the Oakland Terminal out of state, Utah's Community Impact Alleviation Act does not contemplate the free-ranging use of the funds to pay off the debts of a private company in the hopes that the company will be able to complete a qualifying project at some point in the future.  And yet that is precisely what ITS intends to do under its proposed reorganization plan.  The following discussion outlines the significant questions that remain regarding the feasibility of accessing the Utah funds and the legality of the reorganization plan.

---

[13] The Utah legislature amended the Community Impact Alleviation Act in 2019 to declare that "the first throughput infrastructure project considered by the impact board shall be a bulk commodities ocean terminal project."  Utah Code Ann. § 35A-8-309(8)(a).

ITS bases its reorganization plan primarily, if not entirely, on the availability of up to $53 million in public funds, to be contributed from Utah's Throughput Infrastructure Fund described above. Twenty million dollars of this funding is expected to be spent solely toward repaying ITS's private debts. *See* ECF No. 247, § VI.E.2; ECF No. 247-2, ¶ 6 (" . . . [T]he amount required to ensure ITS's emergence from Chapter 11 Bankruptcy is approximately $20,000,000.") (Aff. of Jae Potter); ECF No. 247-4, ¶ 11. It appears that ITS plans to use the Utah funds to satisfy its obligations to its creditors, and then any remaining funds may be made available to invest in the as-yet-unbuilt Oakland Terminal. ECF No. 247, § VI.E.2 ("The Utah Funds shall be used solely to pay all Allowed Claims in accordance with the Plan and after payment of all Allowed Claims, may be retained by the Reorganized Debtors as working capital to further the Project.").

ITS bears the burden to show that its proposed plan is both lawful and feasible. Significant questions about whether those two prongs have been met warrant further explanation by the debtor ITS before this Court approves the plan.

### A. <u>Use of the Utah Funds to Pay Off ITS's Debts Appears to be Barred by State and Federal Law</u>

A bankruptcy court may not approve a reorganization plan that relies upon funds obtained by any means forbidden by law. 11 U.S.C. § 1129(a)(3). Here, the plan proposed by ITS appears to face both state constitutional and statutory hurdles in the State of Utah as well as federal limitations imposed by the MLA.

#### 1. *The Utah Constitution Prohibits the State from Lending its Credit*

Article VI, § 29 of the Utah Constitution prohibits the state from becoming a "surety or guarantor of another's debts." *Utah Tech. Fin. Corp. v. Wilkinson*, 723 P.2d 406, 412 (Utah 1986). As one of the delegates to the state of Utah's constitutional convention explained, it

would be impermissible under this provision to "mortgag[e] the State . . . for the payment of the debt of another." *Id.* at 410.  Here, ITS's proposed reorganization plan anticipates that Utah, through the CIB, will grant a lump sum payment to pay off ITS's debts.  Even more alarming, there is no meaningful limit as to what percentage of the $53 million available in the Utah TIF fund will go toward payment to ITS's creditors (rather than the investment in the Oakland Terminal as legislators indicated they expected in ECF Nos. 247-2, -3, and -4).

Under the terms of the reorganization plan and disclosure statement, neither the CIB nor the Utah counties have any ability to control how the $53 million is spent, and ITS has sole discretion to use up to the full amount awarded to pay its own debts.  (*See* ITS Reorganization Plan, ECF No. 247, Parts VII.B, "Waiver of Conditions," enabling ITS to waive any of the conditions to effectiveness of the plan, including Part VII.A.v, purporting to estimate that claims against ITS "do not exceed Twenty Million Dollars").  As such, Utah is effectively operating as a surety or guarantor for an as-yet-unknown amount of ITS's debts.  This raises serious questions about the CIB's authority under the Community Impact Alleviation Act to fund ITS's proposed reorganization plan.

>    2.    *A Long-Standing Principle of Utah Law Bars the State from Spending Public Funds on Private Enterprise*

ITS's reorganization plan hinges upon funding from the Utah counties which they may not be legally authorized to offer.  Utah courts adhere to the long-standing legal principle that state funds may not be spent for private gain.  *See Utah Tech. Fin. Corp. v. Wilkinson*, 723 P.2d 406, 412 (Utah 1986) (noting that the principle is "closely related" to the prohibition against lending of credit found in art. VI, § 29 of the Utah Constitution); *see also* Utah Code Ann. § 17-50-303 (prohibiting Utah counties from "giv[ing] or lend[ing] its credit to or in aid of any person or corporation, or . . . appropriat[ing] money in aid of any private enterprise").

The key legal question is whether the expenditure of Utah state funds involves a predominantly public purpose. "[W]hether a lending of credit . . . is in aid of private business depends on the state's purpose in participating in the transaction." *Healthcare Servs. Grp., Inc. v. Utah Dep't of Health*, 40 P.3d 591, 595 (Utah 2002) (citing *Utah State Land Bd. v. Utah State Fin. Comm'n*, 365 P.2d 213, 214 (Utah 1961)). Any appropriation of state funds must be for "the benefit of the public welfare, as opposed to purely private interests." *Baker v. Matheson*, 607 P.2d 233, 241 (Utah 1979) (citation omitted).

In this case, the only arguable public benefit (at least from the counties' perspective) is the construction of the Terminal or the acquisition of some kind of right to use the Terminal to ship Utah coal or other goods yet to be identified. Yet ITS's reorganization plan anticipates using approximately $20 million of public monies *not* to build the Terminal or acquire throughput rights, but solely to pay off the company's own pre-existing, substantial debts. *See* ECF No. 247-2, ¶ 6. It is hard to imagine a more purely private benefit than the repayment of millions of dollars of accumulated debts of a private company—far from Utah, the state where such funds are meant to further strictly public purposes such as roads, firefighting facilities, and community centers. And even after expending $20 million, there is no guarantee the Terminal will ever be built, given the ongoing litigation—which means the likelihood of this expenditure ever resulting in benefit to the public welfare is unknown at best. Furthermore, the constitutional bar on using public money for private benefit applies regardless of whether ITS obtains its funds through the MLA or TIF. At a minimum, then, this Court should require ITS to offer further explanation regarding how it intends to surmount these daunting state constitutional hurdles.

3.    *Funding the Reorganization of a Private Entity Pursuant to the Bankruptcy Code is Not a Permissible Use of the Throughput Infrastructure Fund*

Even assuming for the sake of argument that Utah's Community Impact Alleviation Act funding swap is a lawful scheme that avoids the MLA restrictions, the statute itself includes limitations on how the Transportation Infrastructure Funds, or TIF, may be spent, and they do not contemplate the funding of a bankruptcy reorganization plan that would merely pay obligations to existing creditors.  Rather, the statute authorizes the CIB to approve the use of TIF funds only for a limited purpose: "to provide a loan or grant to finance the cost of acquisition or construction of a throughput infrastructure project . . ."  Utah Code Ann. § 35A-8-309(1)(b); *see also* Utah Code Ann. § 35A-8-303 (stating "[t]he amounts in the impact fund available for loans, grants, administrative costs, or other purposes of this part shall be limited to that which the Legislature appropriates for these purposes").

Here, the purpose of the legislation was narrow:  to free public funds for investment in the Oakland Terminal. As noted above, the bill was specifically designed as a mechanism for funding the terminal and evading the MLA restrictions. In fact, the Utah legislature amended the Community Impact Alleviation Act in 2019 to declare that "the first throughput infrastructure project considered by the impact board shall be a bulk commodities ocean terminal project." Utah Code Ann. § 35A-8-309(8)(a).

However, ITS has not shown that the TIF funds could or would be spent on the Oakland Terminal or on any other throughput infrastructure project, as the statute requires.  To the contrary, it appears that the first $20 million of TIF funds will instead go to satisfy ITS's creditors, and not towards actual acquisition of any interest in, or construction of, the Oakland Terminal.

16

Additionally, the Community Impact Alleviation Act includes a firm cap on pre-acquisition administrative costs associated with funding applications. The Act specifically provides that the CIB may award only "*up to 2%* of the money in the Throughput Infrastructure Fund to the interlocal agency . . . *preliminary to its acquisition* of the throughput infrastructure project." Utah Code Ann. § 35A-8-309(8)(b)(i). In other words, no more than two percent of the funding is currently available because the four Utah counties have yet to acquire any interest in the Oakland Terminal (indeed, they have yet to file an application for the funding). Setting aside the question of whether the bankruptcy bailout itself is a valid pre-acquisition cost, the counties' proposed funding of the reorganization plan would necessarily occur well before any acquisition of the property or throughput rights at the Terminal. As such, no more than 2% of the TIF funds are available for disbursement for such costs. Because the counties have not yet submitted an application to the CIB, it is impossible to know how the request for funding will be structured. But if the counties propose to apply first for the $20 million to give ITS relief from its debts, that would far exceed the 2% cap that the Act authorizes. These questions should be resolved before the court approves the proposed reorganization plan.

4.    *There are Serious Questions about the Legality of the Community Impact Alleviation Act's Scheme to Eliminate Restrictions on the Use of MLA Funds by Moving them through the TIF Account*

Neither ITS nor the county affiants explain the statutory accounting scheme upon which the reorganization plan rests, or demonstrate that the funding mechanism complies with the strict limitations governing the use of MLA funds. Simply moving the MLA funds into a transportation account, and simultaneously shifting sales tax dollars that would have gone to the transportation fund to the TIF for investment in the Terminal, does not automatically eliminate the federal restrictions on the use of the MLA funds. The scheme could be legally vulnerable

17

because, among other things, the legislature's clear intent, and the statute's effect, was to use the MLA funds as the central part of a funding scheme that would ultimately divert public funds to a private enterprise—the Terminal. The scheme's supporters openly recognized that, in reality, it was the availability of the MLA funds that enabled the legislative scheme and Terminal investment. *See e.g., supra* at 10 (quoting Sen. Hinkins: "We're not talking about taxpayer dollars, per se. *It's money that was taken [from] some of the royalties that come[] off of these extraction industries, and that's the money we're talking about*.")  At a minimum, ITS should provide further analysis supporting the legal availability of the funds that form the backbone of its reorganization plan.

Additionally, unauthorized use of funds originating from MLA payments could lead to federal action including both civil and criminal penalties.  Section 195(a) of the MLA makes it "unlawful for any person . . . to organize or participate in any scheme, arrangement, plan, or agreement to circumvent or defeat the provisions of [the MLA] or its implementing regulations." 30 U.S.C. § 195(a)(1).   Section 195 provides for both criminal and civil actions where there is a violation of subsection (a).  Any person who "knowingly" violates that subsection "shall be punished by a fine of not more than $500,000, imprisonment for not more than five years, or both." *Id.* § 195(b).  And "[w]henever it shall appear that any person is engaged, or is about to engage, in any act which constitutes or will constitute a violation of subsection (a) . . . , the Attorney General may institute a civil action . . . for a temporary restraining order, injunction, civil penalty of not more than $100,000 for each violation, or other appropriate remedy . . . ." *Id.* § 195(c).

Given the transparent accounting mechanism that was devised to avoid what Senator Adams referred to as the "strings" attached to the MLA funds, we believe that there is a non-

negligible risk that the U.S. Attorney General would take action under this provision, ultimately undermining the foundation of the reorganization plan.  This risk warrants a careful review of the proposed funding source.

**B.  <u>The Plan's Feasibility Cannot be Determined Until ITS Addresses These Questions Regarding the Actual Availability of the Utah Funds.</u>**

A bankruptcy court may not confirm a reorganization plan when such a plan is likely to require further financial reorganization in the future.  11 U.S.C. § 1129(a)(11).  This is known as the "feasibility" prong.  "The Bankruptcy Code imposes upon the Court a duty to specifically determine that . . . the plan will not likely be followed by liquidation or the need for further reorganization." *In re W. Mgmt., Inc.*, 6 B.R. 438, 442-43 (Bankr. W.D. Ky. 1980).  The court must be presented with "competent, concrete and reliable evidence necessary to reach the requisite conclusions." *Id.* at 443.

Here, because ITS's Plan is premised on the availability of the CIB funds, that Plan will not be feasible if the funds are not available.  ITS's first amended plan relies on unsupported, unreliable assertions about the speed with which the CIB funds will be available, and prejudges the outcome of the approval process without acknowledging the controversy surrounding the CIB's authority to fund the counties' investment in the Terminal.

1.  *The Declarants' Description of the Timing and Approval Process for the Utah Funds has Already Proved Overly Optimistic*

Three current and former Utah county commissioners submitted affidavits in this proceeding in support of ITS's reorganization plan:  Garth "Tooter" Ogden, who signed his affidavit on May 29, 2020 (ECF No. 247-3); Casey Hopes, who signed his on June 8, 2020 (ECF No. 247-4); and Jae Potter, who signed his on June 4, 2020 (ECF No. 247-2).  These affidavits generally paint an optimistic picture of the speed and ease with which the CIB funding to support

the plan will be available. However, the affiants' representations about the timing of the submission of the funding applications, and the process by which the CIB will evaluate them, appear to be inconsistent with existing rules and run counter to the CIB staff's recent description of the process.

First, all three affiants represent that four Utah counties[14] will submit their application for funds held in the TIF account imminently. *See* Hopes Aff. ¶ 7 (asserting that the four counties will submit their application with the CIB in the "next several weeks."); Ogden Aff. ¶ 5 (application will be submitted "in the near future"); Potter Aff. ¶ 8 (application should be "complete . . . within a few weeks").

Now, nearly two months after the date of the latest-signed affidavit, the counties have yet to file an application for funding with the CIB. Indeed, in a Salt Lake Tribune story published on July 5, 2020, about a month after the affidavits were signed, CIB's "lead staffer" Keith Heaton, said that he was unaware that the counties were planning to seek a loan or grant.[15] The affiants' representations about the timing of the application submission have proven to be unrealistic.

Additionally, the affiants' representations about the approval process also seem unrealistic and in conflict with CIB's own expectations and its existing rules. *See* Ogden Aff. ¶ 6 (asserting that "reasonable timeframe" for approval of the application is 90 days, but that the counties may seek expedited approval); Hopes Aff. ¶¶ 7, 9 (claiming that the application will be considered at the CIB August 2020 meeting with funds available in September or October)[16];

---

[14] The affiants represent only two Utah counties. Mr. Ogden is the chair of the Sevier County Commission and Mr. Hopes is a member of the Carbon County Commission. (Mr. Potter is a former member of the Carbon County Commission.) The other two of the four counties have not filed affidavits in support of the funding plan.

[15] Brian Maffly, "Utah Coal Counties Pledge $20 Million in State Money to Help Get Oakland Port Back on Track," Salt Lake Tribune (July 5, 2020), https://www.sltrib.com/news/environment/2020/07/05/utah-coal-counties-pledge/ (last visited July 30, 2020).

[16] Mr. Hopes' affidavit includes an attachment that purports to describe the CIB's review and approval process for the application. However, the author is not apparent from the document, the document is not on official letterhead,

Potter Aff. ¶ 10 (also asserting that the counties' application will be on the CIB August 2020 agenda, with funds to be disbursed to the counties in September 2020).

However, it appears that much work remains to be done before the funding could be made available, assuming the CIB is authorized to disburse it, and assuming no party successfully challenges the disbursement of funds as unauthorized or in violation of law. The CIB website indicates that the board will not proceed with its evaluation of the application until it reviews and approves an application template. That process will only begin at the CIB's August 6, 2020 board meeting, when the agenda indicates that the CIB will review the "template" for the Throughput Application Form—but not any applications themselves.[17]

Moreover, in 2017 the CIB posted rules governing the review of requests for TIF disbursements on its website.[18] The CIB's process, attached as Exhibit 3, contemplate an in-depth evaluation of the proposal, including the retention of third-party reviewers and outside experts to assist the CIB in its review of funding applications. The rules also include an "Initial Due Diligence Checklist" with three categories of questions and eleven specific questions to be answered concerning the project and its financing. An independent firm—not just CIB—evaluates the application and the due diligence items and provides updates to the board, followed by a public meeting, a final report by the independent firm, and a vote by the CIB. *Id.*

---

and there is no indication that it is an official government document of any kind. As such it lacks an evidentiary foundation and is inadmissible hearsay. Fed. R. Evid. 801, 802. It also conflicts with information on the CIB website that the approval *process* has yet to be defined. *See infra* n.17.

[17]The agenda for the CIB's August 6, 2020 meeting is at: https://jobs.utah.gov/housing/community/cib/documents/080620cibagenda.pdf (last visited July 30, 2020).

[18] *See* https://jobs.utah.gov/housing/community/cib/tif.html (last visited July 30, 2020). A graphic included on this document highlights the fact that the swap of federal for state funds that the Utah legislature directed in the 2016 Community Impact Alleviation Act was a transparent attempt to eliminate the MLA restrictions through a simple accounting transaction.

Even then, the process is not over.  The applicant must post a bond, and then CIB transfers the funds to an escrow account (which means the funds would not be immediately available to the counties for immediate transmission to ITS), and only then is the applicant "reimbursed for approved expenses after all contracts are in place."[19]  The county affiants say nothing about this complex process involving third-party evaluators who may not be able to complete their technical work on anything close to the expedited timeframe declarants are hoping for.  And it would not be unusual for the CIB to take a slower approach to this proposal given its unprecedented and unusual nature. As the CIB's Keith Heaton indicates, CIB appears to be proceeding more slowly and with greater deliberation than the declarants predicted:

> The best case is getting it before the board in August, but before that, we would have to do due diligence.  We would have to have it reviewed by a financial consultant . . . As you know, we don't do deep-water ports in Utah every day.  The important thing is that it is public funding and we take our responsibility very seriously, especially when we are talking about millions of dollars in an area we don't have much experience in.[20]

Thus, there is no basis for the declarants' prediction about the timing of the funding, the process, or their assumption that the funds, will in the end, be available to the counties to fund ITS's reorganization plan.  As a result, there are significant questions regarding whether ITS has shown that its reorganization plan is feasible.

> 2.  *Uncertainties Surrounding the Timing and Construction of the Terminal Raise Additional Unanswered Questions about the Feasibility of the Reorganization Plan*

As described above, the proposal to construct the Terminal generated widespread controversy and opposition in the City of Oakland, including from city leaders such as the mayor

---

[19] The phrase "after all contracts are in place" is yet another indication that the TIF funds are to be used for investments or obligations associated with a throughput facility, not to fund ITS's satisfaction of its obligations to third-party creditors in this proceeding.

[20] Maffly, *supra*, n.15.  Analogous rules for the administration of the CIB funds similarly require a thorough and public review of funding applications.  *See* Utah Code Ann. § 35A-8-307(2), (5)(a).

and council members, to community and environmental groups, all concerned about the health

impacts of increased train traffic, noise, coal dust and other pollution, and the risk of combustion

of large quantities of coal in the vicinity.  The proposal spawned litigation that continues to this

day, while no construction work is taking place at the Terminal.  *See supra* at 5.  The proposed

plan is completely silent on this longstanding barrier to progress on Terminal construction and

offers no explanation of how the litigation delays and uncertainties may bear on the sole source

of funding identified by the plan:  the Utah CIB funds.  These unanswered questions should be

resolved before the Court approves the proposed reorganization plan.

## IV.    CONCLUSION

ITS has asked this Court to approve its reorganization plan based on a funding scheme

that raises more questions than answers about its feasibility and consistency with non-bankruptcy

law.  We believe the information presented in this filing will assist this Court in determining

whether it can properly make the findings required under 11 U.S.C. § 1129(a), and we encourage

the Court to consider whether the concerns identified by the City and offered in more detail

herein warrant further explanation by the debtor ITS.


Dated:  August 5, 2020                    By:    /s/ Heidi J. McIntosh
                                                 Heidi J. McIntosh CO SBN 48230
                                                 (*pro hac vice admission pending*)
                                                 EARTHJUSTICE
                                                 633 17th Street, Suite 1600
                                                 Denver, CO 80202
                                                 Telephone:    (303) 623-9466
                                                 Facsimile:    (720) 550-5757

                                                 Attorney for Interested Parties Sierra Club
                                                 and Utah Chapter of Sierra Club

## CERTIFICATE OF SERVICE

I certify that on August 5, 2020, the foregoing **NOTICE OF INFORMATION PERTAINING TO DEBTOR INSIGHT TERMINAL SOLUTIONS, LLC'S AND DEBTOR INSIGHT TERMINAL HOLDINGS, LLC'S PROPOSED FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION** was served on all parties authorized to receive notice through the Court's ECF notice system in this case.

s/ Heidi J. McIntosh

Heidi J. McIntosh