UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| INSIGHT TERMINAL SOLUTIONS, LLC et al.[1] | Case No. 19-32231 |
| Debtors. | (Jointly Administered) |
| | Judge Joan A. Lloyd |

**AUTUMN WIND LENDING, LLC'S OBJECTION TO DEBTORS' PLAN**

Autumn Wind Lending, LLC (the "AWL"), the Debtors' largest creditor, through its counsel, respectfully submits this objection (the "Objection") to *Insight Terminal Solutions, LLC's and Insight Terminal Holdings, LLC's Proposed First Chapter 11 Plan of Reorganization Pursuant to Bankruptcy Code Section 1121*(a) [Docket No. 247] (the "Plan").[2] AWL states as follows in support of the Objection:

**PRELIMINARY STATEMENT**

1. The Plan is not merely unfeasible. It is fantastical. It is built upon a series of contingencies so complex, and so daunting, that ITS's own Chief Financial Officer testified that the best case scenario is that an application for *partial* funding—about $53 million—will be not be complete for over a year; the application must then go through a rigorous review process, during which the Debtors will have to prove that they have already secured approximately *$200 million* to finance the Plan. Again, that is the Debtors' own best case scenario; it is undisputed that the

---

[1] The Debtors in these chapter 11 cases are Insight Terminal Solutions, LLC (Case No. 19-32231) ("ITS") and Insight Terminal Holdings, LLC (Case No. 19-32232). The Court has ordered the joint administration of these chapter 11 cases. The docket in this Case No. 19-32231 should be consulted for all matters affecting the above listed cases.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

actual date when complete funding would be obtained is completely unknown, and even a cursory analysis of the steps required to obtain partial funding demonstrates that it is unlikely ever to happen. Notably, the Debtors' expectation that Utah would pass legislation that would help fund the Plan—which was a primary basis for seeking an adjournment from this Court of the confirmation hearing, over AWL's objection— has not and will not come to pass; it represents only the latest, and hopefully final, broken promise that unsecured creditors have been forced to endure during these cases. For these reasons and those set forth below, the Plan should not be confirmed.

## PROCEDURAL HISTORY

2. On July 17, 2019 (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory creditors' committee has been appointed.

3. On June 19, 2020, the Debtors filed the Plan and Disclosure Statement [Docket No. 246]. On July 9, 2020, the Court entered an order approving the Disclosure Statement and setting deadlines for objections to confirmation and ballots, and setting a confirmation hearing [Docket No. 256].

## RELEVANT FACTS

4. The Debtors presently do not have a single dollar to fund the plan. They have no business operations. The Plan relies on the remote possibility of obtaining funding at an unknown future date from four counties in the State of Utah (the "Counties") for the purpose of building a port in Oakland, California to export coal internationally (the "Port Project"). But the Counties do

not presently have the funds either. The Counties must first obtain the funds by going through an application process administered by an entity called the Utah Permanent Community Impact Fund Board (the "CIB"), which also ultimately rules on their access to the money. [Heaton Dep. at 7:5-23, July 30, 2020].[3] That money is presently held in the so-called "Throughput Infrastructure Fund" (the "Fund"), which has never funded a project before. Indeed, the template of the application for money held in the Fund was only approved about a month ago, despite that fact that the Debtors filed letters by Commissioners of each of the Counties (all dated May 18, 2020) with the Plan indicating that the Counties "are preparing to submit to the CIB, our application to draw down the $53 million," despite no approved application existing. As detailed below, it is unknown how long it will take the Debtors to access money from the Fund, if ever, but the best-case scenario based upon the uncontroverted record evidence in this case is that the process will take no less than one year.

5. The reason why the process takes so long is that the CIB, quite reasonably, is not going to provide $53 million in taxpayer money without fully vetting the Port Project, *i.e.,* ensuring it can actually be built. Again, according to the uncontroverted record evidence, in order to pass through the vetting process successfully, the Debtors will have to, among other things: (a) secure contracts for at least approximately $200 million *more* in financing to actually construct the Port Project; (b) obtain approximately 76 permits from various agencies within the City of Oakland (of which the Debtors have only applied for one to date, which was rejected); (c) get the Port Project designed (which alone will cost about $6 million that the Debtors simply do not have); (d) contract with construction firms to actually build the massive and complex Port Project (which negotiations have not yet begun); and (e) enter into a long-term Throughput Agreement (by which a foreign

---

[3] Mr. Heaton is the Community Development Director of the CIB and is the CIB's authority on application requirements.

entity agrees to purchase the coal). If and when all of the foregoing—and then some, as discussed below—is in place and a complete application is filed, the CIB will engage a financial advisor, Zions Bancorporation ("Zions"), which has informed the CIB that it will need to work with additional experts with knowledge of ports. [Heaton Dep. at 18:22 to 19:1-6, 19:20 to 20:1]. Zions has not yet identified the expert(s) it will engage with and will not commence due diligence until an application is submitted. [*Id.* at 19:7-14 to 29:21-23]. To be clear, this is all *before* the CIB can even vote to approve the Counties' application for the funds.

6. If the application is approved, and the Counties obtain the requested money, or some portion thereof, the Debtors also have to come to some kind of contractual agreement with the Counties to obtain the funds for use in the Port Project. As of the deposition of Jim Wolff, CEO of ITS, on July 31, 2020, that agreement did not exist and the Commissioners of the Counties had not even seen a term sheet outlining the basic business terms of such a deal.

7. If the State of Utah does not provide the money to the Counties, who do not in turn provide the money to the Debtors, the Debtors have *no other method* to fund the Plan.

8. Against this backdrop, the Debtors have not provided a scintilla of evidence of the feasibility of the Plan other than: (a) an affidavit from certain Commissioners of the Counties, as well as a former County Commissioner (collectively, the "Affidavits"); and (b) letters from the Commissioners of the Counties (the "Letters"). The Affidavits and Letters appear to have been drafted in part by John Siegel, Manager of ITS. The Letters and Affidavits have been proven false in a number of material respects that seriously call into question the overall credibility and veracity of Mr. Siegel and the Debtors.

## **OBJECTION**

**I.  Debtors' Burden to Satisfy Feasibility Test
    Pursuant to Section 1129(a)(11) by a Preponderance of the Evidence**

9.  For a court to approve confirmation of a plan of reorganization, the requirements of section 1129 of the Bankruptcy Code must be met. *See* 11 U.S.C. § 1129. Among these requirements is that the plan must be feasible, such that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This is commonly referred to as the "feasibility test."

10.  The purpose of the feasibility test is "'to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan than the debtor can possibly attain after confirmation.'.... [W]here the financial realities do not support the proposed plan's projections or where proposed assumptions are unreasonable, confirmation of the plan should be denied." *In re Investors Fla. Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 765 (Bankr.N.D.Fla.1994) (quoting *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 507 (Bankr.S.D.Tex.1989)); *see In re Prudential Energy Co.,* 58 B.R. 857, 862 (Bankr.S.D.N.Y.1986) (a plan based on impractical or visionary expectations cannot be confirmed). "Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Chase Manhattan Mortg. & Realty Trust v. Bergman (In re Bergman),* 585 F.2d 1171, 1179 (2d Cir.1978). "The proponent of a plan of reorganization does not need to guarantee success, but a court cannot confirm a visionary scheme that promises creditors more than the debtor can possibly attain after confirmation, notwithstanding the proponent's sincerity, honesty and willingness to make a best efforts attempt to perform according to the terms of

the plan." *In re Am. Homepatient, Inc.,* 298 B.R. 152, 169 (Bankr.M.D.Tenn.2003) (internal quotations and citations omitted).

11. The purpose of the feasibility requirement of section 1129(a)(11) "is to protect creditors against unrealistic plans that have little or no chance of success." *In re Adelphia Business Solutions, Inc.,* 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003). "Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." *In re Brice Road Devs., L.L.C.,* 392 B.R. 274, 283 (6th Cir. BAP 2008) (internal quotation marks and citation omitted). "Feasibility determinations must be firmly rooted in predictions based on objective fact." *In re Griswold Bldg., LLC*, 420 B.R. 666, 697 (Bankr. E.D.Mich. 2009) (internal citation omitted). It is a debtor's burden to prove, by a preponderance of the evidence that the plan is not likely to fail. *Id.* "Feasibility is fundamentally a factual question since it necessarily depends upon a determination of the reasonable probability of payment." *In re Brice Road Devs., LLC,* 392 B.R. at 283 (6th Cir. BAP 2008) (internal quotation marks and citation omitted).

12. Among the factors relevant to a finding of feasibility is "the past financial performance of the debtor, the availability of credit if the plan is dependent on additional financing, and the term of the plan." *Id.*

II. **The Uncontroverted Record Evidence Demonstrates that the Plan is Not Feasible**

13. Just over a month ago, AWL deposed each of the Commissioners of the Counties as well as the former Commissioner who submitted an affidavit in support of the Plan, *i.e.,* everyone who submitted an affidavit to the Court on behalf of the Debtors. AWL also deposed Keith Heaton—Community Development Director at the CIB, the chief architect of, and most knowledgeable person about, the CIB's application process, and Jim Wolff, CFO of ITS. The

sworn testimony of these witnesses, uncontroverted by any other record evidence, demonstrates that the Plan is not remotely feasible. As a best case scenario, the Debtors need an unknown number of months (over a year) and funding commitments of approximately $200 million, among many other presently-unsatisfied requirements, before the CIB will approve the Counties' application. The evidence is clear that the Debtors' reliance on the Fund to finance its Plan is not feasible.

14.    A complete application requires twenty-three to twenty-four line items. [Wolff Dep. 17:1-5, July 31, 2020]. Before the CIB will even consider the application by the Counties, the Debtors must first complete a number of onerous application requirements, several of which are contingent on the completion of others—so a failure to meet even one of the requirements is likely to doom the application. According to Mr. Wolff—again, the Debtors' own CFO—what follows is the best case scenario for timeline and cost, in chronological order:

| **Application Requirement** | **Explanation of Requirement** | **Mr. Wolff's Anticipated Timeline and Cost** |
|---|---|---|
| Executed long-term throughput agreement [*Id.* at 33:6 to 34:10] | An agreement, likely with a foreign entity, to store and deliver a specified amount of coal per period utilizing the Debtors' proposed facility. | Mr. Wolff was unable to provide an anticipated timeline. A draft agreement was circulated to JERA, an Asian energy firm, two to three years ago. Mr. Wolff testified that no progress has been made in negotiations with JERA, as finalization of the contract is pending the Debtors' ability to build the terminal. [*Id.*] |
| Obtain seventy-six permits from the City of Oakland, of which the Debtors have only applied for one, which was denied [*Id.* at 20:23 to 23:9] | Permits to be issued by various City of Oakland agencies relating to demolition, site utilities, land piles, water treatment plan, storage buildings, administrative/support buildings, dumper pit, maintenance dredging, water piles and structure, | 6 to 9 months, with the City of Oakland's cooperation, longer without. [*Id.* at 23:17 to 24:5] |

| | | |
|---|---|---|
| | ship loader, conveyor system, ship mooring, and wharf repairs. | |
| Mill Creek Consultants Inc. ("Mill Creek") must complete full design of the Port Project [*Id.* at 24:6 to 26:4] | Mill Creek is an engineering firm that designs and constructs, among other things, ocean terminals. Mill Creek would provide the Debtors with design and permitting services. | 6 to 9 months (overlapping with permit process above) and $6 million, which the Debtors do not have [*Id.*]. Notably, Mill Creek cannot finalize the drawings until the storage requirements under the long-term throughput agreement are finalized; so the terms of that agreement must be in place first. [*Id.* at 36:8-25] |
| Secure approximately $200 million in construction financing [*Id.* at 27:6-22, 37:9 to 40:9] | The Debtors must secure financing to complete the Port Project prior to submitting an application. Financing relies on the Debtors' first executing a long-term throughput agreement with a counter-party willing to purchase coal. | 3 months, but the process to obtain funding cannot commence until the long-term throughput agreement is finalized. No contract or term sheet exists and no application for financing has been submitted with any entity. [*Id.*] |
| EPC Contract with Turner Construction Company ("Turner") [*Id.* at 29:4 to 31:6] | An engineering, procurement, and construction agreement. Under an EPC contract, a contractor is obliged to deliver a complete facility to a developer who need only turn a key to start operating the facility, for a guaranteed price by a guaranteed date and it must perform to the specified level. | Mr. Wolff does not believe it will be a matter of months, but does not know one way or the other. The Debtors cannot enter into an agreement until Mill Creek delivers its plans. The Debtors do not have a term sheet or draft contract with Turner. [*Id.*] |
| Executed Contract between the Debtors and the Counties [*Id.* at 40:24 to 43:25] | The Debtors will need to reach an agreement with the Counties regarding the overall transaction, including sources and uses of funds, construction details, capacity, and the division of proceeds. | Mr. Wolff was unable to provide an anticipated timeline. No contract exists. The Debtors have drafted a term sheet, but Mr. Wolff does not know if it has been shared with any of the Counties. [*Id.*] None of the Commissioners appeared to have seen the term sheet. |
| The Counties must approve application before submission to the CIB [*Id.* at 44:10 to 45:2] | Each county must go through its internal approval process to authorize submission of the application once it is complete. | One to two months. However, Mr. Wolff was unaware of the requirements of each of the Counties to obtain authority to submit the application. [*Id.*] |

-8-

15. Once a completed application is submitted, the CIB requires significant due diligence prior to releasing the Utah Funding. [*Id.* 15:21 to 16:1]. Among the diligence required, the CIB needs to review the terminal in Oakland to inspect the infrastructure and Zions and consultants must analyze and appraise the terminal, neither of which has occurred. [*Id.* 17:18 to 18:1-3]. The CIB's financial advisor informed Mr. Heaton that this process will take one month, at a minimum, but more likely two or more months, with no ultimate cap on how long this process may take. [Heaton Dep. at 20:2-19].

16. Upon successful completion of any due diligence, which is not guaranteed, the CIB needs to vote in favor of the application, after which the funding will go to an escrow account maintained by the Counties [*Id.* at 22:6 to 23:8].[4] No evidence exists as to how long it will take the Counties to release the funds to the Debtors, or what the process will entail, however, Mr. Heaton testified the process generally takes months. [*Id.*].

17. The "feasibility test" was established specifically to avoid the present scenario: a Plan based solely on equity's hopes and dreams to the detriment of the creditors. "[C]reditors should not be expected to be bound by the terms of plans entailing visionary schemes which promise creditors more than the debtor can possibly deliver." *In re Arts Dairy, LLC,* 432 B.R. 712, 716–17 (Bankr. N.D. Ohio 2010) (citing *In re Danny Thomas Props. II Ltd. P'ship,* 241 F.3d 959, 963 (8th Cir.2001)). Therefore, while "the proponent of a Chapter 11 plan need not show that success is guaranteed[,]" it must demonstrate that there is "a reasonable assurance of commercial viability," *id.* at 717, and "a 'reasonable probability' that the debtor will be able to make all of the payments to creditors according to the terms provided in the plan." *In re Waterford Hotel, Inc.* 497 B.R. 255, 263 (Bankr.E.D.Mich.2013) (quoting *Trenton Ridge Investors,* 461 B.R. at 478). There

---

[4] The CIB may grant up to 2 percent of the money in the Fund (roughly $1 million) to the Counties for costs incurred before the acquisition of the Port Project.

is no possibility, much less a reasonable probability, that the Debtors can achieve the goals set forth in the Plan.

19. In a similar scenario, another bankruptcy court in this Circuit held that a debtor's plan was unconfirmable. *In re Shefa, LLC*, 524 B.R. 717, 742–43 (Bankr. E.D. Mich.), *aff'd*, 535 B.R. 165 (E.D. Mich. 2015). Judge Shefferly found it significant that the debtor had neither any capital of its own nor any income from any business operations, thus concluding that the debtor's ability to pay its creditors under the plan depended upon the debtor's receipt of funds from an outside source. *Id.,* 524 B.R. at 741. This is exact situation the Debtors are presenting to this Court through their Plan. The *Shefa* debtor only had an expression of interest from an entity formed by an acquaintance of the debtor's principal ("KFG"), but no other sources of financing. *Id.* at 741–42. The bankruptcy court concluded that neither an expression of interest from an investor nor a nonbinding letter of intent is sufficient to demonstrate a plan's feasibility. *Id.* at 742. Thus, the bankruptcy court found that debtor failed to show that there is a reasonable probability that it would be able to make the payments proposed in the Plan. *Id.*

19. On appeal to the district court, the debtor in *Shefa* contended that "the [b]ankruptcy [c]ourt erred by applying too high of a standard for finding feasibility" and not giving sufficient deference to the opinion of sophisticated investors who expressed a belief that the business plan for the debtor's hotel would succeed. *In re Shefa, LLC*, 535 B.R. 165, 177 (E.D. Mich. 2015) (internal citation omitted). The debtor also argued that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." *Id.* The district court held that, while the debtor accurately stated the law that bankruptcy courts should demand less and less

specific proof to prove feasibility as one moves further away from the time of confirmation, the debtor's application of the law was incorrect.

20. The district court looked to the Second Circuit's decision in *In re DBSD North America Inc.* for the appropriate application of specificity of proof with respect to feasibility*:*

> That is true at some level of generality, but exactly how specific those "specifics" must be depends on the circumstances. In most situations, the time immediately following bankruptcy will call for fairly specific proof of the company's ability to meet its obligations—as here, where it was "undisputed that the Debtors have commitments for working capital financing for the next two years." As one moves further away from the time of confirmation, however, the proof will necessarily become less and less specific.

*In re DBSD N. Am., Inc.*, 634 F.3d 79, 107 (2d Cir. 2011) (internal citation omitted).

21. The district court found that the problem for the *Shefa* debtor was "the absence of fairly specific proof of its ability to meet its obligations in the time immediately following bankruptcy[,] regardless of the specificity the bankruptcy court may have sought with respect to the future." *In re Shefa, LLC*, 535 B.R. at 178. The district court went on to find that the debtor had not shown that the bankruptcy court erred in finding that debtor lacked the financial wherewithal to make the payments required under the debtor's plan or that it lacked a firm commitment by KFG or anyone to provide financing for the Plan—including the financing required in the short term to pay creditors. *Id.* The district court stated that, while KFG testified it had sufficient financing to fund a plan, KFG had not committed to either make the loan described in the agreement or provide the equity described in its letter of intent. *Id.* The district court noted that no party was obligated to fund the debtor's project and affirmed the bankruptcy court's finding that the debtor's plan lacked feasibility. *Id.*

22. Just like the debtor in *Shefa*, the Debtors in these cases do not come close to having a firm financing commitment. Rather, they point to an application process that, if successful, will take at least a year. Indeed, the outcome of this application process is much more uncertain than

the lender's letter of intent in *Shefa*; there is not even a reasonable likelihood that the application can be completed, much less approved. The Plan is no more than a veiled attempt to undo the Court's reasoned and correct decision to terminate the Debtors' exclusivity by seeking confirmation of a plan that gives out-of-the-money equity holders seemingly unlimited time to continue their fruitless efforts to find financing as creditors languish.

**III.    Debtors' Sole Evidence in Support of Feasibility
Are the False Letters and Affidavits That the Debtors Failed to Correct**

23.    The Debtors' only purported evidentiary support regarding the feasibility of the Plan, *i.e.,* access to the Fund, are the Letters and Affidavits. Each of these contains materially false statements. Evidently, according to Jae Potter, the former Carbon County Commissioner acting as a point person between the Counties and the Debtors, the Letters and Affidavits were ghostwritten by Mr. Siegel in conjunction with the Debtors. [Potter Dep. 23:8 to 24:4, August 3, 2020]. Mr. Potter's testimony is supported by a privilege log produced by the Debtors' counsel, which appears to show Mr. Siegel working on the false Letters and Affidavits. Though the Debtors have, at the very least, known for months of the materially false statements in these Affidavits and Letters, they have taken no steps to correct them with the Court. [Wolff Dep. at 15:18-20] (testifying that he is aware the final form of the application has not yet been approved by the CIB, in contravention of statements that the Counties would be submitting an application in the next several weeks); [Potter Dep. at 29:2-7] (testifying that he informed Mr. Siegel that the parties were working off the wrong application). The Affidavits and Letters should therefore be given zero weight, especially in light of the overwhelming evidence of the Plan's unfeasibility described above.[5]

---

[5] On August 5, 2020, the Debtors filed *Debtors' Motion to Assume Sublease* [Docket No. 286]. The *Debtors' Motion to Assume Sublease* cannot be granted for the same reasons why the Plan cannot be confirmed, as set forth in this Objection. The unrefuted testimony, including that of the Debtors' own CFO, Mr. Wolff, conclusively shows that the Debtors have no ability to satisfy the requisite cure amount or provide adequate assurance of future performance. On September 7, 2020, the landlord filed an objection to the motion, raising the same arguments. [Docket No. 309].

24. With respect to the Letters, attached to the Plan as **Exhibit A**, these were sent in draft form to Mr. Siegel, who forwarded them to Mr. Potter. [Potter Dep. 23:8 to 24:4, August 3, 2020]. Mr. Potter, who acts as a go-between for the Debtors and the Counties, forwarded the letters to the Commissioners of each of the four Counties. [*Id.* at 25:13-21].

25. The Letters were signed by Casey Hopes, Carbon County Commissioner; Scott Bartholomew, Commission Chair for Sanpete County; Garth Ogden, Commission Chair for Sevier County; and Lynn Sitterud, Emery County Commission Chairman. The Letters were originally submitted to the Court on May 26, 2020 in connection with approval of the Debtors' disclosure statement [Docket No. 217]. Each of the Letters is substantially identical and contains the following sworn statement: "We are preparing to submit to the CIB[,] our application to draw down on the $53 million[.]"[6] Each and every one of the Commissioners has testified that this statement is materially false.

- Mr. Hopes's Testimony: On July 28, 2020, *i.e.,* nine weeks after his Letter was submitted saying that the application was being prepared, Mr. Hopes testified that he is not aware of anyone, other than maybe the CIB board members, who have even seen a form template of the application. Mr. Hopes testified that at the time he signed his Letter, he was not aware of the steps taken to submit an application, nor what the application would require, and that he currently does not know such information. [Hopes Dep. 64:23 to 65:15, July 28, 2020].

- Mr. Bartholomew's Testimony: On July 30, 2020, *i.e.,* nine weeks after his Letter was submitted saying that the application was being prepared, Mr. Bartholomew testified that he did not have specific knowledge that the application was being prepared at the time he signed his Letter; he just assumed it. He presently has no knowledge of or understanding about the requirements the CIB has for applicants. [Bartholomew Dep. 11:4-10, 24:16-17, July 30, 2020].

- Mr. Ogden's Testimony: Mr. Ogden removed the above statement, knowing it to be inaccurate, and replaced it with, "[w]e are prepared to work with our partner counties[.]" Mr. Ogden testified that he had no knowledge whether anyone had actually started on the application. [Ogden Dep. 65:13 to 69:11, July 29, 2020].

---

[6] The letter signed by Mr. Ogden contained a modified version of this statement, as explained below.

- Mr. Sitterud's Testimony: On July 28, 2020, *i.e.,* nine weeks after his Letter was submitted saying that the application was being prepared, Mr. Sitterud testified that he did not know if the statement was true at the time or if it is even accurate today, stating: "I don't know that that sentence stuck out to me. I was just asked to - - to sign anything Emery County support." [Sitterud Dep. 46:25 to 48:5, July 28, 2020].

26. None of the foregoing misstatements in the Letters has been corrected with the Court.

27. As with the Letters, each of the Affidavits were drafted by, or at the direction of, Mr. Siegel and/or the Debtors and contain materially false statements. [Potter Dep. at 26:1-8]. The Affidavits were submitted to the Court on June 19, 2020.

28. Mr. Potter's Affidavit contains a sworn statement that the CIB application would be completed "within a few weeks" and Mr. Hopes swore that the Counties expected the application to be filed "within the next several weeks" [Plan, Ex. B ¶ 8, Ex. D ¶ 7]. Mr. Potter testified that knowing what he knows now, that an application has not yet been approved by the CIB, he would correct this statement. [Potter Dep. 80:1 to 81:1].[7] Similarly, Mr. Hopes testified that the Affidavit was written at a time the Counties did not know the formal application had not been approved and that knowing what he knows now, he would "probably not" have sworn to that statement. [Hopes Dep. 60:21 to 61:19]. Mr. Ogden's modified his Affidavit from stating the Counties intended to submit the application "within the next few weeks" to "in the near future," because he was not comfortable swearing under oath that the application was going to be submitted within the next few weeks. [Ogden Dep. at 54:23 to 56:21].

29. Mr. Siegel was notified by Mr. Potter that the application they were using was wrong and that the new template had not even been approved by the CIB at the time Affidavits were submitted saying that the application was about to be submitted. [Potter Dep. 29:2-7].

---

[7] Mr. Potter also testified that he would not swear to paragraph 6 of his Affidavit stating that the Counties intended to file an application. [Potter Dep. at 80:14-20].

30. None of the foregoing misstatements in the Affidavits have been corrected with the Court.

31. The Affidavits submitted by Mr. Potter and Mr. Hopes also contain sworn statements that no material issues exist preventing timely approval of the application. [Plan, Ex. B ¶ 9, Ex. D ¶ 8]. Mr. Potter testified that he has no knowledge whether there are material issues that would prevent the Counties application from being approved and that he would not certify the statement he made in his Affidavit today under penalty of perjury. [Potter Dep. 63:16-22, 81:7-23]. Mr. Hopes testified he does not know whether material issues exist. [Hopes Dep. 51:6-14]. Mr. Ogden testified that he removed the statement that no material issues exist that would prevent the application from being approved, because he did not have all the information to make such a statement [Ogden Dep. at 47:23 to 48:7, 54:23 to 55:18].

32. Mr. Potter and Mr. Hopes also swore in their Affidavits that the Counties' application would be on the CIB August 2020 agenda, with funds being made available in September or October 2020. [Plan, Ex. B ¶ 10, Ex. D ¶ 9]. Mr. Potter testified, that as of the date of his deposition, these statements regarding timing of approval and availability of funds were both incorrect. [Potter Dep. 82:1-16]. Mr. Hopes testified that his statements depended on the fact that an application existed at the time, but that he has no knowledge as to when funds are going to be approved—not even an approximate date. [Hopes Dep. 62:14 to 63:6]. Mr. Ogden's Affidavit has no reference to an August 2020 CIB approval or accessing fund by September. [Plan, Ex. C]. He instead stated that a reasonable timeframe for review of an application is 90 days, and that the Counties may seek a more expedited review and approval process for the application. [*Id.* at ¶ 6]. Mr. Ogden testified that he removed language stating the time timeframe for review of an application was "60 to 90 day" and modified it to read "90 days" because he did not believe an

application could be approved in 60 days based on his experience as a CIB board member. [Ogden Dep. 53:23 to 54:22].

33. Mr. Ogden's affidavit also attaches a document entitled *Process of Applying for and Receiving SB 248 Throughput Infrastructure Funds* (the "Process of Applying for Funds"), drafted by Mr. Potter. [Potter Dep. at 71:6-7]. Mr. Potter testified that he drafted the Process of Applying for Funds before he realized that the Counties were working with the wrong application and that the statements contained therein, that the Counties are prepared to submit the application in the next few weeks, that the application will be on the August 2020 board meeting, and that funding should take place within the September to October timeframe, are currently not true. [*Id.* at 71:11 to 72:9].

34. Again, none of the foregoing misstatements in the Affidavits have been corrected with the Court. The failure to correct both the Letters and Affidavits—or more properly, to withdraw them—seriously calls the Debtors' credibility into question with respect to any claims about the Plan's feasibility.

**IV.  No Miracle Legislation Passed or is Expected to Pass in the Near Future**

35. Over AWL's objection, the Debtors successfully obtained a continuance of the Confirmation Hearing based, in part, on sworn assertions that the Utah State legislature was expected to "conduct a special legislative session on or about August 20, at which time the Utah State Legislature will consider and vote on proposed statutory legislation that will authorize and direct the release of the Throughput Infrastructure Funds directly to the Counties for the funding of the Debtors' Plan." [Docket No. 268, ¶ 3]. No legislation regarding the Port Project or the Funds was ever calendared on the legislature's agenda, much less passed.[8] The Debtors appear now to

---

[8] Indeed, at the special legislative session, the topic of the $53 million Fund came up. Rep. Brian King objected to using state money to pay off the Debtors' creditors and made a motion for the Executive Appropriations Committee

have conceded that they do not expect any legislative relief in favor of the Counties or the Port Project in the near future, just as their promised settlement with the City of Oakland (which served as justification for seeking an extension of exclusivity) never materialized. Accordingly, no miracle is expected from the Utah State legislature, or any other body, and the Debtors have failed to identify a single source of funding for the Plan other than through the CIB—which, as set forth herein, will take no less than one year to obtain.

36. The Debtors have failed to satisfy their burden to prove feasibility by any standard, much less by a preponderance of the evidence. The Court should not rely on the word of individuals who have submitted letters and affidavits that have been proven, through testimony provided by the signers and affiants themselves, to be false and without factual support. Accordingly, the Court should give zero weight to the Letters and Affidavits, as they are materially false, as well as to any representations made by the drafters or proponents of the Letters and Affidavits. As this was the only purported evidentiary support presented for the feasibility of the Debtors' Plan, the Debtors have failed to meet their burden of proof to show by a preponderance of the evidence that the Plan satisfies section 1129(a)(11) of the Bankruptcy Code, and the Plan cannot be confirmed. In fact, for the reasons detailed above, the evidence overwhelmingly demonstrates that the Plan is unfeasible.

---

to pull the plug on the $53 million and divert the money back to the rural communities it was intended to benefit. [http://sanpetemessenger.com/archives/19201;https://utahpolicy.com/index.php/features/today-at-utah-policy/24657-legislative-republicans-nix-proposal-to-shift-state-funding-away-from-a-controversial-california-coal-port]. This makes sense in light of the fact that the $53 million is sitting unused during a massive financial crisis and global pandemic.

## RESERVATION OF RIGHTS

37. AWL reserves all of its rights to supplement or amend this Objection at or prior to any hearing on the Debtors' Plan. Nothing contained in, or omitted from this Objection constitutes an admission or stipulation by AWL.

## CONCLUSION

WHEREFORE, for the foregoing reasons, AWL respectfully requests that the Court deny confirmation of the Debtors' Plan.

Dated: September 8, 2020
New York, New York

**LOWENSTEIN SANDLER LLP**

/s/ *Robert M. Hirsh*
Robert M. Hirsh (admitted *pro hac vice*)
Rachel Maimin (admitted *pro hac vice*)
Phillip Khezri (admitted *pro hac vice*)
Lowenstein Sandler LLP
1251 Avenue of the Americas
17th Floor
New York, NY 10020
Telephone: (212) 262-6700
rhirsh@lowenstein.com
rmaimin@lowenstein.com
pkhezri@lowenstein.com

-and-

**FROST BROWN TODD LLC**

Ronald E. Gold
Edward M. King
400 W. Market Street
Suite 3200
Louisville, KY 40202
Tel: (502) 589-5400
Fax: (502) 581-1087
tking@ftblaw.com

*Counsel for Autumn Wind Lending, LLC*