UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| In re:<br><br>INSIGHT TERMINAL SOLUTIONS, LLC et al.[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-32231<br><br>(Jointly Administered)<br><br>Judge Joan A. Lloyd |

**AUTUMN WIND LENDING, LLC'S (I) OMNIBUS
REPLY TO RESPONSES TO AUTUMN WIND LENDING, LLC'S
CHAPTER 11 PLAN OF REORGANIZATION FOR THE BANKRUPTCY
ESTATE OF DEBTOR INSIGHT TERMINAL SOLUTIONS, LLC
PURSUANT TO BANKRUPTCY CODE SECTION 1121(c)(2);
AND (II) OBJECTION TO EXPEDITED MOTION BY JOHN J. SIEGEL, JR.**

Autumn Wind Lending, LLC ("AWL"), the proponent of *Autumn Wind Lending, LLC's Chapter 11 Plan of Reorganization for the Bankruptcy Estate of Debtor Insight Terminal Solutions, LLC Pursuant to Bankruptcy Code Section 1121(c)(2)* [Docket No. 245] (as modified, amended, or supplemented from time to time, the "Plan"),[2] respectfully submits this reply and objection (the "Reply and Objection"): (i) in further support of the Plan and in opposition to the objections to confirmation of the Plan filed by (a) the Debtors [Docket No. 312]; and (b) Bay Bridge Exports, LLC ("Bay Bridge") [Docket No. 314] (together, the "Plan Objections"); and (ii) in opposition to the *Expedited Motion by John J. Siegel, Jr., Manager of Cecelia Financial Management, LLC for Additional Time to Provide Written Report by Ernst & Young, LLP* (the

---

[1] The Debtors in these chapter 11 cases are Insight Terminal Solutions, LLC (Case No. 19-32231) ("ITS") and Insight Terminal Holdings, LLC (Case No. 19-32232). The Court has ordered the joint administration of these chapter 11 cases. The docket in this Case No. 19-32231 should be consulted for all matters affecting the above listed cases.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

38097/2
09/11/2020 207182271.5

"Expedited Motion") [Docket No. 311]. In support of this Reply and Objection, AWL respectfully states as follows:

## PRELIMINARY STATEMENT

1. Not a single Holder of Claims filed an objection to the Plan, which provides for payment of all Allowed Claims, except Subordinated Claims, in full. And all ballots received by AWL voted in favor of the Plan.

2. The only parties who objected to the Plan are out-of-the-money: Holders of Interests and the Debtors, acting for the benefit of Holders of Interests, none of whom are entitled to distributions under the Bankruptcy Code. As detailed below, rather than raise legitimate concerns with the Plan, the Plan Objections make a number of baseless claims easily refuted by case law and/or the Plan language itself. In that regard, it is telling that Bay Bridge objects to a number of components of the Plan that are identical or substantially similar to the Debtors' plan, though Bay Bridge raises no concerns there. The Plan—which is the only viable plan—is feasible and lawful and should be confirmed as it provides full payment to long frustrated holders of Allowed Claims, as set forth in the Plan.

3. AWL also objects herein to the untimely relief sought by John J. Siegel Jr. and Cecelia Financial Management, LLC ("Cecelia") pursuant to the Expedited Motion. Mr. Siegel and Cecelia seek to submit a written report by Ernst & Young, LLP ("E&Y") days before the confirmation hearing. As a threshold matter, the Court should reject this request because, as third parties to these proceedings, Mr. Siegel and Cecilia have no standing to present evidence in support of the Debtors' plan—it is they, not the Debtors, who seek to introduce the E&Y report. Indeed, Mr. Siegel and Cecilia failed to file a timely objection to AWL's Plan, thereby affirmatively waiving their right to object. And even if the Court were to entertain evidence propounded by Mr.

Siegel and Cecelia—which it should not—the Expedited Motion should still be rejected for being untimely and unfairly prejudicial. Mr. Siegel and Cecilia (Mr. Siegel's company) have known about AWL's Plan since it was first filed over four months ago, giving them ample time to engage a financial consultant and give AWL notice of the same, so AWL could, in a timely manner, examine the consultant's report, depose the consultant, and engage its own consultant if need be. Instead, Mr. Siegel and Cecilia failed to engage E&Y until Labor Day Weekend, giving AWL no time at all to accomplish the foregoing (and also raising the question of how reliable a report completed in roughly one week can be). No explanation has been provided for this eleventh hour effort to introduce a financial report, which also violates the Court's *Order for Evidentiary Hearing* [Docket No. 297] (the "Scheduling Order"), issued on August 13, 2020, almost a month ago, requiring "the original of each Document and/or written Exhibit" to be filed with the Court by September 8, 2020. The Expedited Motion clearly represents yet another effort to delay these proceedings—which AWL strongly opposes, as it has opposed similar prior efforts—and should be denied.

## REPLY

I. **AWL's Plan Provides Adequate Means of Implementation as required under 11 U.S.C. § 1123(a)(5)**

4. The Plan provides that, on the Confirmation Date, AWL will place the Cash Contribution in the amount of $5,000,000 into a segregated escrow account for the benefit of Holders of Allowed Class 3 Claims. Additionally, the JMB Capital Guarantee provides for payment of all Allowed Claims, except Subordinated Claims, in excess of the Cash Contribution.

5. The Debtors and Bay Bridge assert that the Cash Contribution is insufficient to satisfy Allowed Claims. They are wrong.

6. First, the Cash Contribution is separate from, and in addition to, what AWL will directly pay the Landlord to cure the Sublease (as stated on the record by AWL's counsel at the last hearing). Second, AWL anticipates objecting to various claims after confirmation of the Plan which, if successful, will reduce Allowed Claims, except Subordinated Claims, to an amount less than $5 million. However, *even if AWL fails in all of its claims objections, the Plan provides for the payment of Allowed Claims* through the JMB Capital Guarantee. Accordingly, there is no risk of non-payment.

7. The Plan Objections do not and cannot question the existence of the JMB Capital Guarantee. Instead, without citing any legal authority, they attack the amount of the Cash Contribution and form of the JMB Capital Guarantee because, together, AWL is not escrowing sufficient funds to satisfy all potential Allowed Claims. However, neither the Bankrutpcy Code nor case law requires a plan proponent to escrow all funds necessary to satisfy the payments required under a confirmed plan. That would be an absurd requirement at this time, as there is no claims bar date, and therefore potential claims could be infinite.

8. In a typical bankruptcy case where there has been no claims bar date, the payment of Allowed Claims would be assumed pending reconciliation of such claims and no escrow would be provided; AWL is being attacked and punished for trying to provide *greater* certainty through the escrow, proving that no good deed goes unpunished. In that regard, it is telling that Bay Bridge failed to object to the Debtors' plan, which, in addition to being generally unfeasible for the reasons set forth in AWL's objection [Docket No. 317], provides no escrowed funds to satisfy claims, much less $5 million. This hypocrisy demonstrates that Bay Bridge is objecting neither for legitimate reasons nor as a true post-petition creditor, but simply as what it truly is and has acted

as throughout this case—an equity holder trying to protect its own interests, which have no value, to the detriment of creditors.

9. Moreover, the Debtors and Bay Bridge are correct in identifying that the JMB Capital Guarantee is solely between JMB Capital and AWL, but that hardly makes it "illusory." The fact that Holders of Claims are not parties to the JMB Capital Guarantee does not affect the guarantee's enforceability. AWL still has standing to pursue all claims against JMB Capital to the extent JMB Capital fails to honor its guarantee. JMB Capital has no privity with Holders of Allowed Claims and has no obligation to create such a liability in connection with the JMB Capital Guarantee by allowing Holders of Allowed Claims to directly bring claims against JMB Capital.

10. The bottom line is that AWL is responsible for paying all Allowed Claims, as set forth in the Plan. To the extent AWL fails to satisfy its obligations under the Plan—which it will not—parties who are harmed have recourse by seeking appropriate relief from the Bankruptcy Court, which retains jurisdiction under the Plan. And AWL has strong incentive to satisfy these obligations. If it does not, it risks losing the distribution it receives under the Plan, *i.e.,* Units of New Membership Interests in the Reorganized Debtor. Accordingly, AWL has every reason to satisfy the terms of the Plan and pay all Allowed Claims, except Subordinated Claims, in full.

## II. AWL's Plan Provides for Payment of Allowed Administrative Claims in Full As required under 11 U.S.C. § 1129(9)

11. The Plan Objections argue that the proposed treatment of Allowed Administrative Claims fails to satisfy section 1129(a)(9) of the Bankruptcy Code, which provides for payment of certain administrative claims on the effective date of a confirmed plan. Again, they are wrong. The Plan provides:

> Administrative Claims. Except to the extent that a Holder of an Allowed Administrative Claim and either the Reorganized Debtor and Prepetition Lender agree to less favorable treatment, each Holder of an Allowed Administrative Claim (other than Professional Fee Claims) will, in exchange for full and final satisfaction,

settlement, release, and discharge of such Allowed Administrative Claim, be paid the full unpaid amount of such Allowed Administrative Claim in Cash on, or as soon thereafter as is reasonably practicable, (a) the Effective Date or, if payment is not then due, (b) on the due date of such Allowed Administrative Claim, or (c) within five (5) Business Days from such Administrative Claim being Allowed[.]

[AWL Plan, Art. II.A]. As this Court is aware, this treatment of Administrative Claims set forth in the Plan comports with section 1129(a)(9), is common, and is routinely approved by other bankruptcy courts. *See, e.g.*, *In re Brooks Sand & Gravel, LLC* and *Smith Mining & Material, LLC*, Bankr. W.D. Ky. 06-30259-JAL, 06-30260-JAL, Docket Nos. 632 and 640 (approving a plan which paid administrative claims that were allowed claims on the effective date within thirty (30) days after the effective date or as soon thereafter as is practicable); *In re Southeastern Grocers, LLC, et al.*, Bankr. D. Del 18-10700-MFW, Docket No. 895, May 30, 2019 (confirmation order approving plan which provides that "on the Effective Date, each holder of an Allowed Administrative Expense Claim . . . shall receive . . . ***on, or as soon thereafter as is reasonably practicable***, the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim[.]") (emphasis added).

12. In that regard, it is again telling that—although they don't acknowledge it—the Debtors' *own plan* contains the same "as soon thereafter as is reasonably practicable" language that is evidently so objectionable—though, again, Bay Bridge has raised no issue with it. [Docket No. 247, Art. II.A].

13. That said, to the extent the Bankruptcy Court has any concerns regarding the treatment of Administrative Claims under the Plan—which it should not—AWL will modify the language of the Plan to provide payment in full on the Effective Date for all Allowed Administrative Claims which are not Disputed. Accordingly, AWL will file any objections to Administrative Claims prior to the Effective Date of the Plan.

### III.   Allowed General Unsecured Claim are Unimpaired Under AWL's Plan

14. The Debtors and Bay Bridge dispute the classification of Class 3 General Unsecured Claimants as unimpaired because they are not paid in full in Cash on the Effective Date of AWL's Plan. Again, the structure of paying general unsecured claims upon allowance is common in bankruptcy plans and reasonably affords a plan proponent the opportunity to review claims prior to their allowance. *See, e.g., In re Nuverra Environmental Solutions, Inc., et al.*, Bankr. D. Del 17-10949-KJC, Docket Nos. 226 and 366, July 25, 2017 (confirmation order approving plan which provides that "the Holder of such Allowed Nuverra Group General Unsecured Claim shall receive, payment in Cash or otherwise ***treated in a manner to render Unimpaired such Nuverra Group General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such Nuverra Group General Unsecured Claim becomes an Allowed Nuverra Group General Unsecured Claim.***") (emphasis added).

15. The Claims Objection Deadline is 180 days from the Effective Date of the Plan, subject to further extensions allowed by the Bankruptcy Court. AWL anticipates paying all Allowed General Unsecured Claims, except any Disputed General Unsecured Claims, on or shortly after the Effective Date, or any bar date established pursuant to the Plan. AWL also anticipates that it will file objections to Disputed General Unsecured Claims within a short period after the passing of any claims bar date established in these cases.

16. The Debtors' objection is again, tellingly hypocritical here. The Debtors' Plan, which purports to treat Class 3 General Unsecured Claims as unimpaired, provides the following treatment for such holders of claims:

> Treatment: Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Claim shall, in exchange for full and final satisfaction, settlement, release, and discharge

of such Claim, receive payment in Cash in the full amount of an Allowed General Unsecured Claim, *which payment shall occur on the later of (i) thirty (30) days after the Effective Date, (ii) thirty (30) days after such Claim is Allowed, and (iii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim.*

[Debtors' Plan, Art. III.B.3.(a) (emphasis added)]. Under the Debtors' Plan, which provides treatment identical to AWL's, General Unsecured Creditors are deemed unimpaired where they are not being paid in full on the effective date. Again, Bay Bridge only objected to AWL's Plan, demonstrating that Bay Bridge is not grappling with the Plan on the merits.

17. Moreover, the Debtors and Bay Bridge are not General Unsecured Creditors and do not even have standing to assert arguments on behalf of third parties. All Holders of General Unsecured Claims or potential General Unsecured Claims that were included in the Debtors' schedules received adequate notice of AWL's Plan. None objected.[3]

## IV. Holders of Interests are Not Entitled to a Distribution Because Such Interests Have No Value

18. Without any factual support, both Bay Bridge and the Debtors assert that the value of the sublease exceeds AWL's Claims. Neither provides an explanation for this assertion.

19. The Debtors' own schedules, sworn under oath, ascribe a value to the lease of no more than $10 million, which AWL used as the basis for its liquidation analysis (the "Liquidation Analysis") in its Plan Supplement [Docket No. 265], which is attached hereto as **Exhibit A**.

20. The Liquidation Analysis reflects that, even if the Sublease were ascribed a $10 million valuation, it would fail to satisfy AWL's secured claim, let alone all other claims which have priority before Interests. Even if the Debtors were successful in determining that a portion,

---

[3] Bay Bridge also incorrectly asserts that AWL failed to solicit Holders of General Unsecured Claims. AWL solicited Holders of General Unsecured Claims, as required by the Bankruptcy Court's order, and all Holders of General Unsecured Claims who cast ballots voted in favor of the Plan.

or all, of AWL's claim is not secured by the Sublease, AWL's claim still has priority before Interests, as it is secured by the Interests in the Debtor, a point which is not subject to dispute. The Liquidation Analysis reflects that the Sublease would need to be worth approximately $15 million for Holders of Interests to have any possible right to a distribution under AWL's Plan— *before* paying the Landlord a cure of approximately $5 million. However, the Sublease is worth nowhere near $20 million, or even $15 million, as reflected by the Debtors' failed efforts to obtain funding prior to the Petition Date (or after), secured by the Sublease, to pay off AWL in the approximate amount of $7 million before fees and interest.

21. Moreover, the "best interests test" requires AWL to value the Sublease pursuant to what would be obtained by a chapter 7 trustee in a liquidation, not the Debtors' perceived fair market value. *See* 11 U.S.C. § 1129(a)(7)(A). As no party has set forth any evidence to challenge the valuation provided by the Debtors on the Petition Date, which value has since *decreased* due to the Debtors' continuing non-payment of rent and other charges pursuant to the Sublease, the Bankruptcy Court should find that Interests are properly treated under AWL's Plan.

22. Accordingly, the Bankruptcy Court should overrule the Plan Objections and confirm AWL's Plan.

## **OBJECTION TO EXPEDITED MOTION**

23. AWL objects to the untimely Expedited Motion, which offers no explanation for the failure to obtain a report from E&Y in compliance with the deadline set forth in the Scheduling Order, requiring "the original of each Document and/or written Exhibit" to be filed with the Court by September 8, 2020.

24. As a threshold matter, Mr. Siegel and Cecelia are third parties to these proceedings and have cited no provision of the Bankruptcy Code permitting them to introduce evidence in

support of the Debtors' plan. The Debtors had an opportunity to retain E&Y, or another professional, to generate a report in support of their plan, but chose not to. The Court should defer to the Debtors' judgment in not presenting such evidence. Additionally, Mr. Siegel and Cecelia failed to timely file an objection to AWL's Plan, thereby waiving any such objections. *See Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263, 1267-68 (10th Cir. 1988) (holding that a party in interest that fails to timely object to a plan or that fails to prosecute its objection after filing it may waive its right to object to confirmation). Accordingly, the Expedited Motion should be denied for lack of standing.

25. Even if the Court were to consider the Expedited Motion—which it should not—Mr. Siegel and Cecelia concede that "E&Y was retained on September 5, 2020." September 5, 2020 was the Saturday of Labor Day Weekend, months after AWL filed the Plan. There is no explanation given why Mr. Siegel and Cecelia delayed in retaining E&Y. The Scheduling Order was issued on August 13, 2020, setting a deadline of September 8, 2020 for parties to submit any evidence they seek to present at the confirmation hearing. Mr. Siegel and Cecelia waited over three weeks from the issuance of the Scheduling Order to give AWL notice of their intent to introduce a report of E&Y. This significantly prejudices AWL, which does not have sufficient time to depose E&Y, analyze the report, and engage its own expert to prepare a rebuttal report, if necessary.

26. This eleventh hour request represents yet another effort by Mr. Siegel, over AWL's objections, to delay these proceedings. The Court has already granted all of Mr. Siegel's and the Debtors' requests for delay. No further leniency is required, particularly where it so prejudices AWL.

27. Accordingly, the Court should deny the Expedited Motion without a hearing.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, AWL respectfully requests the Court overrule the Plan Objection, confirm AWL's Plan, and deny the Expedited Motion.

Dated: September 11, 2020
      New York, New York

                **LOWENSTEIN SANDLER LLP**

                /s/ *Robert M. Hirsh*
                Robert M. Hirsh (admitted *pro hac vice*)
                Rachel Maimin (admitted *pro hac vice*)
                Phillip Khezri (admitted *pro hac vice*)
                Lowenstein Sandler LLP
                1251 Avenue of the Americas
                17th Floor
                New York, NY 10020
                Telephone: (212) 262-6700
                rhirsh@lowenstein.com
                rmaimin@lowenstein.com
                pkhezri@lowenstein.com

                -and-

                **FROST BROWN TODD LLC**

                Ronald E. Gold
                Edward M. King
                400 W. Market Street
                Suite 3200
                Louisville, KY 40202
                Tel: (502) 589-5400
                Fax: (502) 581-1087
                tking@ftblaw.com

                *Counsel for Autumn Wind Lending, LLC*

# EXHIBIT A

## **EXHIBIT D**

**Liquidation Analysis**

I.   **Introduction**

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. To assess whether the Plan satisfies the best interests of creditors test, the Prepetition Lender, has prepared the hypothetical liquidation analysis described herein (the "<u>Liquidation Analysis</u>"). The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation. The Liquidation Analysis is based on certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement to which this Liquidation Analysis is attached.

II.   **Statement of Limitations**

The preparation of a liquidation analysis, such as the Liquidation Analysis, is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Prepetition Lender, are inherently subject to significant business, economic and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Prepetition Lender or the Debtor. The values stated herein have not been subject to any review, compilation or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of claims against the Debtor's estate could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 case. Similarly, the value of the Debtor's assets in a liquidation scenario is uncertain and could vary significantly form the values set forth in the Liquidation Analysis. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtor's assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. ACCORDINGLY, THE PREPETITION LENDER DOES NOT MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REFLECTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE RECOVERIES SHOWN DO NOT CONTEMPLATE A SALE OR SALES OF THE DEBTOR'S ASSETS ON A GOING CONCERN BASIS. WHILE THE PREPETITION LENDER MAKES NO ASSURANCES, IT IS POSSIBLE THAT PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALE(S) WOULD BE MORE THAN IN THE HYPOTHETICAL LIQUIDATION, THE COSTS ASSOCIATED WITH THE SALE(S) WOULD BE LESS, FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATE AND/OR CERTAIN ORDINARY COURSE CLAIMS WOULD BE

ASSUMED BY THE BUYER(S) NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION BY THE PREPETITION LENDER. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### III. Liquidation Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis represents an estimate of recovery values based upon a hypothetical liquidation of the Debtor's estate if the Debtor's Chapter 11 Case were converted to cases under chapter 7 of the Bankruptcy Code on or around August 12, 2020 (the "Liquidation Date") and a chapter 7 trustee (the "Trustee") was appointed to convert all assets into cash. In this hypothetical scenario, the Trustee would satisfy claims by converting all of the assets of the Debtor into cash by: (i) selling certain assets owned by the Debtor as going concerns in a rapid sale and (ii) ceasing operations and selling or abandoning the individual assets of the Debtor. There can be no assurance that the recoveries realized from the sale of the assets would, in fact, approximate the amounts reflected in this Liquidation Analysis. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously as possible (generally at distressed prices), taking into account the best interests of stakeholders.

### IV. Global Notes and Assumptions:

The Liquidation Analysis should be read in conjunction with the following notes and assumptions:

   a. **Dependence on unaudited financial statements**. This Liquidation Analysis contains numerous estimates. Proceeds available for recovery are based upon the Debtor's schedules and statement of financial affairs and publicly available information from the Debtor's Chapter 11 Case.
   b. **Additional Claims**. The cessation of business in a liquidation is also likely to trigger certain unsecured Claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of Claims include Claims related to the rejection of unexpired leases and executory contracts and other potential Allowed Claims. These additional Claims could be significant; some may be administrative expenses, others may be entitled to priority in payment over General Unsecured Claims. These administrative and priority Claims will need to be paid in full before any balance of liquidation proceeds would be available to pay General Unsecured Claims or to make any distribution in respect of equity interests. No adjustment has been made for these potential Claims.
   c. **Preference or fraudulent transfers**. No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions due to, among other issues, potential defenses to such actions, the costs of such litigation, the uncertainty of the outcome, and anticipated disputes regarding these matters.

d. **Valuation and Timeline**. This Liquidation Analysis assumes the Debtor's assets will be sold in a rapid sale under a three-month liquidation process (the "Liquidation Timeline") under the direction of the Trustee, utilizing the Debtor's resources and third-party advisors. Following the liquidation of the Debtor's primary asset, the Sublease, the remaining assets of the Debtor, if any, would be wound down by the Chapter 7 Trustee over a period of one to two months (the "Wind-Down Period").

e. **Gross Proceeds**. This Liquidation Analysis assumes that the cash amount (the "Gross Proceeds") that would be available for satisfaction of Allowed Claims and Interests, after payment of Secured Claims, would consist of the net proceeds resulting from the disposition of the assets of the Debtor, augmented by the cash held by the Debtor at the time of the commencement of the liquidation activities.

f. **Distribution of Net Proceeds**. This Liquidation Analysis assumes that Gross Proceeds would be distributed in accordance with the absolute priority rule found in sections 726 and 1129(b) of the Bankruptcy Code. Such cash amount would be distributed, in accordance with, and as required by, applicable law: (i) first, for payment of liquidation and wind down expenses, trustee fees, and professional fees attributable to the liquidation and wind down (together, the "Wind Down Expenses"); (ii) second, to pay the costs and expenses of other administrative and certain priority tax claims that may arise from the termination of the Debtor operations; and (iii) third, to pay the amounts allowed on other priority claims. Any remaining net cash would be distributed to creditors holding unsecured claims, including deficiency claims that arise to the extent of the unsecured portion of the allowed secured claims.

V. **Conclusion**

As summarized below, the Liquidation Analysis shows, and the Prepetition Lender has therefore concluded, that confirmation of the Plan will provide creditors with a recovery that is not less than the recovery they would receive in connection with a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

| Notes | | Recovery Value | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Low | High | | | | | |
| [A] | **Gross Proceeds from Liquidation** | $0 | $10,000,000 | | | | | |
| | Less Prepetition Lender Secured Claim | $10,836,609.73 | $10,836,609.73 | | | | | |
| | Net Proceeds from Liquidation | $0 | $0 | | | | | |
| | **Chapter 7 Administrative Claims** | | | | | | | |
| | Estate Wind-Down Costs | N/A | N/A | | | | | |
| | Chapter 7 Trustee Fees | N/A | N/A | | | | | |
| | Wind-Down Professional Fees | N/A | N/A | | | | | |
| [B] | **Total Chapter 7 Administrative Claims** | N/A | N/A | | | | | |
| | **Net Liquidation Proceeds Available for Distribution** | | | | | | | |
| | | **Claim Estimate** | | **Recovery Estimate $** | | **Recovery Estimate %** | | **Plan Recovery %** |
| | | Low | High | Low | High | Low | High | |
| [C] | **Unclassified Claims** | $105,368 | $1,915,000 | $0 | $0 | 0% | 0% | 100% |
| | **Class 1 - Other Priority Claims** | $0 | $0 | $0 | $0 | 0% | 0% | 100% |
| | **Class 2 - Prepetition Lender Claims** | $10,836,609 | $10,836,609 | $0 | $10,000,000 | 0% | 92% | N/A |
| [D] | **Class 3 - General Unsecured Claims** | $2,989,576.54 | $7,515,864.66 | $0 | $0 | 0% | 0% | 100% |
| [E] | **Class 4 - Subordinated Claims** | $1,665,000 | $0 | $0 | $0 | 0% | 0% | 0% |
| | **Class 5 - Interests** | N/A | N/A | $0 | $0 | 0% | 0% | 0% |

## Notes to Consolidated Analysis

[A] Gross Proceeds from Liquidation: The Debtor's sole potential asset of substantial value is the Sublease. The current deadline to assume the Sublease is August 15, 2020 and cannot be further extended without the consent of the Landlord. The low value is based on the assumption that the Landlord will not extend the deadline to assume the Sublease and, thus, the Sublease will be deemed rejected. The high value is beyond any value the Prepetition Lender believes the Debtor could obtain through a sale of the Sublease, as the Debtor was not able to obtain funding prior to the Petition Date secured by the Sublease to pay off the Prepetition Lender in the approximate amount of $7 million before fees and interest.

[B] Total Chapter 7 Administrative Claims: These amounts are not available as there will be no proceeds from the sale of the Sublease after paying of the secured claim of the Prepetition Lender.

[C] Unclassified Claims: Unclassified claims represents priority tax Claims, scheduled in the amount of $105,368, plus any accrued administrative expenses, including professional fees, post-petition financing, and fees due to the Office of the United States Trustee.

[D] General Unsecured Claims: The low amount incorporates scheduled Claims that are not designates as contingent, unliquidated, and/or disputed. The high amount incorporates all scheduled Claims.

[E] Subordinated Claims: In the low scenario, certain claims that would otherwise be included as Administrative or General Unsecured Claims are considered Subordinated Claims.