UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| **INSIGHT TERMINAL** ) | |
| **SOLUTIONS, LLC,** *et al.* ) | CASE NO. 19-32231-jal |
| ) | |
| Debtor ) | Chapter 11 Case |
| ) | **(Jointly administered)** |
| ) | |

**MOTION BY THE REORGANIZED DEBTOR**
**FOR A RULE 2004 EXAMINATION OF THE CITY OF OAKLAND**

Comes now Insight Terminal Solutions, LLC (the "Debtor"), the reorganized debtor in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases"), by counsel, and hereby moves the Court to enter an order directing the City of Oakland to make a qualified person available for a deposition on certain limited matters described *infra* as permitted under Bankruptcy Rule 2004, and to produce certain documents and communications relating thereto prior to the deposition. In support of this Motion, the Debtor provides as follows:

**BACKGROUND**

**Preliminary Statement**

1. As the Court is aware, the City of Oakland is a contingent debtor of the Debtor. (*See generally, Adv. Proc. No. 24-3007, Insight Terminal Solutions, LLC v. City of Oakland* (the "Adversary Proceeding")). Alarmingly, the City of Oakland now appears to be insolvent, with no realistic cure available. Compounding its dire budget shortfalls, the City is engaging in questionable, if not suspect and improper, financial transactions and dealings that warrant scrutiny and investigation. The City's actions may well constitute post-petition transactions that are

avoidable under Section 549(a) of the Bankruptcy Code. The requested Rule 2004 examination is appropriate and necessary.

### The City of Oakland's Insolvency Crisis

2. The City owns an undivided fifty percent (50%) interest in that certain real property located at 7000 Coliseum Way, Oakland, CA ("Coliseum").[1] On information and belief, the Coliseum represents one of the highest (if not the highest) valued asset owned by the City.

3. The Coliseum is burdened by outstanding bond debt previously incurred by the City in the approximate amounts of (i) Twelve Million Eight Hundred Five Thousand One Hundred Twenty-Five Dollars ($12,805,125), scheduled to be fully defeased by June 30, 2025; and (ii) Twelve Million Eight Hundred Seventy-One Thousand Two Hundred Fifty-Eight Dollars ($12,871,258), scheduled to be fully defeased by June 30, 2026. As such, there is a total outstanding bond debt of approximately Twenty-Five Million Six Hundred Seventy-Six Thousand Three Hundred Eighty Three Dollars ($25,676,383) ("Bond Debt") owed by the City within the next two years related to the Coliseum.[2]

4. After decades of mismanagement, the City has a budget deficit for the fiscal year beginning July 1, 2024, and ending June 30, 2025, in the approximate amount of One Hundred Seventy-Seven Million Dollars ($177,000,000) ("Budget Deficit").[3]

---

[1] City of Oakland, Revised Supplemental Legislation (June 13, 2024) available at https://oakland.legistar.com/LegislationDetail.aspx?ID=6707243&GUID=7298C5D3-3FEA-4F67-A759D702B1566CAC&Options=&Search= .

[2] *Id*.

[3] *Id*. *See also* Tim Johns and Anser Hassan, *Oakland May Have to Declare Fiscal Emergency as It Faces Historic Budget Deficit*, ABC 7 NEWS (June 26, 2024) available at https://abc7news.com/post/budget-crisis-oakland-may-have-declare-fiscal-emergency/15004122/ ; Shomik Mukherjeem, *Amid Oakland City Hall Turmoil, A Devastating Budget Crisis Still Looms*, TIMES-HERALD (June 26, 2024) available at https://www.timesheraldonline.com/2024/06/26/amid-oakland-city-hall-turmoil-a-devastating-budget-crisis-still-looms/ ; Phil Mayer and Terisa Estacio, *Oakland Budget Proposal Includes $63 Million in Cuts*, KRON 4 (June 25, 2024) available at https://www.kron4.com/news/bay-area/oakland-budget-proposal-includes-63-million-in-cuts/; Tim Gardner, *Opinion: As Oakland Reaches a Fiscal Cliff, Mayor Sheng Thao Plans to Jump*, EAST BAY TIMES (June 22, 2024)

5.      On June 28, 2024, the City of Oakland acting by and through its City Council declared "A State of Extreme Fiscal Necessity And The Existence Of A Severe And Unanticipated Financial Event."[4] According to certain City Council members, if the City does not cure the Budget Deficit and balance the budget, the City will be forced to seek bankruptcy protection.[5]

6.      In an effort, in part, to address the Budget Deficit, the City has entered into an exclusive negotiating agreement ("ENA") with the African-American Sports and Entertainment Group ("AAESG"), whereby AAESG would purchase the City's interest in the Coliseum for a purchase price of One Hundred Five Million Dollars ($105,000,000) ("Purchase Price"), which Purchase Price will be phased over at least two years.[6]

7.      The City and AAESG are still negotiating a purchase and sales agreement based on the terms of the ENA. Nevertheless, the City has already publicly announced its intention to apply proceeds from the Purchase Price towards the Budget Deficit, primarily to fund the inflated salaries of City elected officials and employees.[7]

8.      In addition to the Purchase Price, the ENA requires the City and AAESG to negotiate a bundle of community benefits including, without limitation: labor agreements; local

---

available at https://www.eastbaytimes.com/2024/06/22/opinion-as-oakland-reaches-a-fiscal-cliff-mayor-thao-plans-to-jump/.

[4] City of Oakland, Meeting Agenda – Final (June 28, 2024) available at https://oakland.legistar.com/MeetingDetail.aspx?ID=1205749&GUID=F58C0D3B-000C-4F29-BF50-79617EE2B50C&Options=info|&Search= .

[5] Tim Johns, *Oakland Public Service Could Face Deep Cuts Amid City Budget Crisis*, ABC 7 News (June 26, 2024) available at https://abc7news.com/videoClip/15001470/ and https://www.msn.com/en-us/money/companies/we-will-go-bankrupt-oakland-city-council-faces-fiscal-crisis-as-budget-deadline-nears/ar-BB1oTM4o?ocid=BingNewsVerp.

[6] *Supra Revised Supplemental Legislation*.

[7] *Id. See also* Wilson Walker, *Amid City Hall Turmoil, Oakland City Council Faces Crucial Budget Decision Relying on Coliseum Sale*, CBS News Bay Area (June 26, 2024) available at https://www.cbsnews.com/sanfrancisco/news/oakland-city-budget-mayor-sheng-thao-coliseum-sale-city-hall-turmoil-fbi-raid/ .

and small business contracting goals; workforce training and local employment provisions; living wage; public open space and parks; sustainable and green development standards; transportation infrastructure and transportation demand management programs including transit affordability and accessibility; anti-displacement and housing preservation policies; City participation in profit-sharing; and other community benefits (collectively "Community Benefits").[8]

9. Concerned that the Purchase Price may not represent fair market value for the Coliseum, on June 18, 2024, legal counsel for Debtor sent a letter to legal counsel for the City requesting all appraisals, market value estimates, broker opinions, among other items, that support the Purchase Price, as well as information regarding the marketing process that led to the selection of AASEG as the winning bidder ("Letter"). The City has not responded to the Letter—this despite the City's legal counsel's demonstrated practice of responding immediately to Debtor's counsel.

10. On July 2, 2024, the City Council voted to approve a budget which is entirely reliant upon the first tranche of the Purchase Price (in the amount of $63 million) to help with the Budget Deficit ("Proposed Budget").[9]

### Questionable Transactions Warranting Rule 2004 Investigation

11. Whether motivated by panic, negligence or malfeasance, the City is engaging in financial decisions that, at best, can be characterized as "questionable." One alarming decision is the contemplated sale of one of the City's most valuable and prominent assets: the Coliseum. For many years, the Coliseum was the home of Major League Baseball's Oakland Athletics. The "A's", sadly, are fleeing Oakland due, in part, to the City's hostility and ineptitude.

---

[8] *Supra Revised Supplemental Legislation.*

[9] *Oakland City Council Passes Budget Using One-Time Funds from Oakland Coliseum Sale*, CBS News Bay Area (July 2, 2024) available at https://www.cbsnews.com/sanfrancisco/news/oakland-city-council-passes-budget-using-one-time-funds-from-oakland-coliseum-sale/ (meeting minutes from the City Council meeting are not currently available).

12. Rather than engaging in a thoughtful, measured marketing process for the potential sale of the Coliseum, the City has curiously rushed into a sale-purchase transaction with little to no advance diligence, no known marketing process, appraisals, market value estimates, broker opinions of value or other third-party analyses opining on the fair market value of the Coliseum.

13. Debtor also believes that the host of to be negotiated Community Benefits represents many millions of dollars in additional value that could be recognized if the City were to sell the Coliseum as part of a market rate transaction. Ordinarily, such Community Benefits would be negotiated as part of the standard conditions of approval and mitigation measures to which a party would need to agree as part of the separate regulatory approvals needed to develop the property. Here, the City prematurely wants to include such obligations as part of the purchase of the Coliseum thereby decreasing its value.

14. Debtor's concerns on the fair market value of the Purchase Price, in light of the now revealed Budget Deficit, create significant concerns regarding the City using most, if not all, the Purchase Price to pay for City salaries, which do not add to the City's already depleted balance sheet. Moreover, the City has not identified its intention to use any of the Purchase Price to pay off the Bond Debt.

15. Moreover, the fact that the Proposed Budget is entirely dependent upon the first tranche of the Purchase Price means that AASEG now holds significant leverage over the City.

16. Debtor's concerns are further heightened by the recent FBI, IRS and US Postal Service raid of the current Mayor's home and office, as well as the home and office of one of the Mayor's primary donors.

17. For the reasons set forth below, the Coliseum Transaction and the City's other material financial dealings warrant investigation under Rule 2004 of the Federal Rules of Bankruptcy Procedure.

## RELIEF REQUESTED

18. By this Motion, the Debtor seeks the entry of an order directing the City of Oakland to attend a Rule 2004 examination (the "2004 Exam") on Wednesday, August 21, 2024 at 9:30 a.m. prevailing Eastern Time at Gray Ice Higdon, PLLC located at 3939 Shelbyville Road, Suite 201, Louisville, KY 40207 to appear for a deposition on the limited topic of post-petition financial transactions and dealings. In addition, two weeks prior to the deposition, the Debtor asks the Court to order the City of Oakland to produce any and all documents, records or other information in its possession, custody or control relating to its post-petition financial transactions and dealings in accordance with the document request set forth on attached Exhibit A.

## BASIS FOR RELIEF

19. Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). Bankruptcy Rule 2004(b) clarifies that "[t]he examination of an entity under this rule . . . may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b).

20. "The purpose of 2004 is to provide a tool to parties to a bankruptcy . . . to obtain information concerning the acts, conduct, or property of the debtor, the liabilities and financial condition of the debtor, any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." *In re DeShetler*, 453 B.R. 295, 301 (Bankr. S.D. Ohio 2011)

(internal quotation marks omitted). The scope of an inquiry under Bankruptcy Rule 2004 is very broad. *In re Fearn*, 96 B.R. 135, 137 (Bankr. S.D. Ohio 1989). Great latitude is ordinarily permitted to a party seeking discovery under Bankruptcy Rule 2004, a 2004 examination having been characterized as a "lawful 'fishing expedition.'" *In re Lufkin*, 255 B.R. 204, 208 (Bankr. E.D. Tenn. 2000). The standard for determining the propriety of a discovery request under Bankruptcy Rule 2004 is "good cause." *In re Hammond*, 140 B.R. 197, 201 (S.D. Ohio 1992).

21.  Here, good cause exists for entry of an order authorizing the Debtor to request the production of documents from the City of Oakland, and to take the deposition of a qualified representative of the City of Oakland, under Bankruptcy Rule 2004 for the purpose of further investigating the City's material transactions such as the Coliseum Transaction described *supra* to determine whether they may constitute avoidable post-petition financial transactions under Section 549(a) of the Bankruptcy Code.

22.  Moreover, there is a significant public policy benefit for allowing this limited Rule 2004 investigation into the City's post-petition financial dealings to proceed. Disturbing and well-publicized allegations of massive fraud and corruption have permeated and tainted the City of Oakland. And these horrific allegations are bolstered by the existence of various continuing federal investigations. Allowing this 2004 Examination will provide a healthy check and balance to (hopefully) deter the City from proceeding with future improper financial dealings and transactions, with the knowledge that such dealings will be published and scrutinized in a federal court record.

23.  The City will predictably attempt to side-step the Debtor's request herein by arguing that a Rule 2004 examination is improper due to the pendency of the Adversary Proceeding. However, the City should not benefit from this foreshadowed attempt to conflate their

two buckets of misdeeds. To be clear, the scope of the Rule 2004 investigation sought herein is limited in scope. The investigation will merely focus on the City's post-petition financial transactions and dealings; the investigation will not focus on the tortious interference claims asserted against the City in the Adversary Proceeding.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests the Court to (a) enter an order (i) directing the City of Oakland, to attend a Rule 2004 Exam on Wednesday, August 21, 2024 at 9:30 a.m. prevailing Eastern Time at Gray Ice Higdon, PLLC law office located at 3939 Shelbyville Road, Suite 201, Louisville, KY 40207, to appear for a deposition on its material post-petition financial transactions and dealings, and (ii) two weeks prior to the deposition date above, directing the City of Oakland to produce any and all documents, records or other information in its possession, custody or control in accordance with the document request set forth on attached Exhibit A; and (b) grant any other relief that may be just and proper.

Respectfully submitted,

/s/ Robert M. Hirsh
Robert M. Hirsh
NORTON ROSE FULLBRIGHT US, LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone: (212) 318-3400
robert.hirsh@nortonrosefullbright.com

-and-

/s/ Andrew D. Stosberg
Andrew D. Stosberg
GRAY ICE HIGDON, PLLC
3939 Shelbyville Road, Suite 201
Louisville, Kentucky 40207
Telephone: (502) 625-2734
astosberg@grayice.com
COUNSEL FOR THE
REORGANIZED DEBTOR

## **CERTIFICATE OF SERVICE**

It is hereby certified that on July 3, 2024 a true and correct copy of the foregoing was served electronically through the Court's CM/ECF system to all parties having entered a Notice of Appearance in the case via their electronic addresses as set forth in the ECF system.


/s/ *Andrew D. Stosberg*
COUNSEL FOR THE
REORGANIZED DEBTOR

**Exhibit A**

**(Rule 2004 Document Request)**

Definitions

The conjunctions "and" and "or" shall be interpreted conjunctively to include any information otherwise within the scope of the request, and shall not be interpreted disjunctively.

"AASEG" shall mean the African American Sports and Entertainment Group, including its managers, agents, agencies, representatives, directors, officers, partners, shareholders, employees, attorneys, investigators, advisors, accountants, auditors, consultants, staff, and any other persons or entities acting on its behalf or at its direction.

"City" shall mean the City of Oakland, including each City Official, and each of the City of Oakland's current or past managers, agents, agencies, representatives, directors, officers, partners, employees, attorneys, investigators, advisors, accountants, auditors, consultants, staff, and any other persons or entities acting on its behalf or at its direction.

"City Officials" shall mean any elected or appointed official of the City of Oakland, including but not limited to its Mayor (from 2014 – present) and associated staff, any current or past sitting member of the Oakland City Council and their respective staffs including, without limitation, Dan Kalb and Rebecca Kaplan, the City Administrator (from 2014 – present) and its staff, including but not limited to Elizabeth "Betsy" Lake, Winnie Woo, William "Bill" Gilchrist, John Monetta, and Doug Cole, and the City Attorneys' Office, including but not limited to Barbara Parker, Maria Bee, Bijal Patel, and Jamila Jefferson (from 2014 – present) and its staff.

"Coliseum" means that certain real property located at 7000 Coliseum Way, Oakland, CA.

"Communication" means, without limitation, any meeting, conference, conversation, negotiation, oral or written exchange, or other form of communication, whether face-to-face, by telephone, facsimile, telecopier, letter, e-mail, or any other means, including where sent from the City Officials' personal e-mail account or telephone consistent with *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 615-618, 625.

"Contracts" shall mean the agreements entered into between the City and AASEG including, without limitation, any exclusive negotiating agreement and any draft purchase and sales agreement.

"Debtor" refers to (a) Insight Terminal Solutions, LLC, and (b) Insight Terminal Holdings, LLC.

"Documents" means all writings or records of every kind or description, including Communications as defined herein, however produced or reproduced, whether draft or final, original or reproduction and all Electronically Stored Information and tangible things in your custody, possession or control or in the custody, possession or control of any agent, employee or

representative of yours specifically including, but not limited to, writings, correspondence, letters, e-mails, text messages, Facebook messages or posts, LinkedIn messages or posts, tweets, Snapchat messages, WhatsApp messages, Instagram messages or posts, or any other web-based or application-based server, telex messages, story boards, memoranda, reports, interoffice and intraoffice communications, circulars, bulletins, periodicals, drawings, studies, calendar or diary entries, maps, plans, pamphlets, minutes, notes or records of meetings or conversations of any kind, graphs, charts, tabulations, analyses, statistical or information accumulations, agreements, contracts, financial statements, bills, receipts, work orders, purchase orders, invoices, canceled checks, general ledgers, accounting records of any kind, film impressions, photographs, video tapes, thumb drives, flash drives, USB drives, memory cards, computer files, computer printouts (and electronic or other materials from which such printouts may be obtained), data compilations (stored in any medium form which information can be obtained and translated, if necessary into a reasonably usable form), magnetic tapes, mechanical reproductions (of sound, data or visual information), as well as drafts, revisions, amendments or supplements of the above, and copies of documents that are not identical duplicates of the originals (whether, e.g., by revision, amendment, supplement, redline, interlineation, receipt stamp, notation, handwritten or "blind" notes appear thereon or attached thereto, indication of copies sent or received, or otherwise) or any material similar to any of the foregoing, however denominated.

"Electronically stored information" and "ESI" means any information on operational systems including accounting, financial, distribution, or manufacturing systems specifically including, but not limited to computer files, data compilations, e-mail, instant messages (IM), web pages, text messages, cell phone data, digital images and graphics, digital or analog audiotapes and files, digital or analog videotapes and files, excel spreadsheets and underlying formulae, metadata, computer databases (i.e., Access), erased, fragmented or damaged data, PDA data, and anything stored on computer or other electronic means located on or in, but not limited to laptops, desktops, cache memory, optical disks, magnetic tapes/back-up tapes, magnetic disks (hard drive, floppy disks, etc.), PDAs, cell phones, IM tools, USB drives or memory cards.

The term "fair market value" means the estimated price at which an asset would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts.

The term "person" or "individual" means any natural person, legal person, government (or agency thereof), a quasi-public entity, or other form of entity, company, corporation, partnership, trust, unincorporated association, or other entity of any description.

The term "relating to" means constituting, comprising, containing, setting forth, showing, disclosing, mentioning, describing, explaining, summarizing, pertaining to, concerning or referring to, directly or indirectly.

The term "you" and "your" refers to the City.

## Instructions

1. The following Requests for Production (each a "Request," and collectively, the "Requests") are to be responded to in accordance with the Federal Rules of Bankruptcy Procedure.

2. These Requests are continuing in nature and require supplemental answers in the event You or Your attorney discovers additional responsive information.

3. Each Request is for Documents or Communications in our possession, custody, or control. This includes Documents or information possessed by You or Your present or former attorneys, agents, subordinates, employees, representatives, and consultants.

4. Produce each Document called for by the Requests in its entirety, including all attachments and enclosures, even if only a portion of the Document is responsive to the request.

5. If You cannot provide a complete response to a Request, You must furnish as complete an answer as possible, and explain in detail the reasons for the incomplete response, and the information that is needed to provide a complete response.

6. If You encounter any ambiguity in construing any Request, or any definition or instruction relevant thereto, please set forth in Your response the matter You deem ambiguous and the construction You have chosen or used in responding to the request.

7. In the event You file a proper and timely objection to any Request, please respond to all portions of that request that do not fall within Your objection.

8. If You withhold from production any Document (or portion of any Document) that is otherwise responsive to a Request on the basis of a claim of privilege, work product, or other ground, You must assert the privilege in accordance with applicable rules.

9. You shall produce all Documents in the manner in which they are maintained in the usual course of Your business or You shall organize and label the Documents to correspond with the categories in this request.

10. A Request for a Document shall be deemed to include a request for any and all file folders within which the Document was contained, transmittal sheets cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself.

11. ESI, such as emails and MS Word documents, shall be produced in native format, with its original formatting and metadata intact.

12. If and to the extent that ESI is maintained in a database or other proprietary software, You shall produce along with the document(s) software that will enable access to the ESI or database as You would access such ESI or database in the ordinary course of Your business.

<u>Documents to be Produced Two Weeks Prior to the City's Rule 2004 Examination</u>

1. All Documents in your possession—including, but not limited to, all Communications and Contracts—with AASEG relating to the Coliseum.

2. All Documents in your possession evidencing the fair market value of the Coliseum.